**LATHAM & WATKINS LLP**
Kevin M. McDonough
1271 Avenue of Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: Kevin.McDonough@lw.com

*Additional counsel on signature page*

*Attorneys for Defendant AvalonBay*
*Communities, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MATTHEW J. PLATKIN, et al., | Civil Action No. 2:25-cv-03057 |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | Hon. Madeline Cox Arleo |
| REALPAGE, INC., et al., | Hon. Jessica S. Allen |
| Defendants. | **Return Date: November 17, 2025** |

### DEFENDANT AVALONBAY COMMUNITIES, INC.'S BRIEF
### IN SUPPORT OF MOTION TO DISMISS COMPLAINT

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

THE COMPLAINT'S ALLEGATIONS .................................................................4

    A.    AvalonBay Has Been Using LRO Pursuant To Bespoke Terms Since 2007 ..........4

    B.    Defendant Landlords Licensed Different Products From Different Licensors At Different Times ................................................................6

    C.    The Complaint Acknowledges At Least Some Of The Individualized Decisions Each Landlord Needs To Make In LRO ...............................7

RELEVANT PROCEDURAL HISTORY ..............................................................8

    A.    The Tennessee MDL.................................................................8

    B.    D.C. Superior Court Proceedings.................................................9

LEGAL STANDARD...........................................................................................12

ARGUMENT.......................................................................................................12

I.    THE STATE FAILS TO PLEAD A FEDERAL OR STATE ANTITRUST VIOLATION IN COUNTS ONE OR TWO .....................................................12

    A.    AvalonBay's Contracts Render It Implausible That AvalonBay Consciously Joined The Conspiracy Alleged ..........................................13

    B.    The State's Information Sharing Allegations Do Not State An Antitrust Claim Against AvalonBay ......................................................16

    C.    The State Does Not Allege That AvalonBay Engaged In Parallel Conduct With The Other Defendant Landlords, Nor Does It Allege Any Legally Sufficient "Plus Factors"....................................................19

        1.    The State Has Not Plausibly Alleged That AvalonBay Engaged In Parallel Conduct With The Nine Other Defendant Landlords...................19

        2.    The Complaint Does Not Allege Sufficient "Plus Factors" To Make The Alleged Conspiracy Plausible..................................24

II.    THE STATE FAILS TO PLEAD A NEW JERSEY CONSUMER FRAUD ACT CLAIM...........................................................................................29

CONCLUSION....................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allen v. Verizon Commc'ns, Inc.*,
2019 WL 399922 (D.N.J. Jan. 31, 2019) .................................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................................................................................................*passim*

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
239 F. Supp. 2d 550 (E.D. Pa. 2002) .....................................................................................13

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)...................................................................................13, 18, 19, 24

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) .....................................................................................................24

*Colucci v. Bank of America, N.A.*,
2011 WL 13364575 (D.N.J. Mar. 28, 2011)...........................................................................30

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
2024 WL 4356188 (D.N.J. Sept. 30, 2024) .....................................................................*passim*

*D'Augusta v. Am. Petroleum Institute*,
117 F.4th 1094 (9th Cir. 2024) ................................................................................................28

*Dai v. SAS Institute Inc.*,
2025 WL 2078835 (N.D. Cal. July 18, 2025)...................................................................*passim*

*District of Columbia v. RealPage, Inc.*,
No. 2023-CAB-006762 (D.C. Super. Ct. July 2, 2024).....................................................*passim*

*Duffy v. Yardi Sys., Inc.*,
758 F. Supp. 3d 1283 (W.D. Wash. 2024).........................................................................13, 21

*Gibson v. Cendyn Grp., LLC*,
2024 WL 2060260 (D. Nev. May 8, 2024).......................................................................*passim*

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023) .....................................................................18, 21

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010).................................................................................................25

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)....................................................................................17, 24, 25

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d. Cir. 1997)..............................................................................................2

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ..............................................................20, 24

*In re Domestic Airline Travel Antitrust Litig.*,
691 F. Supp. 3d 175 (D.D.C. 2023) ...................................................................................27

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) .........................................................................................*passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ...............................................................................19, 20, 28

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
767 F. Supp. 3d 681 (N.D. Ohio 2025)....................................................................1, 16, 18, 29

*In re Processed Egg Prods. Antitrust Litig.*,
821 F. Supp. 2d 709 (E.D. Pa. 2011) ..................................................................................26

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023)..............................................................9, 13, 21, 23

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
709 F. Supp. 3d 544 (M.D. Tenn. 2023)..........................................................................9, 23

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ..................................................................................27

*Maple Flooring Mfrs.' Ass'n v. United States*,
268 U.S. 563 (1925)............................................................................................................17

*Mladenov v. Wegmans Food Mkts., Inc.*,
124 F. Supp. 3d 360 (D.N.J. 2015) .....................................................................................30

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)............................................................................................................12

*NN&R, Inc. v. One Beacon Ins. Grp.*,
362 F. Supp. 2d 514 (D.N.J. 2005) .....................................................................................30

iii

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) ................................................................................20, 24

*Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*,
  998 F.2d 1192 (3d Cir. 1993).................................................................................2

*Prosterman v. Am. Airlines, Inc.*,
  747 F. App'x 458 (9th Cir. 2018) .........................................................................17

*Riachi v. Prometheus Grp.*,
  822 F. App'x 138 (3d Cir. 2020) ..........................................................................30

*Segal v. Amadeus IT Grp., S.A.*,
  2025 WL 963751 (N.D. Ill. Mar. 31, 2025)..........................................................18

*Sickles v. Cabot Corp.*,
  877 A.2d 267 (N.J. Super. Ct. App. Div. 2005).....................................................29

*State v. Lawn King, Inc.*,
  84 N.J. 179, 417 A.2d 1025 (1980)........................................................................12

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978).................................................................................................17

**STATUTES**

N.J.S. 56:9-18 ...............................................................................................................12

**RULES**

Fed. R. Civ. P. 9(b) .......................................................................................................30

**INTRODUCTION**

The State's specific allegations against AvalonBay are unique and make AvalonBay's participation in the alleged conspiracy inherently implausible—as other plaintiffs' lawyers and courts have recognized in similar cases.[1]

The State alleges that AvalonBay conspired with at least nine other landlords to "collectively set[] rents" for multifamily housing by using various revenue management (RM) software products licensed from defendant RealPage. Compl. ¶ 1. Not all defendants are alleged to have used the same RM product, nor are they alleged to have adopted RM products around the same time. Instead, the State's theory is that the mere fact that AvalonBay licensed a software product from RealPage and, at some other unspecified *later* points in time, other landlords did too is enough to violate federal and state antitrust law. That is wrong, as multiple other courts have recently held. Mem. Op., *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. July 2, 2024) ("July D.C. Opinion") at 27, attached as Ex. 4 to Decl. of Jennifer L. Giordano in Support of AvalonBay's Motion to Dismiss ("Giordano Decl.") filed herewith; *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260 (D. Nev. May 8, 2024); *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188 (D.N.J. Sept. 30, 2024); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 715 (N.D. Ohio 2025); *Dai v. SAS Institute Inc.*, 2025 WL 2078835, at *3-4 (N.D. Cal. July 18, 2025). And it is doubly wrong as to AvalonBay because, according to the Complaint, AvalonBay was one of the first landlords in the country to adopt the

---

[1] AvalonBay agrees with the other defendants in their joint motion that the State has failed to state a claim against any defendant, including AvalonBay, for the reasons stated in the joint motion, and agrees that the Court should dismiss all defendants. AvalonBay moves separately because the State's unique allegations against AvalonBay require its dismissal regardless of the adequacy of State's allegations against any other defendant.

RM software at issue and has been using that product in the same way for the last 18 years under bespoke contract terms that would frustrate the entire supposed purpose of the alleged conspiracy.

AvalonBay first licensed an RM software product called Lease Rent Options ("LRO") in 2007. At that time, AvalonBay was one of the first landlords to adopt the product, which it licensed from a software company called Rainmaker. Defendant RealPage would not acquire LRO until more than a decade later in 2017.

Since its very first LRO contract, and upon every negotiated renewal thereafter, AvalonBay has insisted that Rainmaker, and then RealPage, agree to bespoke contract terms specifying that Rainmaker/RealPage (1) cannot use AvalonBay's confidential data to recommend prices to any other landlord; (2) cannot use any other landlord's confidential data to recommend prices to AvalonBay; (3) cannot share the LRO-generated rent recommendations for AvalonBay with any other landlord; and (4) cannot share the LRO-generated rent recommendations for any other landlord with AvalonBay. These bespoke contract terms (which the Court is permitted to consider on this motion to dismiss[2]) are known collectively as the "Data Use Restrictions."[3]

AvalonBay's continued insistence on the Data Use Restrictions makes it fundamentally implausible that AvalonBay conspired with the other defendant landlords to "collectively set[]

---

[2]    Because the State relied upon and incorporated by reference AvalonBay's contracts with RealPage and Rainmaker in the Complaint (Compl. ¶ 20), the Court can consider those contracts without converting this motion into a motion for summary judgment. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d. Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993). *See* Request for Judicial Notice filed herewith. Based on virtually identical complaint allegations, a D.C. Court twice found it appropriate to consider AvalonBay's contracts for the motion to dismiss. *See* July D.C. Opinion at 23 n.17; Order, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. Apr. 7, 2025) ("April D.C. Order") at 15-16, attached as Ex. 5 to Giordano Decl.

[3]    *See* Giordano Decl. Ex. 1, LRO Master Services Agreement § 4.5 (March 17, 2017), discussed *infra* Section II.A.

rents using RealPage's technology." *See, e.g.*, Compl. ¶ 1. It simply does not make sense that AvalonBay would go through the trouble of insisting on contract provisions to ensure any price recommendations that LRO generated for AvalonBay were (1) based only on publicly available information and AvalonBay's own information, (2) created for AvalonBay alone, and (3) not used by RealPage with any other landlords if AvalonBay had separately agreed with RealPage and at least nine other landlords to collectively set their rents through RealPage. The State does not explain how the Data Use Restrictions fit its conspiracy theory.

The State is not writing on a clean slate. Its complaint is one of the latest in a years-long series of litigations in various state and federal courts against RealPage and various multifamily housing landlords across the country. As discussed further below, AvalonBay was voluntarily dismissed or not named at all in virtually all of those cases because of AvalonBay's insistence on the Data Use Restrictions. Experienced plaintiffs' lawyers, state and federal enforcers, and courts have all recognized that AvalonBay's contracting decisions would frustrate the entire supposed purpose of the alleged conspiracy—to collectively set rents—and thus make AvalonBay's participation in the alleged scheme not plausible.[4]

But one private plaintiffs' class action firm disagrees. And a trio of states—the District of Columbia, the State of Maryland, and the State of New Jersey here—all hired that same private firm to litigate their cases, and those lawyers have filed essentially the same complaint in all three jurisdictions.

---

[4]    *See, e.g.,* Multifamily Second Amended Consolidated Class Action Complaint ¶¶ 219-20, *In re RealPage, Inc., Rental Software Antitrust Litig.*, No. 3:23-md-03071 (M.D. Tenn. Sept. 7, 2023), ECF No. 530; Plaintiffs' Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss LRO Claims for Failure to State a Claim at 6, *In re RealPage, Inc., Rental Software Antitrust Litig.*, No. 3:23-md-03071 (Nov. 8, 2023), ECF No. 621 (characterizing AvalonBay's efforts as guarding against potential antitrust concerns); Amended Complaint, *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Jan. 7, 2025), ECF No. 47.

AvalonBay's motion to dismiss the Maryland complaint is pending, but two different D.C. Superior Court judges have already rejected the State's core theory against AvalonBay.[5] The D.C. Court twice found that, at least for purposes of a motion to dismiss, AvalonBay's Data Use Restrictions place it on different footing from other licensees and render AvalonBay's participation in an overarching multi-defendant, multi-year conspiracy to collusively set rents through RealPage implausible. *See* July D.C. Opinion at 27, 30; Order, April D.C. Order at 15.

Because the State does not allege anything new against AvalonBay here that its lawyers did not already try in D.C., the State's federal and state antitrust claims fail for the same reasons that those antitrust theories failed in the D.C. Court: AvalonBay's bespoke contract terms simply make it implausible that AvalonBay conspired with other landlords to collectively set rents through RealPage. And the State's contrived New Jersey Consumer Fraud Act claims fail for the simple reason that it does not allege, with particularity, AvalonBay did anything fraudulent or unconscionable. The Court should dismiss AvalonBay from this case with prejudice.

## THE COMPLAINT'S ALLEGATIONS

### A.    AvalonBay Has Been Using LRO Pursuant To Bespoke Terms Since 2007

This case is about "revenue management" ("RM") software products that RealPage licenses to real estate owners and property managers all over the country (including in New Jersey) that are allegedly designed to "[o]ptimize rents to achieve the overall highest yield, or combination of rent and occupancy, at each property." Compl. ¶¶ 6, 32. RealPage currently offers three

---

[5]    On July 14, 2025, AvalonBay filed a motion for judgment on the pleadings pursuant to Rule 12(c) in D.C. Superior Court because the D.C. Attorney General ("DCAG") confirmed that it is not pursuing the only narrow theory the D.C. Court found it had plausibly alleged against AvalonBay. That motion is pending.

different RM products:  YieldStar, LRO, and AI Revenue Management ("AIRM").  *Id.*  AvalonBay

has only ever contracted for LRO.  *Id.* ¶ 20.

Prior to 2017, RealPage was offering only YieldStar.  *Id.* ¶¶ 38, 46.  YieldStar and LRO

are different RM products developed by different companies, sold to different customers, and that

operate differently (and have continued to operate differently since RealPage acquired LRO).  *Id.*

¶¶ 33, 44, 47, 114, 118-21.  LRO was developed by a company called Rainmaker, and AvalonBay

signed its first LRO contract with Rainmaker in 2007.  *Id.* ¶ 20 (citing AvalonBay's LRO contract

with Rainmaker).  AvalonBay was one of the first users of LRO in the country.  *Id.*

Since its first contract with Rainmaker in 2007, and in every contract renewal thereafter,

AvalonBay has ensured that specific data restrictions and conditions apply to its use of LRO.  *See*

July D.C. Opinion at 24.  One example of these provisions is contained in the March 2017 LRO

contract between AvalonBay and Rainmaker that the Complaint cites at paragraph 20, which the

Court is permitted to consider on this motion to dismiss.  *Supra* n.2.  That agreement states:

> 4.5  With respect to the LRO Revenue Management Solutions, Rainmaker
> shall be responsible for the following:
>
> - In no event will Rainmaker utilize any data other than data provided by
>   Customer expressly for such purpose or data obtained through publicly
>   available sources or such other sources as identified in the applicable
>   Module which Customer has opted to purchase in writing in the
>   Rainmaker System licensed to Customer without the prior express
>   written consent of Customer (the "Data Entry Representation").
>
> - In no event will Rainmaker utilize in the Rainmaker System licensed to
>   anyone other than Customer any Customer Data that is not obtained
>   through other sources or otherwise developed independently by
>   Rainmaker without use of the Customer Data provided by Customer to
>   Rainmaker.  Furthermore, Rainmaker will not provide any
>   recommendations as to rent provided to Customer for Customer's
>   Managed Properties through the Rainmaker System to any other parties
>   (the "Input Representation").

5

Giordano Decl. Ex. 1, LRO MSA § 4.5 (Mar. 17, 2017).  AvalonBay insisted that Rainmaker "represent[] and warrant[] that it will not violate the Input Representation or the Data Entry Representation," (*id.* § 8.1.6) and agree to indemnify AvalonBay for any breach of these provisions (*id.* § 9.2).

A decade after AvalonBay first licensed LRO, at the end of 2017, RealPage acquired LRO from Rainmaker (Compl. ¶ 46) and assumed AvalonBay's contract in full, including all the Data Use Restrictions.  Giordano Decl. Ex. 1, LRO MSA § 10.12; *see also* Giordano Decl. Ex. 2, 2022 Pricing Amendment.  Thereafter, in January 2022 and January 2025, AvalonBay and RealPage renewed the LRO agreement for additional terms and the Data Use Restrictions continued in force. Giordano Decl. Ex. 2, 2022 Pricing Amendment § 7; Giordano Decl. Ex. 3, 2025 Pricing Amendment § 6.  It is thus undisputed for purposes of this motion that AvalonBay's contracts have always prohibited RealPage from using AvalonBay's confidential information or rent recommendations to recommend rents to other landlords and vice versa.  Due to the Data Use Restrictions, the Complaint's allegations about how RealPage's RM products supposedly work for other users in terms of data and price sharing (which are wrong in any event) ***are not*** applicable to AvalonBay's use of LRO.  This is not in dispute, as the D.C. Court recognized.

**B.      Defendant Landlords Licensed Different Products From Different Licensors At Different Times**

The State alleges that AvalonBay has been using LRO for 18 years, but it does not allege when AvalonBay or any other defendant entered into the purported conspiracy.  It does not allege that any other landlord defendants began using LRO (or any RM product) around the same time as AvalonBay.  The Complaint does not even allege in which *decade* AvalonBay supposedly joined the alleged conspiracy, nor does the Complaint allege that AvalonBay's use of LRO changed since AvalonBay first licensed the product from Rainmaker in 2007.  The Complaint does

6

not allege that any defendant other than AvalonBay licensed any RM product from Rainmaker but does allege that three landlord defendants have not used LRO at all. Compl. ¶ 33.

**C.    The Complaint Acknowledges At Least Some Of The Individualized Decisions Each Landlord Needs To Make In LRO**

With respect to LRO, the Complaint alleges that each landlord must make an array of individualized decisions that change what, precisely, LRO does for that landlord and how it goes about doing it.[6]  *First*, the Complaint alleges that each landlord must enter detailed information about the units in each of its properties that impacts the rents that LRO then recommends for that landlord, for each unit within a building. *Id*. ¶¶ 118-19.  Similarly, the Complaint alleges that each landlord has to decide for itself which other properties and specific units within those properties LRO will consider as market comparables when recommending a rent for a particular unit in a particular property. *Id.* ¶ 118.  Each landlord then must enter prices for whatever other properties it has unilaterally chosen to generate that landlord's own "Market Composite" rate. *Id.*  The State does not allege any prices entered into LRO are nonpublic or that AvalonBay knows which individualized decisions any other landlord makes in LRO or vice versa.

*Second*, the Complaint alleges—and AvalonBay's contract confirms[7]—that each landlord must individually decide whether to license optional LRO add-on features.  Among these options, LRO (but not AIRM or YieldStar) offers a "Rent Syndication" feature that allegedly

---

[6]    In the real world, AvalonBay's use of LRO is far more individualized and customized than the Complaint alleges.  But for purposes of this motion, it suffices that the Complaint alleges at least some of the individualized and customized decisions that each landlord needs to make.

[7]    For example, "Schedule A" to AvalonBay's contract lists various features and services available at that time. *See* Giordano Decl. Ex. 1, LRO MSA.  Users could pick and choose among those optional features as Order Form #1 in the contract illustrates.  Order Form #1 shows that AvalonBay licensed only "LRO Standard System Service" and not other optional features like "Rent Syndication." *See id*.

"automatically sends LRO pricing information to Internet Listing Services where the landlord's units are marketed" and "pushes the adjusted, optimized rents calculated by LRO to landlords' property management systems." *Id*. ¶¶ 139, 144. According to the Complaint, this Rent Syndication feature is critical to the alleged conspiracy because it "facilitates landlords' compliance with the [illegal] agreement" by pressuring them to automatically accept rents generated by LRO. *Id.* AvalonBay never licensed the "Rent Syndication" feature, as its contract confirms (*supra* n.7) and the State's lawyers have conceded. The Complaint does not allege that AvalonBay knew which products or features other landlords chose to buy or vice versa.

*Third,* AvalonBay's contract terms make plain that it never delegated its own rent-setting authority to Rainmaker or RealPage in any way. Nothing in the contracts gives any rent-setting authority to Rainmaker or RealPage. *See generally* Giordano Decl. Exs. 1-3. And the bespoke Data Use Restrictions limit the types of pricing analyses that Rainmaker and RealPage have been allowed to do for AvalonBay. *Id.* Moreover, the State concedes that LRO only "recommends" rents that landlords, including AvalonBay, can and do reject. Compl. ¶¶ 120, 145, 150-51.

**RELEVANT PROCEDURAL HISTORY**

### A.    The Tennessee MDL

The State's Complaint follows a series of lawsuits filed in 2022 by several prominent antitrust plaintiff law firms. Those cases were consolidated in the U.S. District Court for the Middle District of Tennessee (the "Tennessee MDL") and the plaintiffs filed a consolidated complaint on behalf of a putative nationwide class of multifamily lessees (the "MDL Complaint"). *See* MDL Complaint, *In re RealPage*, No. 3:23-md-03071 (Jun. 16, 2023), ECF No. 291. The MDL Complaint named dozens of defendants, including AvalonBay, alleging they conspired to inflate rental prices by agreeing to provide their nonpublic, competitively sensitive data to

8

RealPage's data pool, and then agreeing to charge the rents that the RealPage software recommended based on that pooled confidential data.

After reviewing AvalonBay's Data Use Restrictions, the plaintiffs decided to "drop AvalonBay as a Defendant given its unique contractual arrangements with RealPage." *See* Motion for Leave to File First Amended Consolidated Class Action Complaint at 1, *In re RealPage*, No. 3:23-md-03071 (July 3, 2023), ECF No. 310. In their Second Amended MDL Complaint, and again in their opposition to the motion to dismiss by the remaining defendants that use LRO, the MDL plaintiffs heralded AvalonBay's bespoke contract terms and argued that AvalonBay's insistence on those terms placed AvalonBay in a fundamentally different situation from other RealPage RM users. The Tennessee MDL court agreed; in denying the motions to dismiss, the MDL court cited AvalonBay's unique contractual terms as an example of how to contractually "exclude horizontal competitors' sensitive pricing and supply data from its [Revenue Management Solutions] price recommendations." *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 528 (M.D. Tenn. 2023); *see also In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 544, 550 (M.D. Tenn. 2023).

### B.     D.C. Superior Court Proceedings

The same private class action lawyers who represent the State here also represent the District of Columbia Attorney General ("DCAG") in a virtual copycat case. On May 29, 2024, the D.C. Court granted AvalonBay's motion to dismiss, concluding that the DCAG had failed to adequately allege that AvalonBay conspired with other landlords to delegate price-setting authority to and fix rents through RealPage, and dismissed AvalonBay from the case with prejudice. *See* July D.C. Opinion at 27, 30. The D.C. Court observed that the allegation that "packed most of the explanatory power" in terms of making the existence of *any* conspiracy involving RealPage and anyone else legally viable was that some landlords knowingly exchanged their confidential data

9

with each other through RealPage that RealPage then relied on to set rents for all of them.  *Id.* at 27-28, 29.  For that reason, the Court found that "AvalonBay's contracts plainly require that RealPage only use pricing information that is publicly available or provided directly by AvalonBay to calculate AvalonBay's price recommendations, and forbid RealPage from using AvalonBay's data to calculate price recommendations for its other customers" and this was fatal to the DCAG's claim.  *Id.* at 24, 30.  Without any allegation that AvalonBay knowingly agreed to allow RealPage to use pooled, nonpublic competitor data to generate pricing recommendations, the DCAG had not pleaded that AvalonBay violated antitrust law.  *Id*.  The court also concluded that it is not plausible to infer that AvalonBay conspired with other landlords to delegate rent-setting authority to RealPage based on supposed exchanges of some non-price information outside of RealPage.  *Id*. at 24, 29-30.

Months later, on October 29, 2024, the DCAG moved for reconsideration of the D.C. Court's decision, and in the alternative, requested that the court amend its decision to be "without prejudice."  On December 23, 2024, the D.C. Court reaffirmed that its decision dismissing AvalonBay from the case was correct.  Order, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. Dec. 23, 2024) at 2.  But the D.C. Court did agree to make that dismissal "without prejudice" and permit the DCAG to file an amended complaint.  *Id.* at 2-4.

The DCAG filed an amended complaint, which AvalonBay also moved to dismiss. Although the D.C. Court ultimately denied the second motion on narrow grounds, the court rejected, again, the DCAG's core theory against AvalonBay.  April D.C. Order at 15.  Specifically, the D.C. Court noted that "the District's central assertion is that AvalonBay's role in the alleged conspiracy emerges from its 'use of a common algorithm programmed to set rent at anticompetitive levels, combined with its participation in the direct exchange of sensitive

10

information with its competitors.'" *Id*. at 14.  It then found this assertion "does not suggest that AvalonBay's information sharing was unlawful under the Antitrust Act, because as the District admits, AvalonBay's contract restricts 'RealPage from sharing AvalonBay's data with other users or incorporating other users' data when calculating its rents.'" *Id*. at 15.  That is, AvalonBay's bespoke Data Use Restrictions prevented the core conduct alleged.

As to alleged information exchanges, the D.C. Court found the types of information allegedly exchanged ("occupancy rates, percentage of apartments leased … and any applicable concessions/specials") are "legitimate subjects of enquiry and knowledge in any industry." *Id*.  It thus concluded that "the Amended Complaint does not 'plead factual content that allows the court to draw' any inferences about how AvalonBay worked to undermine its own contract with RealPage." *Id*. at 16.

Although the D.C. Court found that the DCAG failed to adequately plead AvalonBay's participation in an overarching multi-defendant, multi-year conspiracy to delegate rent-setting authority to RealPage, on the second go-round, the D.C. Court did find that the DCAG had plausibly alleged AvalonBay's participation in a separate, standalone agreement.  The agreement was supposedly made during a February 10, 2021 meeting of the LRO User Group related to addressing the impact of the COVID-19 pandemic.  April D.C. Order at 17.  Neither AvalonBay nor the DCAG addressed the plausibility of that separate, standalone COVID-related conspiracy during the motion to dismiss briefing because the DCAG had never argued that it was alleging one.  However, the plausibility of a standalone conspiracy became moot when the DCAG's lawyers subsequently confirmed it is not pursuing any such theory.  Given that concession, on July 14, 2025, AvalonBay filed a motion for judgment on the pleadings seeking its complete dismissal from the case.  That motion is currently pending.

**LEGAL STANDARD**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This allows courts "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Labels and conclusions or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Facts that are "merely consistent with" liability are insufficient to nudge claims "across the line from conceivable to plausible." *Id.* at 557, 570.

**ARGUMENT**

**I.    THE STATE FAILS TO PLEAD A FEDERAL OR STATE ANTITRUST VIOLATION IN COUNTS ONE OR TWO**

To state a claim under Section 1 of the Sherman Act, a plaintiff must allege (1) an agreement (2) to restrain trade unreasonably. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010). The New Jersey Antitrust Act is interpreted in harmony with the federal antitrust statutes. N.J.S. 56:9-18 ("This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it."); *State v. Lawn King, Inc.*, 84 N.J. 179, 192, 417 A.2d 1025 (1980) ("consonance between the federal and state [antitrust] enactments is required"). Count Two, brought under the New Jersey Antitrust Act, accordingly rises or falls with Count One, brought under the Sherman Act.

An "agreement" within the meaning of antitrust law is "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Without allegations of direct evidence of an agreement (which the State does not have here and its lawyers have never claimed exist against AvalonBay), a

12

plaintiff must have sufficient allegations of circumstantial evidence that make the purported conspiracy plausible. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). Specifically, a plaintiff must allege parallel conduct (*i.e.*, each alleged conspirator did the same or similar thing around the same time) and "plus factors," which are "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Because the State does not plausibly allege that AvalonBay agreed with the other defendant landlords to collectively set rental prices through RealPage, the Court should dismiss Counts One and Two.

A.     **AvalonBay's Contracts Render It Implausible That AvalonBay Consciously Joined The Conspiracy Alleged**

The first and biggest problem with the Complaint is that it does not allege any facts that overcome AvalonBay's continued insistence on the Data Use Restrictions. AvalonBay's insistence on bespoke contract provisions that preclude RealPage from using others' confidential data or recommended rates to set AvalonBay's rates (and vice versa) makes it utterly implausible that AvalonBay conspired to delegate rent-setting authority to RealPage—or in any way abdicate its ability to make fully independent pricing decisions—regardless of the other allegations in the Complaint. *See Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563-64 (E.D. Pa. 2002) (complaint failed to state a Section 1 violation where defendant's participation in the alleged conspiracy did not make sense under facts alleged). Recent case law confirms this is a fatal flaw as to AvalonBay.

In addition to the D.C. Court's decisions, there are five other recent court decisions on motions to dismiss in lawsuits that allege theories about RM software like the one the State alleges here. Two decisions denied motions to dismiss: (1) the Tennessee MDL, *In re RealPage*, 709 F. Supp. 3d 478 and (2) *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283 (W.D. Wash. 2024). And

13

three courts granted motions to dismiss: (1) *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *5 (D. Nev. May 8, 2024) ("*Gibson II*"); (2) *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *5 (D.N.J. Sept. 30, 2024); and (3) *Dai v. SAS Institute Inc.*, 2025 WL 2078835, at *3-5 (N.D. Cal. July 18, 2025). In each of these cases, the court's decision whether to grant the motion to dismiss turned on, among other things, the presence or absence of the same core allegations, *i.e.*, whether the complaint alleged that the defendants knowingly shared confidential information through the RM software, knew that the RM software was relying on that common pool of confidential information to recommend rates to each user, understood the software would take into account its recommended rates for other users when recommending a rate for any given user, and largely implemented the recommended rates. In the two cases where the complaints alleged that defendants knowingly engaged in such conduct, courts denied motions to dismiss. That was the result in the Tennessee MDL (after AvalonBay was dismissed) and *Yardi*.

On the other hand, where those types of allegations, among other things, were lacking, courts granted the motions to dismiss. That was the result in *Cornish-Adebiyi, Gibson II*, and most recently *Dai*. *Gibson II*, for example, found that "[p]laintiffs' failure to plausibly allege the exchange of confidential information" among the defendants through their RM software was a "fatal defect" with their antitrust conspiracy claim. 2024 WL 2060260, at *5. And *Cornish-Adebiyi* found that the plaintiffs there had not alleged confidential data was "pooled or otherwise comingled into a common dataset against which the algorithm runs" and held that the "Court cannot infer a plausible price-fixing agreement between the Casino-Hotels from the mere fact that they all use the same pricing software." 2024 WL 4356188, at *5, 7. Similarly, *Dai* found the plaintiffs failed to allege that "competitor pricing is based on non-public information" exchanged by the defendants through the software. 2025 WL 2078835, at *5 (granting motion to dismiss

14

because, "as drafted, Plaintiffs' allegations are more analogous to *Cornish-Adeybi* and the *Gibson* cases than to *In re Real Page* and *[Yardi]*").

This is precisely the distinction the D.C. Court drew when it denied a different landlord's motion to dismiss (a landlord that is not a defendant here), but granted AvalonBay's motion in the same order. July D.C. Opinion at 22, 30. The D.C. Court denied the other landlord's motion because it found that the complaint "plainly states that [landlord] entered into a RealPage One Master Agreement to share proprietary data with RealPage, *and that RealPage contracted to provide [that landlord] with apartment rent pricing based on proprietary data provided by its competitors*" and that "other Defendant Landlords *have entered into substantively similar RealPage One Master Agreements* over the past decade." *Id.* at 14 (emphasis added). In contrast, the D.C. Court granted AvalonBay's motion because the Data Use Restrictions made the DCAG's theory—the same theory the State alleges here—not legally viable as to AvalonBay. *Id.* at 24 ("Because AvalonBay's contracts plainly require that RealPage only use pricing information that is publicly available or provided directly by AvalonBay to calculate AvalonBay's price recommendations, and forbid RealPage from using AvalonBay's data to calculate price recommendations for its other customers, the District has not plausibly alleged that AvalonBay uses RealPage as a facilitator to exchange confidential pricing information with its competitors.").

The D.C. Court's second motion to dismiss opinion likewise found that "the Amended Complaint does not 'plead factual content that allows the court to draw' any inferences about how AvalonBay worked to undermine its own contract with RealPage." April D.C. Order at 16.

Consistent with these decisions, regardless of the State's other allegations, AvalonBay's continued insistence on the Data Use Restrictions renders its participation in the alleged conspiracy implausible.

15

**B.      The State's Information Sharing Allegations Do Not State An Antitrust Claim Against AvalonBay**

The State seeks to sidestep AvalonBay's Data Use Restrictions by alleging two supposed instances in which community-level associates of AvalonBay (at properties *outside of New Jersey*) communicated with other unidentified landlords outside of RealPage about weekly traffic, occupancy and leasing rates, and any concessions/specials.  Compl. ¶¶ 93, 96.  The State does not allege that AvalonBay's purported communications were with any of the defendant landlords named in this case, much less that they related to any communities in New Jersey or were used by any landlord in any way to set rents.  *See id.* (referring only to unidentified "competitors").  That is reason enough alone to render these allegations legally meaningless here.  In any event, the D.C. Court twice considered these non-price information-sharing allegations (because the Complaint here copies the allegations from the D.C. complaint) and twice found them insufficient to state a Section 1 violation in light of all of the countervailing facts specific to AvalonBay.  July D.C. Opinion at 3, 29-30; April D.C. Order at 15.  There is no basis for a different result here.

Just like in the DCAG's complaint, the State here does not allege that AvalonBay input any nonpublic information into LRO that LRO actually used to recommend any rent to AvalonBay. At most, the Complaint alleges LRO users input *rents* that LRO uses to calculate a "Market Composite." *See* Compl. ¶ 118.  But the State cannot dispute (and its lawyers have previously conceded) that rent prices in this industry are publicly available.  It is well-settled that there is nothing anticompetitive or illegal about obtaining and using publicly available prices from competitors in RM products like LRO.  *In re Replacement Tires*, 767 F. Supp. 3d at 715 (use of revenue management product did not support conspiracy because "[t]here is nothing unreasonable about consulting public sources to determine how to price your product") (citations omitted); *Gibson II*, 2024 WL 2060260, at *4-5 (no Section 1 concern when price recommendations are

based on public information absent other factors); *Cornish-Adebiyi*, 2024 WL 4356188, at *6-7 (same); *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 460 (9th Cir. 2018) (no Section 1 conspiracy where airlines allegedly set prices based on competitors' public pricing information).

The State knows all of this, so it seeks to blur the lines by lumping its price and non-price allegations together under the conclusory term "competitively sensitive" information—whatever that means. But *Twombly* does not allow the State to skirt its pleading obligations with conclusory labels or artful pleading. *Cornish-Adebiyi*, 2024 WL 4356188, at *5 (refusing to credit plaintiffs' "rather extraordinary lengths to dance around" key allegations "with linguistic equivocation"). Focusing on the *factual* allegations about the supposed non-price information,[8] these categories of information "'are legitimate subjects of enquiry and knowledge in any industry,'" as the D.C. Court found. April D.C. Order at 15 (citing *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 585 (1925)); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978) (exchange of non-price information among competitors "can in certain circumstances increase economic efficiency"); *cf. In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("communications between competitors do not [alone] permit an inference of an agreement to fix prices" because "[g]athering competitors' price information can be consistent with independent competitor behavior"). The D.C. Court further found that the same allegations the State makes here "do[] not suggest that AvalonBay's information sharing was unlawful under [antitrust law], because as the District admits, AvalonBay's contract restricts 'RealPage from sharing AvalonBay's data with other users or incorporating other users' data when calculating its rents.'" April D.C. Order at 15 (quoting D.C. First Amended Complaint ¶ 21). The State makes the

---

[8]    The State wrongly characterizes this non-price information—e.g., number of visits to a building and occupancy—as "non-public," Compl. ¶ 93, but even accepting the State's allegations as true, its claims still fail.

17

identical admission in paragraph 20 of its Complaint.[9]

Like the D.C. Court, numerous other courts have found such information-exchange allegations insufficient to state a conspiracy. *See, e.g.*, *Burtch*, 662 F.3d at 224 (plaintiff failed to state antitrust conspiracy despite allegations that defendants "regularly and unlawfully shared highly confidential information"); *In re Replacement Tires*, 767 F. Supp. 3d at 716, 743 (failure to connect information exchange to conspiracy alleged was fatal to Section 1 claims); *Segal v. Amadeus IT Grp., S.A.*, 2025 WL 963751, at *6-7 (N.D. Ill. Mar. 31, 2025) (dismissing Section 1 claim based on defendant-hotels' alleged sharing of non-public occupancy information and concluding that plaintiff's conspiracy theory was too attenuated to be plausible).

The State's pleading is even more deficient than in those cases because the Complaint does not allege that LRO used any of the non-price information that AvalonBay allegedly entered into LRO to recommend any rent to AvalonBay (or, for that matter, that AvalonBay used any of the non-price information in any way to set its rents). In a case like this, the relevant consideration for antitrust purposes is not the information allegedly "fed in" to the software, but rather the information that allegedly comes "out." *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at * 5 (D. Nev. Oct. 24, 2023) ("*Gibson I*"). A conspiracy is not plausible when, as here, there are no allegations that the price recommendations that come "out" of the software are based on competitors' non-public, competitively sensitive information. *Id.* In short, the State has merely alleged that LRO used AvalonBay's own information and publicly available information to make

---

[9]     The Complaint does not allege that the extraordinarily limited information one AvalonBay on-site staff member at one community *outside New Jersey* allegedly shared about site visits and applications (Compl. ¶ 93) was particularly "sensitive" to AvalonBay or something AvalonBay believed another landlord could use to undercut rents. How did knowing the number of people who visited a building one week or submitted an application impact the rent any landlord (much less any defendant landlord) charged for any particular unit? The State does not explain.

rent recommendations that AvalonBay then unilaterally decided to reject or accept.  As set forth above, every court to have considered the question has held those allegations do not state a violation of antitrust law.

> **C.     The State Does Not Allege That AvalonBay Engaged In Parallel Conduct With The Other Defendant Landlords, Nor Does It Allege Any Legally Sufficient "Plus Factors"**

The State also fails the traditional test for stating a conspiracy through circumstantial evidence; it does not plausibly allege that AvalonBay engaged in any legally cognizable parallel conduct with the other landlord defendants, nor does it adequately allege "plus factors" that make it plausible to conclude any parallel conduct was the result of a preceding agreement among landlords to collectively set rents through RealPage.  *See Ins. Brokerage*, 618 F.3d at 322-23.

> **1.     The State Has Not Plausibly Alleged That AvalonBay Engaged In Parallel Conduct With The Nine Other Defendant Landlords**

"Parallel conduct" means something specific in antitrust law, and a complaint must allege sufficient *factual* allegations to state such a theory.  *Twombly*, 550 U.S. at 556 n.4.  To adequately plead parallel conduct, a complaint must allege facts that the defendants engaged in similar conduct "around the same time in response to similar market conditions."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).  Specifically, a complaint must have plausible allegations of "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Twombly*, 550 U.S. at 556 n.4.  Most typically parallel conduct allegations are of "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  *Id*.  The State alleges nothing like that here.

In contrast, when, as here, the factual allegations are that the defendants allegedly did

19

*different* things*, at *different* times, that conduct is, by definition, not "parallel." *Burtch*, 662 F.3d at 228 (allegations of conduct occurring three months apart "fall far short of demonstrating parallel behavior by [plaintiffs] because" of the "different time periods"); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (termination notices issued six months apart lacked "temporal proximity" to constitute "parallel conduct"); *Musical Instruments*, 798 F.3d at 1196 ("[D]efendants adopt[ing] the [same pricing] policies over a period of several years … does not raise the specter of collusion."); *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *14, 16 (S.D.N.Y. June 25, 2025) (price increases were not parallel conduct because they differed in amount, covered different geographies and product lines, and occurred at least 10 months apart); *Cornish-Adebiyi*, 2024 WL 4356188, at *4 ("While it is true that Plaintiffs need not allege parallel conduct that is strictly simultaneous or conclusively identify a conspiratorial 'start date,' they must nevertheless place the Casino Hotels' software use 'in a context that raises a suggestion of a preceding agreement.'") (emphasis omitted) (quoting *Twombly*, 550 U.S. at 557); *Gibson II*, 2024 WL 2060260, at *4 ("the only plausible inference that the Court can draw is that the timing 'does not raise the specter of collusion'") (quoting *Musical Instruments*, 798 F.3d at 1196).

As an initial matter, multiple courts have found that a plaintiff cannot state an antitrust conspiracy merely by alleging that all the defendants used the same software. *See Cornish-Adebiyi*, 2024 WL 4356188, at *7 (court cannot infer conspiracy "from the mere fact that [defendants] all use the same pricing software"); *Gibson II*, 2024 WL 2060260 at *1, 3 (without an agreement to charge the recommended price, it was "too implausible to infer that each [defendant] was signing up for a price fixing conspiracy when it agreed to license and use" the software); *Dai*, 2025 WL 2078835, at *3-4 (finding allegations of defendants mere use of the

20

software was not legally cognizable parallel conduct).  No court has held otherwise.

The only two courts in RM cases that have found sufficient allegations of parallel conduct—the Tennessee MDL (after AvalonBay was dismissed) and *Yardi*—did so based on specific allegations that the defendants collectively, and in parallel, changed their rental pricing strategies in material ways.  *See In re RealPage*, 709 F. Supp. 3d at 504 (finding parallel conduct based on allegations supported by a regression analysis of "a parallel *change in pricing strategy* 'once a critical level of RealPage RMS adoption had been reached around January 2016'") (emphasis added); *Yardi*, 758 F. Supp. 3d at 1293 (crediting allegations defendants changed their pricing strategy in parallel to "de-prioritizing occupancy in favor of algorithmic pricing" to "rais[e] rental prices regardless of occupancy and/or competitiveness").  But here the State does not allege that AvalonBay changed its pricing strategy at all since it began using LRO in 2007, much less in parallel with any other defendant.

Indeed, the State's allegations against AvalonBay here are far more like those in *Gibson* and *Dai*.  In both of those cases, the courts found that the plaintiffs' failure to even allege basic facts about when each defendant began to use RM software, which product(s) each used and when each defendant's pricing strategy supposedly changed meant that the plaintiffs had failed to allege parallel conduct.  *Gibson I*, 2023 WL 7025996, at *4 (lack of basic allegations about when defendants supposedly began using RM software precluded a finding of parallel conduct); *Dai*, 2025 WL 2078835, at *3-4 (no parallel conduct because there were no allegations about "when any of the named Hotel Defendants began to 'outsource' their pricing decisions to [RM software]" or "about when they began to make the 'complex and historically unprecedented changes' to their room prices."); *cf. Gibson II*, 2024 WL 2060260, at *4 (conspiracy not plausible where defendants began to use software at different times "over an approximately 10-year period" and "never agreed

21

to charge the prices [RM software] recommended").  The same is true here.

Although the State alleges that AvalonBay was one of the first users of LRO back in 2007, it alleges nothing about (1) when any of the other landlord defendants began using RM products (except to suggest it was *years* later), (2) who the other defendants allegedly licensed their products from initially (Rainmaker or RealPage), (3) when or even whether any defendants supposedly changed their pricing strategies in parallel, or (4) whether AvalonBay knew when any other landlord decided to license its particular RM product, what features it decided to license, or under what contractual terms.

In contrast to these glaring omissions, facts that the State *does* allege show that AvalonBay's conduct was *not* parallel with the other defendants.  For example:

- Three of the landlord defendants allegedly have used YieldStar or AIRM, but never LRO.  Compl. ¶ 33.  LRO, YieldStar, and AIRM are alleged to work differently and have different features.  *Id*. ¶¶ 47-48, 114.

- Even among the defendants using LRO, the State admits AvalonBay's contract for LRO is different from other LRO users because AvalonBay insisted on the bespoke Data Use Restrictions.  *See id*. ¶ 20; July D.C. Opinion at 26.

- In contrast to AvalonBay's bespoke provisions, the State alleges other landlord defendants entered into a "'One Master Agreement' with RealPage that expressly obligate the landlord to provide RealPage with 'correct and accurate' data and acknowledge that RealPage may use that data to operate its products (including the RealPage RM Software)."  Compl. ¶ 80; *see also* July D.C. Opinion at 14.

- The State alleges each LRO user has to make an array of individualized decisions— including choosing optional add-on features—that change what, precisely, LRO does

22

for each landlord and how LRO goes about doing it. Compl. ¶¶ 118-19. The State does not allege that AvalonBay coordinated any of these decisions with any other defendant or knew what choices any other defendant made.

- It is undisputed that AvalonBay did not license the "Rent Syndication" feature in LRO (or any other similar "auto-accept functionality") that the State alleges "facilitates landlords' compliance with the [illegal] agreement" by pressuring them to automatically accept rents generated by their RM software (something that defendants dispute but the point here is that AvalonBay is not alleged to be implicated by any such features). *Id*. ¶¶ 139, 141, 144; April D.C. Order at 6, 11; *supra* n.7.

- AvalonBay's contract terms make plain that it never delegated its rent-setting authority to RealPage in any way. *See generally* Giordano Decl. Exs. 1-3. The Complaint does not attempt to allege otherwise as to AvalonBay. *See Gibson II*, 2024 WL 2060260, at *7 (conspiracy not plausible when customers could and did "override" price recommendations); *Cornish-Adebiyi*, 2024 WL 4356188, at *5 (same).

No court has ever found allegations of this nature to constitute "parallel" conduct under the antitrust laws. Much to the contrary, both the plaintiffs and the court in the related Tennessee multidistrict litigation found that AvalonBay's insistence on its bespoke Data Use Restrictions placed AvalonBay in a fundamentally different, *i.e.*, non-parallel, situation from other RealPage revenue management software users. *See In re RealPage*, 709 F. Supp. 3d at 528 (highlighting AvalonBay's unique contractual terms); *In re RealPage, Inc.*, 709 F. Supp. 3d at 550 (same); *see also* MDL Compl. ¶¶ 219-20, *In re RealPage, Inc.*, No. 3:23-md-03071 (M.D. Tenn. June 16, 2023), ECF No. 291 (alleging that AvalonBay's insistence on the Data Use Restrictions differently situated it from other RealPage RM users). Indeed, the court in the Tennessee MDL went so far

23

as to cite AvalonBay's contract terms as one possible way to gain procompetitive efficiencies from RM software while reducing antitrust risk. *In re RealPage*, 709 F. Supp. 3d at 528.

When, as here, the factual allegations do not sufficiently demonstrate that the defendants engaged in "parallel" conduct, courts regularly dismiss antitrust claims, regardless of whether the complaint also alleges supposed "plus factors." *Concrete & Cement Additives*, 2025 WL 1755193, at *17 ("Plaintiffs' failure to plead parallel conduct thus is fatal to their claims under Section 1" of the Sherman Act); *see City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 401 (2d Cir. 2024) ("Because Plaintiffs fail to allege parallel conduct with respect to the alleged auction conspiracy, they cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors."); *Park Irmat*, 911 F.3d at 517 ("Because [plaintiff] fails to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary."). Under this well-settled body of law, the Court should dismiss with prejudice Counts One and Two and need not consider whether the State adequately alleged any plus factors.

### 2. The Complaint Does Not Allege Sufficient "Plus Factors" To Make The Alleged Conspiracy Plausible

Even assuming counterfactually that the State had pled some parallel conduct, it has not alleged plus factors to provide the "something more" to "plausibly suggest" an agreement. *Ins. Brokerage*, 618 F.3d at 322-23 (quoting *Twombly*, 550 U.S. at 557, 560). Plus factors "are necessary conditions for the conspiracy inference." *In re Baby Food*, 166 F.3d at 122. The Third Circuit has "identified at least three types of facts, often referred to as 'plus factors,' that tend to demonstrate the existence of an agreement: '(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.'" *Burtch*, 662 F.3d at 227 (quoting *Ins. Brokerage*, 618 F.3d at 321–22).

24

**Motive:**  For the first, the State's only allegation of AvalonBay's motive to conspire is the financial benefit of "increased rents."  Compl. ¶ 161.  But the Third Circuit has specifically rejected profits as a sufficient conspiratorial motive because "all entrepreneurs have a legitimate understandable motive to increase profits."  *In re Baby Food*, 166 F.3d at 137.  Accordingly, "it is not plausible to infer" an agreement when "the 'obvious alternative explanation' for such an industry practice is that each member of the industry believes its profits would suffer without the practice."  *Ins. Brokerage*, 618 F.3d at 350.

**Contrary to Self-Interest:**  For the second plus factor, the State does not allege that AvalonBay (or, for that matter, any other defendant) acted "contrary to its interests."  Quite the opposite, as the State alleges an "obvious alternative explanation" for the alleged conduct: AvalonBay "independently calculated that it would be more profitable" to use LRO than to not use it—and regardless of whether any other landlord was using it.  *Ins. Brokerage*, 618 F.3d at 328; *see* Compl. ¶¶ 77, 113-14 (alleging the purpose of using RM software was to raise rents to "make more money").  The State alleges AvalonBay was "one of the first" users of LRO (way back in 2007), before any other landlord defendant, and that AvalonBay used LRO because it "enabled AvalonBay to charge higher rents."  *Id.* ¶ 20.  The State further alleges AvalonBay insisted on the Data Use Restrictions.  *Id*.  The only plausible inference is that AvalonBay started using LRO for its own, independent financial benefit (under bespoke contract terms).  *See Ins. Brokerage*, 618 F.3d at 328; *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255–56 (3d Cir. 2010) ("simply because each Dealer, on its own, might have been economically motivated to exert efforts to keep Dentsply's business and charge the elevated prices Dentsply imposed does not give rise to a plausible inference of an agreement among the Dealers themselves").

**Traditional Conspiracy:**    For the third plus factor, "evidence implying a traditional conspiracy[] consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action." *Ins. Brokerage*, 618 F.3d at 322 (internal quotation marks omitted).  But mere "[p]roof of opportunity to conspire … will not sustain an inference that a conspiracy has taken place." *Id.* at 349.  There must be "facts describing what occurred" at the alleged get-togethers. *Allen v. Verizon Commc'ns, Inc.*, 2019 WL 399922, at *2, 4-5 (D.N.J. Jan. 31, 2019) (allegations of "opportunity to collude" at industry group meetings and "private" meeting did not support inference of conspiracy without "facts describing what occurred" at the meetings); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 722 (E.D. Pa. 2011) (collecting cases that "attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of *agreement* to the conspiracy").

The State alleges AvalonBay engaged in three types of conduct that are supposedly indicative of a traditional conspiracy.  None of these allegations—which all must be viewed against the immutable backdrop of the Data Use Restrictions—move the needle towards AvalonBay's plausible participation in the alleged conspiracy:

- First, the State alleges that the RM products are "anticompetitive by design," Compl. ¶ 113, and that AvalonBay committed an antitrust violation simply because it used an RM product and other defendants did too.  *Id.* ¶¶ 113-32.  But every court that has considered this argument has rejected it as a matter of law.  *Cornish-Adebiyi*, 2024 WL 4356188, at *7 (court cannot infer conspiracy "from the mere fact that [hotels] all use the same pricing software"); *Gibson II*, 2024 WL 2060260, at *6 (same); *Dai*, 2025

26

WL 2078835, at *3-4 (same).  Even the courts that denied motions to dismiss in algorithmic pricing cases (the Tennessee MDL and *Yardi*) did not accept this argument. As the D.C. Court explained, so long as AvalonBay did not conspire with other landlords to use RealPage (it did not), it does not matter how LRO works or whether the prices LRO recommends to AvalonBay are designed to be at, above, or below some "fair market value."  *See* July D.C. Opinion at 27 (citing *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 194, (D.D.C. 2023)).  That is because AvalonBay can unilaterally determine its own prices using whatever mechanism, tool, or software it wants without running afoul of antitrust law.  *Id.* ("Even assuming that AvalonBay took advantage of an existing cartel between the other Defendant Landlords and used publicly available data to track the cartel price, such behavior would be perfectly legal.").  To state a Section 1 violation, the State had to plausibly allege AvalonBay made an *agreement* with other landlords to all use RM software to collectively set rents. It has not come close to doing so.

- Second, just like in the D.C. complaints, the State alleges that an employee of AvalonBay did a single videotaped "testimonial[]" that Rainmaker (not RealPage) "published on its website" (Compl. ¶ 71) in which the employee supposedly "urg[ed] adoption of LRO by any 'professional who's procrastinating on using revenue management.'" *Id.* ¶ 73.  Those allegations did not persuade the D.C. Court either time. Just as in D.C, the State does not allege any Defendant ever saw that website video— which the State's lawyers have conceded was published ***in 2012***, five years before RealPage acquired LRO and long before any other Defendant is alleged to have started using an RM product.  *Cf. Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 839

(N.D. Ill. 2017) ("document has little probative value" when "there is no evidence that any other Defendant was even aware of" the statement). Indeed, the Complaint does not even allege that any conspiracy existed between *anyone* in 2012, and admits that some of the defendant landlords never licensed LRO. If a customer testimonial published on a business's website—one of the most ubiquitous practices in modern marketing—were enough to establish an antitrust conspiracy, courts would be overrun with antitrust litigation. It is not enough. July D.C. Opinion at 2-3, 30; *see also Musical Instruments*, 798 F.3d at 1196-97 (allegation that industry urged the adoption of similar policies did not suggest agreement).

- Third, the Complaint alleges that an AvalonBay employee chaired the LRO User Group during the COVID-19 pandemic (2019–2021) and that during a meeting on February 10, 2021, *three* of the ten landlord defendants allegedly discussed how (at most) the LRO software might be configured technologically to account for the unprecedented circumstances of the COVID-19 pandemic. Compl. ¶ 102. The Complaint characterizes these efforts as suspicious and alleges that they were done to "facilitate and further the … conspiracy." *Id.* ¶ 99. But allegations about a COVID-related discussion between just *three* landlord defendants in 2021 about LRO alleges nothing plausible about AvalonBay supposedly conspiring with (at least) seven other landlords (some not even LRO users) *years* earlier to all set rates through RealPage. Indeed, the COVID allegations have nothing at all to do with delegating rent-setting authority to RealPage. Because of AvalonBay's bespoke Data Use Restrictions, AvalonBay's alleged removal of its COVID-era data could not have had any impact on the rents RealPage recommended to any of the other defendants or vice versa. In any event,

28

courts have recognized the unprecedented nature of the COVID pandemic created an "obvious alternative explanation" for supposed parallel behavior, such as allegedly seeking to understand LRO's software capabilities. *See Dai*, 2025 WL 2078835, at *4 (reactions to COVID could be equally indicative of "market interdependence" not collusion); *D'Augusta v. Am. Petroleum Institute*, 117 F.4th 1094, 1104 (9th Cir. 2024) (affirming dismissal of conspiracy claims because "[t]he 'obvious alternative explanation' [for parallel conduct] was the outbreak of the global Covid-19 pandemic'") (citation omitted); *In re Replacement Tires*, 767 F. Supp. 3d at 730-31, 737 (granting motion to dismiss and finding COVID-19 pandemic provides an "obvious alternative explanation" for defendants' alleged parallel price increases).

Even when considered collectively, none of these allegations come close to satisfying the legal standard to adequately plead that AvalonBay conspired with other landlords or overcome the obvious implications of the Data Use Restrictions.

The Court should dismiss Counts One and Two against AvalonBay with prejudice.

## II.    THE STATE FAILS TO PLEAD A NEW JERSEY CONSUMER FRAUD ACT CLAIM

The State alleges two separate violations of the New Jersey Consumer Fraud Act ("NJCFA"):  one for commercial practices in violation of state or federal law (Count Three) and one for unconscionable commercial practices, misrepresentations, and acts of deception (Count Four).  Count Three is based only on the alleged violations of the Sherman Act and New Jersey Antitrust Act (Compl. ¶¶ 244-45) and so fails for the same reasons. *See Sickles v. Cabot Corp.*, 877 A.2d 267, 277 (N.J. Super. Ct. App. Div. 2005) (dismissing NJCFA claim premised on antitrust theory).  Count Four is based on alleged "unconscionable commercial practices and acts of deception" including "engaging in an unlawful conspiracy to set prices" and "employing

29

misleading consumer-facing communications strategies designed to obfuscate the cause of rent increases and limit the information available to consumers." Compl. ¶ 256. To the extent this claim also is predicated on the alleged conspiracy (*id*. ¶ 256.a), it must be dismissed for the reasons above and because the complaint does not allege AvalonBay engaged in any "inherently misleading" conduct. *Sickles*, 877 A.2d at 274, 277 (there is nothing "inherently misleading" in antitrust allegations). To the extent Count Four purports to rely on other alleged conduct (Compl. ¶ 256.b), the Complaint lacks the required particularity as to AvalonBay.

To state a claim under the NJCFA, the State must meet the heightened pleading standard in Rule 9(b). *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 372 (D.N.J. 2015); *Riachi v. Prometheus Grp.*, 822 F. App'x 138, 142 (3d Cir. 2020) (affirming dismissal of CFA claim for failure to meet exacting Rule 9(b) standard). Additionally, the State must "distinguish among defendants" because "collectivized allegations against 'defendants' do not suffice." *Colucci v. Bank of America, N.A.*, 2011 WL 13364575, at *2 (D.N.J. Mar. 28, 2011). For claims based on alleged affirmative acts, as here, the State must indicate "at the very least who made the material representation giving rise to the claim and what specific representations were made" *by AvalonBay*. *NN&R, Inc. v. One Beacon Ins. Grp.*, 362 F. Supp. 2d 514, 518 (D.N.J. 2005). The State has not even attempted to satisfy this level of specificity as to AvalonBay. Indeed, the Complaint does not allege that AvalonBay made any material misrepresentation to anyone about anything. The Court should dismiss Counts Three and Four as to AvalonBay.

## CONCLUSION

AvalonBay respectfully requests that this Court dismiss all claims against AvalonBay with prejudice.

Dated:  July 29, 2025                              Respectfully submitted,

                                                  /s/ Kevin M. McDonough
                                                  Kevin M. McDonough (ID: 41892005)
                                                  LATHAM & WATKINS LLP
                                                  1271 Avenue of Americas
                                                  New York, NY 10020
                                                  Telephone: (212) 906-1200
                                                  Email:  Kevin.McDonough@lw.com

                                                  Jennifer L. Giordano (*pro hac vice*)
                                                  Allison B. Smith (*pro hac vice*)
                                                  Ehson Kashfipour (*pro hac vice*)
                                                  LATHAM & WATKINS LLP
                                                  555 Eleventh Street, NW, Suite 1000
                                                  Washington, D.C. 20004
                                                  Telephone: (202) 637-2200
                                                  Facsimile: (202) 637-2201
                                                  Email:  Jennifer.Giordano@lw.com
                                                          Allison.Smith@lw.com
                                                          Ehson.Kashfipour@lw.com

                                                  Belinda S Lee (*pro hac vice*)
                                                  LATHAM & WATKINS LLP
                                                  505 Montgomery Street, Suite 2000
                                                  San Francisco, CA 94111
                                                  Telephone: (415) 395-0600
                                                  Facsimile: (415) 395-8095
                                                  Email:  Belinda.Lee@lw.com

                                                  *Attorneys for AvalonBay Communities, Inc.*

31