# EXHIBIT 4

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |  |  |
|---|---|---|---|
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | **Case No. 2023 CAB 6762** | |
| v. | : | **Judge Todd E. Edelman** | |
| | : | | |
| REALPAGE, INC., *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

On May 29, 2024, the undersigned issued a summary Order denying Defendant JBG Associates, LLC's ("JBG") Opposed Motion to Dismiss Plaintiff District of Columbia's Complaint ("JBG's Motion"), filed January 19, 2024 and Defendant Highmark Residential LLC's ("Highmark") Opposed Motion to Dismiss ("Highmark's Motion"), filed January 19, 2024, and granting Defendant AvalonBay Communities, Inc.'s ("AvalonBay") Opposed Motion to Dismiss ("AvalonBay's Motion"), filed January 25, 2024. As promised in the summary Order, the Court now issues this Memorandum Opinion to elucidate the bases for its prior decisions.

I.    **Background**

On November 1, 2023, the District of Columbia filed a Complaint against "fourteen of the largest landlords in the District," which the District refers to as the "Defendant Landlords," and RealPage, Inc. ("RealPage"), a corporation that "provides software and services to managers of residential rental apartments." Compl. ¶¶ 1, 14. The Complaint alleges that the Defendant Landlords, including JBG, AvalonBay, and Highmark, have colluded to fix rental prices "by collectively adopting the rents set by RealPage's technology and unlawfully agreeing to exchange competitively sensitive data in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501 *et seq.*" *See* Compl. ¶ 1. According to the Complaint, RealPage and the

Defendant Landlords entered into agreements "to delegate their price-setting authority" to RealPage through its three "Revenue Management" ("RM") software products: YieldStar, LRO, and AIRM.  Compl. ¶¶ 2, 31.  As part of this agreement, the Defendant Landlords allegedly grant RealPage access to "competitively sensitive data," including rents charged by each Defendant Landlord, which RealPage then feeds into its RM software.  *Id.* ¶ 3.  The RM software runs this data through statistical models that "estimate supply and demand for multifamily housing that is specific to particular geographic areas and unit types, and then generate a 'price' to charge for renting those units that maximizes the landlord's revenue."  *Id.* ¶ 31.  RealPage allegedly "suppresses the Defendant Landlords' independent price decision-making" by disseminating training documents stating that achieving best results with the product requires acceptance of the RM-generated rent "90%+ of the time" and by emphasizing the importance of disciplined pricing practices.  *Id.* ¶¶ 57-59.  The RM software also offers a "a feature that automatically accepts . . . and deploy[s]" the RM software-generated rents to the landlord's property management system, which in some cases can only be overridden after consulting a RealPage Pricing Advisor.  *Id.* ¶¶ 61-65.  The Complaint further alleges that RealPage monitors compliance with the RM software-generated rents by randomly calling and questioning landlords' employees about their compliance levels; providing landlords with compliance reports within the software interface; and monitoring compliance levels using the "real-time, competitively sensitive, non-public data supplied by [RealPage's] clients" in accordance with contracts between RealPage and the Defendant Landlords.  *Id.* ¶¶ 66-69, 100-101.

The District charges that the Defendant Landlords have agreed with one another to impose RealPage-generated rents, and "further their agreement via communications aimed at recruiting additional members [and] exchang[ing] proprietary data."  *Id.* ¶ 76.  Recruitment

efforts include public video testimonials recorded by employees and executive officers of Defendant Landlords aimed at encouraging other landlords to adopt RealPage's software. *Id.* ¶¶ 77-86. The Defendant Landlords allegedly communicate at weekly meetings where they discuss non-public information, through ongoing contact in a RealPage-sponsored RM software user group, and at regular in-person conferences. *Id.* ¶¶ 87-92.

Moreover, the District points to certain additional factors that render the multifamily housing market in the District of Columbia "particularly conducive to an unlawful agreement among direct competitors." *Id.* ¶ 93. Such factors include highly inelastic demand for housing,[1] concentrated ownership of multifamily housing,[2] high barriers to entry in the multifamily housing market,[3] high "switching costs" for renters,[4] standardization of the housing offered by the RM software users,[5] and the substantial financial incentives for collusion among the Defendants. *Id.* ¶¶ 94-99. The District alleges that the cartel formed between the Defendant Landlords and RealPage has "allow[ed] Defendant Landlords to charge higher rents than they otherwise would have and artificially reduc[ed] the supply of housing units in the District . . . to the detriment of District residents," and that the RM software insulates Defendant Landlords from the pressures of macroeconomic downturns, "render[ing] rent decreases smaller than they

---

[1] Inelastic demand for housing means that "residents' demand for housing does not change dramatically in response to pricing increases or decreases," because housing is a necessity. Compl. ¶ 94.

[2] Concentrated ownership refers to the fact that much of the multifamily housing in the District of Columbia is owned or managed by a small group of entities. *See* Compl. ¶ 95.

[3] In this context, high barriers to market entry exist because "there are many challenges that would make it difficult for would-be competitors to enter the market" for multifamily housing in the District of Columbia. Compl ¶ 96.

[4] "Switching costs" refers to the costs a renter must incur to switch to a competitor, for example, penalties for breaking a lease, investment of time and research into searching for a new apartment, and the cost of moving possessions from one apartment to another. Compl. ¶ 97.

[5] The District alleges that the Defendant Landlords have grouped apartments based on floorplan, which allows RealPage to standardize pricing for apartments with similar attributes in different buildings. Compl. ¶ 98.

would have been in competitive market conditions." *Id.* ¶¶ 107, 113. The District posits that the alleged cartel also affects non-participating units, as academic studies have found that "once market adoption crosses a threshold—25% of buildings or 30% of units—market impacts such as increased rent and lower occupancy can be observed across market participants," and the District has crossed such a threshold for participating units. *Id.* ¶¶ 49, 115, 132.

The District alleges that by delegating "a substantial majority of price-setting authority" to RealPage and by exchanging sensitive non-public information with competitors through RealPage, "Defendant Landlords and Defendant RealPage have entered into contracts, combinations in the form of a trust or otherwise, or conspiracies in restraint of trade or commerce . . . in violation of the D.C. Antitrust Act, D.C. Code § 28-4502." Compl. ¶¶ 136, 138. The District maintains that the agreements between the Defendant Landlords and RealPage constitute a conspiracy to "reduce the supply of multifamily housing units . . . and to fix and increase the price of leases for multifamily housing units in the District of Columbia." *Id.* The District further alleges that the "Defendant Landlords have entered with each other into horizontal contracts, combinations in the form of a trust or otherwise, or conspiracies in restraint of trade or commerce . . . in violation of the D.C. Antitrust Act, D.C. Code § 28-4502" by "recruit[ing] one another into an agreement to exchange sensitive non-public data among competitors and delegate to RealPage price-setting responsibility for multifamily housing units in the District, instead of competing on the basis of price." Compl. ¶ 137.

JBG and Highmark filed their Motions on January 19, 2024, and AvalonBay filed its Motion on January 25, 2024. The District filed its Oppositions to all three Motions on March 5, 2024 to which JBG, AvalonBay, and Highmark filed their Replies on April 4, 2024. AvalonBay submitted a Notice of Supplemental Authority on May 10, 2024, and JBG submitted the same on

May 13, 2024.  The District submitted a Consent Motion for Leave to File Response to Notices of Supplemental Authority and a Response to Notices of Supplemental Authority on May 15, 2024.  On May 29, 2024, the undersigned issued a summary Order granting AvalonBay's Motion, denying JBG and Highmark's Motions, and granting the District's Consent Motion for Leave to File a Response to Notices of Supplemental Authority.  The summary Order promised to set forth the reasoning behind these rulings in the instant Memorandum Opinion.

## II.     Legal Standard

JBG, AvalonBay, and Highmark sought dismissal of the District's Complaint pursuant to D.C. Superior Court Rule of Civil Procedure 12(b)(6).  JGB Mot. at 1; AvalonBay Mot. at 1; Highmark Mot. at 1.  Dismissal pursuant to this section is only appropriate if it is "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  *Atkins v. Indus. Telecomm. Ass'n*, 660 A.2d 885, 887 (D.C. 1995) (quoting *Owens v. Tiber Island Condo. Ass'n*, 373 A.2d 890, 893 (D.C. 1977)).  In assessing a motion to dismiss, a trial court must construe a complaint in the light most favorable to the plaintiff.  *Id*.  "The only issue on review of a dismissal made pursuant to Rule 12(b)(6) is the legal sufficiency of the complaint; and a complaint should not be dismissed because a court does not believe that a plaintiff will prevail on [its] claim."  *Grayson v. AT&T Corp*., 15 A.3d 219, 228-29 (D.C. 2011) (quoting *Murray v. Wells Fargo Home Mortg*., 953 A.2d 308, 316 (D.C. 2008)) (en banc) (internal quotations omitted); *see also Poola v. Howard Univ*., 147 A.3d 267, 276 (D.C. 2016) (citing *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1266 (D.C. 2015)).

The trial court must conduct a two-pronged inquiry to determine whether a complaint survives a motion to dismiss, examining whether the complaint includes well-pled factual

allegations and whether such allegations plausibly give rise to an entitlement for relief. *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While a court "must accept as true all of the allegations contained in a complaint . . . [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Bernabei & Wachtel*, 116 A.3d at 1266. A well-pled complaint must "fairly put[] the defendant on notice of the claim against him." *Keranen v. AMTRAK*, 743 A.2d 703, 713 (D.C. 2000) (quoting *Nelson v. Covington*, 519 A.2d 177, 178 (D.C. 1986)).

## III.    Analysis

The District brings its claims against JBG, AvalonBay, and Highmark under the District of Columbia Antitrust Act (the "D.C. Antitrust Act"), which declares "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce all or any part of which is within the District of Columbia . . . to be illegal." D.C. Code § 28-4502; *see* Compl. ¶¶ 136-37. When interpreting the D.C. Antitrust Act, this Court "use[s] as a guide interpretations given by federal courts to comparable antitrust statutes." D.C. Code § 28-4515. Section 1 of the federal Sherman Anti-Trust Act (the "Sherman Act") is substantively identical to Section 28-4502 of the D.C. Antitrust Act, and the Court may therefore look to case law interpreting Section 1 of the Sherman Act in deciding whether the District has made out a claim under the D.C. Antitrust Act. *See* 15 U.S.C.S. § 1 ("Every contract, combination in the

6

form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."); *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 87 (D.D.C. 2003) ("the District of Columbia Antitrust Act . . . parallels [Section] 1 of the Sherman Act").

Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 709 (E.D. Pa. 2012) (alterations in original) (quoting *Twombly*, 550 U.S. at 553). "[T]he existence of an agreement is the hallmark of a Section 1 Sherman Act claim." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). Courts often must draw a fine line between an agreement to collude and so-called "conscious parallelism," where firms "coordinat[e] their pricing without an actual agreement to do so." *In re Text Messaging*, 782 F.3d at 871. Conscious parallelism does not violate the Sherman Act, even where firms in a concentrated market artificially inflate prices to a "supercompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *In re Domestic Airline Travel Antitrust Litig.*, MDL Docket No. 2656, 2023 U.S. Dist. LEXIS 160764, at *42 (D.D.C. Sep. 5, 2023). However, "at the pleading stage, the plaintiff is not required to allege facts showing that an unlawful agreement is more likely than lawful parallel conduct." *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012). In applying the Rule 12(b)(6) pleading standard to a claim brought under Section 1 of the Sherman Act, the Supreme Court has held that a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made . . . [and to] raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. While "a

conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," *id.* at 557, the District "need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct," *Morton Salt, Inc.*, 702 F.3d at 869, to plausibly state a claim that the Defendants entered into an illegal agreement in restraint of trade.

To state a claim under Section 1 of the Sherman Act, a plaintiff usually must allege that (i) the defendants entered into a "contract, combination, conspiracy or other concerted activity" that (ii) "unreasonably restricts trade" and (iii) affects the relevant market. *WAKA, LLC v. DC Kickball*, 517 F. Supp. 2d 245, 250 (D.D.C. 2007) (citing *Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 591 (D.D.C. 1995), aff'd 317 U.S. App. D.C. 240, 82 F.3d 484 (D.C. Cir. 1996) and *Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534, 536 (D.D.C. 1986)). However, "there are some methods of restraint that are so inherently and facially anti-competitive that an elaborate and burdensome inquiry into a demonstrable economic impact on competition in a relevant market is not required." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Agreements in antitrust law may be either horizontal or vertical: horizontal agreements are made between "competitors at the same level of the market structure," while vertical agreements are made between entities "at different levels of the market structure, e.g., manufacturers and distributors[.]" *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972). "Typically only 'horizontal' restraints . . . qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540-41 (2018). Vertical restraints are generally subject to the "rule of reason," a "fact-specific assessment of 'market power and market structure'" that courts use to determine whether an agreement unreasonably restricts trade in the relevant market. *Id.* at 541.

8

Courts have also recognized a hybrid theory of liability under the Sherman Act known as the "hub-and-spoke" theory. "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)). "[W]hen there is express collusion among competitors, and a hub uses vertical agreements to organize that horizontal conspiracy, the hub is also subject to *per se* liability." *In re McCormick & Co.*, 217 F. Supp. 3d 124, 135 (D.D.C. 2016). This is because "the reasonableness of a restraint turns on its anticompetitive effects, and not the identity of each actor who participates in imposing it." *United States v. Apple, Inc.*, 791 F.3d 290, 323 (2d Cir. 2015). However, *per se* liability only arises in a hub-and-spoke conspiracy where the plaintiff plausibly alleges the existence of the rim—the horizontal agreement between the spokes. *In re McCormick & Co.*, 217 F. Supp. 3d at 135.

Here, the District has alleged that the Defendant Landlords—the "spokes"—have entered into agreements with RealPage—the "hub"—to provide proprietary information in exchange for automated rental pricing based on the combined proprietary data submitted by all participants in the alleged conspiracy.[6] *See* Compl. ¶¶ 54-71; District Opp'n JBG at 5. The "rim" consists of horizontal agreements among the Defendant Landlords to feed proprietary data to RealPage and

---

[6] Had the District failed to advance factual allegations that plausibly set forth a claim for horizontal or hub-and-spoke agreements that would give rise to *per se* liability, it could still attempt to make out a plausible claim that the vertical agreements between the Defendant Landlords and RealPage unreasonably restrain trade under the "rule of reason" test. *See Total Benefits Planning Agency, Inc*, 552 F.3d at 436. "To state a claim under the rule-of-reason test, a plaintiff must allege, *inter alia*, that the purportedly unlawful contract, combination, or conspiracy 'produced adverse, anticompetitive effects within relevant product and geographic markets.'" *Warrior Sports, Inc. v. NCAA*, 623 F.3d 281, 286 (6th Cir. 2010) (quoting *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)).

9

to share this data with one another, and to encourage other landlords to delegate price-setting authority to RealPage. *See* Compl. ¶¶ 72-92.

In order to successfully make out a claim for *per se* liability under the D.C. Antitrust Act—either pursuant to a hub-and-spoke theory or a purely horizontal theory of agreement—the District must plausibly allege "a unity of purpose" or a "conscious commitment to a common scheme" among the Defendant Landlords to fix rents above the market rate.[7] *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 764 (1984) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) and citing *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir. 1980) and *H. L. Moore Drug Exch. v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir. 1981)). The District may allege such unity of purpose through direct or circumstantial evidence. *Id.* at 764. Direct evidence of an agreement to unlawfully restrain trade is extremely rare, and courts generally must rely on circumstantial evidence to create an inference of an unlawful agreement. *In re Domestic Airline Travel Antitrust Litig*., 221 F. Supp. 3d 46, 58 (D.D.C. 2016). "Circumstantial evidence must include both parallel conduct and at least one 'plus factor.'" *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071, MDL No. 3071, 2023 U.S. Dist. LEXIS 230200, at *38 (M.D. Tenn. Dec. 28, 2023) (Crenshaw, J.) (citing Twombly, 550 U.S. at 557). Plus factors are used to place allegations of parallel conduct "in a context that raises a suggestion of a preceding agreement." *In re Domestic Airline Travel*, 221 F. Supp. 3d at 58 (quoting *Twombly*, 550 U.S. at 557). Plus factors "may include a showing that the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior." *In re Urethane Antitrust Litig*., 913 F. Supp.

---

[7] The District maintains that it has made allegations sufficient to support a "purely horizontal price-fixing arrangement" between the Defendants. District Opp'n JBG at 5. As explained in footnote 8, the Court need not decide at the pleadings stage whether a purely horizontal or hub-and-spoke description best fits the facts of this case.

2d 1145, 1151 (D. Kan. 2012) (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 858-59 (10th Cir. 1999)).  "Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."  *Id.* (quoting *Mitchael*, 179 F.3d at 858-59). Plus factors must be evaluated holistically.  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

A.  <u>JBG's Motion to Dismiss</u>

JBG's Motion argued that the Complaint does not plausibly allege that JBG (i) directed RealPage to share its data with or use its data to provide pricing recommendations to competitors, or to use competitors' data to generate JBG's pricing recommendations; (ii) attempted to recruit or communicate with competitors regarding their collective use of RealPage software or attended any "industry conferences hosted by or discussing RealPage[;]" (iii) agreed with any competitor to use RealPage software; or (iv) refrained from overriding the RM software-generated rents or relinquished its ability to override RealPage's pricing recommendations.  JBG Mot. at 6-8.  Specifically, JBG contended that the allegations that identify JBG by name are not sufficient to show that JBG joined a conspiracy with the other Defendant Landlords, and characterized the collective allegations lodged against all Defendant Landlords as so conclusory that they "are not entitled to the benefit of the assumption of truthfulness."  *Id.* at 5 (quoting *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 99 (D.C. 2018)).

The Complaint alleges that JBG relies on RealPage's LRO software "as part of the process for determining the price of rental leases in the District of Columbia," and that it uses the

11

RM software pursuant to a contract titled "RealPage One Master Agreement" which was executed on January 27, 2020. Compl. ¶¶ 20, 32. The District further alleges that JBG's One Master Agreement contains a provision stating that RealPage's RM software "rel[ies] upon Site Owner Data to function and deliver value to Site owners, managers, and residents . . . [and that t]he pricing for the [RM software] is partially based on the expected value exchange whereby Site Owner grants to RealPage certain limited rights in the Site Owner Data." Compl. ¶ 35. The Complaint also avers that RealPage acquired the LRO software in 2017, and that JBG had contracted to use the LRO software before it was acquired by RealPage. *Id.* ¶¶ 44, 63. JBG's contract with the original owner of the LRO software allegedly "stated that LRO 'automates apartment rent pricing on a daily basis,' thereby leading 'properties to perform better than non-LRO peers in terms of pricing.'" *Id.* ¶ 63.

As outlined *supra,* the District could pursue several theories of liability for conspiracy: horizontal, hub-and-spoke, or vertical. The first two require the District to adequately plead essentially the same set of facts.[8] The rim—or the horizontal relationships between competitors—serves as the bedrock of a hub-and-spoke conspiracy, because a hub-and-spoke theory is usually used to extend the *per se* liability of a group of horizontal competitors to the vertical facilitator of the horizontal agreements (in this case, RealPage). *See Apple, Inc.*, 791

---

[8] The main difference between a purely horizontal conspiracy and a hub-and-spoke conspiracy is the level of industry at which RealPage operates. If the relationship between RealPage and the Defendant Landlords is more analogous to that of a distributor and manufacturer, then the relationship is vertical, and the facts pled here would lend themselves to a hub-and-spoke agreement. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007). If the relationship between the Defendant Landlords and RealPage is more like a horizontal relationship between competitors in the same market, then all of the relationships in this case would be horizontal, and a purely horizontal price-fixing theory would be a better fit. *Total Benefits Planning Agency, Inc.*, 552 F.3d at 435. The nature of the relationship between RealPage and the Defendant Landlords poses a somewhat novel question, and it is not necessary to resolve it before more substantial discovery is undertaken in this case. *See Apple, Inc.*, 791 F.3d at 314 ("determining the orientation of an agreement can be difficult as a matter of fact and turns on more than simply identifying whether the participants are at the same level of the market structure."). At the pleadings stage, the Court need only decide whether each type of agreement has been adequately pled, not whether such agreement actually exists.

F.3d at 322; *Howard Hess Dental Labs. Inc.'*, 602 F.3d at 255; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010). Therefore, at this stage, it does not matter for the purposes of the Court's analysis whether a hub-and-spoke or purely horizontal theory of liability attaches. The important question for both theories turns on whether the District has adequately pleaded that JBG entered into a conspiracy to fix rent prices with its competitors—the other Defendant Landlords. Under either theory, the District must adequately allege that JBG entered into an agreement with other Defendant Landlords to use the coordinating mechanism of RealPage's RM software to fix rents.[9]

In antitrust cases, plaintiffs are rarely able to plead direct evidence of an agreement and must resort to circumstantial evidence in the form of parallel conduct in combination with plus factors that make an agreement plausible when placed in the full context of the pleadings. *See In re Domestic Airline Travel*, 221 F. Supp. 3d at 58. Here, the Complaint plausibly alleges that JBG entered into agreement with the other Defendant Landlords because (i) the District alleges that JBG and the Defendant Landlords engaged in parallel conduct when each entered into a contract to share proprietary data through RealPage and almost invariably implemented the rents RealPage generated using their pooled data, and (ii) in combination with certain plus factors, this parallel conduct makes out a plausible case for conspiracy because it would not be in JBG's interests to share proprietary pricing data with its competitors in the absence of an agreement to fix rents at the RealPage-generated prices. The District has pled when, where, how, why, and

---

[9] The District also argued that its allegation that JBG entered into an agreement to delegate its rent-setting authority to RealPage could alone amount to a conspiracy to fix rents, even in the absence of horizontal collusion between JBG and the other Defendant Landlords. *See* District Opp'n JBG at 5, 5 n.1. It is true that if the District plausibly alleges that a vertical agreement between RealPage and JBG unreasonably restricted trade under a "rule of reason" analysis, its claim should survive a motion to dismiss on this basis. *Leegin Creative Leather Prods*, 551 U.S. at 894. However, the Court need not consider this argument, in part because the District did not outline it in detail, and in part because the District has plausibly alleged that JBG joined either a horizontal or hub-and-spoke conspiracy.

13

with whom JBG would enter into a conspiracy to fix rents, and it is plausible that further

discovery will reveal that JBG entered into such a conspiracy.

### 1. Parallel conduct

The Complaint plainly states that JBG entered into a RealPage One Master Agreement to

share proprietary data with RealPage, and that RealPage contracted to provide JBG with

apartment rent pricing based on proprietary data provided by its competitors.[10] *See* Compl. ¶ 35.

The Complaint also alleges that the other Defendant Landlords have entered into substantively

similar RealPage One Master Agreements over the past decade.[11] *See id*. ¶¶ 15-27. This

behavior is in and of itself sufficient to allege that JBG and the Defendant Landlords acted in

parallel.[12] The Complaint also alleges that "[Defendant] Landlords agree to and do impose the

---

[10] JBG contended that it did not exchange its proprietary data through RealPage because it did not "direct[] or control[] RealPage's use of its data." JBG Mot. at 6. Although the District does not allege that JBG *directed* RealPage to share its data with its competitors, it avers that JBG entered into a contract permitting RealPage to do so and acknowledging that RealPage would calculate the rent prices provided to JBG using its competitors' data. Compl. ¶ 35.

[11] The earliest One Master Agreement that the Complaint alleges RealPage entered into was with Defendant Bell Partners, Inc., dated May 1, 2014. *See* Compl. ¶ 25. However, some Defendant Landlords entered into earlier contracts with RealPage's predecessors to use the RM software later acquired by RealPage, including with Rainmaker Group Real Estate, LLC, the purveyor of the LRO software prior to RealPage. *See e.g. id.* ¶¶ 19, 21, 42, 44, 63.

[12] In its Motion, Reply, and in a Notice of Supplemental Authority, JBG raised two opinions issued by the United States District Court for the District of Nevada in *Gibson, et al. v. Cendyn Group, LLC, et al*., Case No. 2:23-cv-00140-MMD-DJA (Du, J.). *Gibson* involves a set of facts similar to those in this case: individual plaintiffs who stayed in hotel rooms on the Las Vegas Strip allege that those hotels conspired with a software company to "unlawfully restrain[] trade in violation of [the Sherman Act] by artificially inflating the price of hotel rooms after agreeing to all use [hotel room pricing] software marketed by the software company." *Gibson* at *1 (D. Nev. May 8, 2024). *Gibson* holds that "consulting your competitors' public rates to determine how to price your hotel room—without more—does not violate the Sherman Act." *Id*. at *9; *see also Gibson*, 2023 U.S. Dist. LEXIS 190432, at *14 (D. Nev. Oct. 24, 2023). Indeed, *Gibson* dismissed the complaint in that case partially due to "[p]laintiffs' failure to plausibly allege the exchange of confidential information" among the hotel defendants. *Gibson* at *9 (D. Nev. May 8, 2024). JBG urged the Court to likewise conclude that the District's Complaint against JBG is fatally flawed because "it does not allege that JBG received any confidential information from the other Defendant [Landlords] through the LRO software's pricing recommendations." JBG Not. Suppl. Auth. at 2; *see also* JBG Mot. at 7.

RealPage-generated rents nearly all of the time."[13]  Compl. ¶ 71.  This extremely high level of

adherence to the pricing recommendations represents further parallel conduct among the

Defendant Landlords, including JBG.[14]


        *2.  Coordination with Defendant Landlords*

As JBG indicated in its Motion, the Complaint does not allege any specific occasions

when JBG coordinated with the other Defendant Landlords.  JBG Mot. at 5, 8.  "[A]ntitrust

conspiracy allegations need not be detailed on a defendant-by-defendant basis."  *In re Processed*

*Egg Prods.*, 902 F. Supp. 2d at 710 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig*., 586 F.

Supp. 2d 1109, 1117 (N.D. Cal. 2008) and *In re OSB Antitrust Litig*., No. 06-826, 2007 U.S. Dist.

---

*Gibson*, however, explicitly distinguished that case from multi-district litigation ("MDL") brought against RealPage and many of the Defendant Landlords currently pending before the United States District Court for the Middle District of Tennessee, Nashville Division.  *Gibson* included a footnote to make abundantly clear "to the extent it is not obvious" that the MDL "involve[s] allegations of competitors pooling their confidential or proprietary information in the dataset that the pertinent algorithm runs on," while *Gibson* did not.  *Gibson* at *8 n.7 (D. Nev. May 8, 2024).  Like the MDL plaintiffs, the District has adequately alleged that JBG pooled its data with its competitors and that the RealPage algorithm uses this dataset to generate rental pricing recommendations, which is tantamount to sharing proprietary data with competitors.

[13] More specifically, the Complaint alleges (i) that the RM software automatically deploys its pricing to many Defendant Landlords' property management systems, and that those prices can be manually overridden only after providing a "written business justification for why they wish to depart from the RealPage-generated rent," Compl. ¶¶ 61-65; (ii) that RealPage exhorts its customers to maintain pricing "discipline" and to limit overrides of RealPage pricing in training materials, *id.* ¶¶ 57-59; (iii) that the Defendant Landlords accept the proposed rents more than 90 percent of the time, *id.* ¶ 70; and (iv) that "[i]n the rare instance when a landlord does not impose the RealPage-generated rent, the cartel's oversight mechanisms ensure that such a decision is not a landlord 'cheating' the system, but rather is accounting for some factor of which the RealPage RM Software was unaware (e.g., a natural disaster having just occurred which substantially affects the property's value)," *id.*

[14] JBG also appeals to *Gibson* to argue that "the Complaint fails to adequately plead that JBG joined the alleged conspiracy by delegating its decision-making to RealPage."  JBG Reply at 5; JBG Mot. at 6.  *Gibson* held that the plaintiffs in that case must plausibly allege that they were required to accept the algorithm's pricing recommendations to make out a case for a conspiracy between the hotels.  *Gibson* at *13-14 (D. Nev. May 8, 2024).  Because the hotels alleged only that "pricing recommendations are accepted 90% of the time," and conceded that the pricing decisions can be overridden, *Gibson* found that the hotels had not fully delegated their pricing decisions to a central coordinating entity.  *Id.* at *14-15.  Again, this case is not entirely analogous to *Gibson* because JBG has agreed to share its proprietary information with the other Defendant Landlords through RealPage.  As explained *infra*, the high acceptance rate of rents implies a conspiracy in light of the data-sharing agreement, and the District need not allege that JBG relinquished control over its rental prices to plausibly allege a conspiracy.

15

LEXIS 56584, at *5 (E.D. Pa. Aug. 3, 2007) (Diamond, J.)).  However, "[s]imply using the 'global term "defendants" to apply to numerous parties without any specific allegations' that would tie each particular defendant to the conspiracy is not sufficient." *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) (quoting *Jung v. Assoc. of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163-64 (D.D.C. 2004)).  A complaint in an antitrust case "must allege that 'each individual defendant joined the conspiracy and played some role in it' because, 'at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it.'" *Id*.  As stated *supra*, a well-pled complaint will put the defendant on notice of the claim against it.  *See Keranen*, 743 A.2d at 713 (quoting *Nelson*, 519 A.2d at 178).  The complaint must provide some explanation as to "when Defendants joined the . . . conspiracy, where or how this was accomplished, and by whom or for what purpose." *Total Benefits Planning Agency, Inc.*, 552 F.3d at 436.

Here, the Complaint states that "LRO users can and do conduct weekly calls with their competitor landlords"; that "Defendant Landlords directly communicate regarding their collective use of RealPage RM Software in the ongoing 1,000+ User Group designed specifically to, 'promote communications between users'"; and that Defendant Landlords gather at the annual "Real World" conference "to discuss how they are delegating and will continue to delegate the pricing for their rents."  Compl. ¶¶ 88-89, 91.  Though these allegations of direct communications between the Defendant Landlords do not mention JBG by name, they are sufficient to put JBG on notice of claims that it has participated in forums organized by RealPage to facilitate direct agreements between software users to delegate rental pricing power to RealPage.  *See Keranen*, 743 A.2d at 713 (quoting *Nelson*, 519 A.2d at 178).

16

While the District has not provided direct factual support for the notion that JBG communicated with its fellow landlords on any particular occasion, the allegations advanced in the Complaint make out a case that the Defendant Landlords routinely communicate with one another.  The Complaint alleges that JBG entered into a contract to supply its proprietary data to RealPage's LRO software and to receive rental pricing based on other users' proprietary data, and that the users of such software regularly communicate about sharing proprietary data and encouraging delegation of rental pricing to RealPage.  *See* Compl. ¶¶ 20, 32, 88-89, 91.  At the pleadings stage, all that is needed is "enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Twombly,* 550 U.S. at 556.  The Complaint has adequately tied JBG to these communications by alleging that it agreed to share its proprietary data with RealPage in a contract entered into in January 2020, that RealPage would in turn use that data to recommend rental prices to JBG's competitors, and that RealPage provided JBG with opportunities to interface with its competitors about their use of the RM software, which RealPage's customers regularly utilized.

Here, drawing all reasonable inferences in favor of the District, it is fair to infer from the Complaint that communications with other Defendant Landlords is part and parcel of JBG's use of the LRO software.  *See Total Benefits Planning Agency, Inc.*, 552 F.3d at 434.  Many of the statements in furtherance of recruitment efforts reproduced in the Complaint were made publicly, and it is plausible that discovery will reveal that JBG was a full participant in such efforts behind closed doors.[15]  Taking the allegations in the Complaint as a whole, the District has provided

---

[15] The Complaint contains a number of public statements from JBG's competitors recruiting other landlords to utilize RealPage's RM software with the intent of drawing larger swathes of the market into a price-fixing scheme. *See* Compl. ¶ 75 ("[Camden's competitors] "all use revenue management . . . [and] raise[] rents when they should."); ¶ 77 ("Defendant UDR . . . praised the 'sense of discipline' and [stated] that the RealPage RM Software enables UDR to 'have confidence accepting certain pricing that otherwise would have made [them] nervous' about potentially being undercut."); ¶ 79 ("YieldStar [provides] 'unparalleled access to market data' to inform decisions based on 'what everyone in the industry is doing.'"); ¶ 80 ("Revenue management will become the norm, and . . .

17

answers to when, where, how, why, and with whom JBG would have entered into a conspiracy to fix rents. *See id.* at 437. It is therefore not fatal to the District's claim that it has not advanced any direct factual allegations that JBG conferred with its fellow Defendant Landlords.

### 3. *Plus factors*

As explained *supra,* the Complaint makes out a case that JBG engaged in parallel conduct with the other Defendant Landlords by alleging that JBG exchanged proprietary data with the Defendant Landlords through RealPage and that the Defendant Landlords almost uniformly accepted RealPage's pricing recommendations. Both of these allegations also act as plus factors, enhancing the likelihood that the parallel conduct resulted from a "meeting of the minds" between JBG and the Defendant Landlords. *See Twombly*, 550 U.S. at 557. In addition, the District advances certain market plus factors—features of the multifamily apartment rental market in the District of Columbia—that render it particularly vulnerable to collusion. Considering these plus factors holistically, the District's theory that JBG entered into an agreement with the other Defendant Landlords to fix rental prices in the District of Columbia market for multifamily apartments is plausible. *See SD3, LLC*, 801 F.3d at 424.

### a. Exchange of proprietary data and acceptance of RealPage rents as evidence of a conspiracy beyond mere parallel conduct

JBG's behavior is suggestive of a conspiracy with the Defendant Landlords because in the absence of a conspiracy, the conduct outlined *supra* would probably not benefit JBG. An

---

within 2 or 3 years if you are not doing it, you will be in the minority."); ¶ 82 ("We're in a position now where occupancy is extremely strong and we are pushing rents[.]"); ¶ 84 ("we want the smartest owners being our competitors…. We want people with revenue management. We want people to understand when to raise rents and how to operate their portfolios at maximum efficiency.").

allegation of parallel behavior "go[es] beyond simple parallel conduct and . . . plausibly raise[s]

an inference of an agreement" where such behavior "would probably not result from chance,

coincidence, independent responses to common stimuli, or mere interdependence unaided by an

advance understanding among the parties" or "indicates the sort of restricted freedom of action

and sense of obligation that one generally associates with agreement[.]" *Morton Salt, Inc*., 702

F.3d at 868 (quoting *Twombly*, 550 U.S. at 556-57). Allegations that "the alleged conspirators

acted in a manner that would have been contrary to their own interests absent a conspiracy" also

raise the inference of an agreement. *In re Urethane,* 913 F. Supp. 2d at 1156.

JBG's consent to pool its data with the other Defendant Landlords suggests that JBG

entered into a horizontal conspiracy. Unless JBG knew that RealPage would suggest similarly

high prices for all its customers, RealPage could have used JBG's data to recommend that JBG's

competitors set prices just below JBG's, thus attracting renters away from JBG. One explanation

for JBG's behavior—indeed, perhaps the most logical explanation flowing from the averments in

the Complaint—is that it knew RealPage would suggest similar pricing for all its customers and

that JBG's competitors would adopt such pricing, because JBG had agreed with its competitors

to use the software in this way.

That JBG and the other Defendant Landlords accepted the RealPage generated rent

"nearly all the time" also suggests an agreement between them, because each Defendant

Landlord would have an incentive to use their competitors' proprietary data to undercut the

competition in the absence of such agreement. *See* Compl. ¶¶ 59, 71. The Complaint alleges

that RealPage encourages users to set "sustainable occupancy" rates for their properties, which

"allows users to identify target occupancy levels to maximize rent." Compl. ¶ 114. Without an

agreement to accept the RealPage-generated rent and occupancy rate, JBG's competitors could

set their rents just below RealPage's suggestion, thereby luring renters away from JBG and into their own empty units. JBG would only benefit from keeping its rents high and occupancy rates low if it knew that the other Defendant Landlords would also forego the "heads in beds" strategy, "*i.e.*, competing on price to attract the most renters." Compl. ¶ 8. If one RealPage user defects and sets a lower rent than the one suggested by RealPage, the remaining users may be left with fewer than the desirable number of renters to maximize profit at the RealPage-generated price. The extremely high adherence rate to RealPage-generated pricing therefore suggests an agreement among the Defendant Landlords, including JBG, to accept RealPage rents, as adherence would only benefit JBG if it knew its competitors would also do so. Because a Defendant Landlord could defect at any time, an agreement would be the most expedient means for JBG to secure its profits.

The District need not show that a conspiracy is more likely than other possible explanations for the parallel conduct of JBG and the Defendant Landlords. *See Morton Salt, Inc.*, 702 F.3d at 868. The District must merely show that its allegations, viewed holistically, "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. The allegations made by the District here, especially the allegations that JBG has agreed to share its data with its competitors through RealPage's RM software and that JBG and its competitors almost always accept RealPage's rents, are sufficient to raise a suggestion of a preceding agreement. Indeed, it is plausible that an agreement would be required to implement the pricing discipline necessary to render JBG's data-sharing agreement with RealPage a coherent business decision.

20

b.  Market plus factors

The District has advanced several market plus factors that further bolster the plausibility of its claim against JBG.  These factors include (i) highly inelastic demand for housing in the District of Columbia; (ii) concentrated ownership of multifamily housing in the District of Columbia; (iii) high barriers to entry in the multifamily housing market; (iv) high switching costs for renters; (iv) standardization of the housing offered by the RM software users; and (v) the substantial financial incentives for collusion among the Defendant Landlords.  Compl. ¶¶ 94-99.  Specifically, the District alleges that because "[h]ousing is a human necessity . . . demand for multifamily housing is relatively insensitive to changes in price, [and] is therefore more susceptible to collusion on price-setting." *Id*. ¶ 94.  This inelasticity of demand is exacerbated by the heavily concentrated market for multifamily housing in the District of Columbia, where "[t]he Defendant Landlords . . . control more than 58,000 rental units . . . out of approximately 141,000 . . . per the most recently available 2021 Census data." *Id*. ¶ 95.  JBG would therefore only have to discuss an agreement with a limited number of actors in order to effect a price-fixing conspiracy.

Moreover, it is "difficult for would-be competitors to enter the [multifamily housing] market" in the District of Columbia because purchasing and building requires multi-millions of dollars in investment, as well as the expertise and resources necessary to comply with the "laws and regulations that govern multi-family housing." *Id*. ¶ 96.  The supply of multifamily housing in the District of Columbia is further restricted by zoning laws, building height constraints, and limited physical space. *Id*.  A conspiracy to fix multifamily rents in the District of Columbia is unlikely to be undermined by new actors entering the market and competing on price, or providing an influx of new units that would prevent the conspirators from inflating prices by

21

lowering occupancy rates.  This would increase the attractiveness of a conspiracy for JBG and the other Defendant Landlords by decreasing the likelihood that it would lose revenue long-term by a new entrant disrupting the market.

The District also alleges that the inconvenience and cost of switching apartments mid-lease, or even moving after a lease has expired, makes it easier for would-be conspirators to maintain price discipline.  *Id.* ¶ 97.  In addition, the District maintains that the multifamily apartments offered for lease in the District of Columbia are easy to standardize and group into pricing tranches, which makes them easier to price-fix than if apartments were unique and required diverse pricing to accurately capture their value.  *Id.* ¶ 98.  These plus factors enhance the plausibility of the District's theory that JBG entered into a conspiracy to fix rents, rather than independently engaging in parallel conduct with the other Defendant Landlords.

Taken together, the allegations in the Complaint plausibly raise the inference that JBG entered into a conspiracy with its competitors to fix rent prices in the District of Columbia. Because the District has plausibly alleged that JBG engaged in parallel conduct and has advanced sufficient plus factors to infer that such parallel conduct resulted from an agreement between the parties, the undersigned denied JBG's Motion to Dismiss.[16]

---

[16] As outlined *supra*, to make out a claim for a violation of the D.C. Antitrust Act, the District must also allege either that (i) the conspiracy "unreasonably restricts trade" and affects the relevant market, *WAKA, LLC*, 517 F. Supp. 2d at 250, or (ii) that the conspiracy is "so inherently and facially anti-competitive that an elaborate and burdensome inquiry into a demonstrable economic impact on competition in a relevant market is not required," *Total Benefits Planning Agency, Inc*., 552 F.3d at 434.  It is not necessary for the Court to embark on this analysis at the pleadings stage as to JBG because JBG's Motion did not raise any challenge to the sufficiency of the pleadings on this point. *See generally* JBG Mot.

B.  AvalonBay's Motion to Dismiss

AvalonBay centered its Motion on an argument that the District has not plausibly alleged its participation in a conspiracy to fix rents in the District of Columbia because AvalonBay's contract with RealPage specifically prohibits the kind of proprietary data sharing upon which the District premises its theory of liability as to all of the other Defendant Landlords.  AvalonBay Mot. at 1-2.  In the absence of any plausible allegation that AvalonBay contracted to share proprietary data with its competitors through RealPage, AvalonBay maintained that the District's allegations at most make out a case for parallel conduct, and cannot raise a plausible inference that AvalonBay agreed to artificially inflate prices.  *Id.* at 12-14.  The District countered that (i) AvalonBay's contract with RealPage does not preclude it from directly sharing information with its competitors,[17] District Opp'n AvalonBay at 11 n.4, 12; and (ii) even if AvalonBay's contract prohibits RealPage from sharing confidential information with AvalonBay's competitors, the other allegations lodged against AvalonBay, considered holistically, still make out a plausible claim that AvalonBay engaged in a conspiracy to fix rents in the District of Columbia, *id.* at 7-10, 12-14.

---

[17] The District also argued that it is inappropriate for the Court to consider AvalonBay's contracts—documents outside of the Complaint—at the pleadings stage of this litigation.  *See* District Opp'n AvalonBay at 1.  AvalonBay responded that because the contracts are "incorporated by reference into the Complaint," the Court may "consider those contracts without converting this Rule 12(b)(6) motion into a motion for summary judgment."  AvalonBay Mot. at 1 n.1 (citing *Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1024-25 (D.C. 2007) and *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 218 (D.D.C. 2012).  AvalonBay is correct that "[i]n examining the sufficiency of the complaint, the court may consider the complaint itself and any documents it incorporates by reference[.]"  *Bell v. First Invs. Servicing Corp.*, 256 A.3d 246, 251 (D.C. 2021) (quoting *Abdelrhman v. Ackerman*, 76 A.3d 883, 887 (D.C. 2013)); *see also Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 178 (D.C. 2006).  Because the Complaint directly references the Rainmaker and RealPage contracts, it incorporates those documents by reference, allowing the Court to consider them even at this stage in the litigation.  *See* Compl. ¶ 21 ("AvalonBay uses RealPage RM Software pursuant to contracts including, among others, a contract it entered into with The Rainmaker Group Real Estate, LLC in March 2017, and a contract with RealPage following RealPage's acquisition of LRO in 2017.").

Because AvalonBay's contracts plainly require that RealPage only use pricing information that is publicly available or provided directly by AvalonBay to calculate AvalonBay's price recommendations, and forbid RealPage from using AvalonBay's data to calculate price recommendations for its other customers, the District has not plausibly alleged that AvalonBay uses RealPage as a facilitator to exchange confidential pricing information with its competitors. *See* Avalon Bay Ex. 1 ("Rainmaker Contract") at 5-7. In the absence of this keystone, the remainder of the District's theory of a horizontal or hub-and-spoke conspiracy between AvalonBay and its competitors loses its integrity.

### 1. *AvalonBay's contracts to use RM software*

In its Motion, AvalonBay represented that it entered into its first contract to use the LRO software with the then-owner of the software, Rainmaker Group Real Estate, LLC ("Rainmaker"), in 2007. AvalonBay Mot. at 4. RealPage acquired the LRO software from Rainmaker in 2017, and in 2022 AvalonBay entered into a contract with RealPage for continued use of the LRO software.[18] *See* Compl. ¶ 21; AvalonBay Ex. 2 ("RealPage Agreement"). Section 5 of the 2017 agreement with Rainmaker, labeled "Confidential Information," states that "[e]xcept as set forth specifically herein, the Receiving Party [i.e., Rainmaker] shall not disclose the Disclosing Party's [i.e. AvalonBay's] Confidential Information to any third party without the prior written consent of the Disclosing Party," and that "[t]he Receiving Party shall not use the Disclosing Party's Confidential Information, except in connection with the performance of its obligations hereunder." Rainmaker Contract at 7. Confidential Information is defined as "all

---

[18] AvalonBay attached to its Motion a contract between AvalonBay and Rainmaker signed in March 2017 as Exhibit 1, and a LRO Master Services Agreement executed between AvalonBay and RealPage in January 2022 as Exhibit 2. *See* AvalonBay Exs. 1-2.

non-public information about the Disclosing Party's business . . . [which] shall include, without limitation, all [AvalonBay d]ata and *all information regarding [AvalonBay's] pricing decisions and practices*." *Id.* (emphasis added).

The 2017 contract also prohibits Rainmaker from using any data in calculating its rent recommendations for AvalonBay other than publicly available data and "data provided by [AvalonBay] expressly for such purpose."[19] *Id.* at 6. Under the contract, Rainmaker must not "utilize in the Rainmaker System licensed to anyone other than [AvalonBay] any [AvalonBay data] that is not obtained through other sources or otherwise developed independently by Rainmaker without use of [AvalonBay data] provided by [AvalonBay] to Rainmaker." *Id.* "Rainmaker will not provide any recommendations as to rent provided to [AvalonBay] for [AvalonBay's] Managed Properties through the Rainmaker System to any other parties." *Id.* at 6-7.

The 2022 contract between AvalonBay and RealPage, titled "2022 Pricing Amendment to LRO Master Services Agreement," incorporates and extends the terms of AvalonBay's 2017 contract with Rainmaker, except for several provisions that do not relate to data confidentiality. *See* RealPage Agreement at 1.

### 2. *The effect of AvalonBay's data sharing provisions*

As explained *supra,* a plausible allegation of conspiracy requires some parallel conduct combined with "plus factors" that increase the likelihood that the parallel conduct stemmed from

---

[19] Section 4 of the Rainmaker Agreement also requires AvalonBay to "[a]ppoint a core team . . . that shall . . . work directly with Rainmaker and attend a project Kick-off meeting to be held shortly after contract signing." Rainmaker Agreement at 5. AvalonBay's core team, pricing manager authority, and executive sponsor must also "participate [in] weekly or bi-weekly pricing calls to cover Rainmaker Output with Rainmaker during the Training Period" and "[b]e available for conference calls or meetings with Rainmaker . . . at three (3) and six (6) month increments . . . to review project results." *Id.* at 5.

an agreement rather than independent business decisions. *Twombly*, 550 U.S. at 556-57. Here, the parallel conduct alleged by the District is that AvalonBay entered into a contract with RealPage to algorithmically generate rent prices, as did its competitors. *See* Compl. ¶¶ 14-28. AvalonBay argued that because "it has always been careful to insist on contract terms that ensure that the RM product it purchases provides information unique to AvalonBay," it has not participated in any agreement to "use[] RealPage to pool non-public, proprietary data to facilitate price coordination among competitors."[20] AvalonBay Mot. at 2. Taken together, the provisions of AvalonBay's contract with Rainmaker (i) require Rainmaker to use only publicly available data or data provided directly by AvalonBay in calculating price recommendations, and (ii) prohibit Rainmaker from using AvalonBay's proprietary data in calculating price recommendations for other landlords. Clearly, this contract forbids Rainmaker, and its successor RealPage, from acting as a conduit for an exchange of proprietary data between AvalonBay and the other Defendant Landlords.

The District argued that the information sharing limitations in AvalonBay's contract do not matter because "AvalonBay achieved the same effect as other cartel adherents, because it promoted cartel participation, communicated with cartel members to further the scheme, all while knowing that *other* competitors were sharing data via RealPage with the effect of lifting market rents." District Opp'n AvalonBay at 10 (emphasis in original) (citing *Interstate Circuit,*

---

[20] The District pointed out that the MDL Complaint alleges that AvalonBay only insisted on the data sharing provisions after RealPage acquired LRO in 2017. *See* District Opp'n AvalonBay at 5; District Opp'n AvalonBay Ex. 2 ("Middle District Complaint") ¶ 219. By contrast, AvalonBay here alleges that it has insisted on its data sharing contract provision since its first contract with Rainmaker in 2007. *See* AvalonBay Mot. at 4 ("Since its first contract with Rainmaker, AvalonBay has perpetually ensured that certain specific data restrictions and conditions apply to its use of LRO."). The District contended that this "undercuts the claim that AvalonBay only imposed [its data sharing provisions] around the time of RealPage's 2017 acquisition of LRO due to concerns about data-sharing." District Opp'n AvalonBay at 14. This may be true, but it is not material to the question of whether the data sharing provisions preclude the District from plausibly alleging that AvalonBay took part in a conspiracy to fix rents. The salient point is that AvalonBay insisted upon these data sharing provisions at least as early as 2017, and that the conspiracy was allegedly formed and implemented sometime thereafter.

26

*Inc. v. United States*, 306 U.S. 208 (1939).  However, the *effects* of AvalonBay's actions do not determine whether AvalonBay entered into a conspiracy.  What matters is whether the District has plausibly alleged that AvalonBay *agreed* to enter into a conspiracy to fix rents.  *Twombly*, 550 U.S. at 556-57.  Even assuming that AvalonBay took advantage of an existing cartel between the other Defendant Landlords and used publicly available data to track the cartel price, such behavior would be perfectly legal.  It would constitute, in fact, a textbook case of conscious parallelism, where a firm independently sets prices at an artificially inflated level by recognizing and taking advantage of an anti-competitive feature of the market.  *In re Domestic Airline Travel*, 2023 U.S. Dist. LEXIS 160764, at *42.  As explained *supra*, conscious parallelism, standing alone, does not violate the Sherman Act or the District of Columbia Antitrust Act.

The District also asserted that even if AvalonBay did not exchange proprietary data with its competitors through RealPage "[f]undamentally, AvalonBay must stay in the case because it relinquished independent pricing authority to a centralized entity . . . and encouraged other landlords to do likewise, knowing that RealPage would increase their collective revenues." District Opp'n AvalonBay at 7 (citing Compl. ¶¶ 56-71, 81).  The Complaint does include robust factual allegations that due to RealPage's persistent pursuit of pricing discipline, the Defendant Landlords accepted RealPage's pricing recommendations "nearly all of the time."[21]  Compl. ¶¶ 56-71.  As explained *supra*, the MDL *RealPage* litigation also grapples with the issue of the delegation of pricing authority.[22]  District Opp'n AvalonBay at 6.  However, the Middle District

---

[21] The District maintained that the Rainmaker contract contains an attachment wherein AvalonBay agreed to allow Rainmaker to "push LRO pricing to multiple [Internet Listing Services] in real time."  District Opp'n AvalonBay at 9; Rainmaker Contract at 35-36.  AvalonBay contended that it never purchased this feature, and that the attachment the District cites to is a schedule of available products, not a list of products that AvalonBay purchased.  AvalonBay Reply at 3 n.4.  Regardless, the allegations provided in the Complaint as to all Defendant Landlords are sufficient to raise the inference that AvalonBay almost always accepts the RealPage-generated rents.  *See* Compl. ¶¶ 56-71.

[22] AvalonBay represented that it was voluntarily dismissed from the Middle District of Tennessee *RealPage* litigation because those plaintiffs recognized that its contractual provisions "exclude horizontal competitors'

of Tennessee found in the MDL litigation that the "most persuasive evidence of horizontal agreement is the simple undisputed fact that each [defendant] provided RealPage its proprietary commercial data, knowing that RealPage would require the same from its horizontal competitors and use all of that data to recommend rental prices to its competitors." *In re RealPage, Inc.,* 2023 U.S. Dist. LEXIS 230200, at *60-61. Though evidence of RealPage's "aggressive scheme . . . to monitor acceptance of its pricing recommendations" bolstered the theory that the defendants entered into an agreement to engage in a price-fixing scheme through RealPage, the exchange of confidential data packed most of the explanatory power. *Id.* at *84-85.

As *Gibson, et al*. v. *Cendyn Group, LLC, et al*. reasons, "an agreement to accept pricing recommendations from [RealPage] could more plausibly give rise to an inference of an agreement between" AvalonBay and the Defendant Landlords. Case No. 2:23-cv-00140-MMD-DJA, at *14 (D. Nev. May 8, 2024) (Du, J.). Had AvalonBay completely forfeited control of its pricing decisions to RealPage, and the other Defendant Landlords had done so as well, that would provide strong circumstantial evidence that AvalonBay had entered into an agreement with the other Defendant Landlords to set prices at a certain level through RealPage. However, the District has alleged only that the Defendant Landlords *almost always* accept the RealPage generated rents. *See* Compl. ¶ 71. When they want to deviate from those rents, there are override protocols. *See id.* ¶¶ 64-66. The Defendant Landlords who have agreed to share their proprietary data have another layer of motivation to ensure that no one uses anyone else's data

---

sensitive pricing and supply data from its [RM software] price recommendations[.]" *In re RealPage, Inc*., 2023 U.S. Dist. LEXIS 230200, at *106; *see* AvalonBay Mot. at 2-3. The District contends that the Middle District of Tennessee "never ruled on any motion to dismiss filed by AvalonBay . . . [n]or did it consider the allegations in the District's complaint[.]" District Opp'n AvalonBay at 6. Regardless, in declining to dismiss its multifamily defendant landlords, the Middle District of Tennessee cited the exchange of proprietary information accomplished through RealPage as the "most persuasive evidence" in support of its finding that the plaintiffs had adequately alleged a price-fixing agreement between the defendants. *In re RealPage, Inc*., 2023 U.S. Dist. LEXIS 230200, at *61.

for their own gain, and therefore the high compliance rate is more suggestive that those defendants entered into an agreement.

The Complaint also provides detailed allegations that the Defendant Landlords participate in meetings and events intended to recruit additional landlords to use the RealPage RM software. Compl. ¶¶ 72-92.  The District specifically alleges that Rajiv Verma of Defendant AvalonBay issued a public statement urging the adoption of LRO by any "professional who's procrastinating on using revenue management."  Compl. ¶ 81.  Though these allegations do tend to raise the specter of an agreement between AvalonBay and the other Defendant Landlords, they do not raise an agreement from the realm of the possible to the plausible.  As AvalonBay points out, "[a]ny decision AvalonBay supposedly made to delegate authority to RealPage 'could just as well be independent action' and thus does not plausibly allege a conspiracy *among landlords*." AvalonBay Reply at 3 (emphasis in original) (quoting *Twombly*, 550 U.S. at 557).  If AvalonBay had exchanged its confidential information with the other Defendant Landlords through RealPage, then delegation of rent setting authority would be an important piece in the puzzle of why it felt safe doing so—i.e., why it was confident its competitors would not use its pricing information to undercut the competition.  But AvalonBay specifically declined to share its pricing information, which substantially enhances the plausibility of other explanations for delegation of pricing authority, such as the sheer convenience of automatically setting prices rather than doing so by hand.

The Complaint's other allegations do little to plausibly allege more than parallel conduct. The District contended that, despite the limitations in the contractual language, "AvalonBay is free to exchange non-public information directly with its competitors—exactly as alleged in the Complaint."  District Opp'n AvalonBay at 11 n.4.  The Complaint does allege that LRO users

29

conduct weekly calls "to provide non-public data for input into the LRO software."  Compl. ¶ 88.

It is possible that AvalonBay exchanged non-public data with its competitors at private meetings,

and that AvalonBay then gave this data to RealPage to use in calculating rent at AvalonBay's

properties.  However, because this allegation is so much more speculative and so much less

concrete than the factual allegations that the other Defendant Landlords contractually consented

to real-time pooling of their data, it not suitable to act as the centerpiece of the District's theory

of collusion.[23]

The fact that AvalonBay does not exchange its proprietary data with the other Defendant

Landlords through RealPage ultimately proved fatal to the District's claim against AvalonBay.

Though the District alleged many possible motivations for AvalonBay to enter into a price-fixing

agreement, without the exchange of data or an agreement to completely delegate its price-setting

ability to RealPage, the District did not plead any plausible motivations.  The Court accordingly

granted AvalonBay's Motion to Dismiss.


C.  Highmark's Motion

Highmark is "a residential apartment manager" that operated only one building in the

District of Columbia, Ellicott House, which contains 327 units.[24]  *See* Compl. ¶ 27; Highmark

---

[23] The District also argues that "the contract only limits the use of competitor data in [LRO]," implying that RealPage could be feeding AvalonBay's data into the other RM software provided by RealPage.  However, the District has only alleged that AvalonBay contracts to use the LRO system.  *See* Compl. ¶ 21, 32.  Even if RealPage were feeding AvalonBay's proprietary information into its other RM software, this would not benefit AvalonBay because it would not receive pricing recommendations based on its competitors' proprietary information in return.  It would be difficult to devise a plausible explanation for why it would be in AvalonBay's interest to enter into an agreement with its competitors whereby its competitors receive the benefit of AvalonBay's pricing information, while AvalonBay continues to base its pricing decisions on its own information and publicly available information alone.

[24] Highmark avers that in October 2023, management of Ellicott House transferred to Defendant Greystar Management Services, L.P., and that Highmark no longer manages any properties in the District of Columbia. Highmark Mot. at 4; Highmark Ex. 3 at 2-4.

Mot. at 4, 12.  Highmark challenged the sufficiency of the District's Complaint based on the fact that "[r]ent control laws deprived Highmark of the ability to 'drive up rents' through 'staggering rent increases'" during the period of time covered by the Complaint.  Highmark Mot. at 1.  Highmark argued that the Court should be permitted to take judicial notice of "[t]he District's rent control laws and regulations, as well as related publications," and "Highmark's rent disclosures," because these documents are either related to District of Columbia rent control laws and regulations or are matters of public record, available on websites maintained by the District of Columbia.  *Id*. at 7-8.  Highmark maintained that these documents show that all of the units at Ellicott House are subject to the regulatory rent stabilization scheme under D.C. Code §§ 42-3502.01 *et seq*., and that Highmark complied with these rent control regulations during the relevant period.  Highmark Mot. at 5-6; Highmark Ex. 2 ("RAD Registration Form") at 2.  Given its compliance with rent control, Highmark concluded that it "had no ability to increase rents above competitive levels," and therefore could not have participated in any agreement with its competitors to "'drive up rents,' knowing 'their competitors would not dramatically undercut their prices.'"  Highmark Mot. at 7; 9 (quoting Compl. ¶¶ 8-9).  Highmark separately argued that under the filed-rate doctrine, the District cannot apply antitrust law to invalidate the "rates that are filed with a regulatory authority[.]"  Highmark Mot. at 10-12.

       1.  *The District of Columbia's rent stabilization law*

      The District of Columbia's rent stabilization regulatory scheme sets maximum annual rent increases for certain types of housing, including housing for which the building permit was issued before 1976.  *See* D.C. Code §§ 42-3502.05(a)(2), 3502.08(g).  The Rental Accommodations Division ("RAD") of the Department of Housing and Community

Development ("DHCD") administers the rent stabilization statute. *See* D.C. Code §§ 42-3502.03, 3502.04(b). For occupied units covered under this scheme, rent increases cannot exceed an "adjustment of general applicability," which is pegged to the annual rate of inflation in the District of Columbia, plus two percent, not to exceed ten percent of the "current allowable amount of rent charged[.]"[25] D.C. Code §§ 42-3502.06(b), 3502.08(h)(2)(A)(i). Covered housing providers may exceed the general adjustment in certain circumstances, e.g., when a tenant vacates a rental unit, when the housing provider files a hardship or capital improvement petition, or by voluntary agreement of seventy percent or more of the tenants of a housing accommodation. *See* D.C. Code §§ 42-3502.06, 3502.10, 3502.12, 3502.13, 3502.15.

Covered housing providers must file a "Certificate of Rent Adjustment" form "no more than thirty (30) days after the effective date of any rent adjustment" with RAD. 14 D.C.M.R. § 4204.10. The Certificate of Rent Adjustment must state "[e]ach rental unit to which the adjustment applies"; "[t]he dollar amount of the rent adjustment and its percentage of the prior rent charged"; "[t]he new rent charged for the rental unit, the date on which it became effective"; and other information specific to certain categories of rent increases. *Id.* No prior authorization from RAD is required to raise rent at the rate of general applicability or for a vacancy adjustment; a housing provider need only file the notice informing RAD that it has instituted the statutorily permitted increase. *Id.* However, to increase rents beyond the rate of general applicability due to hardship, pursuant to a voluntary agreement, or as a surcharge for capital improvement, related services and facilities, or substantial rehabilitation, covered housing providers must file a petition to seek "prior administrative approval" from RAD. 14 D.C.M.R. §§ 4204.3, 4204.4.

---

[25] "[A]djustments that take effect from July 1, 2023, through April 30, 2025 . . . shall not exceed 6%[.]" D.C. Code § 42-3502.08(h)(2)(A)(ii).

### 2. *Judicial notice of the DHCD documents*

As a preliminary matter, the District contended that it would be inappropriate for the Court to make factual determinations based on the District of Columbia DHCD documents, including (i) RAD Registration forms from 2015 and 2023, *see* Highmark Exs. 2-3; (ii) documents notifying RAD and Highmark's tenants of rent adjustments from various dates in 2016, 2019, 2020, 2021, and 2023, Highmark Exs. 4-22; and (iii) a set of guidelines posted on RAD's website, and Rent Control and Rent Increase Caps from 1985-2022 and January 20, 2023 through the end of Rent Control Year 2023 published on the Office of the Tenant Advocate's website, Highmark Exs. 1, 23-24.[26]

The Court may take judicial notice of "laws, statutes, and other matters of public record." *Bostic v. District of Columbia*, 906 A.2d 327, 332 (D.C. 2006) (citing *In re Estate of Barfield*, 736 A.2d 991, 995 n.8 (D.C. 1999) and *Gaither v. District of Columbia*, 333 A.2d 57, 59-60 (D.C. 1975)); *see also Vining v. Exec. Bd. of the D.C. Health Ben. Exch. Auth.,* 174 A.3d 272, 281 n.42 (D.C. 2017) (taking judicial notice of District budget documents available to the public and posted on the District of Columbia Office of the Chief Financial Officer's website). Therefore, the Court may take judicial notice of the existence and authenticity of the documents proffered as exhibits by Highmark, all of which are in the public record. *See* Bonanno Decl. ¶¶ 4-27.

---

[26] Highmark attaches a Declaration of Michael D. Bonanno in Support of Highmark's Motion to Dismiss, wherein Mr. Bonanno declares that as an attorney for Highmark in this matter, he can competently testify that all of the documents attached as exhibits are publicly available on a website or database maintained by the District. *See* Bonanno Decl. ¶¶ 4-27.

33

The District argued that there is an important difference between "[t]aking judicial notice of the *existence* of public records . . . [and] assuming . . . that those records reflect regulatory compliance." District Opp'n Highmark at 7-8. Indeed, the Court cannot take judicial notice of published articles offered "to present new factual allegations to counter the factual allegations underlying [the p]laintiffs' claim as set forth in the Complaint." *In re Domestic Airline Travel,* 221 F. Supp. at 71. While it is true that factual determinations are not appropriate at the pleadings stage, Highmark argued that it has not introduced its exhibits to "present new factual allegations" to counter the allegations in the Complaint, but rather to show that (i) a complex regulatory scheme for rent stabilization applies to the only units managed by Highmark in the District of Columbia during the relevant time period, and (ii) "Highmark filed its rents with the [District of Columbia] authorities, as required by law." Highmark Reply at 1-2.

The Court may take notice of public records because they are documents "whose accuracy cannot reasonably be questioned." U.S.C.S. Fed. Rules Evid. R. 201; *see Renard v. D.C. Dep't of Emp't Servs.,* 673 A.2d 1274, 1276 n.2 (D.C. 1996). Therefore, the Court may take note of these documents for the propositions offered by Highmark: namely, that Ellicott House was covered by the rent stabilization scheme for the relevant period, and that Highmark filed the notices included as exhibits with RAD. The Court may also make determinations as to whether the filed documents align with the requirements applicable to such documents under the rent stabilization scheme. However, the Court cannot use these exhibits to determine whether Highmark actually charged the rents listed, as that is a factual finding not appropriate for the pleadings stage. *See In re Domestic Airline Travel,* 221 F. Supp. at 71.

34

3.  *Plausibility of conspiracy under a rent stabilization scheme*

Highmark's Motion only briefly attacked the sufficiency of the District's allegations taken outside of the context of the District of Columbia's rent stabilization law.  The District alleges that Highmark entered into a One Master Agreement with RealPage in 2016, and used the RM software to set rents at Ellicott House.  Compl. ¶ 27.  The District also alleges that "Steve Lamberti, President of Defendant Highmark," stated on a RealPage-sponsored webcast that Highmark is "in a position now where occupancy is extremely strong and we are pushing rents[.]"[27]  *Id.* ¶ 82.  Moreover, as one of the Defendant Landlords, the Complaint alleges that Highmark (i) provided RealPage with proprietary data and received price recommendations in turn that were based on the pooled proprietary data from the other Defendant Landlords, *see id*. ¶¶ 100-106; (ii) communicated with competitors in furtherance of an agreement to conspire, *id.* ¶¶ 87-92; and (iii) encouraged competitors to use RealPage software and implement RealPage-generated prices, *id.* ¶¶ 72-86.  In combination with the "plus factors" that make the District multifamily rental market susceptible to price-fixing conspiracies and RealPage's highly successful campaign to enforce its rental prices "nearly all of the time," *see id.* ¶¶ 71, 93-99, and for the reasons articulated above with respect to JBG, the District has made out a plausible case that the Highmark made an agreement to fix rents when considered outside the context of the rent stabilization statute.  *See supra* III.A.

The bedrock of Highmark's argument — what it claimed differentiated its position from that of the other Defendant Landlords — was that common sense dictates that Highmark had no

---

[27] Highmark notes that Steve Lamberti's statement was made in 2021, when Highmark was statutorily prohibited from raising rents due to a pandemic related rent freeze, and was therefore taken out of context.  Highmark Mot. at 10.  Because "Highmark's rent filings from that time show that Highmark was regularly reducing rent for its tenants," Highmark concludes that placed in context, Mr. Lamberti could not have been referring to the District of Columbia rental market in his statement.  *Id.*  As the District argues, it is not appropriate at this time for the Court to use the RAD disclosure documents to draw factual conclusions "to counter the factual allegations . . . set forth in the Complaint."  *In re Domestic Airline Travel*, 221 F. Supp. 3d at 71.

incentive to enter into an agreement to fix prices above competitive levels when it was legally prohibited from raising prices more than a certain percentage each year.  Highmark Mot. at 7. The RAD filings supplied by Highmark support the propositions that (i) the only building administered by Highmark from 2015 through 2023 in the District of Columbia was covered by the rent stabilization statute, and (ii) that Highmark complied with the notice elements of that statute on numerous occasions.  Highmark Mot. at 8.  Highmark argued that "[t]he mere existence of rent-control laws makes this case implausible with respect to Highmark because D.C. laws and regulations deprived Highmark of the ability to increase rents above 'affordable' levels, leaving Highmark no incentive to participate in the alleged conspiracy."  Highmark Reply at 2; *see also* Highmark Mot. at 7-10.

In response, the District pointed out that while the District's rent regulations prohibited Highmark from raising rents above a certain percentage each year, "[r]egulated landlords retain enormous discretion when it comes to the rents they charge below this 'upper bound.'"  District Opp'n Highmark at 8.  The District proposed a counterfactual in which Highmark would have charged rents below the statutory maximum increase had it not entered into an alleged conspiracy to fix rents with the other Defendant Landlords.  *Id.* at 8-9.  As the District alleges in the Complaint, "even in the rare instances in which RealPage RM Software might decrease the asking rent for a particular unit, Defendants' coordinated use of the pricing software renders rent decreases smaller than they would have been in competitive market conditions."  Compl. ¶ 113. This is especially true during "challenging cycles" when rents would otherwise fall precipitously. *Id.*

In short, Highmark and the District proffered competing narratives for why Highmark used the RealPage software.  Highmark argued that it is not plausible that it entered into an

36

agreement to use the RealPage software to fix rents above competitive levels because the rent stabilization scheme prohibited it from even setting rents at the "market rate." Highmark Mot. at 9. The District countered that it is plausible that Highmark would enter into a conspiracy to fix rents, as such an agreement would have allowed Highmark to set a rent floor, and the rent stabilization scheme only controlled its ceiling.[28] District Opp'n Highmark at 9-10. To resolve Highmark's Motion, the Court had to determine whether the narrative advanced by the District in its Complaint retained its plausibility in the context of the rent stabilization scheme, or if the rent stabilization statute rendered the District's allegations as to Highmark merely possible, as opposed to plausible.

Many of the "plus factors" discussed with respect to JBG apply to Highmark as well, though in some cases with less potency. The District has plausibly alleged that Highmark agreed to share its pricing data with RealPage, and through RealPage with its competitors. *See* Compl. ¶¶ 100-106. As with JBG, this raises the question of why Highmark would agree to share its proprietary pricing data unless it could be assured that its competitors would not undercut its rent prices to compete on occupancy. Therefore, the explanatory power of the "sustainable occupancy" rates, where RealPage sets an optimal occupancy rate to keep prices artificially inflated and the Defendant Landlords agree to maintain that rate, remains compelling. Compl. ¶ 114. Even if Highmark would eventually have reached a limit on the level of inflated rent it could charge, once it agreed to share its data, it would still have had an interest in ensuring that its competitors did not cut their rental prices to draw business away from Highmark, especially in a distressed market. An agreement would explain why Highmark acted contrary to its own

---

[28] The rent stabilization scheme does not impose a hard rent ceiling—i.e. a maximum rent level. The term "ceiling" is used here to indicate the maximum percentage increase allowed each year.

37

interest by sharing its proprietary data through RealPage with its competitors.  *See In re Urethane*, 913 F. Supp. 2d at 1156.

Still, the limit on how quickly Highmark can increase prices substantially reduces Highmark's incentive to participate in a rent-fixing conspiracy.  Given the application of rent control at the only building it managed, Highmark can only derive so much profit from participating in this agreement, unlike the other Defendant Landlords who can continue to raise rents as long as renters will continue to accept those prices.  Accordingly, market qualities such as inelastic demand for housing and high switching costs seem less likely to benefit Highmark in a conspiracy to fix rents, because rent stabilization prohibits Highmark from raising rents beyond the regulated level.  *See* Compl. ¶¶ 94, 97.

Other Courts have held that "an illegal antitrust conspiracy may be based on an agreement to keep prices from falling or from falling too much."  *In re Urethane*, 913 F. Supp. 2d at 1156.  Even where an entire market is subject to price controls, the defendants might still enter into an agreement "to fix, stabilize and maintain such price at the allowable maximum," in violation of the Sherman Act.  *Cont'l Baking Co. v. United States*, 281 F.2d 137, 154 (6th Cir. 1960).  Therefore, the rent stabilization statute does not, as Highmark argues, eliminate the possibility that Highmark entered into a price-fixing conspiracy to maintain rents above where they otherwise would have fallen had no conspiracy existed.  Highmark Mot. at 9.  It is conceivable that Highmark's rents reached a supra-competitive level without violating the rent stabilization statute if rent would have fallen below the maximum allowable rent in a world without a price-fixing conspiracy.  *See United States v. Container Corp. of Am.,* 393 U.S. 333, 337 (1969) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Stabilizing prices as well as raising them is within the ban of § 1 of the Sherman Act.").

38

Even placing the allegations in the Complaint in the full context of the rent stabilization statute, they are sufficient to "raise[] a suggestion of a preceding agreement" between Highmark and its competitors. *Twombly*, 550 U.S. at 557. While it is true that Highmark did not have as much to gain as its competitors from entering into such an agreement, it still had an interest in ensuring that its competitors did not *undercut* the rent charged by Highmark. While Highmark's behavior could also be attributed to independent conduct, the District's allegations provide "sufficient factual matter to plausibly suggest an inference of conspiracy." *Gelboim v. Bank of Am. Corp.,* 823 F.3d 759, 782 (2d Cir. 2016) (quoting *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 184 (2d Cir. 2012)). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d at 185. Though other explanations of Highmark's parallel behavior with its competitors are perhaps more convincing in Highmark's case than with regard to the other Defendant Landlords, the fact remains that it would not be in Highmark's "economic self-interest to contribute its data to RealPage without knowing that it would benefit from its horizontal competitors doing the same." *In re RealPage, Inc.,* 2023 U.S. Dist. LEXIS 230200, at *61. Highmark had less to gain from surrendering its data to RealPage, but it had as much to lose as any of its competitors, and the most straightforward explanation for why Highmark would take such a risk is that it knew that its competitors would behave in accordance with a preexisting agreement. Therefore, the District made out a plausible case that Highmark participated in a conspiracy to fix rents above the competitive level.

39

4. *The filed-rate doctrine*

Highmark argued that because it "complied with the District's complex regulatory scheme by filing its rents with [RAD, t]he filed-rate doctrine . . . bars the District's antitrust claim." Highmark Mot. at 12. The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate . . . regulatory authority." *Watergate E. v. D.C. Pub. Serv. Comm'n*, 662 A.2d 881, 888 (D.C. 1995) (alterations in original) (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). "It is the filing of the [rates], and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000) (citing *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 417 (1986) and *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 374 (1988)). When applying the filed rate doctrine outside of the federal context, it "operates to bar only claims, which, if successful, would undermine the critical policies underlying the filed-rate doctrine in the first place: nondiscrimination among customers and nonjusticiability as to the reasonableness of a rate." *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 19 (D.D.C. 2019) (citing *Marcus v. AT&T Corp.*, 138 F.3d 46, 59 (2d Cir. 1998). "In other words, the filed-rate doctrine bars claims that would require a regulated entity to charge more or less than the rate approved by the . . . regulatory authority but does not reach those claims for which the remedy would leave the regulated entity in compliance with the approved rate." *Id.* Where "rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge." *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 394 (9th Cir. 1992).

Here, the rates at issue are the maximum allowable percentage increase in rental prices that a regulated entity may implement in a calendar year. *See* D.C. Code §§ 42-3502.01 *et seq.* As explained *supra,* the rent stabilization statute and regulations require regulated landlords to file annual rent increases with RAD, and to request prior authorization to raise rents in certain scenarios. 14 D.C.M.R. §§ 4204.3-.4, .10. The District insisted that the policies underlying the filed-rate doctrine cut against applying the doctrine to the rent stabilization statute. First, the District argued that the Court would not intrude on DHCD's domain in permitting the District to proceed against Highmark because DHCD "has no affirmative duty to even review, let alone approve, inflation- and vacancy-based rent increases," and therefore "'antitrust price-fixing claims do not require interpretation of any law or issue within [DHCD's] expertise[.]'" District Opp'n Highmark at 14 (quoting *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1248 (1993)). Moreover, the District contended that DHCD does not "purport to set rents for landlords or otherwise opine on the overall 'reasonableness' of rents." *Id.* at 13. Because DHCD does not set rents, the District argued that regulated parties here cannot engage in price discrimination between ratepayers because landlords already "have significant discretion to increase rents below the statutory maximum (or otherwise lower rents)." *Id.* at 14.

The filed rate doctrine has thus far only been applied to utilities in the District of Columbia, as application of the doctrine is statutorily mandated in such cases. *See District of Columbia v. D.C., Pub. Serv. Comm'n,* , 257 (D.C. 2006) (stating that the filed rate doctrine is statutorily mandated under D.C. Code Section 34-603, which provides that "[a]ll rates. . . fixed by the [Public Service] Commission shall be in force and shall be prima facie reasonable until finally found otherwise in an action brought for that purpose"); *Watergate E.,* 662 A.2d at 889 n.7 (citing to D.C. Code Section 43-529, "which amounts to a codification of the filed rate

41

doctrine"). Highmark did not provide any comparable statute specifically authorizing application of the filed rate doctrine in the rent stabilization context. Therefore, the applicability of the filed rate doctrine in this context comes down to whether the policies underlying the doctrine are implicated by the rent stabilization statute.

In the undersigned's view, neither the nonjusticiability nor the nondiscrimination policy rationales apply in this context. "[T]he 'nonjusticiability' principle . . . 'preserve[s] the regulating agency's authority to determine the reasonableness of rates.'" *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992)). The nonjusticiability principle is implicated when a court must second guess the reasonableness of a rate set by an agency. *Id.* at 850. The rent stabilization statute is part of a legislative scheme enacted to "protect low- and moderate-income tenants from the erosion of their income from increased housing costs . . . [and] prevent the erosion of moderately priced rental housing while providing housing providers and developers with a reasonable rate of return on their investments." D.C. Code § 42-3501.02(1), (5). The statute aims to balance the need for affordable housing with a reasonable rate of return for investors in real estate. The Court may find that the rents charged by Highmark were higher than they would have been in a competitive market without second guessing whether RAD successfully struck a balance between affordability and rate of return for investors in setting the maximum yearly rent increases. Therefore, the nonjusticiability principle does not weigh in favor of applying the filed rate doctrine here.

The nondiscrimination rationale does not "permit any claim to go forward that, if successful, would require an award of damages that would have the effect of imposing different rates upon different consumers." *Bryan v. BellSouth Commc'ns*, 377 F.3d 424, 429-30 (4th Cir.

42

2004) (citing *Marco Supply Co., Inc. v. AT&T Commc'ns, Inc.*, 875 F.2d 434, 436 (4th Cir. 1989)).  Highmark contended that were the District to prevail in its suit, "tenants who leased rent-controlled apartments from other property managers would pay discriminatory (higher) rents than tenants who rented from Highmark."  Highmark Reply at 4.  However, under the District's theory, it is likely that during some periods the tenants of other rent stabilized buildings had experienced rent increases below the statutorily allowed maximum, while Highmark maintained higher increases due to its participation in the price-fixing conspiracy.  At this stage of the litigation, it is impossible to determine whether the District's claim against Highmark would require damages that would impose different rates upon different consumers without resorting to factfinding.

Because the policy rationale underlying the filed rate doctrine does not apply here, the Court will not utilize this doctrine in the context of District of Columbia law absent a statute specifically authorizing its application.  *Krukas v. AARP, Inc.*, 376 F. Supp. 3d at 19.  As the District made out a plausible case that Highmark entered into a conspiracy with its fellow Defendant Landlords, and because the filed rate doctrine does not apply in this case, the Court denied Highmark's Motion.

IV.     **Conclusion**

For the foregoing reasons, the Court denied JBG and Highmark's Motions, and granted AvalonBay's Motion.

Date: July 2, 2024

Todd E. Edelman
Associate Judge
(Signed in Chambers)

43

*Copies to:*

Adam Gitlin, Esq.
Amanda Hamilton, Esq.
Mehreen Imtiaz, Esq.
Emmy L. Levens, Esq.
Robert A. Braun, Esq.
Aaron J. Marks, Esq. *Counsel for Plaintiff District of Columbia*
Adam.gitlin@dc.gov
Amanda.hamilton@dc.gov
Mehreen.imtiaz@dc.gov
Elevens@cohenmilstein.com
Rbraun@cohenmilstein.com
Amarks@cohenmilstein.com

Belinda S. Lee, Esq.
Jennifer L. Giordano, Esq.
Elizabeth B. Prewitt, Esq.
*Counsel for Defendant AvalonBay Communities, Inc.*
Belinda.lee@lw.com
Jennifer.giordano@lw.com
Elizabeth.prewitt@lw.com

Danny David, Esq.
James Kress, Esq.
Paul Cuomo, Esq.
Natalie Borges Cardenas, Esq.
Kelsey Ann Paine, Esq.
*Counsel for Defendant Avenue5 Residential, LLC*
Danny.david@bakerbotts.com
James.kress@bakerbotts.com
Paul.cuomo@bakerbotts.com
Natalie.cardenas@bakerbotts.com
Kelsey.paine@bakerbotts.com

Marguerite Willis, Esq.
Michael A. Parente, Esq.
Margaret M. Siller, Esq.
Mark C. Moore, Esq.
Jennifer J. Hollingsworth, Esq.
Shannon V. Lipham, Esq.
*Counsel for Defendant Bell Partners, Inc.*
Mwillis@maynardnexsen.com
Mparente@maynardnexsen.com
Msiller@maynardnexsen.com
Mmoore@maynardnexsen.com
Jhollingsworth@maynardnexsen.com
Svlipham@maynardnexsen.com

James D. Bragdon, Esq.
Sam Cowin, Esq.
Joseph C. Dugan, Esq.
Philip A. Giordano, Esq.
Faranak Tabatabai, Esq.
Daniel Chan, Esq.
*Counsel for Defendant Bozzuto Management Company*
Jbragdon@gejlaw.com
Scowin@gejlaw.com
Jdugan@gejlaw.com
Philip.giordano@hugheshubbard.com
Fara.tabatabai@hugheshubbard.com
Daniel.chan@hugheshubbard.com

Lynn H. Murray, Esq.
Maveric R. Searle, Esq.
Ryan Sandrock, Esq.
Laurie A. Novion, Esq.
Cary Silverman, Esq.
*Counsel for Defendant Camden Development, Inc.*
Lhmurray@shb.com
Msearle@shb.com
Rsandrock@shb.com
Lnovion@shb.com
Csilverman@shb.com

45

Carl W. Hittinger, Esq.
Matthew T. Schock, Esq.
Jeffrey E. Liskov, Esq
Alyse F. Stach, Esq.
Tyson Y. Herrold, Esq.
*Counsel for Defendant Equity Residential Management, LLC*
Chittinger@bakerlaw.com
Mschock@bakerlaw.com
Jliskov@bakerlaw.com
Astach@bakerlaw.com
Therrold@bakerlaw.com

Christina E. Fahmy, Esq.
Thomas J. Lang, Esq.
*Counsel for Defendant Gables Residential Services, Inc.*
Cfahmy@ktslaw.com
Tlang@ktslaw.com

Michael M. Maddigan, Esq.
Julia K. York, Esq.
Karen Hoffman Lent, Esq.
Boris Bershteyn, Esq.
Sam Auld, Esq.
Evan Kreiner, Esq.
*Counsel for Defendant Greystar Management Services, LLC*
Michael.maddigan@hoganlovells.com
Julia.york@skadden.com
Karen.lent@skadden.com
Boris.bershteyn@skadden.com
Sam.auld@skadden.com
Evan.kreiner@skadden.com

Michael D. Bonanno, Esq.
Ryan T. Andrews, Esq.
Carl Spilly, Esq.
*Counsel for Defendant Highmark Residential, LLC*
Mikebonanno@quinnemanuel.com
Ryanandrews@quinnemanuel.com
Carlspilly@quinnemanuel.com

Andre Geverola, Esq.
Jonathan I. Gleklen, Esq.
Summer K. Quintana, Esq.
*Counsel for Defendant JBG Associates, LLC*
Andre.geverola@arnoldporter.com
Jonathan.gleklen@arnoldporter.com
Summer.quintana@arnoldporter.com

Rachel J. Lamorte, Esq.
Britt M. Miller, Esq
Daniel T. Fenske, Esq.
Matthew D. Provance, Esq.
*Counsel for Defendant Mid-America Apartments, LP*
Rlamorte@mayerbrown.com
Bmiller@mayerbrown.com
Dfenske@mayerbrown.com
Mprovance@mayerbrown.com

Keturah Taylor, Esq.
Milton A. Marquis, Esq.
Ketan Bhirud, Esq.
Ann-Marie Luciano, Esq.
*Counsel for Defendant Paradigm Management II, LP*
Ktaylor@cozen.com
Mmarquis@cozen.com
Kbhirud@cozen.com
Aluciano@cozen.com

Stephen Weissman, Esq.
Michael J. Perry, Esq.
Jay Srinivasan, Esq.
Daniel G. Swanson, Esq.
S. Christopher Whittaker, Esq.
Ben A. Sherwood, Esq.
Travis C. Wheeler, Esq.
*Counsel for Defendant RealPage, Inc.*
Sweissman@gibsondunn.com
Mjperry@gibsondunn.com
Jsrinivasan@gibsondunn.com
Dswanson@gibsondunn.com
Cwhittaker@gibsondunn.com
Bsherwood@gibsondunn.com
Twheeler@maynardnexsen.com

47

David D. Cross, Esq.
Jeffrey A. Jaeckel, Esq.
Robert W. Manoso, Esq.
Eliot A. Adelson, Esq.
Mika M. Fitzgerald, Esq.
Ramsey W. Fisher, Esq.
*Counsel for Defendant Udr Inc.*
Dcross@mofo.com
Jjaeckel@mofo.com
Rmanoso@mofo.com
Eadelson@mofo.com
Mfitzgerald@mofo.com
Ramseyfisher@mofo.com

W. Todd Miller, Esq.
Lucy S. Clippinger, Esq.
*Counsel for Defendant William C. Smith & Co., Inc.*
Tmiller@bakerandmiller.com
Lclippinger@bakerandmiller.com