Brian F. McDonough (NJ Attorney ID 026121980)
Assistant Attorney General
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (609) 696-5271

Brent W. Johnson (NJ Attorney ID 031902003)
Emmy L. Levens (*pro hac vice*)
Robert A. Braun (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 800
Washington, DC 20005
(202) 408-4600

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MATTHEW J. PLATKIN, et al., | **FILED UNDER SEAL** |
| *Plaintiffs*, | Civil Action No. 2:25-cv-03057 |
| v. | |
| REALPAGE, INC. et al., | Hon. Madeline Cox Arleo |
| | Hon. Jessica S. Allen |
| *Defendants*. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO AVALONBAY COMMUNITIES, INC.'S
## MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    I.     AvalonBay Used RealPage RM Software Designed to Inflate Rents ............ 3

    II.    AvalonBay Actively Coordinated with Competitors via RealPage's User
           Groups .......................................................................................................... 4

    III.   AvalonBay Exchanged Non-Public, Competitively Sensitive Information
           Directly with Competitors for the Purpose of Increasing Prices ................... 5

    IV.   AvalonBay Recruited Other Conspiracy Participants ................................... 6

RELATED CASES ..................................................................................................... 7

LEGAL STANDARD .................................................................................................. 8

ARGUMENT .............................................................................................................. 8

    I.     The Complaint Plausibly Alleges Federal and State Antitrust Claims
           Against AvalonBay ....................................................................................... 8

         A.   The Complaint Plausibly Alleges Parallel Conduct by AvalonBay in
             Furtherance of the Conspiracy .................................................................. 10

             1.    AvalonBay's Contract Provision Does Not Immunize It from
                   Liability or Render Its Role in the Conspiracy Implausible ......... 13

             2.    AvalonBay's Direct Exchange of Information with Competitors
                   Constitutes Parallel Conduct .......................................................... 15

             3.    Parallel Conduct Need Not Be Simultaneous or Perfectly
                   Identical to Support an Inference of Conspiracy .......................... 17

          B.   The Complaint Plausibly Alleges "Plus Factors" .................................... 21

    II.    The Complaint Adequately Pleads New Jersey Consumer Fraud Act
           Claims ........................................................................................................ 25

          A.   The Complaint Plausibly Alleges a Commercial Practice in Violation of
             Law .......................................................................................................... 25

         B.   The Complaint Plausibly Alleges That AvalonBay's Conduct was
             Unconscionable ....................................................................................... 25

CONCLUSION ........................................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.*,
547 A.2d 1134 (N.J. Super Ct. App. Div. 1988)...............................................26

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010)...................................................................................10

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)...................................................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................17

*Associates Home Eq. Serv's v. Troup*,
778 A.2d 529 (N.J. Sup. Ct. App. Div. 2001)...................................................27

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)........................................................................23

*Bagic v. Univ. of Pittsburgh*,
773 F. App'x 84 (3d Cir. 2019) .....................................................................9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................8, 12, 16

*Maryland ex rel. Brown v. RealPage, Inc.*,
No. C-16-CV-25-000241 (Md. Cir. Ct. 2025)....................................................8

*Browne v. Nat'l Collegiate Student Loan Tr.*,
No. 2:22-cv-2713, 2024 WL 2194265 (D.N.J. Apr. 30, 2024) (Arleo, J.) .....................27

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)......................................................................9, 21

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015).................................................................22, 23, 24

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)...................................................................................14

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
No. 123-cv-2536, 2024 WL 4356188 (D.N.J. Sept. 30, 2024), *appeal argued*
(3d Cir. Sept. 17, 2025)...............................................................................13

ii

*D'Agostino v. Maldonado*,
  78 A.3d 527 (N.J. 2013)..........................................................................................27

*District of Columbia v. RealPage, Inc.*,
  No. 2023-CAB-006762 (D.C. Super. Ct. July 2, 2024)...................................................12

*District of Columbia v. RealPage, Inc.*,
  No. 2023-CAB-006762 (D.C. Super. Ct. Apr. 7, 2025) ...........................2, 8, 15, 23, 25

*District of Columbia v. RealPage, Inc.*,
  No. 2023-CAB-006762 (D.C. Super. Ct. Sept. 23, 2025) ......................................15, 26

*Doe v. Princeton Univ.*,
  30 F.4th 335 (3d Cir. 2022) ......................................................................................9

*Duffy v. Yardi Sys., Inc.*,
  758 F. Supp. 3d 1283 (W.D. Wash. 2024)............................................................ *passim*

*Eisai v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394 (3d Cir. 2016)......................................................................................9

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ..................................................................................14

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013)..................................................................................9, 14

*In re Fragrance Direct Purchaser Antitrust Litig.*,
  No. 2:23-cv-02174, 2025 WL 579639 (D.N.J. Feb. 21, 2025)................................19, 20

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ........................................................................24

*Gibson v. Cendyn Grp., LLC*,
  No. 23-cv-00140, 2024 WL 2060260 (D. Nev. May 8, 2024), *aff'd*, 148 F.4th
  1069 (9th Cir. 2025)...............................................................................................13

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)...........................................................................10, 14, 22

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939)...............................................................................................18

*InterVest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003)....................................................................................10

*Lifewatch Servs. Inc. v. Highmark Inc.*,
  902 F.3d 323 (3d Cir. 2018)................................................................................10, 23

*In re Musical Instruments & Equipment Antitrust Litigation*,
798 F.3d 1186 (9th Cir. 2015) ...................................................................19

*In re Processed Egg Prods. Antitrust Litig.*,
902 F. Supp. 2d 704 (E.D. Pa. 2012) .....................................................15, 25

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 ..................................................................... *passim*

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) .................................................................15, 19

*Sitts v. Dairy Farmers of Am., Inc.*,
417 F. Supp. 3d 433 (D. Vt. 2019)...............................................................15

*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*,
967 F.3d 295 (3d Cir. 2020).....................................................................8, 17

*State v. N.J. Trade Waste Ass'n*,
472 A.2d 1050 (N.J. 1984)............................................................................9

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d. Cir. 2001) (Sotomayor, J.)...............................................13

*Toll Bros., Inc. v. Township of Moorestown*,
No. 10-cv-4843, 2011 WL 2559507 (D.N.J. June 27, 2011)........................28

*William Goldman Theatres v. Loew's, Inc.*,
150 F.2d 738 (3d Cir. 1945)........................................................................18

**Statutes**

N.J. Stat. Ann. § 56:8-2.............................................................................26

N.J. Stat. Ann. § 56:8-4.............................................................................26

N.J. Stat. Ann. § 56:9-3................................................................................9

**INTRODUCTION**

The New Jersey Attorney General and the Director of the New Jersey Department of Consumer Affairs (collectively, "Plaintiffs") allege a conspiracy among Defendant Landlords—including AvalonBay Communities, Inc. ("AvalonBay")—to use Defendant RealPage's Revenue Management Software ("RM Software") to inflate rents for hundreds of thousands of New Jerseyans. The Complaint alleges that AvalonBay meaningfully participated in the conspiracy and, as such, AvalonBay's motion to dismiss should be denied.

Specifically, the Complaint alleges that, in addition to adopting the same pricing software as its rivals that was designed to raise rents, AvalonBay (1) presided over a RealPage User Group where competitors devised strategies to raise rents—including during the COVID-19 pandemic when renters were particularly vulnerable; (2) exchanged non-public, competitively sensitive information about occupancy, leases, visits, and pricing directly with competitors, and (3) recruited new members into the cartel. This is more than sufficient to plausibly allege AvalonBay's participation in the conspiracy.

AvalonBay's principal argument for dismissal rests on its "bespoke" contract provision with RealPage that limited how RealPage used AvalonBay's data in its software (and, conversely, how RealPage incorporated other users' data when generating rents for AvalonBay). But that provision did not bar AvalonBay from sharing its own information *directly* with competitors or from obtaining similar information *from* competitors—conduct the Complaint specifically alleges. Nor does the contract speak to AvalonBay's broader coordination with competitors to facilitate their collective use of RealPage's RM Software.

That AvalonBay's role differed somewhat from its co-conspirators, as reflected by its contract terms, is of no moment. It is a well-settled principle of antitrust law that conspirators need

1

not act identically or play the same part in a scheme—what matters is their agreement to pursue a common purpose. Here, that purpose was the adoption and use of RealPage's RM Software—facilitated by the direct exchange of non-public, competitively sensitive information—to raise rents.

The D.C. Superior Court held that similar allegations of AvalonBay's involvement were sufficient to sustain an antitrust claim, rejecting the same arguments AvalonBay makes here.[1] The D.C. Superior Court recently reaffirmed that holding, explaining that allegations of AvalonBay's acts in furtherance of the conspiracy—including its role in the RealPage User Group and coordination as to how the software would be used during COVID-19—sufficiently support an antitrust claim regardless of AvalonBay's contract provision.[2] These decisions correctly applied well-settled law in declining to dismiss AvalonBay from that case.

That private plaintiffs in the related MDL suit against RealPage and its customers voluntarily dismissed AvalonBay before discovery—a fact emphasized throughout its Motion—is of no consequence. The New Jersey Attorney General—acting as the State's chief law enforcement officer—has a unique responsibility to investigate offenses against the State and its residents and access to investigatory tools and information unavailable to private plaintiffs.

Because the Complaint, taken as a whole, plausibly pleads federal and state antitrust violations, as well as a state consumer fraud claim, AvalonBay's motion should be denied.[3]

---

[1] Dkt. 120-7 at 17 (Order, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. Apr. 7, 2025)) ("*RealPage D.C. II*") (holding that the D.C. Attorney General "sufficiently pled that AvalonBay joined other Defendants to increase prices on rental housing in the District.").

[2] *See* Ex. A at 7–8 (Order, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. Sept. 23, 2025)) ("*RealPage D.C. III*").

[3] AvalonBay also asks the Court to take judicial notice of three contracts with RealPage and Rainmaker. *See* Dkt. 120-8. Plaintiffs' position is that judicial notice is unnecessary: the

2

## BACKGROUND

The Complaint alleges that Defendant Landlords, including AvalonBay, conspired with RealPage and one another to increase rents for more than 90,000 apartments in New Jersey, reaping millions in unlawful overcharges as a result. Compl. ¶ 9; Opp. to Joint Mot (Factual Background).[4] AvalonBay—one of RealPage's largest and most important users—played a central role in the Defendants' unlawful conspiracy. Compl. ¶ 20. Specifically, the Complaint alleges AvalonBay furthered the conspiracy's purpose by: using RealPage RM Software (specifically LRO) to inflate rents; leading RealPage "user groups" where competitors coordinated their use of the software; directly exchanging non-public, competitively sensitive information with competitors; and recruiting competitors to join the scheme.

### I.    AvalonBay Used RealPage RM Software Designed to Inflate Rents

A core feature of the conspiracy was Defendant Landlords' delegation of rent-setting authority to RealPage, whose RM Software products—LRO, YieldStar, and AI Revenue Management—generated rent levels using competitors' non-public, competitively sensitive data. Compl. ¶¶ 6, 133–54. AvalonBay and at least four other Defendant Landlords used LRO. Compl. ¶¶ 20, 123.

---

Complaint already describes AvalonBay's contract terms, and the precise language of the agreements is irrelevant to deciding this motion. Furthermore, AvalonBay's submission is incomplete—it includes only contracts from 2017 onward, even while AvalonBay claims the documents show it has insisted on special terms "[s]ince its very first LRO contract" in 2007. Defendant AvalonBay Communities, Inc's Brief in Supp. of Mot. to Dismiss Complaint at 2 (Dkt. 120-1) ("Mot."). The contracts therefore are incomplete, unnecessary, and do not undermine Plaintiffs' allegations. Plaintiffs nevertheless do not oppose the Court taking judicial notice of the three contracts AvalonBay submitted.

[4] RealPage and eight landlord defendants filed a joint motion to dismiss for failure to state a claim. Dkt. 115. Plaintiffs' brief in opposition to that motion recites many of the same relevant facts and legal arguments cited herein.

LRO's chief purpose was to raise prices for all users. Compl. ¶ 58. Indeed, LRO was specifically designed to "push rates more frequently/aggressively." Compl. ¶ 115. LRO used non-public, competitively sensitive information to generate rents, Compl. ¶ 117, and was programmed to minimize the scenarios in which users would reduce rents, Compl. ¶ 121. One way LRO accomplished this goal was with the "Market Composite." Compl. ¶ 118. The Market Composite was calculated based on competitors' prices and served as a floor for users' unit pricing. Compl. ¶¶ 118, 122.

As part of their unlawful agreement, Defendant Landlords—including AvalonBay— adopted RealPage's rents the "vast majority" of the time, and RealPage actively policed their compliance to ensure they did so. Compl. ¶¶ 121, 151.

## II.    AvalonBay Actively Coordinated with Competitors via RealPage's User Groups

The Complaint alleges that the RealPage "User Groups," including the LRO User Group, served as a means through which competitors coordinated rent-maximizing strategies and influenced RealPage's algorithms. *See* Compl. ¶¶ 97–106. RealPage created the groups explicitly to facilitate competitor communications and, consistent with this aim, the groups met regularly. *See* Compl. ¶ 97. For example, the LRO User Group met quarterly. *Id*. In addition to these regular meetings, the groups had a digital forum through which users could communicate outside of regularly scheduled meetings and many Defendant Landlords, including AvalonBay, also regularly communicated with one another over email. *Id.*

According to the Complaint, AvalonBay played a leading role in the User Groups. Its Vice President of Revenue Management, Rajiv Verma, chaired the LRO User Group from 2019 to 2021, setting agendas, directing discussions, and presiding over competitor discussions regarding changes to the RM Software that served users' "mutual benefit." Compl. ¶ 98. Competitors agreed

4

on changes to the RM Software by voting on whether RealPage should implement proposed changes. *Id*.

A particularly striking example of how the LRO User Group facilitated coordination among competitors occurred during the COVID-19 pandemic: the Complaint alleges that during the pandemic, AvalonBay and its competitors coordinated regarding "strategies for making more money from tenants." Compl. ¶ 99. Specifically, at a December 2020 meeting, they discussed "Future Pricing"—and soon after, Verma asked RealPage how "we" could "manipulate the demand and supply forecasts" in LRO's algorithm to inflate rents. Compl. ¶¶ 99–101. By February 2021, participants agreed to ██████████ by ████████████████████████ ███ one landlord admitted it had already done so, and others—including AvalonBay—pressed RealPage to implement the change. Compl. ¶¶ 102–03. This collective decision, under AvalonBay's leadership, had "a very real impact on rents," such as raising Defendant Morgan's rents by $152 per unit per year. Compl. ¶ 104.

Notably, though AvalonBay used LRO, it also participated in RealPage's YieldStar User Group, giving AvalonBay additional visibility into competitors' practices and ideas for collaboration. Compl. ¶¶ 105–06. Verma imported those ideas into the LRO User Group, including the competitor voting process. Compl. ¶ 98.

III.    **AvalonBay Exchanged Non-Public, Competitively Sensitive Information Directly with Competitors for the Purpose of Increasing Prices**

LRO used non-public, competitively sensitive information to generate rents in two ways. First, for all LRO users other than AvalonBay (because of its contract terms with RealPage), LRO drew on competitor data from clients' internal databases—without any manual intervention from users—to maximize rents through a feature called "market-level seasonality." Compl. ¶ 79. Second, for all users *including* AvalonBay, RealPage instructed LRO users to reach out directly to

5

their competitors for non-public, competitively sensitive information such as rent charged for each unit type, the number of visits at a property per week, and occupancy percent for the property. Compl. ¶ 79. Users followed that instruction and entered the data they gathered directly from competitors into LRO, which drew on it "to maximize rent prices." Compl. ¶ 117; *see also* Compl. ¶¶ 88, 231. For example, LRO calculated the "Market Composite" discussed above using the pricing information that competitors gather and enter into LRO. Compl. ¶ 118.

Consistent with RealPage's instruction, the Complaint alleges that Defendant Landlords, including AvalonBay, regularly exchanged non-public, competitively sensitive information including "current occupancy rates, how many prospects visited the competitor each week, and how many new leases a competitor signed each week," as well as "current price information." Compl. ¶¶ 88–89. Defendant Landlords effectuated this exchange of information through direct conversations and via email. Compl. ¶¶ 88, 90.

The Complaint details multiple examples of AvalonBay and other Defendant Landlords regularly providing and soliciting non-public, competitively sensitive information from competitors. Compl. ¶¶ 88–96. For example, in one instance, an AvalonBay employee informed competitors that, during the prior week, its property had "49 visits [and] 8 applications (one of which was denied/cancelled)." Compl. ¶ 93. AvalonBay sought this information in *quid pro quo* fashion, providing information about its own buildings and then asking competitors to "provide occupancy/leasing rate, as well as any specials for prospects or renewals that your community may have." Compl. ¶ 96. Competitors obliged, exchanging non-public demand and pricing data that could be fed into LRO and used to sustain higher rents. Compl. ¶ 88.

### IV.    AvalonBay Recruited Other Conspiracy Participants

Defendant Landlords, including AvalonBay, also actively recruited other landlords into the scheme. Compl. ¶¶ 97–108. They provided written testimonials recruiting other landlords to use

RM Software, recorded videos to bring landlords into the cartel, and urged more landlords to use RealPage RM Software at private, in-person meetings. Compl. ¶¶ 97–108. Verma publicly urged any "professional who's procrastinating on using revenue management" to adopt LRO. Compl. ¶ 73.

As the Complaint explains, the mere fact that AvalonBay and other landlords recruited would-be competitors to use RealPage RM Software is a telltale sign of their participation in an anticompetitive scheme. Compl. ¶ 77. If LRO provided landlords with a "competitive edge," there would be no reason for AvalonBay to actively work to recruit other landlords to use it. *Id.* But because LRO provides an anticompetitive edge—ensuring that all participants raise rents together without fear of being undercut—AvalonBay and its peers had every incentive to expand the cartel, to the detriment of New Jersey renters. *Id.*

## RELATED CASES

AvalonBay has been named as a Defendant in related RealPage cases brought by the Attorney General of the District of Columbia ("DCAG"), the Attorney General of Maryland,[5] and a proposed class of private plaintiffs.[6] In the suit brought by the DCAG, AvalonBay was initially dismissed, but it was reinstated after the filing of an amended complaint with allegations similar to those in this case. *RealPage D.C. II* at 17. The opinion reinstating AvalonBay in the D.C. case stated: "[T]he Court finds that the District has sufficiently pled that AvalonBay joined other Defendants to increase prices on rental housing in the District, and denies AvalonBay's motion to

---

[5] The motion to dismiss in that case is pending. *Maryland ex rel. Brown v. RealPage, Inc.*, No. C-16-CV-25-000241 (Md. Cir. Ct. 2025).

[6] Private plaintiffs in the MDL voluntarily dismissed AvalonBay before discovery commenced. *See* Order Dismissing AvalonBay Communities, Inc., Without Prejudice, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 3:23-md-3071 (Md. Tenn. July 13, 2023) (ECF No. 357).

dismiss." *Id*. AvalonBay then moved for judgment on the pleadings in that case, which the D.C. Superior Court recently denied. *RealPage D.C. III* at 8.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When deciding whether a complaint alleges sufficient facts to state a plausible claim, "all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299 (3d Cir. 2020) (quoting *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009)).

A court reviewing a motion to dismiss is limited to examining the "plausibility of 'allegations in the complaint.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 344–45 (3d Cir. 2022) (quoting *Twombly*, 550 U.S. at 555). "When considering a motion to dismiss, a district court cannot weigh competing inferences and forgo drawing a reasonable one in the plaintiff's favor." *Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 88–89 (3d Cir. 2019). Put differently, "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 n.11 (1984)).

## ARGUMENT

**I.    The Complaint Plausibly Alleges Federal and State Antitrust Claims Against AvalonBay**

The Complaint alleges claims against AvalonBay under the Federal Sherman Act, 15 U.S.C. § 1 (Count 1) and the New Jersey Antitrust Act ("NJAA"), N.J. Stat. Ann. § 56:9-3 (Count

8

2). Both statutes prohibit agreements in restraint of trade. 15 U.S.C. § 1; N.J. Stat. Ann. § 56:9-3.[7]

Under both statutes, an antitrust plaintiff must plead two elements: (1) "concerted action" and (2) that the conspiracy imposed an unreasonable restraint on trade. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)).

AvalonBay's motion takes aim at only one aspect of Plaintiffs' antitrust claims—the first "concerted action" element, or whether the Complaint plausibly alleges that a horizontal conspiracy existed between AvalonBay and the other Defendant Landlords.[8] The concerted-action inquiry is a "functional" analysis focused on "how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010). At the motion to dismiss stage, the Complaint's allegations need only contain plausible grounds to infer an unlawful agreement. *Ins. Brokerage*, 618 F.3d at 326.

"An agreement may be shown by either direct or circumstantial evidence*." Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018) (citation omitted). Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted."

---

[7] Accordingly, "[t]he applicable law is the same" for both of Plaintiffs' antitrust claims against AvalonBay. *Eisai v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016); *see also State v. N.J. Trade Waste Ass'n*, 472 A.2d 1050, 1056 (N.J. 1984) ("[T]he New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes.").

[8] AvalonBay's motion to dismiss challenges only the first element of Plaintiffs' antitrust claims—whether the Complaint plausibly alleges an unlawful agreement. That is a narrow attack, and it fails for the reasons outlined in this opposition. AvalonBay also does not challenge the sufficiency of the Complaint's allegations as to the "vertical" component of the alleged hub-and-spoke agreement—its relationship with RealPage—which are supported by direct evidence in the form of AvalonBay's contracts. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 503 ("*RealPage MDL*") (holding that the plaintiffs plausibly alleged direct evidence of vertical agreements between RealPage and each defendant). Plaintiffs therefore focus here on the element that AvalonBay actually contests.

*InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)). Because "smoking gun" direct evidence is generally "difficult to come by," most antitrust conspiracies must be proven with circumstantial evidence. *Id.*

Plaintiffs relying on circumstantial evidence "must allege both parallel conduct and something 'more,' which we have sometimes called a 'plus factor.'" *Lifewatch Servs.*, 902 F.3d at 333 (citation omitted). Plaintiffs here have alleged both parallel conduct, *see* Compl. ¶¶ 19–28, 57–62, 78–112, and multiple "plus factors," *see* Compl. ¶¶ 155–61. AvalonBay's motion should therefore be denied.

### A. The Complaint Plausibly Alleges Parallel Conduct by AvalonBay in Furtherance of the Conspiracy

Defendant Landlords—including AvalonBay—engaged in parallel conduct by collectively relying on RealPage to set and maximize rental prices in New Jersey. As the Complaint details, Defendant Landlords (1) delegated their rent-setting authority to RealPage, *e.g.* Compl. ¶¶ 2, 19–28, 133–54; (2) used its RM Software to drive rents upward, *e.g.* Compl. ¶¶ 2, 35, 49; 50–54; (3) shared non-public, competitively sensitive information with one another both directly and through RealPage, *e.g.* Compl. ¶¶ 78–125; and (4) recruited additional landlords into the scheme, *e.g.* Compl. ¶¶ 63–77. The scheme marked a "fundamental departure" from traditional competitive behavior—such as undercutting competitors to fill vacancies—in favor of artificial supply constraints and inflated prices. Compl. ¶¶ 56, 162.

Courts considering allegations of materially similar behavior have held that such conduct constitutes parallel conduct sufficient to support an inference of unlawful agreement. *See RealPage MDL*, 709 F. Supp. 3d at 507; *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283, 1293 (W.D. Wash. 2024) ("*Yardi*") ("The Court also finds persuasive the argument that raising rental prices regardless

10

of occupancy and/or competitiveness would, in a competitive market, work against each lessor defendant's economic self-interest."). In this respect, Defendants' conduct here is strikingly similar to the conduct at issue in those cases. *See* Opp. to Joint Mot. § I.A.1.

AvalonBay actively participated in all mechanisms of the alleged conspiracy save one—consistent with its contract provision, it did not share non-public, competitively sensitive information with competitors through RealPage. Compl. ¶ 20. Specifically, AvalonBay delegated its rent-setting authority to RealPage, used the software to drive rents upward, and recruited other landlords into the scheme. *Id.* AvalonBay also shared non-public, competitively sensitive information—including unit pricing, traffic, and occupancy rates—with its competitors *directly* on a regular basis. Compl. ¶¶ 88–96. It did so at RealPage's explicit direction. Compl. ¶ 79 ("A RealPage LRO user manual states, for example, that 'You should gather . . . information each week from each competitor[.]'"). All of this coordinated conduct is more than enough to plausibly allege "tacit agreement" from AvalonBay to join the other Defendants' unlawful conspiracy. *Twombly*, 550 U.S. at 557.

In some respects, AvalonBay's participation in the conspiracy went *further* than other Defendant Landlords—AvalonBay played a leadership role in the LRO User Group, which brought competitors together to share confidential business strategies and brainstorm ways to manipulate the algorithm to increase prices for all landlords' benefit, including during the pandemic when tenants were most vulnerable. Compl. ¶¶ 96–104. These allegations make clear that AvalonBay was an active participant in the conspiracy, using RealPage both to raise prices in coordination with competitors (through LRO) and as the forum for landlords to entrench their collusion (through the User Groups).

11

Recent court decisions involving algorithmic pricing support Plaintiffs' position as to AvalonBay. Courts have repeatedly held that allegations of competitors exchanging non-public, competitively sensitive information for the purpose of generating inflated prices is sufficient to state a claim.[9] By contrast, courts have dismissed antitrust claims premised predominantly on defendants' common use of the same software that was not alleged to have incorporated non-public, competitively sensitive information.[10] Here, there are extensive allegations of Defendant Landlords sharing non-public, competitively sensitive information in addition to other meaningful allegations as to AvalonBay's participation in the conspiracy.

AvalonBay argues at length that this case should be dismissed because its contract terms precluded RealPage from using competitors' confidential data to set AvalonBay's rates (and vice versa). *See* Mot. at 13–15.[11] But the distinction that AvalonBay, rather than RealPage, executed the data sharing is legally irrelevant: what matters is the exchange of competitively sensitive information among competitors for the purpose of inflating prices. *See e.g., Todd v. Exxon Corp.,*

[9] *See RealPage MDL*, 709 F. Supp. 3d at 488–90 (denying motion to dismiss multifamily lessee complaint where plaintiffs alleged horizontal conspiracy facilitated by pooling confidential rent data); *Yardi*, 758 F. Supp. 3d at 1295–1300 (finding tenants plausibly alleged that landlords' parallel conduct and plus factors supported inference of conspiracy where Yardi software pooled sensitive information).

[10] *Gibson v. Cendyn Grp., LLC,* No. 23-cv-00140, 2024 WL 2060260, at *5 (D. Nev. May 8, 2024) ("And to be clear, Plaintiffs do not explicitly allege or argue that Hotel Defendants share confidential information with each other by using [the software]."), *aff'd*, 148 F.4th 1069 (9th Cir. 2025); *Cornish-Adebiyi v. Caesars Ent., Inc.,* No. 123-cv-2536, 2024 WL 4356188, at *5 (D.N.J. Sept. 30, 2024) ("Plaintiffs do not allege that the Casino-Hotels receive or directly benefit from the non-public pricing and occupancy data they individually place into the Rainmaker products."), *appeal argued* (3d Cir. Sept. 17, 2025).

[11] Citing *Gibson*, 2024 WL 2060260, at *5; *Cornish-Adebiyi*, 2024 WL 4356188, at *5; *Yardi*, 758 F. Supp. 3d at 1290–91; *RealPage MDL*,709 F. Supp. 3d at 492; and Dkt. 120-6 (Mem. Op, *Dist. of Columbia v. RealPage, Inc.*, No. 2023-CAB-6762 (D.C. Super. Ct. July 2, 2024)) ("*RealPage D.C. I*").

275 F.3d 191, 198–99 (2d. Cir. 2001) (Sotomayor, J.) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.").

AvalonBay makes a number of additional arguments as to why the Complaint's allegations of parallel conduct should fail. As discussed below, these arguments misapply the governing standard and misconstrue the Complaint, and, therefore, are not valid bases for dismissal.

### 1. AvalonBay's Contract Provision Does Not Immunize It from Liability or Render Its Role in the Conspiracy Implausible

AvalonBay argues that its contract terms "render it implausible" that it consciously joined the conspiracy alleged, "regardless of the State's other allegations." Mot. at 13, 15. But courts assessing plausibility must "examine the *entirety* of the complaints' factual allegations and determine whether, taken as true, they support a plausible inference of horizontal conspiracy." *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 326 (emphasis added); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (Plaintiffs must be given "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

The Complaint alleges that AvalonBay not only used pricing software designed to raise rents along with its competitors, but that it exchanged non-public, competitively sensitive information to facilitate that end. *E.g.* Compl. ¶ 93. Additionally, AvalonBay's leadership role in the User Group allowed it to coordinate its pricing strategy with competitors as the allegations pertaining to its decision to ███████████ in LRO in response to the COVID pandemic powerfully indicate. *See* Compl. ¶¶ 99–104.[12]

---

[12] Even if AvalonBay's contract terms are consistent with lawful parallel conduct, the Court must deny the motion to dismiss if AvalonBay's *other* conduct raises the inference that it participated in an illegal agreement. *See Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012) ("[A]t the pleading stage, the plaintiff is not required to allege facts showing that

13

That AvalonBay did not participate in one mechanism of the alleged conspiracy does not render other well-pled allegations of its involvement implausible. It is entirely plausible that a large market participant would seek to shield itself from potential liability by inserting a contract provision like AvalonBay's, while at the same time furthering the conspiracy in other ways to serve its own interests. Furthermore, an antitrust complaint "need not allege that each defendant was involved in every aspect of the conspiracy" to plausibly state a claim. *In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 715 n.11 (E.D. Pa. 2012). Indeed, even at summary judgment, "a party need not show that every co-conspirator participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement." *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 469 (D. Vt. 2019). Put simply, antitrust law does not require that every co-conspirator play exactly the same role.[13] What matters is that the alleged co-conspirator took material steps in furtherance of the conspiracy—which is exactly what the Complaint alleges as to AvalonBay. Applying these well-settled principles, the D.C. Superior Court held that similar allegations plausibly stated an antitrust claim as to AvalonBay. *RealPage D.C. II* at 17.

AvalonBay attempts to limit the scope of the D.C. decision, characterizing it as being on "narrow grounds" and arguing that the complaint there failed to allege AvalonBay's participation

---

an unlawful agreement is more likely than lawful parallel conduct."); *Evergreen Partnering Grp., Inc,* 720 F.3d at 45 ("It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." (citing *Monsanto Co.,* 465 U.S. at 766 n. 11)).

[13] *See, e.g., Am. Tobacco Co. v. United States*, 328 U.S. 781, 800–01 (1946) (upholding a jury verdict in a price-fixing conspiracy where defendants used a variety of differing methods to achieve the same ultimate objective); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428 (4th Cir. 2015) (holding that "parallel" conduct of boycotting a particular entity could be effectuated through different mechanisms and still serve as circumstantial evidence of a conspiracy).

in the broader conspiracy to use RealPage RM Software. Mot. at 10–11.[14] The D.C. Court put all doubt about this issue to rest just last week, when it issued an order denying AvalonBay's motion for judgment on the pleadings. *RealPage D.C. III* at 8. The D.C. Court explicitly rejected AvalonBay's argument that the complaint only alleged a narrow, COVID-specific conspiracy, holding that the D.C. complaint alleges AvalonBay's role in "the broader 'RealPage conspiracy' alleged against all Defendants." *RealPage D.C. III* at 7–8. The D.C. Court explained: "The [DCAG] in its Opposition argues that under black-letter antitrust law, plaintiffs may plead participation in unlawful agreements through parallel conduct and plus factors, which the Court already found that the District has done." *Id.* (citing *RealPage D.C. II* at 13–17). This Court should do the same.

### 2.   AvalonBay's Direct Exchange of Information with Competitors Constitutes Parallel Conduct

AvalonBay separately argues that Plaintiffs' allegations regarding its information sharing directly with competitors are insufficient to state a claim. Once again, AvalonBay asks the Court to misapply the Rule 12(b)(6) standard.

First, it argues that because the Complaint does not cite specific examples of AvalonBay employees exchanging non-public information with competitors *in New Jersey*, the allegations are implausible. But Plaintiffs need not plead such detail at this early stage. The Complaint need only "raise a reasonable expectation that discovery will reveal evidence" of the elements of Plaintiffs' antitrust claims. *Twombly*, 550 U.S. at 556. The Complaint easily satisfies that burden: it alleges that AvalonBay and other named Defendant Landlords "conduct[ed] weekly calls with would-be competitor landlords, and those landlords agree to provide non-public data for input into the LRO

---

[14] And contrary to AvalonBay's suggestion, the plausibility of the DCAG's claims never "became moot" because the DCAG never "conce[ded]" anything in that case. Mot. at 11; *see also RealPage D.C. III* at 7.

software" (Compl. ¶ 88) and "exchanged non-public, competitively sensitive information regarding leases and multifamily rental properties *at least* outside of New Jersey" (Compl. ¶ 90 (emphasis added)). And, in any event, the Complaint also provides multiple concrete examples of such exchanges, including from AvalonBay and in New Jersey itself. *See* Compl. ¶¶ 93 (AvalonBay examples); ¶¶ 91–2, 94 (New Jersey examples). That is more than sufficient to raise the inference that AvalonBay engages in similar conduct in New Jersey and "unlock the doors of discovery" into AvalonBay's information-sharing practices there. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In addition, AvalonBay contends that Plaintiffs do not "allege that AvalonBay input any non-public information into LRO that LRO actually used to recommend any rent to AvalonBay." Mot. at 16. That is wrong. The Complaint alleges that "the rates LRO ultimately sets for almost all users . . . arise from RealPage's collection of landlords' non-public information." Compl. ¶ 117; *see also id.* ("LRO's algorithm then uses the data collected by landlords to maximize rent prices."). The Complaint also describes how the Market Composite, which is based on competitor prices, plays a significant role in LRO's inflated rents. Compl. ¶ 118. Contrary to AvalonBay's assertion that all of the pricing information used by LRO is "public" (Mot. at 18), the Complaint alleges that the pricing information that competitors exchange and enter into LRO is "*non-public, competitively sensitive information*" (Compl. ¶ 90) (emphasis added) and that it "has the greatest potential for generating anticompetitive effects" (Compl. ¶ 89). If AvalonBay wants to dispute the allegation that information used by LRO is non-public, it may choose to do so at summary judgment. But at this stage, the Court is required to treat the Complaint's allegations as true and draw all reasonable inferences in Plaintiffs' favor. *St. Luke's Health Network, Inc.*, 967 F.3d at 299–30.

16

With respect to information sharing, at bottom, AvalonBay takes issue with allegations regarding how LRO functions. *See* Mot. at 16–18. But—again—a motion to dismiss is not the appropriate time for deciding fact disputes. The Complaint plausibly alleges that LRO uses non-public, competitively sensitive information collected by its users to inflate rental prices. *E.g.* Compl. ¶ 90. The Complaint's allegations explain that: (1) LRO required users to identify competitors (Compl. ¶ 118); (2) RealPage instructed LRO users to gather rent, traffic, and occupancy information from competitors every week (Compl. ¶ 79); (3) AvalonBay and the other Defendant Landlords followed that instruction by regularly collecting such information from competitors (Compl. ¶ 88); and (4) LRO then used at least some of that data in its rent-setting algorithm (Compl. ¶ 118). It is entirely reasonable to infer from these detailed allegations that LRO harnessed the information that RealPage instructed landlords to collect from their competitors to maximize landlords' rent revenues.[15]

### 3. Parallel Conduct Need Not Be Simultaneous or Perfectly Identical to Support an Inference of Conspiracy.

Finally, AvalonBay quibbles with the Complaint's allegations of parallel conduct, arguing that they are not sufficiently "parallel." Mot. at 19–20.[16] But the law is clear that conduct need not be perfectly identical or simultaneous to constitute parallel conduct in furtherance of an alleged

---

[15] AvalonBay's effort to invert this logic is deeply unconvincing. To illustrate that the information it regularly gathered was meaningless, it asks "How did knowing the number of people who visited a building one week or submitted an application impact the rent any landlord . . . charged for any particular unit?" Mot. at 18 n.9. But the better question is, why would AvalonBay and its competitors go to such lengths to regularly exchange that very information if not to improve their bottom line?

[16] AvalonBay's brief frames this point as proving that Plaintiffs "fail[] the traditional test for stating a conspiracy through circumstantial evidence." Mot. at 19. That framing implies that AvalonBay's preceding arguments (Mot. at 13–19) rest on some "nontraditional" test. But which elements of a Sherman Act claim those arguments actually address is not specified by the briefing. While AvalonBay's motion is no model of clarity, Plaintiffs' opposition proceeds along the settled elements of a Sherman Act/NJAA claim as defined by the Supreme Court and the Third Circuit.

17

conspiracy. As the Supreme Court held nearly 100 years ago, "an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939); *accord. William Goldman Theatres v. Loew's, Inc.*, 150 F.2d 738, 743 (3d Cir. 1945).[17] Other courts have similarly rejected arguments that steps in furtherance of a conspiracy must be identical to constitute parallel conduct. *See*, *e.g.*, *SD3*, 801 F.3d at 428 (holding that "parallel" conduct of boycotting a particular entity could be effectuated through different mechanisms and still serve as circumstantial evidence of a conspiracy).

Based on this longstanding precedent, courts have rejected AvalonBay's exact argument. As the *RealPage MDL* court explained, "courts accept allegations of close-in-time agreements as evidence of a horizontal conspiracy . . . [b]ut temporal proximity of the parallel conduct is only one factor." *RealPage MDL*, 709 F. Supp. at 505 (citing *Interstate Circuit*, 306 U.S. at 227). In reaching this conclusion, the court deemed *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186, 1195–96 (9th Cir. 2015)—which AvalonBay also cites—as flatly "not analogous to this case." *Id.* at 506 n.11. The court then went on to engage in the exact "functional" analysis that is required under the Sherman Act and concluded for the reasons discussed above, *see supra* § I.A.1, that the plaintiffs had plausibly alleged parallel conduct. *RealPage MDL*, 709 F. Supp. at 505; *see also Yardi*, 758 F. Supp. 3d at 1290–94 (denying motion to dismiss similar Sherman Act claim). The Court here should do the same.

---

[17] *See also*, *e.g.*, *In re Fragrance Direct Purchaser Antitrust Litig.*, No. 2:23-cv-02174, 2025 WL 579639, at *8 (D.N.J. Feb. 21, 2025) ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.")

AvalonBay attempts to distinguish the *RealPage MDL* and *Yardi* decisions by claiming those cases included factual allegations absent here—namely, "specific allegations that the defendants collectively, and in parallel, changed their rental pricing strategies in material ways." Mot. at 21. Not so. In *Yardi*, the court identified the change in rental strategy as "de-prioritizing occupancy in favor of algorithmic pricing." *Yardi*, 758 F. Supp. 3d at 1292. The Court need look no further than page two of the Complaint to see that Plaintiffs allege precisely that strategic shift: "[a]s a result" of Defendants' unlawful agreement, "instead of lowering rents to fill vacancies, Defendant Landlords hold rents high—knowing their competitors will not undercut them." Compl. ¶ 3; *see also id.* ("They work with RealPage and each other to keep apartments vacant in service of extracting unlawfully high rents from New Jersey renters."). And the Complaint does not stop there. It includes detailed examples showing how Defendants' scheme "represents a fundamental departure from the traditional, competitive marketplace that historically existed" (Compl. ¶ 56) and "artificially limited the supply of multifamily housing units." Compl. ¶ 171; *see also* Compl. ¶¶ 67, 131, 166 (detailing landlords' own descriptions of this strategy).

Likewise, as discussed previously, AvalonBay's suggestion that its *direct* exchange of non-public, competitively sensitive information—as opposed to sharing this information through RealPage's software—distinguishes it from other Defendants is wrong as a matter of law. Courts addressing algorithmic pricing schemes have not focused on *how* information was shared between competitors, but whether it was shared at all. No matter the mechanism, sharing information with competitors for the purpose of inflating prices demonstrates that independent competitors "join[ed] together" to "depriv[e] the marketplace of independent centers of decisionmaking." *Yardi*, 758 F. Supp. 3d at 1293 (quoting *Am. Needle*, 560 U.S. at 195); *see also RealPage MDL*, 709 F. Supp. 3d at 503–04. That is exactly what is alleged as to AvalonBay.

Next, AvalonBay resorts to a strawman, asserting without citation that "a plaintiff cannot state an antitrust conspiracy merely by alleging that all the defendants used the same software." Mot. at 20.[18] But that is not Plaintiffs' theory. As discussed above, the Complaint alleges far more: that Defendant Landlords used RealPage RM Software to exchange non-public, competitively sensitive information, to align their pricing strategies, and to raise rents in parallel. AvalonBay's strawman therefore has no relevance here.

Finally, AvalonBay contends that the Complaint must be dismissed because it alleges "nothing" about when other landlords began using RealPage RM products, who they licensed them from, or when they changed their pricing strategies. Mot. at 22. That's wrong on both the facts and law. *See* Opp. to Joint Mot. § I.A.1.a. The Complaint specifies, for example, that AvalonBay contracted with RealPage after the latter acquired LRO in 2017 (¶ Compl. 20) and that Greystar entered an August 2017 Master Agreement (¶ Compl. 23), and it further alleges that each Defendant Landlord has used RealPage RM Software for at least the past six years (Compl. ¶¶ 19–28). That suffices to plead parallel conduct, as courts have held even when landlords contracted with RealPage at different times. *See RealPage MDL*, 709 F. Supp. 3d at 510. And while Defendant Landlords licensed different RealPage products, each performed the same function: relying on non-public data—gathered directly, through RealPage, or both—to set daily rents, preventing meaningful price reductions, and encouraging collective rent increases. Compl. ¶ 6. Defendant Landlords are all alleged to have conspired to raise New Jersey rents to supra-competitive levels,

---

[18] *Burtch*, cited by AvalonBay, is inapposite. *See* Mot. at 20. There, the Third Circuit rejected price-fixing and boycott claims because the complaint showed inconsistent conduct— some defendants extended credit while others withheld it. 662 F.3d at 216. The fatal problem in *Burtch* was contradictory behavior, not differences in timing.

regardless of which version of RealPage's software they used, when they started using it, or whether their contract contained "bespoke" data restrictions.[19]

### B. The Complaint Plausibly Alleges "Plus Factors"

Antitrust plaintiffs relying on circumstantial evidence must plead at least one "plus factor." *Ins. Brokerage Antitrust*, 618 F.3d at 323 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). Although the Third Circuit has "not identified an exhaustive list," recognized plus factors include: (1) evidence that the defendant had a motive to participate in the conspiracy; (2) evidence that the defendant acted contrary to its independent self-interests; and (3) evidence implying a traditional conspiracy. *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) (citations omitted). All of these plus factors, and others, are plausibly alleged here.

**Motive:** First, AvalonBay plainly had a "motive to enter into a price fixing conspiracy," *Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 398, as it stood to gain millions of dollars in inflated rent from New Jersey renters. *See* Compl. ¶¶ 9, 161, 172. AvalonBay's leadership of the LRO User Group is particularly strong proof of its motive to collude with its so-called competitors to raise rents. Compl. ¶¶ 97–106. Through the LRO User Group, competitors "execute[d] shared business strategies." Compl. ¶ 104. For example, the LRO User Group discussed ways to inflate prices through LRO after the COVID-19 pandemic, when tenants were most vulnerable. Compl. ¶¶ 100–104. But the User Group wasn't limited to COVID-19—and indeed, AvalonBay's

---

[19] AvalonBay also contends that its "contract terms make plain that it never delegated its rent-setting authority to RealPage in any way." Mot. at 23. That is a factual dispute, not a basis for dismissal. The Complaint plausibly alleges that AvalonBay did delegate rent-setting authority, *see* Compl. ¶¶ 133–54, and nothing in the contracts AvalonBay has submitted unambiguously forecloses that allegation. At most, AvalonBay raises a question of contractual interpretation that cannot be resolved on the pleadings and must await summary judgment, when extrinsic evidence of intent and course of dealing may be considered.

executive led the group before the start of the pandemic. *See* Compl. ¶ 98 (alleging that he led the LRO User Group from "at least 2019 to 2021"). As the D.C. Court held, that alone is a powerful "plus factor" supporting AvalonBay's illegal conduct. *See RealPage D.C. II* at 17 (holding that the DCAG's allegations of AvalonBay's participation in the LRO User Group "describe[] specific conversations from which it [is] fair to infer an agreement because it alleged motives for [Defendants, including AvalonBay] to join the conspiracy" (quoting *In re McCormick & Co.*, 217 F. Supp. 3d 124, 132, 132–33 (D.D.C. 2016) (internal citation omitted)).

AvalonBay contends that a motivation to increase profits alone is insufficient because "all entrepreneurs have a legitimate understandable motive to increase profits," Mot. at 25 (quoting *Baby Food*, 166 F.3d at 137). But in a case decided after *Baby Food*, the Third Circuit made clear that the desire to increase profits can serve as a "plus factor" when accompanied by evidence of "concerted, collusive conduct*." LifeWatch Servs., Inc.*, 902 F.3d at 335 n.7 (quoting *Burtch*, 662 F.3d at 229). Here, AvalonBay's leadership role in the User Groups provides precisely that further evidence. And the Complaint goes further still, alleging dozens of additional examples of direct, anti-competitive communications among Defendant Landlords, including AvalonBay. *See* Compl. ¶¶ 63–112.

**Acts against independent self-interest:** Second, the Complaint is replete with "evidence that [AvalonBay] acted contrary to its interests." *Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 398. The Complaint alleges that AvalonBay shared non-public, competitively sensitive information with its competitors—information it would never share with them in the absence of an anticompetitive agreement. Compl. ¶¶ 88–96; *see also RealPage MDL*, 709 F. Supp. 3d at 510 ("It would clearly not be in any individual Defendant's economic self-interest to contribute its data . . . without knowing that it would benefit from its horizontal competitors doing the same.").

22

Indeed, AvalonBay specifically asked its competitors to provide that information in exchange for its own. Compl. ¶ 96.

The Complaint also alleges that AvalonBay recruited additional landlords to adopt RealPage RM Software, Compl. ¶ 73, conduct it would not have undertaken but for an agreement to collude. *See* Compl. ¶ 77 ("A landlord would not provide its competitors with one of its best tools to increase revenue if those competitors would just take away that revenue from the landlord.").

Finally, the Complaint alleges that RealPage users—including AvalonBay—sacrificed occupancy for higher prices, which would be contrary to their economic self-interest absent a conspiracy. Compl. ¶¶ 3, 56, 67, 131, 166. As the *Yardi* court explained, "raising rental prices regardless of occupancy and/or competitiveness would, in a competitive market, work against each lessor defendant's economic self-interest," and "[i]t is only in the presence of a prior understanding that competitors would likewise raise rates that such conduct appears rational." 758 F. Supp. 3d at 1293.

**Evidence of a traditional conspiracy:** Third, Plaintiffs allege significant "evidence implying a traditional conspiracy." *Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 398; *see* Compl. ¶¶ 78–112. Such evidence may involve "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449 (E.D. Pa. 2018). The Complaint documents numerous opportunities to coordinate and reinforce the alleged scheme through RealPage-sponsored User Group meetings, conferences, and other industry forums where landlords shared competitively sensitive strategies and policed adherence to RealPage's rent-maximizing model. Compl. ¶¶ 88–

106. AvalonBay's leadership of the LRO User Group is particularly strong evidence implying a traditional conspiracy. Through that group, competitors "execute[d] shared business strategies." Compl. ¶ 104. For example, the LRO User Group discussed ways to inflate prices through LRO after the COVID-19 pandemic. Compl. ¶¶ 100–04.

AvalonBay's effort to downplay its leadership role in the LRO User Group misses the point, especially at this stage. It insists the Complaint is deficient because, in its view, allegations that only three Defendants discussed the User Group's plan to increase prices after the pandemic cannot establish a conspiracy. Mot. at 28. But it is well-settled that defendants need not be involved in every mechanism of a conspiracy to state a claim. *See*, *e.g.*, *Processed Egg*, 902 F. Supp. 2d at 715 n.11 (E.D. Pa. 2012).

Moreover, the COVID-19 example is just that—an *example* of the collusive conduct the User Group facilitated. The Complaint expressly alleges that this episode was "emblematic" of the ways coconspirators coordinated with one another and with RealPage at the expense of New Jersey renters. Compl. ¶ 104. Indeed, the User Group wasn't limited to COVID-19—and AvalonBay's executive led the group in 2019, before the pandemic. *See* Compl. ¶ 98. While the example is not necessary, it is particularly powerful. AvalonBay was not just involved in this part of the conspiracy —it was the leader.

The D.C. Superior Court gave significant weight to AvalonBay's leadership in the LRO User Group, and this Court should do the same. As the D.C. court recognized, the allegations of AvalonBay's participation in the User Groups represents a concrete "'collective decision by competitors' which resulted in rent increases." *RealPage D.C. II* at 17. These allegations more than adequately "serve as a plus factor alleged in support of the broader RealPage conspiracy alleged against all Defendants.'" *RealPage D.C. III* at 7 (quotation marks omitted).

## II.    The Complaint Adequately Pleads New Jersey Consumer Fraud Act Claims

AvalonBay's motion devotes just two pages to addressing Plaintiffs' New Jersey Consumer Fraud Act ("CFA") claims (Counts Three & Four). The Court should reject AvalonBay's cursory arguments as to those counts.

### A.    The Complaint Plausibly Alleges a Commercial Practice in Violation of Law

The CFA declares unlawful any "commercial practice that is unconscionable or abusive, deception, fraud," or other otherwise unfair in ways listed in the statute. N.J. Stat. Ann. § 56:8-2. In actions brought by the Attorney General, the Act further provides that "any commercial practice that violates State or federal law is conclusively presumed to be an unlawful practice." N.J. Stat. Ann. § 56:8-4(b). Although the statute does not define "commercial practice," New Jersey courts have long held that the CFA "applies to landlords as 'sellers'" and covers "the rental of real estate," particularly in the multifamily housing context. *49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.*, 547 A.2d 1134, 1142 (N.J. Super Ct. App. Div. 1988).

Count Three alleges that AvalonBay's practices as a seller of real estate violate federal and state antitrust law, and are therefore "conclusively presumed to be [] unlawful" under the CFA. Compl. ¶¶ 242–45. AvalonBay effectively concedes that Count Three rises or falls with the antitrust claims, devoting a single sentence to it. *See* Mot. at 29. Thus, if the Court denies AvalonBay's motion on the antitrust claims, it should also deny dismissal of Count Three.

### B.    The Complaint Plausibly Alleges That AvalonBay's Conduct was Unconscionable

The Complaint also sufficiently pleads Count Four against AvalonBay under the CFA by alleging specific unconscionable practices and deceptive conduct tied to its use of RealPage's pricing software. The Complaint details how Defendant Landlords, including AvalonBay, exploited a significant power imbalance over renters by employing RealPage's software to inflate rents and create artificial urgency for a good that is a necessary part of life—housing. Compl. ¶¶

25

1, 11, 203, 258. Far from relying solely on antitrust allegations or vague allegations, the Complaint identifies AvalonBay's participation in practices designed to extract exorbitant rents from vulnerable New Jersey tenants while obscuring the true cause of rent increases, including concealing its use of RealPage and key features of its pricing matrix. Compl. ¶¶ 202–25. These allegations are precisely the kind of grossly unfair conduct that courts have recognized as actionable under the CFA. *See, e.g.*, *D'Agostino v. Maldonado*, 78 A.3d 527, 538–40 (N.J. 2013) (complex transactions obscuring key terms can be unconscionable). This is especially true in light of the principle that the CFA was meant to be construed "liberally" to fulfill its broad purpose of protecting the public against unconscionable commercial practices. *Associates Home Eq. Serv's v. Troup*, 778 A.2d 529, 543 (N.J. Sup. Ct. App. Div. 2001).

AvalonBay's argument that the Complaint fails to meet Rule 9(b)'s heightened pleading standard is misplaced. First, as this Court stated just last year, "CFA claim[s] based on 'unconscionable commercial practices' [are] subject only to the baseline requirements under Federal Rule of Civil Procedure 8." *Browne v. Nat'l Collegiate Student Loan Tr.*, No. 2:22-cv-2713, 2024 WL 2194265, at *4 n.8 (D.N.J. Apr. 30, 2024) (Arleo, J.), *aff'd*, No. 24-1896, 2025 WL 1681134 (3d Cir. June 16, 2025). Accordingly, Plaintiffs' unconscionability claim need not be pled with particularity.

Even if the higher pleading standard applies, the Complaint satisfies Rule 9(b). The entire Complaint provides particularized allegations describing AvalonBay's role in implementing RealPage's directives to manipulate pricing and mislead consumers, including citations to specific communications. *E.g.*, Compl. ¶¶ 20, 73, 87–108. These allegations provide adequate notice of the practices challenged and "inject sufficient precision to survive dismissal." *Toll Bros., Inc. v. Township of Moorestown*, No. 10-cv-4843, 2011 WL 2559507, at *10 (D.N.J. June 27, 2011)

26

(upholding common law fraud claim even though plaintiffs did not allege specific dates, times, and individual speakers of fraudulent statements).

## CONCLUSION

This Court should deny AvalonBay's motion to dismiss in full.

September 30, 2025                    Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Brian F. McDonough*
Brian F. McDonough (NJ Attorney ID 026121980)
Assistant Attorney General
David Reichenberg (NJ Attorney ID 507282024)
Section Chief, Antitrust Section
Jesse J. Sierant (NJ Attorney ID 049342013)
Section Chief, Consumer Fraud Prosecution
Section
Douglas T. Post (NJ Attorney ID 405852022)
Deputy Attorney General
Blair Gerold (NJ Attorney ID 294602019)
Deputy Attorney General
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (609) 696-5271
Brian.McDonough@law.njoag.gov
David.Reichenberg@law.njoag.gov
Jesse.Sierant@law.njoag.gov
Douglas.Post@law.njoag.gov
Blair.Gerold@law.njoag.gov

*Attorneys for Plaintiffs*

*/s/ Brent W. Johnson*
Brent W. Johnson (NJ Attorney ID 031902003)
Emmy L. Levens (*pro hac vice*)
Robert A. Braun (*pro hac vice*)
Amanda K. Chuzi (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 800

27

Washington, DC 20005
(202) 408-4600
bjohnson@cohenmilstein.com
elevens@cohenmilstein.com
rbraun@cohenmilstein.com
achuzi@cohenmilstein.com

Aaron J. Marks (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
amarks@cohenmilstein.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Plaintiffs' Brief in Opposition to AvalonBay Communities, Inc.'s Motion to Dismiss the Complaint dated September 30, 2025, was filed electronically with the United States District Court for the District of New Jersey through the Court's ECF System on this date.

Dated: September 30, 2025

/s/ Brent W. Johnson
Brent W. Johnson

*Counsel for Plaintiffs*