<u>NOT FOR PUBLICATION – FILED UNDER SEAL</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MATTHEW J. PLATKIN, Attorney General of the State of New Jersey, et al.,** *Plaintiffs,* v. **REALPAGE, INC., et al.,** *Defendants.* | **Civil Action No. 25-3057** **OPINION** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of five separate motions to dismiss the Plaintiffs' Complaint.[1]  See ECF Nos. 115, 116, 117, 118, 120.[2]  Each motion is opposed.  See ECF Nos. 139, 140,  141, 142, 143.  For the reasons stated below, the Joint MTD, ECF No. 115; AION MTD, ECF No. 116; K&C MTD, ECF No. 117; Russo MTD, ECF No. 118; and AvalonBay MTD, ECF No. 120, are each **GRANTED in part** and **DENIED in part**.

---

[1] Plaintiffs are Matthew Platkin, Attorney General of the State of New Jersey, and Jeremy Hollander, Acting Director of the New Jersey Division of Consumer Affairs (collectively, "Plaintiffs").  The Plaintiffs bring this case pursuant to the Attorney General's authority to bring civil enforcement actions under each of these statutes.  See ECF No. 1, Compl., at ¶ 17; see also 15 U.S.C. § 15c; N.J.S.A. §§ 56:8-8, 56:8-11, 56:9-6, 56:9-10(a).

[2] Defendants RealPage, Inc. ("RealPage"), Morgan Properties Management Company, LLC ("Morgan"), The Kamson Corporation ("Kamson"), LeFrak Estate, L.P. ("LeFrak"), Greystar Management Services, LLC ("Greystar"), AION Management, LLC ("AION"), Cammeby's Management Co. of N.J., L.P. ("Cammeby's"), Veris Residential, Inc. ("Veris"), and Bozzuto Management Company ("Bozzuto, and with the preceding Defendants, the "Joint Defendants"), have jointly moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  See ECF No. 115 ("Joint MTD").  In addition to joining the Joint MTD, Defendants AION, Kamson, and Cammeby's have filed their own supplemental motions to dismiss under Rule 12(b)(6).  See ECF No. 116 ("AION MTD"); ECF No. 117 ("K&C MTD").  Defendants Russo Development, LLC and Russo Property Management, LLC (collectively, "Russo") have filed an independent motion to dismiss under Rule 12(b)(6).  See ECF No. 118 ("Russo MTD").  And Defendant AvalonBay Communities, Inc. ("AvalonBay," collectively with the Joint Defendants and Russo but excluding RealPage, the "Defendant Landlords," and collectively with all other Defendants, the "Defendants") has also filed an independent motion to dismiss under Rule 12(b)(6).  See ECF No. 120 ("AvalonBay MTD").

## I.    FACTUAL BACKGROUND[3]

This case is one of several currently pending lawsuits against RealPage and various landlords asserting violations of federal and state antitrust laws based on a price-fixing conspiracy facilitated by RealPage's Revenue Management Software ("RMS").[4]  The cases, including this lawsuit, assert that landlords have agreed to provide RealPage with their non-public, competitively sensitive data, which is then used by the algorithms powering RealPage's RMS to inflate rental prices to supracompetitive levels.

According to the Plaintiffs, the Defendant Landlords agreed to ignore market dynamics and instead delegate their pricing authority to RealPage's RMS in various New Jersey housing markets.  This, Plaintiffs assert, represents unlawful collusion in violation of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C § 1; the New Jersey Antitrust Act ("NJAA"), N.J.S.A. § 56:9-3; and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1, et seq.

### A.    Development and Functioning of RealPage's RMS

RealPage is a Texas corporation that provides different technology-based products and services to real estate owners and property managers.  See Compl. ¶¶ 18, 30.  This includes RMS products that are designed to help landlord's maximize revenue on multifamily housing units they rent.  See id. ¶¶ 6, 32.

---

[3] The Court draws these facts from the Complaint and certain exhibits the Parties attached to their filings that are the proper subject of judicial notice at this stage.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining a court may consider documents "integral to or explicitly relied upon in the" complaint when deciding a motion to dismiss (quotation marks omitted)).

[4] See, e.g., In re RealPage, Inc., Rental Software Antitrust Litig. (No. II), No. 23-3071 (M.D. Tenn.); Commw. of Ky. ex rel. Att'y Gen. Russell Coleman v. RealPage, Inc., et al., No. 25-93 (E.D. Ky.) ("Coleman"); Dist. of Columbia v. RealPage, Inc., No. 2023-CAB-6762 (D.C. Super. Ct.); Brown v. Highmark Residential, LLC, et al., No. C-24-CV-25-3498 (Cir. Ct. Baltimore City).

RealPage offers three different RMS products: YieldStar, Lease Rent Options ("LRO"), and AI Revenue Management ("AIRM," and collectively with YieldStar and LRO, the "RM Products"). See id. ¶¶ 6, 30, 32. In 2002, RealPage launched the first of these RM Products, YieldStar. See id. ¶ 38. Around the same time, a competitor launched LRO. See id. ¶ 44. Over the next decade-and-a-half, use of RMS grew significantly, with YieldStar and LRO representing "the two largest RM products for rental real estate in the United States." Id. ¶¶ 43, 46.

Then, in 2017, RealPage acquired LRO. See id. ¶ 46. Between these two products, RealPage has amassed a vast repository of data on multifamily housing units across various markets in the United States and "solidified its position as the dominant player in the revenue management space." Id. ¶¶ 32, 46, 47. That position was further entrenched in 2020, when RealPage expanded the scope of its offerings and launched AIRM, which is a more advanced RMS tool that incorporates machine learning into its price modeling. See id. ¶ 48.

All three of these RM Products are "functionally similar." Id. ¶ 32. Each uses an algorithm that is programmed to "push rents higher" and "minimize[e] the frequency and magnitude of . . . rent decreases." Id. ¶¶ 114. The algorithms pull from a shared data repository managed and controlled by RealPage that includes competitively sensitive, proprietary, non-public information provided by landlords, such as occupancy rates, inventory, prices of actual leases, concessions offered to tenants, weekly totals of prospective tenants visiting properties, amenities and rental unit values, and pricing strategies (collectively, "Confidential Data"). See id. ¶¶ 5, 32, 79, 88–89. With this information, each RM Product "estimate[s] supply and demand for multifamily housing that is specific to particular geographic areas and unit types, and then generate[s] a price to charge for renting those units that maximizes the landlord's revenue." Id. ¶ 32.

3

More specifically, each RM Product uses the Confidential Data to generate a market range for each unit and floor plan. See id. ¶¶ 118–19, 122, 127. The algorithms are programmed to never recommend prices below the bottom of the range, which represents a "hard floor," but regularly recommend prices above the top of the range, which represents a "soft ceiling" that accounts for the changing, competitively sensitive inputs accessible to the algorithms. Id. ¶¶ 120–22, 127–29. This often means landlords maintain vacancies to hold rental prices high instead of lowering prices to fill their vacant units. See id. ¶¶ 3, 67, 131, 171. Although this cuts against typical market dynamics, by following the RMS's generated rental prices, RealPage touts that landlords can enjoy revenue increases from two to seven percent. See id. ¶¶ 9, 163.

Although these rental prices are framed as "recommendations," RealPage has created a multi-layered system to monitor landlords compliance with the prices generated by its RMS. First, on the front-end, RealPage trains landlords that contract to use its RM Products to "be compliant" and impose the rents generated by its RMS "90+% percent of the time." Id. ¶¶ 134–36. As part of this training, landlords are "command[ed]" to turn on a feature that will automatically accept all of the RMS's pricing recommendations. Id. ¶¶ 139–40. They are also instructed not to reveal that their rental properties are priced using RealPage's RMS and to instead represent that their units are "individually priced." Id. ¶ 147.

Second, to manage the RMS while its being used, RealPage has created an administrative infrastructure intended to dissuade landlords from deviating from the RMS's pricing recommendations. If landlords opt not to turn on their RM Products' auto-accept features, they still are only permitted to "override" a price recommendation if they submit a "written explanation [to RealPage] for why they wish to depart from the RealPage-generated rent." Id. ¶¶ 137, 143. And if landlords get this far, they will then be contacted by a RealPage Pricing Advisor, who "will

not accept landlords' explanations for proposed overrides except in extenuating circumstances," such as "a recent natural disaster." Id. ¶¶ 137, 145.

Third, on the back-end, RealPage itself polices compliance with its RMS's pricing recommendations in several ways. It uses "secret shops," which are instances in which a RealPage employee calls a property pretending to be a renter, to ensure that landlords are presenting pricing information for their units consistent with RealPage's training. Id. ¶¶ 146–47, 214. It has programmed its RMS to calculate landlords' compliance rates, i.e., how often the landlords are "imposing the RealPage generated rent." Id. ¶ 148. And, it hires Pricing Analysts to create "Rate Acceptance and Lease Compliance Analysis" reports that "identify detached potentially at-risk clients, properties that need additional training, or opportunities for parameter and strategy alignment." Id. ¶¶ 149, 153. Simply put, RealPage pays to identify any landlord that is departing from the agreement to fix prices according to the RMS and then actively seeks to "discipline that member into adhering to the RealPage-generated prices." Id. ¶ 149.

This system has ensured strong adherence to the RMS's generated prices. RealPage retains ninety-five percent of all landlords that contract to use one of its RM Products. See id. ¶ 150. Among these landlords, "[o]verrides are exceedingly rare" and RealPage-generated rents are imposed "the vast majority of the time, in some instances 90% of the time or greater." Id. ¶ 151. The "rare" repeat offenders ultimately lose their access to the RMS. Id. ¶ 150.

**B.      Defendant Landlords Agree to Use RealPage's RM Products to Set Rent**

Following RealPage's ascension as the "dominant player in the revenue management space," id. ¶ 46, Defendant Landlords entered contracts with RealPage to use the RM Products and coordinate pricing for their New Jersey multifamily rental units, see id. ¶¶ 19–28, 33, 35 (stating that the Defendant Landlords entered contracts with RealPage in 2017 or have contracted to use at least one of the RM Products for "at least the past six years," i.e., since 2019). These landlords

own a significant share of various multifamily rental units in geographic markets across the State, and their arrangements with RealPage mean that more than 90,000 multifamily rental units are now priced according to RealPage's RMS. See id. ¶¶ 52–54, 192–93, 195–98.

The Defendant Landlord's decision to enter contracts with RealPage and price their rental units based on its RMS was "a fundamental departure from the traditional competitive marketplace that historically existed for multifamily rentals" because by doing so, competitors were transformed into collaborators. Id. ¶¶ 5, 55–56. Pursuant to these contracts, the Defendant Landlords agreed to provide their "valuable proprietary data"—i.e., Confidential Data—to RealPage and allow RealPage to use this data to power its RM Products. Id. ¶ 37. The contracts require the Defendant Landlords to provide RealPage with "correct and accurate" Confidential Data. Id. ¶ 80. They know that their competitors' agreements with RealPage obligate them to do the same. See id. ¶¶ 80, 81, 83–84. Indeed, the contracts make clear that the RMS will rely upon the Confidential Data in its price modeling to "deliver value" to all landlords using the service. Id. ¶ 37. Thus, each Defendant Landlord "know[s] that their competitors' information," in conjunction with their own, "is being used to generate the rents [RealPage's RMS recommends that] they charge" for their units. Id. ¶ 80–81, 83. To access the service, the Defendant Landlords also agreed to pay "substantial" fees, including "an initial set-up fee" and a subsequent "monthly fee for each multifamily residential unit" priced using the RMS. Id. ¶ 36.

On top of this exchange of information designed to power the RMS algorithms, RealPage provides certain landlords with access to certain "non-aggregated" data, such as "property-specific occupancy and rent data at the floorplan level for competitor properties." Id. ¶ 85. The Defendant Landlords were also invited to, and did, participate in different virtual and in-person forums, which included regularly scheduled user group meetings and conferences for landlords using RealPage's

RMS, that directly facilitated the further exchange of Confidential Data. See id. ¶¶ 87–92, 97–98, 105–08, 110. Certain Defendant Landlords used these forums to exchange information about property visits and applications—the type of non-publicly available information that relates directly to demand. See id. ¶¶ 93–94. Others used the forums to coordinate pricing strategies following the onset of the COVID-19 pandemic. See id. ¶¶ 99–104. And to help further solidify this price-fixing scheme, certain of the Defendant Landlords agreed, "at RealPage's behest," to consult with and recruit other landlords to become RealPage RMS users. Id. ¶¶ 65–66.

One Defendant Landlord, AvalonBay, is subject to a unique agreement with RealPage. It contracted with RealPage to use LRO. See id. ¶ 20. But pursuant to its contract, RealPage is "restricted . . . from sharing AvalonBay's [Confidential] [D]ata with other landlords," referred to as the Input Representation provision, "or incorporating other landlords' [Confidential] [D]ata when calculating [AvalonBay's] rents," referred to as the Data Entry Representation provision (collectively, the "Data Restriction Provisions"). Id.; see also ECF No. 120.1, AvalonBay MTD, Ex. 1 ("Master Service Agreement"), § 4.5. However, Plaintiffs allege this is a "nominal[]" restriction that AvalonBay circumvents to partake in this price-fixing conspiracy. See Compl. ¶ 20. Specifically, AvalonBay is alleged to participate in (and, in certain circumstances, lead) regularly scheduled LRO User Group meetings where they exchange Confidential Data with other Defendant Landlords. See id. ¶¶ 90, 93, 96–98. They also allegedly helped devise and propose algorithmic amendments to RealPage to ensure LRO did not propose rental price reductions based on certain market circumstances (like the COVID-19 pandemic). See id. ¶¶ 99–104.

By agreeing to use RealPage's RMS to set their rental prices, the Defendant Landlords have been able to increase rental rates and revenue despite decreasing occupancy rates, difficult

market conditions, or rent control ordinances.  Id. ¶¶ 163, 166, 168–71, 196, 218.  Plaintiffs assert that this has been achieved through unlawful means.

Specifically, in Count I, Plaintiffs allege that the arrangement between RealPage and the Defendant Landlords constitutes a hub-and-spoke price-fixing conspiracy in violation of the Sherman Act.  See id. ¶¶ 226–33.  In Count II, they assert that this same conspiracy violates the NJAA.  See id. ¶¶ 234–41.  In Count III, they claim that this same conspiracy also constitutes a violation of the NJCFA.  See id. ¶¶ 242–25.  In Count IV, they allege that Defendants engaged in certain unconscionable commercial practices, misrepresentations, and knowing omissions in violation of the NJCFA.  See id. ¶¶ 246–61.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (3007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The Court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  See Huertas v. Bayer US LLC, 120 F.4th 1169, 1174 (3d Cir. 2024).  The standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (quotation marks omitted).

## III.   DISCUSSION

### A.   Plaintiffs' Federal Antitrust Claim

The Sherman Act broadly outlaws "[e]very contract, combination . . ., or conspiracy in restraint of trade."  15 U.S.C. § 1.  Despite its breadth, courts have interpreted its language to only prohibit "concerted action that unreasonably restrains trade."  Pa. Dental Ass'n v. Med. Serv.

8

Ass'n, 745 F.2d 248, 255 (3d Cir. 1984). Thus, to plead a violation of the Sherman Act, a plaintiff must allege (1) concerted action, and (2) that the concerted action imposes an unreasonable restraint on trade. See Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011).

Here, all motions to dismiss contend only that Plaintiffs have failed to allege "concerted action."[5] Concerted action is defined as a "unity of purpose[,] or a common design and understanding[,] or a meeting of minds[,] or a conscious commitment to a common scheme." Burtch, 662 F.3d at 221 (quotation marks omitted). Simply put, concerted action requires "the existence of an agreement" between competitors. Ins. Brokerage, 618 F.3d at 315 (quotation marks omitted).

Alleged anticompetitive agreements can take one of three forms: a horizontal conspiracy, a vertical conspiracy, or a hub-and-spoke conspiracy. A horizontal conspiracy involves an agreement between "competitors at the same level of the market structure." United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972). A vertical conspiracy involves an agreement between "combinations of persons at different levels of the market structure." Id. A hub-and-spoke conspiracy is a hybrid agreement that involves elements of both horizontal and vertical

---

[5] The second element of the pleading standard—whether the conduct unreasonably restrains trade—is analyzed under either the per se standard or the rule of reason. See Burtch, 662 F.3d at 221. The per se standard applies when a practice, "on its face, has no purpose except stifling competition." Eichorn v. AT&T Corp., 248 F.3d 131, 143 (3d Cir. 2001) (quotation marks omitted). An agreement to fix prices is a "paradigmatic example" of an inherently anticompetitive practice that falls under the per se standard, and it is therefore "conclusively presumed to unreasonably restrain competition." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 316–17 (3d. Cir. 2010) (quotation marks omitted); see also United States v. Apple, Inc., 791 F.3d 290, 322–25 (2d Cir. 2015) (explaining that hub-and-spoke price fixing conspiracies are considered inherently anticompetitive and subject to the per se standard).

Here, Plaintiffs claim the alleged hub-and-spoke conspiracy represents a price-fixing agreement and therefore constitutes a per se violation of the Sherman Act. See Compl. ¶¶ 232, 240. No Defendants substantively argue otherwise. The Joint Defendants state in a footnote that they "disagree" with this characterization. See Joint MTD at 15 n.3. But this alone is insufficient to warrant the Court's consideration. See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."). Accordingly, the Court only addresses whether Plaintiffs have plausibly alleged concerted action.

9

conspiracies. See Howard Hess Dental Lab'ys, Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 254–55 (3d Cir. 2010). It involves a central actor, the "hub," who coordinates anticompetitive vertical agreements with market competitors, the "spokes," as well as an anticompetitive horizontal agreement among the competing "spokes" (creating the "rim" of the conspiracy). Id. at 255. "In all hub-and-spoke conspiracies, the horizontal agreement among the spokes supports the agreements between the hub and each spoke, and vice versa." Ins. Brokerage, 618 F.3d at 347. Here, Plaintiffs are alleging the existence of a hub-and-spoke conspiracy, with RealPage serving as the "hub" and the Defendant Landlords acting as the competing "spokes." See ECF No. 139 ("Joint Opp.") at 16–17.

At the pleading stage of an antitrust case, factual allegations must not be assessed in isolation, but holistically. See Ins. Brokerage, 618 F.3d at 326 (explaining that the court "must examine the entirety of the complaint['s] factual allegations and determine whether, taken as true, they support a plausible inference" of conspiracy (emphasis added)). Plaintiffs only need to allege "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556. This can be accomplished by sufficiently alleging the existence of either direct or circumstantial evidence. See Lifewatch Servs., Inc. v. Highmark, Inc., 902 F.3d 323, 333 (3d Cir. 2018). Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted." InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003) (quotation marks omitted). If the complaint contains direct evidence, "a court need go no further on the question of whether an agreement has been adequately pled." W. Penn Allegheny Health Sys, Inc. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010).

This "proverbial smoking gun," however, is often difficult to come by, and most plaintiffs therefore seek to plead and prove antitrust conspiracies through "circumstantial evidence (and the

10

reasonable inferences that may be drawn therefrom)." InterVest, 340 F.3d at 159 (quotation marks omitted). Because § 1 of the Sherman Act does not outlaw unilateral conduct, mere allegations of parallel conduct among competitors, without more, are insufficient to plausibly plead the existence of a conspiracy from circumstantial evidence. See Twombly, 550 U.S. at 556–57. Instead, Plaintiffs must allege "both parallel conduct and something 'more,'" often referred to as "plus factors." Lifewatch, 902 F.3d at 333.

Often, "the 'critical issue' for establishing a hub-and-spoke conspiracy is determining 'how the spokes are connected to each other.'" Cornish-Adebiyi v. Caeser's Ent., Inc., No. 23-2536, 2024 WL 4356188, at *3 (D.N.J. Sept. 30, 2024) (quoting Ins. Brokerage, 618 F.3d at 347). Here, Defendants argue that Plaintiffs have failed to allege sufficient circumstantial evidence to infer that the competing spokes—the Defendant Landlords—entered an interconnected horizontal agreement. See Joint MTD at 17–31; AION MTD at 10–13; K&C MTD at 14–20; Russo MTD at 17–22; AvalonBay MTD at 24–34.[6] As part of this argument, they contend that these allegations represent impermissible group pleading. See Joint MTD at 24–25; AION MTD at 13–16; Russo MTD at 11 n.5, 16–17. Separately, the Joint Defendants argue that Plaintiffs have failed to allege any evidence to support vertical agreements to restrain trade between RealPage and the Defendant Landlords. See Joint MTD at 32–34. And AvalonBay distinctly argues, based on its unique agreement with RealPage, that Plaintiffs have failed to adequately state its involvement in the alleged conspiracy. See AvalonBay MTD at 18–24. The Court considers each argument in turn.

---

[6] Across their multiple motions to dismiss, the Defendants all make similar arguments that Plaintiffs' allegations of parallel conduct and plus factors are insufficient to infer the existence of a horizontal agreement to fix prices. The Court therefore addresses these arguments collectively. Where Defendants Cammeby's, Kamson, AION, or Russo make unique arguments, the Court addresses those specifically.

1.    **Plaintiffs Sufficiently Plead the Existence of a Horizontal Agreement Among the Defendant Landlords.[7]**

a.    **Plaintiffs Plead Parallel Conduct and Plus Factors.**

Plaintiffs seek to plead the existence of a horizontal agreement among the Defendant Landlords through alleged circumstantial evidence.  See Joint Opp. at 18.  But Defendants argue that they fail to sufficiently plead either the parallel conduct or plus factors necessary to support a claim based on circumstantial evidence.  The Court disagrees and finds Plaintiffs have sufficiently pleaded the horizontal component of their hub-and-spoke conspiracy.

Parallel conduct is any "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance[d] understanding among the parties."  Twombly, 550 U.S. at 556 n.4.  This may include the parallel adoption of certain business practices or policies, or "parallel pricing changes."  In re RealPage, Inc., Rental Software Antitrust Litig. (No. II), 709 F. Supp. 3d 478, 501 (M.D. Tenn. 2023) ("RealPage MDL"); see also Lifewatch, 902 F.3d at 333–34 (holding that the adoption of the same business practice among competitors was sufficient to plead parallel conduct).

Although parallel conduct "gets the complaint close to stating a claim," to establish plausibility, a plaintiff must provide further "factual enhancement" to "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Twombly, 550 U.S. at 557.  This comes by pleading the existence of "at least one 'plus factor.'"  Ins. Brokerage, 618 F.3d at 323.

Plus factors recognized by the Third Circuit include: (1) allegations of motive, (2) conduct contrary to independent self-interest, or (3) facts suggestive of a traditional conspiracy.  See In re

---

[7] In this subsection, references to "Defendant Landlords" excludes AvalonBay, who is separately addressed by the Court.  See infra § III.A.3.

Choc. Confectionary Antitrust Litig., 801 F.3d 383, 398 (3d Cir. 2015). "Evidence of a motive to conspire means the market is conducive to price fixing, and evidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market." Id. Evidence of a traditional conspiracy consists of "non-economic evidence that there was an actual manifest agreement not to compete," and may include "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." In re Flat Glass Antitrust Litig., 385 F.3d 350, 361 (3d Cir. 2004) (quotation marks omitted). The court "must assess plus factors holistically," not individually. RealPage MDL, 709 F. Supp. 3d at 510 (citing Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99 (1962)); see also Valspar Corp. v. E.I. Du Pont De Nemours & Co., 873 F.3d 185, 193 (3d Cir. 2017) (explaining that, absent allegations that the relevant market is an oligopoly, "plus factors are weighed together").

Defendants argue that Plaintiffs have merely pleaded that each of the Defendant Landlords entered licensing agreements with RealPage to use its RMS, which represents parallel conduct consistent with each's individual economic self-interest. But Defendants take a short-sighted view of the Complaint.

First, Plaintiffs plausibly allege parallel conduct. Specifically, they claim that after Defendant Landlords entered contracts with RealPage, they departed from the "traditional, competitive marketplace that historically existed for multifamily rentals" and engaged in parallel shifts regarding (1) their pricing priorities, and (2) their information exchange practices. Compl. ¶¶ 5, 55–56. Before agreeing to price their rental units according to RealPage's RMS, the Defendant Landlords competed on pricing with a goal "to increase occupancy" rates in their multifamily housing units. Id. ¶ 55. Afterwards, however, they agreed to prioritize increasing

13

rental prices over filling vacancies.  See id. ¶¶ 3, 56, 67, 131, 162, 166, 171, 196.  To facilitate this shift, they agreed to exchange their previously non-public Confidential Data with RealPage— knowing that their fellow competitors are doing the same—to power RealPage's RMS and the rental price recommendations they receive from it.  See id. ¶¶ 35, 37, 79–81, 83–84.  They also exchange this information directly with one another through different digital and in-person forums RealPage has organized for its RMS users.  See id. ¶¶ 87–94, 97–108, 110.  These parallel changes in pricing priorities and business practices sufficiently allege parallel conduct.  See Duffy v. Yardi Sys., Inc., 758 F. Supp. 3d 1283, 1293 (W.D. Wash. 2024) (holding that landlords using RMS engaged in parallel conduct "by agreeing to use Yardi's products, delegating their pricing decisions [to Yardi], and de-prioritizing occupancy in favor of algorithmic pricing"); RealPage MDL, 709 F. Supp. 3d at 504–08 (similar); Coleman, No. 25-93, ECF No. 129 at 12–14 (similar).[8]

Second, Plaintiffs accompany these allegations of parallel conduct with "at least one 'plus factor.'"  Ins. Brokerage, 618 F.3d at 323.  Specifically, their allegations regarding the Defendant Landlords exchange of Confidential Data allows the Court to plausibly infer the existence of a preceding price-fixing agreement.  Defendant Landlords argue that it is in the self-interest of each of them to license RealPage's RMS and maximize their revenue streams.  But doing so requires that they disclose their Confidential Data to RealPage to be used by the RMS for the benefit of their competitors also licensing RealPage's software.  See Compl. ¶¶ 37, 80.  It is not in any Defendant Landlord's self-interest to provide RealPage with "its proprietary commercial data" that

---

[8] The Joint Defendants argue that Plaintiffs cannot "seek refuge in the RealPage MDL decision" because that decision relied on regression analyses of the price changes that occurred in four markets, whereas Plaintiffs here do not.  See Joint MTD at 26.  However, Plaintiffs have alleged a shift in pricing strategy sufficient to constitute parallel conduct. At this stage, that is sufficient.  Plaintiffs will eventually be held to their proofs, but they need not proffer detailed statistical regression analysis at the pleading stage.  See, e.g., Duffy, 758 F. Supp. 3d at 1292 (holding that allegations that landlords, following agreements to access Yardi's RMS, de-prioritized occupancy in favor of algorithmic pricing—absent any proffered regression analysis—was sufficient to state parallel conduct).

it knows RealPage will then use "to recommend rental prices to its competitors," unless each Landlord Defendant knows that RealPage is requiring the same information sharing from each Defendant Landlord's competitors as well and "they are receiving in return the benefit of their competitors' data in pricing their own units." RealPage MDL, 709 F. Supp. 3d at 510; see also Compl. ¶¶ 5, 79–81. Simply put, the Defendant Landlords are engaging in parallel information sharing that is "inconsistent with a competitive market" because doing so promotes an axiomatic anticompetitive end—price fixing. Choc. Confectionary, 801 F.3d at 398; see also Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."); In re Broiler Chicken Antitrust Litig., No. 16-8637, 2025 WL 461407, at *4 (N.D. Ill. Feb. 11, 2025) ("It is well-settled that the exchange of price information among competitors is indicative of [an] anticompetitive agreement.").[9]

But there is more. Plaintiffs' alleged parallel conduct is also bolstered by additional factual allegations that support other recognized plus factors, including:

- **Motive.** Defendant Landlords have an incentive to license RealPage's RMS to maximize profits. See Compl. ¶¶ 9, 32, 161, 163. The coordination of Confidential Data provided by RealPage's RMS allows Defendant Landlords to continue pushing price increases and profit margins, even when market conditions would otherwise warrant price reductions or lead to losses. See id. ¶¶ 99–104, 168–71. This profit motive is appropriate to consider in light of the other allegations of "concerted, collusive conduct" offered by Plaintiffs. See Burtch, 662 F.3d at 229.

- **Motive/Market Structure.** The multifamily housing rental market is also "conducive to price-fixing." Choc. Confectionary, 801 F.3d at 398. Because shelter is a necessity, the

---

[9] Indeed, it is the specific nature of Plaintiffs' allegations regarding Defendant Landlords' knowing exchange of non-public, Confidential Data that distinguishes this case from the other out-of-District RMS cases that Defendants rely upon—as those cases themselves recognize. See In re Passenger Vehicle Replacement Tires Antitrust Litig., 767 F. Supp. 3d 681, 716 (N.D. Ohio 2025); Dai v. SAS Institute, Inc., No. 24-2537, 2025 WL 2078835, at *4–5 (N.D. Cal. July 18, 2025); Cornish-Adebiyi, 2024 WL 4356188, at *5–7; Gibson v. Cendyn Grp., LLC, 2024 WL 2060260, at *4 n.7 (D. Nev. May 8, 2024). And, in any event, none of those decisions are binding on this Court.

15

New Jersey multifamily rental market is highly inelastic—i.e., demand will remain consistent, even in response to significant price increases. See Compl. ¶ 156. High barriers to entry, in the form of significant building costs, have constrained supply. See id. ¶ 158. And high switching costs create conditions under which renters are more likely to expect and accept price increases then seek out cheaper alternatives. See id. ¶ 159. Agreeing to coordinate price increases for similar rental units further dampens any incentive renters may have to seek cheaper alternatives under this market structure and gives landlords further incentive to collude. See In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 623, 631–32 (E.D. Pa. 2010) (explaining certain aspects of market structure, including "high barriers to entry" and "inelastic demand," "are each conducive to transforming [] motive into action").

- **Action Against Economic Self-Interest.** Defendant Landlords are recruiting competitors to use a tool that is designed to provide them with a competitive advantage on pricing to maximize their revenue streams. See Compl. ¶¶ 65–66, 77–78. That is "inconsistent with a competitive market," Choc. Confectionary, 801 F.3d at 398—unless the success of the tool actually depends on the recruitment of competitors because it is powered by the anticompetitive exchange of information.

- **Action Against Economic Self-Interest.** Defendant Landlords pay "substantial" fees to RealPage to license its RMS, including an "initial set up fee" and a "monthly fee for each multifamily residential unit" priced according to the RMS. See Compl. ¶ 36. It is reasonable to infer that Defendant Landlords do not pay these "substantial" fees to access a tool that they then regularly disregard. Id.; see also RealPage MDL, 709 F. Supp. 3d at 511.

- **Traditional Conspiracy.** RealPage has organized different digital and in-person forums and regular user group meetings for its RMS users where competitors can further exchange Confidential Data and which provide an opportunity to "exchange[] assurances of common action." Flat Glass, 385 F.3d at 361; see also RealPage MDL, 709 F. Supp. 3d at 511; Compl. ¶¶ 87–94, 97–98, 105–08, 110.

- **Traditional Conspiracy.** RealPage has created a multi-layered enforcement system that involves training and monitoring to enforce adherence to the RMS-generated prices. See Compl. ¶¶ 134–49, 152–53. This provides an assurance to each Defendant Landlord that horizontal competitors are complying with the terms of the conspiracy. See RealPage MDL, 709 F. Supp. 3d at 511.

The Defendants attempt to equate the information sharing alleged here with what occurred in Insurance Brokerage. But the situation is unanalogous. That case alleged that brokers were sharing commission rates with competing insurers to organize a price-fixing conspiracy. See 618 F.3d at 329. But the insurers were dependent on the brokers to access clients—i.e., to obtain business. See id. at 328. It was therefore in each insurers' economic self-interest to obtain this information to match or exceed competitors' commission rates; otherwise, they would lose out on

16

potential business. See id. at 332. Here, no similar market dynamic is alleged. The Defendant Landlords are not reliant on RealPage for business, and RealPage possesses no market power in the Defendant Landlords' markets—they do. Moreover, the Defendant Landlords are sharing their Confidential Data with RealPage to allow RealPage's algorithm to inform the price that their competitors should charge. That is not in their economic self-interest.

Defendants also contend that the Plaintiffs have fallen short of their pleading burden to allege parallel conduct in three ways: (1) Defendant Landlords conduct was not identical; (2) Defendant Landlords did not act at or about the same time; and (3) Defendant Landlords can override the RMS's pricing recommendations. No argument is persuasive.

First, parallel conduct need not be identical; instead, plaintiffs only need to allege "that defendants 'acted similarly.'" See In re Generic Pharms. Pricing Antitrust Litig., 338 F. Supp. 3d 404, 442 (E.D. Pa. 2018) (quoting Petruzzi's IGA Supermarkets, Inc. v. Darling- Delaware Co., 998 F.3d 1224, 1243 (3d Cir. 1993); see also SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 427–29 (4th Cir. 2015). Defendants argue that Plaintiffs have failed to allege parallel conduct because each of the Defendant Landlords used different RM Products. See Joint MTD at 22; Compl. ¶ 33. But to gain access to any of them, they each had to contractually agree to share their Confidential Data with RealPage and allow RealPage to use this data to power all of the RM Products. Compl. ¶¶ 5, 35–37, 79–81. And all three are "functionally similar." Id. ¶ 32. They all rely on the same "shared" data repositories. Id. ¶¶ 32, 79. They all are programmed to use the Confidential Data provided by landlords to establish price ranges that push rents higher, even when market conditions may warrant price decreases. Id. ¶¶ 114, 118–22, 127–31, 168–71. And they all contain auto-accept pricing features and are supported by a monitoring system designed to prevent users from deviating from the RMS-generated rent prices—which users, including

17

Defendant Landlords, therefore adopt the "vast majority of the time." Id. ¶¶ 137, 139–40, 143, 145, 151.[10]  In short, by contracting to use any of the RM Products, the Defendant Landlords agreed to "act[] similarly." Petruzzi, 998 F.3d at 1243.[11]

Second, parallel conduct need not be simultaneous. See Interstate Cir. v. United States, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators").  This is particularly true in the context of a hub-and-spoke conspiracy. See United States v. Masonite Corp., 316 U.S. 265, 274–75 (1942) (explaining that it was insignificant in a hub-and-spoke conspiracy if the "spokes" independently entered contracts with the "hub" at different times without knowledge that their agreement was "part of a larger arrangement" if, "as the arrangement continued[,] each became familiar with [the conspiracy's] purpose and scope" and agreed to adhere to it).

Here, although Plaintiffs do not allege that the Defendant Landlords all entered contracts with RealPage to access its RMS at the same time, they do allege that in those contracts, Defendant Landlords were agreeing to immediately share their Confidential Data with RealPage and knew

---

[10] Russo relies on an email chain that was excerpted in Plaintiffs' Complaint that it claims shows that it rejected an RMS-generated price. See ECF No. 118-2, Russo MTD, Ex. A; Compl. ¶¶ 128, 189. But the email only shows that a Russo employee informed a RealPage employee that Russo was "leaning towards" deviating from the RMS-generated price and that "it would be helpful to have further discussion on the topic." See Russo MTD, ECF No. 118.1, Ex. A. It then shows the RealPage employee elevated the issue to a pricing advisor. Such action is consistent with Plaintiffs' allegations of how RealPage responds to push back from landlords. See Compl. ¶ 145. It also does not demonstrate that Russo ultimately rejected this RMS-generated price. And even if it could be so construed, it is but one example of one Defendant Landlord rejecting an RMS-generated price and does not contradict Plaintiffs' allegation that these prices are adopted "the vast majority of the time." Compl. ¶ 151.

[11] Cammeby's and Kamson contend that the Complaint claims that they used LRO, that LRO functions differently from YieldStar and AIRM, and that these differences defeat allegations of parallel conduct. See K&C MTD at 14–16. But the Complaint states that all three RM Products are "functionally similar." See Compl. ¶ 32. All three rely on Confidential Data pulled from a shared repository of information managed by RealPage, see id. ¶¶ 32, 79; all three are programmed to establish supracompetitive prices, see id. ¶¶ 118–22, 127–31; and, all three have auto-accept features that RealPage "command[s]" users to turn on, see id. ¶¶ 139–40. These allegations sufficiently plead parallel functioning across LRO, YieldStar, and AIRM. Accord Duffy, 758 F. Supp. 3d at 1291 n.1 ("Defendants cannot obtain a dismissal at the pleading stage by ignoring or challenging the facts alleged.").

18

other competitors were agreeing to do the same.  See Compl. ¶¶ 37, 80–81, 83–84.  They also allege that RealPage was immediately taking steps to enforce adherence with the RMS-generated rental prices, and that users, including Defendant Landlords, adopted these prices at a significant rate.  Id. ¶¶ 134–51.  This represents "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan" and is sufficient to establish parallel conduct.  Masonite, 316 U.S. at 275 (quotation marks omitted); see also In re MultiPlan Health Insurance Provider Litigation, 789 F. Supp. 3d 614, 637 (N.D. Ill. 2025) (holding that an agreement among health insurers to use an algorithm to calculate prices for out-of-network care that the insurers began to use at different times was sufficient to allege parallel conduct because "concurrent adoption of a price-fixing scheme is not required to prove parallel conduct").

Defendants attempt to elide this conclusion by pointing to Burtch v. Milberg Factors, Inc., but that case is of no help to them.  There, the court found no parallel conduct sufficient to support a credit-denying conspiracy where, at different times, certain of the alleged conspirators were extending unlimited credit to plaintiff, others were extending plaintiff credit for a limited set of purchases, and others were denying plaintiff credit.  See 662 F.3d at 228–29.  There are no allegations of similar disparate conduct among the alleged conspirators here.[12]

---

[12] The Defendants also argue that Plaintiffs fail to specifically allege when each Defendant Landlord contracted with RealPage and organized the alleged conspiracy.  See Joint MTD at 22–23.  But each Defendant Landlord "can determine when and where it is alleged that it entered the alleged conspiracy merely by looking at its contract with RealPage."  In re RealPage, Inc., Rental Software Antitrust Litig. (No. II), 709 F. Supp. 3d 537, 542 (M.D. Tenn. 2023) ("RealPage MDL II").  Moreover, Plaintiffs do allege the following: RealPage became the "dominant player in the revenue management space" in 2017 after it acquired LRO, Compl. ¶ 46; that same year, certain Defendant Landlords entered contracts with RealPage, see id. ¶ 23; and, by 2019, all Defendant Landlords had entered into contracts with RealPage, see id. ¶¶ 19, 21–22, 24–28.  The reasonable inference from these allegations is that Defendant Landlords began to conspire with RealPage following its ascension to the top of the RMS market in 2017, and that all had entered the conspiracy by 2019, at which point its impact in the asserted New Jersey markets began to be effectively measurable (i.e., the relevant period is 2019 through the present).

Third, the fact that the RMS-generated rental prices are framed as "recommendations" does not undermine Plaintiffs' allegations of parallel conduct. That is because the "theoretical ability to deviate from a [RealPage]-calculated rate does not mean [landlords] actually reject [RealPage's] recommendations in practice." MultiPlan, 789 F. Supp. 3d at 638. Despite their best efforts, Defendants cannot turn Plaintiffs' allegations into something they are not. Plaintiffs claim that RealPage goes to great lengths to ensure and enforce compliance with the "recommendations" offered by its RM Products. See Compl. ¶¶ 134–49, 153. This includes training users, including Defendant Landlords, to "be compliant" and "command[ing]" them to turn on auto-accept features. Id. ¶¶ 134, 139–40. It includes imposing administrative roadblocks and demanding justifications for deviations to discourage overrides. See id. ¶¶ 137, 143, 145. And it includes monitoring compliance rates. See id. ¶¶ 146–49, 153, 214. Plaintiffs further allege that this system functions as intended, prompting users, including Defendant Landlords, to accept and use the RMS-generated prices for their units "the vast majority of the time," including as significant as ninety percent of the time or greater. Id. ¶ 151. Simply put, "[w]hether or not [RealPage's] calculated rates are labelled as 'recommendations,' the [P]laintiffs plausibly allege that they are more akin to mandates." MultiPlan, 789 F. Supp. 3d at 638.

In sum, Plaintiffs' allegations of parallel conduct and "plus factors" are sufficient to infer the Defendant Landlords reached a preceding agreement to fix prices in accordance with RealPage's RMS.

### b. Plaintiffs' Allegations Do Not Constitute Impermissible Group Pleading.

Defendants also object that, despite having access to pre-suit discovery from similar, pending litigation, Plaintiffs' factual allegations supporting the horizontal component of their hub-

20

and-spoke conspiracy are marred by insufficient group pleading.[13]  See Joint MTD at 24–25; AION MTD at 13–16; Russo MTD at 11 n.5, 16–17.  They chide Plaintiffs for only specifically referencing certain named Defendants several times and instead collectively asserting allegations as to "Defendant Landlords" or "Defendants" throughout the Complaint.  This, they contend, lacks the specificity necessary to plausibly plead that each Defendant Landlord participated in or agreed to join the conspiracy.  As an example, they emphasize Plaintiffs' only generally claim that all Defendant Landlords followed the RMS's price recommendations "the vast majority of the time," and fail to state each's specific compliance rate with the RMS-generated prices to support this broad assertion.  See Joint MTD at 24.  Plaintiffs counter that Defendants are attempting to hold them to a significantly higher pleading standard than Twombly requires, and that their allegations satisfy Twombly's demands.  See Joint Opp. at 27–29.  The Court agrees with Plaintiffs.

As this Court has previously recognized, a complaint engages in impermissible group pleading only if it "lumps" defendants together and "does not allege any facts to permit an inference that an individual defendant should be equally liable, such as a complaint that implies an individual defendant was uninvolved."  Zanfardino ex rel. Zerify, Inc. v. Kay, No. 22-7258, 2023 WL 8232896, at *4 (D.N.J. Nov. 28, 2023) (quotation marks omitted).  By contrast, a complaint that collectively alleges that Defendants "have committed multiple similar acts of wrongdoing" and "permit[s] an inference that each Defendant should equally be liable" adequately puts "Defendants on notice of the claims against each of them."  Id. (quotation marks omitted). This applies equally in the antitrust context, where myriad courts have held that allegations of

---

[13] The pleading standard is not elevated because Plaintiffs obtained pre-suit discovery.  See In re Air Cargo Shipping Servs. Antitrust Litig., No. 06-1775, 2010 WL 10947344, at *10 (E.D.N.Y. Sept. 22, 2010) (explaining that "having access to more information" before filing a complaint "does not require plaintiffs to plead with greater factual specificity than" what Twombly and Iqbal require—i.e., enough facts to state a plausible claim for relief).

conspiracy need not be detailed on a defendant-by-defendant basis.  See, e.g., In re Processed Egg Prods. Antitrust Litig., 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011); In re OSB Antitrust Litig., No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007); see also Duffy, 758 F. Supp. 3d at 1290 ("[T]here is no need to provide defendant-specific allegations beyond those that raise a plausible inference that they each joined the [same] anti-competitive scheme.").

Here, Plaintiffs satisfy this standard.  They allege that each Defendant Landlord entered into a contract with RealPage.  See Compl. ¶¶ 19, 21–28, 35.  Per this contractual arrangement, each Defendant Landlord obtained a license to one of RealPage's three RM Products.  See id. ¶ 33. They each agreed to provide RealPage with their Confidential Data, knowing their competitors were doing the same, and knowing this Confidential Data would be collectively used by "functionally similar" RM Products to generate inflated rental prices that each competitor should charge.  See id. ¶¶ 32, 37, 79–81, 83–84.  They also each agreed to shift from prioritizing occupancy rates to adhering to the supracompetitive prices generated by RealPage's RMS, with an understanding that RealPage could and would enforce each's compliance with these prices.  See id. ¶¶ 3, 55, 67, 131, 134–49, 153, 162, 171.

These allegations, even when referring to "Defendants" or "Defendant Landlords" together, put "Defendants on notice of the claims against each of them."  Zanfardino, 2023 WL 8232896, at *4.  They state that the Defendant Landlords "have committed multiple similar acts of wrongdoing" and "permit an inference that each Defendant should equally be liable" for their role in this price-fixing conspiracy.  Id.; see also Duffy, 758 F. Supp. 3d at 1290 (holding that collective allegations that defendants entered into RMS-licensing agreements as part of the same price-fixing scheme was sufficient to satisfy notice requirements of Rule 8); RealPage MDL II, 709 F. Supp. 3d at 542–43 (holding that the argument that allegations collectively asserted against

22

landlord defendants constituted impermissible group pleading was "unserious" and that defendants had sufficient notice of the conspiracy alleged and their role within it).

Defendants nonetheless argue that the lack of specific allegations related to certain Defendant Landlords undermines the conclusion that they agreed to participate in the alleged conspiracy. They also contend that the general allegations about Defendant Landlords' adherence to the RMS-generated prices fails to support an inference that each Defendant Landlord did in fact adopt these prices at similar rates. But both arguments fail for the same reason: they scrutinize Plaintiffs' allegations in a vacuum.

First, the factual allegations about specific Defendant Landlords "must be viewed through the lens of this larger price-fixing conspiracy." Jung v. Ass'n of Am. Med. Colleges, 300 F. Supp. 2d 119, 166 (D.D.C. 2004); see also Ins. Brokerage, 618 F.3d at 326 (explaining that a court must "examine the entirety of the complaint['s] factual allegations" to determine if "they support a plausible inference of horizontal conspiracy" (emphasis added)). Defendants' focus on the few instances in which, for example, LeFrak, Veris, or AION are specifically mentioned by name improperly views these allegations in isolation. See Joint MTD at 25; AION MTD at 10–12; see also Jung, 300 F. Supp. 2d at 166–67 (explaining that a defendant mischaracterized the complaint "by limiting the scope of the claim to the [three] allegations that explicitly name" that one defendant). Considered holistically, the Court finds that these specific references to certain Defendant Landlords provide additional examples of facts representing "plus factors" that reinforce the plausibility of Plaintiffs' allegations of parallel conduct, which is otherwise adequately pleaded.

Second, Plaintiffs allegations that all landlords that use RealPage's RMS adopted its price "recommendations" the "vast majority of the time," Compl. ¶ 151, must too be analyzed in the

23

context of the "entire[]" Complaint, Ins. Brokerage, 618 F.3d at 326. When assessed holistically, it is reasonable to infer that the Defendant Landlords nearly always adopt the RMS-generated rental prices.[14] On the one hand, Defendant Landlords have an incentive to follow these prices. Plaintiffs claim that Defendant Landlords are making "substantial payments" to RealPage to access its RMS, including a fee for each pricing "recommendation" it provides per unit. Id. ¶ 36. It is reasonable to infer that the Defendant Landlords would not pay for an expensive tool they intended to regularly disregard, and that they therefore abide by the "recommendations" the RMS provides. On the other hand, RealPage enforces compliance. It actively seeks to prevent or subsequently address instances of non-compliance. Id. ¶¶ 137, 145–49, 153. This makes deviations from its price recommendations "the rare exception." Id. ¶ 150. In the event a "rare exception" persists, RealPage ultimately ensures that the user loses access to its RMS. Id. And RealPage boasts a ninety-five percent retention rate. See id. Together, this makes it reasonable to infer that if the Defendant Landlords have maintained access to RealPage's RMS, as Plaintiffs allege, it is because they each have either willingly, or through RealPage's enforcement, adopted the RMS's rental prices "the vast majority of the time." Id. ¶ 151.

In short, the Complaint's framing of the factual allegations is sufficient to plausibly infer all Defendant Landlords participated in and joined the conspiracy.

\* \* \*

"Competitors act in concert for purposes of a Section 1 [Sherman Act] claim when their conduct 'joins together separate decisionmakers,' such that their agreement 'deprives the

---

[14] Price-fixing agreements are unlawful even if they are not "aimed at the complete elimination of price competition." Socony-Vacuum, 310 U.S. at 224 n.59. It is therefore unnecessary for Plaintiffs to plead 100 percent compliance with RealPage's "recommendations" to sufficiently allege an unlawful price-fixing arrangement. See RealPage MDL, 709 F. Supp. 3d at 504 (rejecting argument that Plaintiffs must plead 100 percent adoption rate with the RealPage RMS-generated prices).

24

marketplace of independent centers of decisionmaking.'" Duffy, 758 F. Supp. 3d at 1293 (quoting Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 195 (2010)). This is exactly what Plaintiffs' factual allegations of parallel conduct and plus factors suggest has occurred here. The Court concludes that they have sufficiently stated the existence of the horizontal element of their hub-and-spoke conspiracy.

### 2.    Plaintiffs Sufficiently Plead the Existence of a Vertical Agreement Between RealPage and Each Defendant Landlord.[15]

Plaintiffs seek to plead the existence of the vertical agreements within their hub-and-spoke conspiracy between each Defendant Landlord and RealPage through alleged direct evidence. See Joint Opp. at 33. They argue that the contracts between RealPage and each Defendant Landlord constitute sufficient direct evidence of agreements to fix prices to supracompetitive levels. See id. at 33–34. The Joint Defendants counter that these contracts are merely licensing agreements that alone cannot support a claim of concerted action. They further contend that these agreements do not represent agreements "in restraint of trade" because they do not require the Defendant Landlords to accept the "recommended" RMS-generated rental prices. See Joint MTD at 32–33. But Plaintiffs respond that this ignores their allegations emphasizing the multi-layered enforcement system RealPage has built to ensure compliance with its RMS "recommendations." See Joint Opp. at 34–35. The Court agrees with Plaintiffs.

RealPage's contracts with the Defendant Landlords are not mere licensing agreements that provide access to its RMS. Per their plain terms, RealPage and Defendant Landlords agree to exchange information designed to restrain trade. These agreements obligate the Defendant Landlords to provide RealPage with their Confidential Data. Id. ¶¶ 19, 21–28, 35, 37, 80. They

---

[15] In this subsection, references to "Defendant Landlords" excludes AvalonBay, who is separately addressed by the Court. See infra § III.A.4.

also make clear that this Confidential Data will be used, along with other competitors' Confidential Data, to power RealPage's RMS and "deliver value" to the Defendant Landlords. Id. ¶ 37. Thus, Defendant Landlords understand that Confidential Data is being commingled to generate supracompetitive rental prices. See id. ¶¶ 37, 80–81, 83–84. Indeed, they pay for this service. See id. ¶ 36. Simply put, the contracts between RealPage and the Defendant Landlords reveal that the Defendant Landlords agreed to provide information they would not otherwise share with competitors to RealPage to coordinate supracompetitive price increases to the benefit of themselves and their fellow competitors. That represents an anticompetitive agreement. See RealPage MDL, 709 F. Supp. 3d at 502–03 (holding that contracts between RealPage and landlords in which landlords agreed to share their "proprietary commercial data" to serve as "an input to [RealPage's] RMS" represented direct evidence of a vertical anticompetitive agreement in a larger hub-and-spoke conspiracy).

These agreements also are in "restraint of trade." As previously recognized, Plaintiffs have alleged that RealPage takes various steps to actively ensure these price "recommendations" instead act as mandates. See supra at 20. This includes RealPage directly communicating with landlords, including Defendant Landlords, that they should "be compliant" with the RMS-generated prices. See Compl. ¶¶ 134–36. It includes RealPage "command[ing]" landlords to turn on auto-accept features, which it states are not an "ask" or an "optional process." Id. ¶ 140. And, it includes RealPage creating and employing a multi-faceted system that uses override restrictions, compliance monitoring, and audits to limit any deviations from the RMS's generated prices. Id. ¶¶ 137, 143, 145–49, 153, 214.

Plaintiffs' allegations constitute sufficient direct evidence of an agreement between RealPage and Defendant Landlords to facilitate the creation of, and ensure RMS users adopt,

supracompetitive rental prices.  The Court "need go no further" and concludes that Plaintiffs have also sufficiently alleged the vertical component of their hub-and-spoke conspiracy.  W. Penn Allegheny, 627 F.3d at 99.

### 3.    AvalonBay's Contract With RealPage Undermines any Inference that It Agreed to Fix Prices According to RealPage's RMS.

Defendant AvalonBay moves to dismiss the antitrust claims asserted against it based on unique aspects of its contractual arrangement with RealPage.  See AvalonBay MTD at 18–24. AvalonBay obtained a license to use LRO.  See Compl. ¶ 20.  As part of its agreement with RealPage for this license, AvalonBay obtained specific Data Restriction Provisions that prevent the rental prices it receives from the RMS from incorporating other landlords Confidential Data (the "Data Entry Representation"), or the rental prices other landlords receive from the RMS from incorporating its Confidential Data (the "Input Representation").  See id.; see also Master Serv. Agmt., § 4.5.  Based on these provisions, AvalonBay argues that it is implausible to infer it engaged in the exchange of Confidential Data integral to inferring the existence of a preceding agreement among the other Defendant Landlords.  The Court agrees with AvalonBay.

Multiple cases have now assessed whether the use of RMS is sufficient to plead the existence of a price-fixing conspiracy.  Some courts have sustained these claims, whereas others have denied them. The takeaway between the two camps is clear:  to infer a price-fixing conspiracy among RMS users, plaintiffs must allege that competitors knowingly provide their Confidential Data to the RMS provider, and that all competitors' Confidential Data is comingled and used by the RMS to generate supracompetitive prices for each competitor to charge.  Where these key allegations have been included in the complaint, claims of a price-fixing conspiracy have advanced to discovery.  See Duffy, 758 F. Supp. 3d at 1291–93; RealPage MDL, 709 F. Supp. 3d at 504–13; Coleman, No. 25-93, ECF No. 129, at 13–14; accord MultiPlan, 789 F. Supp. 3d at 641–42

27

(holding that although plaintiffs did not sufficiently allege that the RMS algorithm aggregated competitors' non-public, competitively sensitive data, plaintiffs sufficiently alleged that the hub conspirator managing the RMS facilitated the exchange of this data among competitors).  Where they were absent (or stated in a conclusory fashion), these claims were dismissed.  See Passenger Vehicle, 767 F. Supp. 3d at 716; Dai, 2025 WL 2078835, at *5; Cornish-Adebiyi, 2024 WL 4356188, at *5–7; Gibson, 2024 WL 2060260, at *4–5 & n.7.

AvalonBay's Data Restriction Provisions place it in the latter camp.  Specifically, they prevent AvalonBay from engaging in the requisite "exchange of confidential information" through RealPage's RMS that is necessary to coordinate the alleged price-fixing.  Gibson, 2024 WL 2060260, at *5.  They do not permit other competitors from receiving "recommended" rental prices that are based on AvalonBay's non-public, Confidential Data.  See Master Serv. Agmt. § 4.5 (Input Representation).  And they do not permit AvalonBay from similarly receiving its own "recommended" rental prices based on other competitors' Confidential Data.  See id. (Data Entry Representation).

Plaintiffs nonetheless argue that AvalonBay is circumventing this "nominal[]" restriction by engaging in the exchange of Confidential Data directly with other Defendant Landlords.  Compl. ¶ 20.  Plaintiffs allege that AvalonBay participated in (and, in certain circumstances, led) regularly scheduled LRO User Group meetings in which they exchanged "non-public, competitively sensitive information . . . including weekly traffic, occupancy rates, starting prices for floorplans, percentage of apartments leased, total appointments, and any applicable concessions/specials."  Id. ¶¶ 90, 93, 96–98.  They also allegedly helped devise and propose algorithmic amendments to RealPage to ensure LRO did not propose rental price reductions based on certain market circumstances (like the COVID-19 pandemic).  See id. ¶¶ 99–104.

28

In response, Plaintiffs emphasize that LRO offered an option to users allowing them to manually input Confidential Data collected from competitors into LRO to be used in LRO's pricing algorithm, and suggest it is reasonable to infer that AvalonBay utilized this option to circumvent the Data Restriction Provisions. See ECF No. 143 ("AvalonBay Opp.") at 11, 21–22 (citing Compl. ¶¶ 79, 117–18). But Plaintiffs do not actually allege that AvalonBay did this; they only plead AvalonBay had the opportunity to do this. In other words, Plaintiffs "dance around" the allegation that AvalonBay used LRO's manual input to circumvent their Data Restriction Provisions "with linguistic equivocation in an obvious attempt to imply it, but [they] never unambiguously allege[] as much." Cornish-Adebiyi, 2024 WL 4356188, at *5. That is insufficient to state a claim. And to the extent they clearly make this allegation in their opposition brief, "it is 'axiomatic' that a plaintiff cannot amend its complaint by way of a brief in opposition to a motion to dismiss." D&D Tech., Inc. v. CytoCore, Inc., No. 14-4217, 2014 WL 4367314, at *3 (D.N.J. Sept. 14, 2014) (quoting Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1998)).

Even if Plaintiffs did go so far as to unequivocally allege that AvalonBay engaged in this work-around of the Data Restriction Provisions, one key allegation remains entirely absent. Pursuant to the Data Entry Provision, RealPage was restricted from allowing its algorithm to generate any rental prices for AvalonBay based on anything other than AvalonBay's own Confidential Data or publicly-available data, unless AvalonBay provided "express written consent" for the algorithm to incorporate other data. See Master Serv. Agmt., §4.5. Plaintiffs do

29

not allege that AvalonBay and RealPage entered any agreement in writing (or otherwise) effectively amending the Data Entry Representation.[16]

Without any of these key allegations, Plaintiffs' Complaint only suggests AvalonBay agreed to an information exchange with certain Defendant Landlords, but not an "information exchange [that] was part of an agreement to fix prices" through RealPage's RMS. In re Granulated Sugar Antitrust Litig., No. 24-3110, 2025 WL 3012238, at *9 (D. Minn. Oct. 15, 2025) (emphasis added). To state a plausible claim that AvalonBay participated in the hub-and-spoke conspiracy, Plaintiffs' Complaint must take this next step. Because it does not do so, Plaintiffs' antitrust claims against AvalonBay are dismissed.

* * * * *

Taken collectively, Plaintiffs' factual allegations support a "reasonable expectation that discovery will reveal evidence of [an] illegal" hub-and-spoke agreement between RealPage and the Defendant Landlords (excluding AvalonBay) to fix rental prices to supracompetitive rates. Twombly, 550 U.S. at 556. Simply put, "genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . and obtain from [a jointly employed expert] a 'harmonized' estimate of the market." Am. Column & Lumber Co. v. United

---

[16] The allegations here are distinguishable from District of Columbia v. RealPage, Inc., No. 2023-CAB-6762 (D.C. Super. Ct.). There, the court sustained claims against AvalonBay where the plaintiffs asserted AvalonBay participated in a specific conspiracy to fix rental prices in response to the COVID-19 pandemic. See AvalonBay MTD, Ex. 5, Order at 17–18 (Apr. 7, 2025). Here, Plaintiffs do not similarly allege an independent price-fixing conspiracy involving AvalonBay related to rental rates during the pandemic. Instead, they allege a single hub-and-spoke price-fixing conspiracy centered on all Defendant Landlords exchange of Confidential Data through RealPage's RMS, and point to AvalonBay's information exchange with other Defendant Landlords during the COVID-19 pandemic as a "striking example" supporting an inference of conspiracy. AvalonBay Opp. at 10; see also Compl. ¶¶ 99–104. But the Data Restriction Provisions make it implausible to infer (without allegations clearly stating AvalonBay subverted these provisions) that AvalonBay engaged in the specific information exchange necessary to participate in this broader conspiracy.

30

States, 257 U.S. 377, 410 (1921).  Allegations of such a conspiracy, like those alleged here, state a plausible claim under Section 1 of the Sherman Act.

### B.   Plaintiffs' State Antitrust Claim

Like its federal counterpart, the NJAA makes "[e]very contract, combination . . ., or conspiracy in restraint of trade" illegal.  N.J.S.A. § 56:9-3.  The NJAA also instructs that it must "be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes."  Id. § 56:9-18; see also Marin v. Landgraf, No. 11-690, 2013 WL 356623 (D.N.J. Jan. 29, 2013) (explaining that "[u]niform construction of the federal and [New Jersey] state antitrust laws is 'mandatory, not [] permissive'" (quoting Sickles v. Cabot Corp., 877 A.2d 267, 275 (N.J. Super. Ct. App. Div. 2005)).

Defendants argue that Plaintiffs' NJAA claim must be dismissed on the same basis as their federal Sherman Act claim.  But the Court has sustained the latter claim.  To ensure that the federal and state antitrust laws are interpreted harmoniously, it will therefore deny Defendants' motion to dismiss Plaintiffs' NJAA claim as well.  See CSR Ltd. v. Fed. Ins. Co., 40 F. Supp. 2d 559, 566 (D.N.J. 1998) (denying motion to dismiss plaintiffs' NJAA claim where court had denied motion to dismiss plaintiffs' Sherman Act claim).

### C.   Plaintiffs' NJCFA Claims

Plaintiffs bring two additional causes of action under the NJCFA.  The first asserts that Defendants have violated the NJCFA because they have violated federal and state antitrust law. See Compl. ¶¶ 242–45.  The second asserts that Defendants have committed specific "unlawful practices" in violation of the NJCFA.  See id. ¶¶ 246–61.  Defendants have moved to dismiss all NJCFA claims.  The Court considers each in turn.

31

1.      **Defendants' Alleged Antitrust Misconduct Does Not Alone State a Claim Under the NJCFA.**

Plaintiffs' first cause of action under the NJCFA is based entirely on their allegations that Defendants have engaged in certain forms of anticompetitive conduct.  Defendants argue that this claim must be dismissed because New Jersey courts do not permit plaintiffs to recycle allegations of antitrust misconduct as violations of the NJCFA.  See Joint MTD at 35; AvalonBay MTD at 34–35.  Plaintiffs counter that recent amendments to the NJCFA abrogate this caselaw and permit NJCFA claims to proceed based on alleged antitrust violations.  See Joint Opp. at 37–38.  Upon close scrutiny of the recent amendments to the NJCFA, the Court ultimately agrees with the Defendants.

The NJCFA makes it illegal to engage in any "unlawful practice," as defined by state law, "in connection with the sale or advertisement of any merchandise or real estate."  N.J.S.A. § 56:8-2.  This extends to "landlords as 'sellers'" and covers "the rental of real estate."  49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 547 A.2d 1134, 1141–42 (N.J. Super. Ct. App. Div. 1988).  But New Jersey courts have held that claims based "sole[ly]" on alleged anticompetitive conduct, such as price-fixing, do not fall within this ambit.  Sickles, 877 A.2d at 276–77.  The NJCFA "was enacted to help eradicate consumer fraud, not to advance public policy in favor of competition and prevent practices which deprive consumers of the benefit of competitive markets."  Id. at 277.  Based on this statutory purpose, factual allegations supporting an NJCFA claim must indicate or show that the defendant's conduct had the "capacity to mislead" consumers through the use of "deception, fraud or misrepresentation, or by conceal[ing] material facts."  Id. at 276–77.  Allegations of anticompetitive conduct alone fail to make such a showing.  See id. at 277.

Plaintiffs contend that this caselaw is inapposite because of recent amendments to the NJCFA that extended the scope of an "unlawful practice" to "any commercial practice that violates

32

State or federal law." Id. § 56:8-4(b). According to Plaintiffs, Defendants' anticompetitive conduct—specifically, their (1) exchange of Confidential Data, and (2) agreement to fix rent prices based on RealPage's RMS—represent "commercial practices" that violate "State and federal" antitrust laws. Compl. ¶¶ 244–45. But Plaintiffs do not provide any authority for what constitutes a "commercial practice" under the amendments to the NJCFA. The statute does not define the term. See generally N.J.S.A. § 56:8-1, et seq. And the New Jersey Supreme Court has not done so either. This Court, therefore, endeavors to "predict how [the New Jersey Supreme Court] would rule if faced with the issue." Lomando v. United States, 667 F.3d 363, 385 (3d Cir. 2023) (quotation marks omitted).[17]

New Jersey courts approach statutory interpretation by beginning with a law's plain language, which is analyzed according to its "ordinary meaning" and "in the context of related provisions so as to give sense to the legislation as a whole." DeSimone v. Springpoint Senior Living, Inc., 306 A.3d 1276, 1282 (N.J. 2024) (quotation marks omitted). The goal is to interpret this language in a way that "determine[s] and effectuate[s] the Legislature's intent." Id. (quotation marks omitted). If the language is unclear or ambiguous, courts will consult "extrinsic evidence, including legislative history, committee reports, and contemporaneous construction." Id. (quotation marks omitted).

---

[17] The New Jersey Supreme Court has defined an "unconscionable commercial practice" within the context of § 56:8-2. But the definition is clearly influenced by the adjective "unconscionable" that modifies the term "commercial practice" in that provision. See, e.g., Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994) (defining the term as including any act lacking "good faith, honesty in fact, and observance of fair dealing" (quotation marks omitted)). The newly amended § 56:8-4, by contrast, only refers to a "commercial practice." The legislature's decision to more broadly refer to a "commercial practice" in this provision implies that it intended for the term to have some broader meaning than the meaning ascribed to an "unconscionable" commercial practice in § 56:8-2. See, e.g., In re S.O., 341 A.3d 1229, 1241 (N.J. Super. Ct. App. Div. 2025) (explaining that New Jersey courts "view the Legislature's choice of words and phrases as deliberate"). The Court therefore proceeds to define what constitutes a "commercial practice" under the NJCFA.

The purpose behind the NJCFA has been consistently understood for decades: to protect consumers from being directly deceived or defrauded by businesses in commercial transactions. See, e.g., id. at 1282 ("The [New Jersey] Legislature enacted the [NJ]CFA in 1960 to combat sharp practices and dealing that victimized consumers by luring them into purchase[s] through fraudulent or deceptive means" (internal citation and quotation marks omitted).); Cox, 647 A.2d 454 (explaining that the NJCFA was intended "to combat the increasingly widespread practice of defrauding the consumer" (quotation marks omitted)). To enforce this purpose, courts interpret the provisions of the NJCFA broadly. See Lemelledo v. Beneficial Mgmt. Corp., 696 A.2d 546, 551 (N.J. 1997). However, "notwithstanding a broad and liberal reading of the statute, the [NJ]CFA does not cover every sale in the marketplace." Papergraphics Int'l, Inc. v. Correa, 910 A.2d 625, 628 (N.J. Super. Ct. App. Div. 2006). Instead, its "applicability hinges on the nature of a transaction, requiring case by case analysis." Id. Based on this admonition, courts have concluded that its protections do not extend to non-consumer transactions, i.e., transaction that do not directly involve "consumers" or "consumer goods." Id. at 628–29 (collecting cases).

The term "commercial practice" must be understood in this context. At a minimum, this means the act being asserted as a "commercial practice" must involve some type of interaction between a vendor and a consumer. Longstanding New Jersey Supreme Court precedent supports this conclusion. See, e.g., Kugler v. Romain, 279 A.2d 640, 651–52 (N.J. 1971) (holding that the NJCFA's prohibition on "unconscionable commercial practices" is intended to "balance the interests of the consumer public" with those of the "marketers of consumer goods"). And the "practice" must involve some type of deception, fraud, or misleading conduct on the part of the vendor directed at the consumer. See Lemelledo, 696 A.2d at 552 (explaining that the [NJ]CFA is intended to bar "sharp practices and dealings in the marketing of merchandise and real estate

34

whereby the consumer could be victimized by being lured into a purchase[s] through fraudulent, deceptive[,] or other similar kind[s] of selling or advertising practices" (quotation marks omitted)). Although the recent amendments to the NJCFA expand the definition of an "unlawful practice" to any "commercial practice that violates State or federal law," they do nothing to alter the purpose of the statute or the scope of what must constitute a "commercial practice" prohibited under it. Accordingly, the "commercial practice[s]" that are barred by other State or federal laws must be of the same character as those prohibited under the NJCFA.[18]

Based on this interpretation, the Court concludes the scope of "commercial practice" under § 56:8-4(b) does not extend to purely anticompetitive conduct and that Sickles remains good law. Simply put, the anticompetitive conduct asserted by Plaintiffs as "commercial practice[s]" did not involve any interaction between the Defendants and any consumers; it only involved interaction between the Defendants. See Sickles, 877 A.2d at 277 (holding that conspiring with competitors to fix prices is insufficient to constitute a violation of the NJCFA where the conspirators anticompetitive conduct does not involve "communication or contact of any kind" with the allegedly harmed consumers). And, as Sickles held, this purely anticompetitive conduct lacks a "capacity to mislead" and is not "inherently misleading" to consumers. Id. Plaintiffs' NJCFA claims based solely on the specifically asserted anticompetitive conduct are therefore dismissed. See Fed. Trade Comm'n v. Amazon.com, Inc., No. 23-1495, 2025 WL 871715, at *3 (W.D. Wash.

---

[18] Legislative history buttresses this conclusion. New Jersey courts view "[a] legislative committee's statement of the purpose of a proposed bill, including the nature and effect of the measure," as "a highly persuasive indication of legislative intent." Lucca v. Wells Fargo Bank, N.A., 117 A.3d 1267, 1271 (N.J. Super. Ct. App. Div. 2015). The initial "Statement" of purpose provided with the law that added § 56:8-4(b) to the NJCFA states that this provision was added "to ensure that the division can take action based on violations of relevant consumer protection statutes such as the 'Fair Debt Collection Practices Act' (15 U.S.C. § 1692, et seq.) and other similar federal laws designed to prevent overreaching or abuse of consumers." See Statement, Bill No. A1556, Sponsorship Update (Feb. 7, 2022).

35

Mar. 20, 2025) (rejecting argument that 2022 amendments to the NJCFA abrogated <u>Sickles</u> and dismissing NJCFA claims based only on alleged antitrust violations).[19]

### 2. Certain of Defendants Landlords' Alleged Conduct Constitutes Specific Violations of the NJCFA.

Plaintiffs second cause of action under the NJCFA asserts that the Defendants have engaged in specific unconscionable commercial practices, misrepresentations, and knowing omissions that violate the statute. Defendants argue that Plaintiffs have failed to plausibly plead unconscionability. They also contend that Plaintiffs' misrepresentation and omissions claims must meet Rule 9's heightened pleading requirements but fail to do so. <u>See</u> Joint MTD at 36–43; K&C MTD at 22–23; Russo MTD at 22–25; AvalonBay MTD at 34–35. Plaintiffs counter that they have satisfied the pleading standards applicable to each of the acts they assert as violations of the NJCFA. <u>See, e.g.</u>, Joint Opp. at 38–45. The Court finds that Plaintiffs' have sufficiently pleaded that certain acts by the Defendant Landlords constituted unconscionable commercial practices, but have only sufficiently pleaded that certain Defendant Landlords engaged in misrepresentations or knowing omissions in violation of the NJCFA.

In an action initiated by the Attorney General, to state a claim under the NJCFA the complaint only needs to state that the defendants engaged in an "unlawful practice." <u>See</u> <u>Lee v.</u>

---

[19] New Jersey courts also adhere to "a long-standing canon of statutory interpretation that presumes that the Legislature is knowledgeable regarding the judicial interpretation of its enactments." <u>Coyle v. Bd. of Chosen Freeholders of Warren Cnty.</u>, 787 A.2d 881, 886 (N.J. 2002). They also do not assume the legislature intends to "alter an established judicial interpretation absent a 'clear manifestation' of such intent." <u>Id.</u> at 886 (quoting <u>State v. Dalglish</u>, 432 A.2d 74, 79 (1981)). In the context of the NJCFA, courts recognize that when the legislature broadens the definition of "unlawful practice," it does so "by adding sections to address <u>particular areas of concern</u>." <u>DeSimone</u>, 306 A.3d at 1282 (quotation marks omitted) (emphasis in original). These laws make it explicitly clear that the "commercial practice" at issue is now an "unlawful practice" under the NJCFA. <u>See, e.g.</u>, N.J.S.A. § 56:12-70 (Consumer Protection Leasing Act of 1994) ("It is an unlawful practice and a violation of [the NJCFA] to violate any provision of this act."); <u>id.</u> § 56:12-96(a) (Service Contract Act of 2013) (same); <u>id.</u> § 56:13-21 (Predatory Towing Prevention Act of 2007) (same). Considering this precedent, the generic reference to "any commercial practice" in § 56:8-4(b) is not a sufficiently explicit "manifestation" of the legislature's intent to abrogate <u>Sickles</u> or make any violation of the NJAA an "unlawful practice."

Carter-Reed Co., LLC, 4 A.3d 561, 576 & n.10 (N.J. 2010). Pursuant to § 56:8-2, unlawful practices include engaging in any of the following actions "in connection with the sale or advertisement of any merchandise or real estate": (1) any commercial practice that is unconscionable; (2) any misrepresentation; or (3) any knowing omission of material fact. N.J.S.A. § 56:8-2. Unconscionable commercial practices only need to be pleaded in accordance with Rule 8; misrepresentations and knowing omissions sound in fraud and must be pleaded in accordance with Rule 9. See Browne v. Nat'l Collegiate Student Loan Trust, No. 22-2713, 2024 WL 2194265, at *4 n.8 (D.N.J. Apr. 30, 2024).

Plaintiffs' Complaint reads as follows. First, Plaintiffs allege that RealPage engaged in the following unconscionable commercial practices: (1) training landlords to mislead or conceal how rental rates were set, and (2) pushing inflated rental rates directly to Internet Listing Services that advertise landlords' units to renters. See Compl. ¶¶ 205, 207–10, 255(b), 255(c). They further claim all Defendant Landlords engaged unconscionable commercial practices by following RealPage's instructions and using daily price changes and exploding offers to "create a false sense of urgency" and pressure consumers to accept inflated rental rates. See id. ¶¶ 205, 256(b).[20] Plaintiffs separately allege that all Defendants misrepresented or knowingly omitted material information regarding how they determined their rental rates. See id. ¶¶ 206, 211, 213, 220, 259. They specifically claim Bozzuto, Greystar, and LeFrak represented that they charged "market rates" when they were, in fact, charging an inflated rate based on the asserted price-fixing scheme. See id. ¶¶ 206, 218, 221, 223, 259. And they allege the Defendant Landlords concealed their use of RealPage's RMS from renters (at RealPage's instruction). See id. ¶¶ 206, 216–217, 225. The

---

[20] Plaintiffs also again assert that Defendants' anticompetitive actions constitute unconscionable commercial practices. See Compl. ¶¶ 255(a), 255(d), 256(a). But because Plaintiffs cannot recycle antitrust violations to assert NJCFA violations, this conduct cannot be construed as an unconscionable commercial practice. See Sickles, 877 A.2d at 277.

37

Court addresses each set of allegations in turn—focusing first on RealPage, and then on the Defendant Landlords.[21]

### a.  Plaintiffs Fail to Allege RealPage Violated the NJCFA.

Plaintiffs allege RealPage engaged in unconscionable commercial practices and omissions under the NJCFA by instructing or training landlords to use tactics designed to create a false sense of urgency around rental pricing rates and to misrepresent or conceal their use of RealPage's RMS in pricing.  See Compl. ¶¶ 205, 207–10, 255(b). They also claim that RealPage itself pushed inflated rental prices generated by its RMS to landlords' Internet Listing Services where they were advertised directly to consumers.  See id. ¶¶ 255(c).  The Court concludes that these allegations are inactionable or insufficiently pleaded.

Plaintiffs first set of allegations about RealPage's interactions with landlords, including the Defendant Landlords, is missing a critical element to be actionable under the NJCFA: direct interaction between a vendor and a consumer.  See supra at 34–35.  Without this interface, the transaction at issue cannot be considered a "consumer transaction" regulated by the NJCFA. Papergraphics, 910 A.2d at 628–29.  Here, RealPage's interactions with the Defendant Landlords do not directly involve consumers, and may only have a tangential or incidental effect on the downstream "consumer transaction" between the Defendant Landlords (the vendor) and the prospective renters (the consumers).  Courts have held that parties similarly once-removed from consumer transactions cannot be held liable under the NJCFA.  See Papergraphics, 910 A.2d at

---

[21] Plaintiffs' Complaint does not neatly delineate their allegations as the Court has, and instead offers allegations that certain of Defendants' alleged misrepresentations or omissions constitute unconscionable commercial practices as well.  See, e.g., Compl. ¶¶ 214–15, 255(b), 257–58.  But because these are distinct "unlawful practices" under § 56:8-2 and are subject to different pleading thresholds, the Court must analyze these acts separately.  See In re Insulin Pricing Litig., No. 17-699, 2019 WL 643709, at *15 (D.N.J. Feb. 15, 2019) (recognizing that the list of "unlawful practices" included in § 56:8-2 are "defined separately and differently in the text of the statutes and in relevant case law interpreting them").  It has therefore delineated Plaintiffs' claims as specified.

629 (collecting cases holding that wholesalers that sell goods to vendors for resale are not engaged in consumer transactions under the NJCFA).  Plaintiffs NJCFA claims against RealPage related only to its direct interactions with the Defendant Landlords are therefore not actions taken pursuant to a "consumer transaction" and are not actionable under the NJCFA.

Plaintiffs second set of allegations do allege a form of direct interaction between RealPage and consumers.  Specifically, they claim that by requiring landlords, including the Defendant Landlords, to use the RMS's auto-accept features, RealPage is directly advertising supracompetitive rental prices to consumers, which they claim constitutes an unconscionable commercial practice.  See Compl. ¶¶ 139–40, 255(c).  But the Complaint does not allege that RealPage makes any other statements about these prices to consumers (e.g., that they are "competitive" or "market rate," see infra at 43–44).  Without such allegations, there is no indication that these price listings have the "capacity to mislead" prospective renters.  See Sickles, 877 A.2d at 276.  Absent this essential "ingredient," Plaintiffs fail to state a claim under the NJCFA.  Id.

Accordingly, Plaintiffs NJCFA claims asserted against RealPage are dismissed.

### b. Plaintiffs Sufficiently Allege Defendant Landlords Committed Certain Unconscionable Commercial Practices.

To plead an unconscionable commercial practice, plaintiffs must state that an act:  (1) lacks "good faith, honesty in fact, and observance of fair dealing," and (2) has "the capacity to mislead." Sickles, 877 A.2d at 276 (quoting Cox, 647 A.2d at 462).  They are not required to plead an "intent to defraud." Katz v. Live Nation, Inc., No. 09-3740, 2010 WL 2539686, at *5 (D.N.J. June 17, 2010).  Because unconscionability is "an amorphous concept [] designed to establish a broad business ethic," Kugler, 279 A.2d at 651, courts liberally assess whether a commercial practice is unconscionable on a case-by-case basis, Gonzalez v. Wilshire Credit Corp., 988 A.2d 567, 573 (N.J. Super. Ct. App. Div. 2010).

39

Here, Plaintiffs allege that there is a "substantial power imbalance" in housing negotiations between landlords and renters in New Jersey because: (1) housing is essential, making demand inelastic, and (2) the market for housing is supply-constrained. Compl. ¶¶ 156, 158, 202. Defendant Landlords are aware of this imbalance and have sought to take advantage of it by pursuing a pricing strategy that "create[s] a false sense of urgency" designed to pressure renters to accept inflated rental prices. Id. ¶¶ 204–05. Specifically, they have departed from traditional market pricing practices and now change prices for units daily (using RealPage's RMS), as well as employ exploding offers. See id. ¶ 205. The Court is satisfied, under the broad construction it must afford to the term unconscionable commercial practices, that this states a plausible claim that the Defendant Landlords have engaged in an "unlawful practice" under the NJCFA.

Defendants argue that these tactics amount to nothing more than a differential pricing strategy that courts have found is not unlawful under the NJCFA. See Joint MTD at 42–43 (citing, e.g., Silver v. Pep Boys-Manny, Moe & Jack of Delaware, Inc., No. 17-18, 2018 WL 1535285, at *5–6 (D.N.J. Mar. 29, 2018). Although Plaintiffs are correct that the NJCFA does not require landlords to charge "the same prices for the same product," even if sold through "the same distribution channel, at the same time," Silver, 2018 WL 1535285, at *6, Plaintiffs allegations do not simply claim that renters have been subject to disparate, high prices for similar rental units. Instead, Plaintiffs assert that the Defendant Landlords know that they have a superior bargaining position that they can exploit. And they claim Defendants have done so by shifting away from the traditional market pricing model in favor of strategy with the "capacity to mislead," Sickles, 877 A.2d at 276—specifically, one designed to create a false "sense of urgency" in the market so

40

renters accept supracompetitive prices, Compl. ¶ 205.[22]  That does not represent "honest in fact"

dealing.  Sickles, 877 A.2d at 276.  In fact, it is the quintessential set of circumstances the

unconscionable commercial practices prohibition is intended to prevent.  See Kugler, 279 A.2d at

651–52 (explaining that this provision is intended to ensure that consumer transactions "result[]

from real bargaining between parties who had freedom of choice and understanding and [an] ability

to negotiate in a meaningful fashion").[23]

Plaintiffs have provided sufficient factual allegations to plausibly infer that the Defendant

Landlords intentionally used unconscionable commercial practices, specifically in the form of

daily pricing changes and exploding offers, to mislead consumers about the state of the rental

market and accept inflated prices.  Defendants' motions to dismiss Plaintiffs' NJCFA claim based

on unconscionable commercial practices are therefore denied.

### c.  Defendant Landlords' Misrepresentations and Omissions.

Claims for misrepresentations and knowing omissions under the NJCFA each sound in

fraud and must satisfy the heightened pleading requirements of Rule 9(b).  See Frederico v. Home

Depot, 507 F.3d 188, 200, 202–03 (3d Cir. 2007); see also Coba v. Ford Motor Co., No. 12-1622,

2013 WL 244687, at *8–9 & n.9 (D.N.J. 2013) (holding NJCFA claims based on affirmative

misrepresentations must satisfy Rule 9's pleading requirements).  This requires alleging "the date,

---

[22] Although these allegations rest, in part, on anticompetitive conduct, Sickles' holding was limited to (and only barred) attempts to assert an NJCFA violation based "sole[ly]" on anticompetitive conduct.  Sickles, 877 A.2d at 276–77. Anticompetitive conduct, coupled with other commercially deceptive, misleading, or fraudulent behavior, can state a claim under the NJCFA.

[23] Defendant Landlords protest that Plaintiffs' allegations are too conclusory because they do not allege that each individual Defendant Landlord engaged in an unconscionable commercial practice.  But this claim is only subject to Rule 8's pleading requirement.  The Complaint asserts that all Defendant Landlords embraced these pricing tactics. See Compl. ¶ 205.  At this stage, the Court accepts this allegation as true and finds that it states that all Defendant Landlords "have committed multiple similar acts of wrongdoing," and "permit[s] an inference that each Defendant should equally be liable" for their role in this pricing scheme.  Zanfardino, 2023 WL 8232896, at *4.

time[,] and place of the alleged fraud or otherwise inject[ing] precision of some measure of substantiation into [the] fraud allegation." Frederico, 507 F.3d at 200; see also In re Supreme Specialties, Inc. Sec. Litig., 438 F.3d 256, 276–77 (3d Cir. 2006) (explaining that Rule 9 requires pleading the "who, what, where, when[,] and how of the events at issue" (quotation marks omitted)). If the claims apply to multiple defendants, it also requires specifying "the allegations of fraud applying to each defendant." MDNet, Inc. v. Pharmacia Corp., 147 F. App'x 239, 245 (3d Cir. 2005) (emphasis added).

Misrepresentations and omissions represent opposite sides of the same coin. Both involve material facts. A claim for misrepresentation focuses on what was affirmatively said about those facts. It requires showing that a defendant made a false or misleading statement about a fact material to the transaction with the intent that it would induce the consumer to complete the transaction. See Suarez v. Eastern Int'l College, 50 A.3d 75, 87 (N.J. Super. Ct. App. Div. 2012). A claim for omission, by contrast, focuses on what was not said about those facts. It requires showing that a defendant knowingly concealed a material fact with the intent that the consumer rely upon the concealment. See Judge v. Blackfin Yacht Corp., 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003). As a threshold matter, an omission claim also requires showing an "underlying duty on the part of the defendant to disclose what he concealed to induce the purchase." Mickens v. Ford Motor Co., 900 F. Supp. 2d 427, 441 (D.N.J. 2012). A fact is material under either claim if it "involves information that is important to consumers" and is "likely to affect their choice of, or conduct regarding," a transaction. Argabright v. Rheem Mfg. Co., 201 F. Supp. 3d 578, 608 (D.N.J. 2016).

Here, the Court concludes that Plaintiffs have only pleaded misrepresentation claims with the required specificity against Defendants Bozzuto and LeFrak. Plaintiffs specify that these

42

specific Defendant Landlords represented to prospective renters that they price their units at the "market rate" or "at a competitive price point." See Compl. ¶¶ 218, 221, 223. But, these Defendant Landlords know that this representation is false because they price their units at inflated rates based on an anticompetitive price-fixing conspiracy that is powered by RealPage's RMS. See id. ¶¶ 217–18, 223. Plaintiffs also allege that this information, which is directly related to the price of their rental units vis-à-vis competitors, is material to their decision to agree to rent these units at the price offered. See id. ¶ 211; see also Leon v. Rite Aid Corp., 774 A.2d 674, 679 (N.J. Super. Ct. App. Div. 2001) (holding that allegations that a vendor offered the "lowest and best" price, but instead used a pricing system that charged "a set of prices that was increased for certain customers," constituted a misrepresentation about a material fact). This specific misrepresentation created the impression that the prospective renters could not find a better price on the market. Had they known the truth regarding how Bozzuto and LeFrak priced their rental units, these renters would likely have rejected the price offered and re-negotiated for, or sought a unit on the market with, a lower price. See Compl. ¶ 211. In fact, Plaintiffs claim this occurred with certain renters when they discovered that certain Defendant Landlords were pricing their units based on RealPage's RMS. See id. ¶ 212.

However, Plaintiffs do not provide any other allegations—general or specific—claiming any other Defendant Landlords made these types of representations about their pricing to prospective renters. See id. ¶ 220 (only alleging that certain "landlords' employees" may make misrepresentations about units being priced at the "market rate"). Misrepresentation claims,

43

however, must be pleaded as "to each defendant." MDNet, 147 F. App'x at 245. Accordingly, there is no misrepresentation specifically alleged against each of the other Defendant Landlords.[24]

Plaintiffs have also only pleaded omission claims against Bozzuto and LeFrak. New Jersey courts do "not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993). The Complaint alleges that Defendants Bozzuto and LeFrak represented to renters that their prices reflected market rate, and that this was a knowingly false statement about a material fact because Defendants knew they were charging inflated prices based on a price-fixing conspiracy. See Compl. ¶¶ 211–12, 217–18, 221, 223; Leon, 774 A.2d at 679. This affirmative misstatement created a duty to disclose that these Defendants units were actually priced at inflated rates using RealPage's RMS and not according to traditional market conditions at market rates. See Lightning Lube, 4. F.3d at 1185.

Plaintiffs do not, however, allege that the remaining Defendant Landlords specifically misrepresented that their prices reflected market rates. They were thus under no duty to correct a "previous statement" and make it "true." Lightning Lube, 4 F.3d at 1185. Plaintiffs can therefore only plead a successful omission claim against these Defendants if each had an independent duty to reveal how they determined the prices they charged for their rental units. But the Complaint fails to state that such a duty exists.

Under New Jersey law, a party generally "has no duty to disclose information to another party in a business transaction unless a fiduciary duty exists between them, unless the transaction itself is fiduciary in nature, or unless one party expressly reposes a trust and confidence in the

---

[24] Plaintiffs otherwise only specifically assert that Greystar and Veris misrepresented their prices to the market. But the specific statements that Plaintiffs cite do not refer to how either Defendant actually priced its rental units. See Compl. ¶¶ 219, 224.

44

other." N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc., 725 A.2d 1133, 1139 (N.J. Super. Ct. App. Div. 1998); see also World Finer Foods, Inc. v. Archway Cookies, LLC, No. 03-1277, 2005 WL 8175075, at *4 (D.N.J. Mar. 9, 2005) (explaining that independent "fiduciary duties generally are not imposed in ordinary commercial business transactions").

Plaintiffs point to no authority suggesting that a transaction between a seller and a prospective buyer for a negotiable commodity creates fiduciary obligations; indeed, these arms-length transactions are typically understood as involving adverse parties vying for their own self-interests. See, e.g., United States v. Lavin, 942 F.2d 177, 188 n.14 (1991) (defining an arms-length business transaction as "a transaction negotiated by unrelated parties, each acting in his or her own self-interest" (quotation marks omitted)). Thus, a fiduciary relationship creating a duty of disclosure could only arise if there was a "repose[]" of trust between the parties, Pavonia, 725 A.2d at 1139—i.e., if prospective renters indicate that they were trusting some aspect of the Defendant Landlords' price representations or if the Defendant Landlords made statements encouraging renters to trust their price representations, see Stevenson v. Mazda Motor of Am., Inc., No. 14-5250, 2015 WL 3487756, at *9 (D.N.J. June 2, 2015). The Complaint, however, is devoid of factual allegations to this effect. Thus, the remaining Defendant Landlords were under no independent duty to disclose their use of RealPage's RMS to determine their rental prices. Plaintiffs, in turn, fail to state a knowing omission claim as to the remaining Defendant Landlords under the NJCFA.

\* \* \* \* \*

In short, the Court concludes that Plaintiffs have sufficiently alleged that all Defendant Landlords committed unconscionable commercial practices under the NJCFA. Additionally,

45

Plaintiffs have stated a claim for relief against Bozzuto and LeFrak for misrepresentations and knowing omissions under this statute.

## IV.    CONCLUSION

For the foregoing reasons, the Joint Defendants' motion to dismiss, ECF No. 115; AION's motion to dismiss, ECF No. 116; Cammeby's and Kamson's motion to dismiss, ECF No. 117; Russo's motion to dismiss, ECF No. 118; and AvalonBay's motion to dismiss, ECF No. 120, are each **GRANTED in part** and **DENIED in part**.

Plaintiffs sufficiently allege federal and state antitrust claims under the Sherman Act and NJAA against all Defendants except AvalonBay.  The Joint Defendants', AION's, Cammeby's, Kamson's, and Russo's motions are **DENIED** as to these claims.  AvalonBay's motion is **GRANTED** as to these claims, and the Sherman Act and NJAA claims asserted against AvalonBay under Counts I and II are **DISMISSED**.

Plaintiffs cannot allege a violation of the NJCFA based solely on Defendants' alleged anticompetitive misconduct or violation of federal or state antitrust law.  Defendants' motions to dismiss as to Count III are **GRANTED**, and Count III is **DISMISSED**.

Plaintiffs fail to allege specific claims under the NJFCA against RealPage.  RealPage's motion to dismiss the claims brought against it under Count IV is **GRANTED**, and those claims are **DISMISSED**.

Plaintiffs sufficiently allege specific unconscionable commercial practices in violation of the NJCFA under Count IV against all Defendant Landlords.  All motions seeking the dismissal of these claims are **DENIED**.

Plaintiffs only sufficiently allege specific misrepresentations and knowing omissions in violation of the NJCFA under Count IV against Defendants Bozzuto and LeFrak.  All motions seeking dismissal of these claims as to these two Defendants are **DENIED**.  Plaintiffs otherwise

fail to state a claim for misrepresentations or knowing omissions against the remaining Defendant Landlords. The motions to dismiss these claims brought by Defendants Morgan, Kamson, Greystar, AION, Cammeby's, Veris, Russo, and AvalonBay are **GRANTED**, and these claims are **DISMISSED**.

As this is Plaintiffs' first Complaint, all claims are dismissed **WITHOUT PREJUDICE**. An appropriate Order will follow the entry of this Opinion.

Date: 03.31.2026

*s/ Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

47