# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ~~MATTHEW J. PLATKIN~~JENNIFER DAVENPORT, Attorney General of the State of New Jersey;[1] JEREMY E. HOLLANDER, Acting Director of the New Jersey Division of Consumer Affairs,<br><br>Plaintiffs,<br><br>v.<br><br>REALPAGE, INC.; MORGAN PROPERTIES MANAGEMENT COMPANY, LLC; AVALONBAY COMMUNITIES, INC.; KAMSON CORP.; ~~REALTY OPERATIONS GROUP LLC;~~ LEFRAK ESTATES, L.P.;[2] GREYSTAR MANAGEMENT SERVICES, LLC; AION MANAGEMENT, LLC; CAMMEBY'S MANAGEMENT CO. OF NEW JERSEY L.P.; VERIS RESIDENTIAL, INC.; RUSSO PROPERTY MANAGEMENT, LLC; RUSSO DEVELOPMENT LLC; AND BOZZUTO MANAGEMENT COMPANY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

---

[1] This action was commenced by former Attorney General Matthew J. Platkin on behalf of the State of New Jersey. In accordance with Fed. R. Civ. P. 25(d), this caption has been revised to substitute the current Attorney General of New Jersey, Jennifer Davenport.

[2] On June 17, 2025, the parties stipulated to the voluntary dismissal without prejudice of Realty Operations Group LLC, as Defendant LeFrak Estates, L.P. ("LeFrak") has represented that Realty Operations Group is a "doing business as" or "d/b/a" name under which LeFrak operates, has never been a separate legal entity from LeFrak, and Realty Operations Group LLC is a separate entity that has never been affiliated with LeFrak. ECF No. 51.

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 5

THE PARTIES ...................................................................................................................... 6

UNNAMED CO-CONSPIRATORS .................................................................................. 10

RELEVANT FACTS .......................................................................................................... 10

    I.   RealPage and Defendant Landlords Position RealPage RM Software to Dominate the Market. .................................................................................................................... 10

        A.  RealPage RM Software Uses Public and Proprietary Data to Increase Landlords' Returns Above Competitive Levels. ....................................................................... 11

        B.  RealPage Models its RM Software Off Software Previously Deemed Anticompetitive ........................................................................................................ 13

        C.  RealPage Acquires Its Largest RM Competitor, LRO, Cementing Its Dominant Market Position in 2017. ........................................................................................... 14

        D.  RealPage RM Software Is Used to Set Rents for a Meaningful Portion of Multifamily Apartments in New Jersey. ....................................................................... 16

    II.  Defendant Landlords Unlawfully Agree to Use RealPage RM Software to Increase Rent Prices Above Competitive Levels and to Share Competitively Sensitive Data ............... 18

        A. Defendant Landlords Agreed Among Themselves to Forgo Competition and Set Rents Using RealPage RM Software. ....................................................................... 18

        B. RealPage RM Software Is Anticompetitive by Design, Resulting in Consistently Higher Rents for New Jersey Renters. ....................................................................... 33

    III. RealPage and Defendant Landlords Agree to Delegate Rent-Setting Authority to RealPage, Which Enforces Compliance. ....................................................................... 39

    IV. Market "Plus Factors" Support the Existence of an Unlawful Agreement Among Defendants. ................................................................................................................... 46

    V.  Impact and Damages: Defendants' Agreement to Set Rents and Information Sharing Unlawfully Increased Rents, Overcharging New Jersey Residents Millions of Dollars. . 48

i

VI. Defendants Have Market Power in the Relevant Market(s). ........................................... 52

    A.  The Relevant Product Market(s). .............................................................................. 52

    B.  The Relevant Geographic Market(s). ......................................................................... 54

VII.    Defendants' Unconscionable Commercial Practices and Misrepresentations Harm New Jersey Consumers. ................................................................................................... 59

COUNT ONE ............................................................................................................................ 67

COUNT TWO ............................................................................................................................ 69

COUNT THREE ......................................................................................................................... 70

COUNT FOUR .......................................................................................................................... 71

PRAYER FOR RELIEF ............................................................................................................. 75

INTRODUCTION ....................................................................................................................... 2

JURISDICTION AND VENUE .................................................................................................. 5

THE PARTIES ............................................................................................................................. 6

UNNAMED CO-CONSPIRATORS .......................................................................................... 10

RELEVANT FACTS .................................................................................................................. 11

    I.   RealPage and Defendant Landlords Position RealPage RM Software to Dominate the Market. .................................................................................................................................. 11

        A.  RealPage RM Software Uses Public and Proprietary Data to Increase Landlords' Returns Above Competitive Levels. ............................................................................. 11

        B.  RealPage Models Its RM Software Off Software Previously Deemed Anticompetitive. ....................................................................................................... 13

        C.  RealPage Acquires Its Largest RM Competitor, LRO, Cementing Its Dominant Market Position in 2017. ......................................................................................... 15

        D.  RealPage RM Software Is Used to Set Rents for a Meaningful Portion of Multifamily Apartments in New Jersey. ............................................................................................ 17

    II.  Defendant Landlords Unlawfully Agree to Use RealPage RM Software to Increase Rent Prices Above Competitive Levels and to Share Competitively Sensitive Data ................ 18

A. Defendant Landlords Agreed Among Themselves to Forgo Competition and Set Rents Using RealPage RM Software. ...................................................................... 19

1. Participating Landlords—Including Defendant Landlords—Actively Recruit Additional Members to the Cartel.................................................................... 20

2. Participating Landlords Regularly Communicate in Furtherance of the Cartel and Agree to Share Competitively Sensitive Data for the Purpose of Raising Rents. ............................................................................................................ 24

3. AvalonBay Joined and Participated in the Conspiracy Despite a Contract Provision that Purportedly Restricted Use of Competitor Data........................... 34

4. AvalonBay Repeatedly Disclosed and Received Competitively Sensitive Information as Part of Its Agreement with Would-be Competitors to Exchange Such Information. ........................................................................................... 37

B. RealPage RM Software Is Anticompetitive by Design, Resulting in Consistently Higher Rents for New Jersey Renters............................................................... 43

1. LRO is Programmed to be Anticompetitive. ................................................ 43

2. YieldStar and AIRM are Likewise Programmed to be Anticompetitive.......... 46

III. RealPage and Defendant Landlords Agree to Delegate Rent-Setting Authority to RealPage, Which Enforces Compliance. ............................................................. 49

IV. Market "Plus Factors" Support the Existence of an Unlawful Agreement Among Defendants. ......................................................................................................... 56

V. Impact and Damages: Defendants' Agreement to Set Rents and Information Sharing Unlawfully Increased Rents, Overcharging New Jersey Residents Millions of Dollars. . 59

VI. Defendants Have Market Power in the Relevant Market(s). ......................................... 62

A. The Relevant Product Market(s). ........................................................................ 62

B. The Relevant Geographic Market(s). .................................................................. 65

VII. Defendants' Unconscionable Commercial Practices and Misrepresentations Harm New Jersey Consumers............................................................................................... 70

COUNT ONE................................................................................................................ 78

COUNT TWO................................................................................................................ 80

COUNT THREE—PRESERVED CLAIM ......................................................................... 81

COUNT FOUR—PRESERVED CLAIM ........................................................................... 82

PRAYER FOR RELIEF ............................................................................................. 86

DEMAND FOR JURY TRIAL .................................................................................... 88

i

## **FIRST AMENDED COMPLAINT**

1.      New Jersey residents have been victimized by an illegal conspiracy between some of the largest landlords in the State, including several headquartered in New Jersey, and RealPage, Inc., a large technology company. Plaintiffs, ~~Matthew J. Platkin~~Jennifer Davenport, Attorney General of the State of New Jersey, and Jeremy E. Hollander, Acting Director of the New Jersey Division of Consumer Affairs (collectively, "Plaintiffs"), bring this action against Defendant RealPage, Inc. ("RealPage") and ten of the largest landlords in New Jersey—Morgan Properties Management Company, LLC; AvalonBay Communities, Inc.; Kamson Corp.; LeFrak Estates, L.P~~.~~ ~~and its affiliate, Realty Operations Group LLC;.;~~ Greystar Management Services, LLC; AION Management, LLC; Cammeby's Management Co. of New Jersey L.P.; Veris Residential, Inc.; Russo Development, LLC and its affiliate, Russo Property Management, LLC; and Bozzuto Management Company (collectively, "Defendant Landlords")—for unlawfully colluding to raise residential rents by collectively setting rents using RealPage's technology and unlawfully agreeing to exchange current, competitively sensitive information in violation of the Sherman Act, 15 U.S.C. § 1, and the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3. ~~Defendants'~~Defendant Landlords' collusive imposition of inflated prices on New Jersey renters, which they concealed from renters and achieved by exploiting the gross power imbalance that exists between landlords and renters, and use of daily rent pricing changes and exploding offers, also ~~constitutes~~ ~~an~~constitute unconscionable commercial ~~practice~~practices under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.* ("CFA"). Certain Defendants further violated the CFA by making misrepresentations to New Jersey renters, including as to the reasons for these inflated prices. In support of their claims, Plaintiffs allege as follows:

**<u>INTRODUCTION</u>**

2.      RealPage and Defendant Landlords have orchestrated a deliberate and unlawful scheme to deprive New Jersey renters of a competitive market for multifamily apartment rentals—and the lower prices that would result from that competition. They have conspired to replace normal market forces with pricing software designed to drive rents to levels that exceed what would prevail in a competitive market. This lawsuit seeks to hold them accountable for their unconscionable misconduct that has forced hundreds of thousands of New Jerseyans to pay unlawfully inflated prices for what is often the largest single expense in their lives: rent.

3.      Historically, the market for leases in multifamily buildings in New Jersey operated competitively: landlords vied to attract tenants by offering better prices and terms than their rivals. But that competitive marketplace has been displaced by Defendants' unlawful scheme. Because of that scheme, tens of thousands of New Jersey apartments are priced not through independent decision-making, but through centralized software provided by RealPage. Defendant Landlords have unlawfully agreed to not compete with one another, and instead ~~price~~have priced their apartments using RealPage's software. As a result, instead of lowering rents to fill vacancies, Defendant Landlords ~~hold~~have held rents high—knowing their competitors will not undercut them. They ~~work~~have worked with RealPage and each other to keep apartments vacant in service of extracting unlawfully high rents from New Jersey renters. And they ~~force~~have forced current tenants to pay substantially increased rents when they renew their leases, or else give up their homes and reenter the market.

4.      Given Defendant Landlords' dominance of the multifamily housing markets in numerous cities and towns across New Jersey, renters are often forced to suffer the inflated prices dictated by the cartel. And the scheme is especially harmful to renters in New Jersey, where average monthly rent prices are already among the highest in the nation.

2

5.    Defendants' conspiracy ~~operates~~has operated the same way that illegal antitrust conspiracies have for decades: by direct collaboration with one another. Defendants ~~share~~have shared sensitive, real-time data on occupancy rates, leasing activity, concessions, and pricing strategies. They ~~participate~~have participated in user groups and industry meetings where they ~~coordinate~~have coordinated tactics and ~~reinforce~~reinforced their collective commitment to the scheme. And they have actively ~~recruit~~recruited other landlords into the scheme, knowing that broader participation will drive rents even higher.

6.    RealPage ~~makes~~has made this conspiracy incredibly lucrative by the use of its Revenue Management ("RM") Software to impose supracompetitive rents. RealPage ~~offers~~has offered three RM Software products to landlords: YieldStar, AI Revenue Management ("AIRM"), and Lease Rent Options ("LRO"). Each tool ~~relies~~has relied on sensitive, non-public information exchanged by the would-be competitor landlords to set daily rents across participating properties. The software is anticompetitive by design: it ~~prevents~~has prevented meaningful price reductions and ~~encourages~~has encouraged collective action to push rents higher.

7.    What's more, RealPage ~~enforces~~has enforced strict adherence to the prices it generates by landlords, using tools like automatic price acceptance, compliance tracking, secret shops, and direct oversight by RealPage employees to ensure landlords stay in line. ~~In the rare instance when~~When landlords do deviate, they ~~risk~~have risked corrective action—both from RealPage and from their peers in the cartel.

8.    The landlords participating in this scheme, including Defendant Landlords, are among the largest owners and operators of multifamily housing in New Jersey. Together, landlords who ~~use~~have used RealPage RM Software ~~control~~have controlled tens of thousands of rental units, many of them concentrated in the State's most supply-constrained and sought-after communities.

3

9.    The effects of this unlawful conduct have been staggering. A significant portion of New Jersey's population has been forced to overpay for rent, month after month. More than 90,000 multifamily units in New Jersey have been priced using ~~Realpage~~RealPage RM Software and likely many more units are impacted as a result of this scheme. RealPage advertises that its RM Software leads to landlords boosting their revenues by 2-7%, which they achieve by increasing rents. These inflated rents amount to thousands of dollars per apartment due to the unlawful conduct—hundreds of millions of dollars in total. It is no exaggeration to say that Defendants have lined their pockets at the expense of New Jersey renters who struggle to pay the increasingly unlivable rents imposed by the cartel.

10.    The misconduct extends beyond the collusive imposition of higher rents. Defendants have engaged in unconscionable and deceptive business practices, and certain Defendants have misrepresented material facts to New Jersey renters in connection with their businesses. Defendant Bozzuto, for example, has misrepresented the true nature of its pricing practices, falsely portraying rent increases as the product of market dynamics rather than coordinated algorithmic collusion. These misrepresentations were facilitated by RealPage, which has instructed landlords to hide the existence of the RM Software from consumers and conducted "secret shop" tests to ensure compliance with these misleading practices. Meanwhile, Defendants have publicly touted their commitments to integrity—while privately extracting unlawful profits by colluding with their would-be competitors.

11.    New Jerseyans are facing an affordable housing crisis. New Jersey is among the five ~~highest~~ states in the nation ~~for~~with the highest average rents. ~~The~~As of early 2025, the State ~~currently has~~had a shortage of over 200,000 affordable rental homes. In North Jersey, on average over twelve prospective tenants compete for each apartment vacancy. In addition, as of early 2025, fifty-four percent of low-income renters are cost-burdened in their housing—meaning that they

4

spend more than thirty percent of their income on housing costs—as are a quarter of middle-income renters. New Jersey is also the most densely populated state in the nation; the lack of space for additional construction is a natural constraint on the ability of competitor landlords to enter the market by building new multifamily properties. Additionally, renters in New Jersey face a highly concentrated market, where individual landlords control thousands upon thousands of apartments in the State. Despite all of this, demand for multifamily housing is highly inelastic: renters need someplace to live and cannot forgo the essential human need of shelter. Defendants have taken advantage of the gross power imbalance to deprive New Jersey renters of the competitive housing market that the law protects. Their scheme has contributed to and worsened the affordable housing crisis to the detriment of New Jersey renters.

12.    This case is about restoring competition to New Jersey's multifamily housing market and State residents' right to competitive rental rates. New Jersey has a strong interest in its residents' ability to afford housing. Through this action, Plaintiffs seek to dismantle the rent-setting cartel, hold Defendants accountable for their violations of the law, and secure meaningful relief for the people of New Jersey, who deserve a fair and competitive multifamily housing market.

13.    Plaintiffs bring this action seeking an order requiring Defendants to cease all unlawful conduct. Plaintiffs further seek a judgment requiring Defendants to pay civil penalties and damages, submit to an accounting and disgorge ill-gotten gains, reimburse fees and costs as permitted by statute, and other relief identified below.

## **JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

15.    The Court has personal jurisdiction over Defendants. Each of the Defendants purposefully does business in New Jersey and has the requisite minimum contacts with New Jersey

to permit the Court to exercise personal jurisdiction—selling the software and services at issue in this case, as to RealPage, and engaging in the business of leasing multifamily apartment leases that are at issue in this case, as to Defendant Landlords. Each Defendant is also registered to do business in the State of New Jersey. Defendants Kamson, Cammeby's, Veris, and Russo maintain their principal places of business in New Jersey.

16.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because each Defendant transacts business and/or resides within this District.

## THE PARTIES

17.     Plaintiffs are New Jersey Attorney General ~~Matthew J. Platkin~~Jennifer Davenport and Acting Director of the Division of Consumer Affairs Jeremy E. Hollander. The Attorney General is the State's chief legal officer and has broad oversight of the State's legal and law enforcement matters. Among other things, ~~he~~the Attorney General is responsible for bringing civil enforcement actions to ensure that companies and individuals comply with New Jersey law. The New Jersey Antitrust Act and Sherman Act each empower and specifically vest in the Attorney General the authority to bring antitrust claims on behalf of New Jersey residents. *See* N.J. Stat. Ann. § 56:9-6; 15 U.S.C. § 15c. The CFA likewise empowers the Attorney General to bring actions to remedy violations of the CFA, and the Attorney General has delegated the administration of the CFA to the Director of the Division of Consumer Affairs. *See* N.J. Stat. Ann. §§ 52:17B-120, 52:17B-124, 56:8-8, 56:8-11, 56:8-13, and 56:8-19.

18.     Defendant RealPage, Inc. is a corporation organized and existing under the laws of Delaware and headquartered in Richardson, Texas. RealPage provides products and services— including RM Software—to owners and managers of residential rental housing in New Jersey.

6

RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm Thoma Bravo.

19.    Defendant Morgan Properties Management Company, LLC ("Morgan") is a limited liability company organized and existing under the laws of Delaware and headquartered in Conshohocken, Pennsylvania. Morgan is a residential apartment manager and owner that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Morgan and its affiliates ownhave owned and/or managemanaged at least 7,000 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

20.    Defendant AvalonBay Communities, Inc. ("AvalonBay") is a corporation organized and existing under the laws of Maryland and headquartered in Arlington, Virginia. AvalonBay, an equity real estate investment trust ("REIT"), is a residential apartment manager and owner that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. AvalonBay and its affiliates ownhave owned and/or managemanaged at least 6,100 units in the State and used RealPage RM Software during at least the past six years. AvalonBay has used RealPage RM Software pursuant to contracts including, among others, a contract it entered into with The Rainmaker Group Real Estate, LLC in March 2017, and a contract with RealPage following RealPage's acquisition of LRO in 2017. AvalonBay was one of the first, and remains one of the largest, users of RealPage RM Software (specifically LRO) in the country. RealPage has considered AvalonBay to be among its "largest and most strategic LRO clients." AvalonBay even had special privileges—such as the ability to test LRO updates. AvalonBay incorporated a term into its As discussed in greater detail below, AvalonBay's contract with RealPage that nominally restrictedrestricts RealPage from sharing AvalonBay's data with other landlords or █████████████████████████████████

7

██████████████ when calculating ~~its~~AvalonBay's rents. However, AvalonBay worked to undermine this contractual provision by ████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████ All of this conduct, as described in more detail below, and which included private meetings with would-be competitors spanning back at least into the early 2010s, enabled AvalonBay to charge higher rents to New Jersey residents than it otherwise would have, in violation of the antitrust laws and the CFA.

21.    Defendant Kamson Corporation ("Kamson") is a corporation organized and existing under the laws of New Jersey and headquartered in Englewood Cliffs, New Jersey. Kamson is a residential apartment manager and owner that ~~utilizes~~has utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Kamson and its affiliates ~~own~~have owned and/or ~~manage~~managed at least 5,400 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage. Kamson is a dominant landlord in New Jersey, with RealPage having described the company as "a kingpin of NJ."

22.    Defendant LeFrak Estates, L.P. ("LeFrak") is a limited partnership organized and existing under the laws of New York and headquartered in New York, New York. ~~Defendant Realty Operations Group LLC is a New York limited liability company headquartered in New York, New York. Realty Operations Group LLC is an affiliate of LeFrak Estates, L.P. (together with Realty Operations Group LLC, "LeFrak").~~ LeFrak is a residential apartment owner and

8

manager that utilizeshas utilized RealPage RM Software to maximize the price of rental leases in New Jersey. LeFrak and its affiliates ownhave owned and/or managemanaged at least 5,400 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

23. Defendant Greystar Management Services, LLC ("Greystar") is a limited liability company organized and existing under the laws of Delaware and headquartered in Charleston, South Carolina. Greystar is a residential apartment manager that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Greystar and its affiliates ownhave owned and/or managemanaged at least 5,300 units in the State and used RealPage RM Software during at least the past six years. Greystar has used RealPage RM Software pursuant to its agreement with RealPage, including, among other aspects of the agreement, an August 2017 Master Agreement that states: "Greystar will use commercially reasonable efforts to . . . cause new and existing Sites to use . . . YieldStar Asset Optimization (revenue management)."

24. Defendant AION Management, LLC ("AION") is a limited liability company organized and existing under the laws of Delaware and headquartered in Philadelphia, Pennsylvania. AION is a residential apartment manager and owner that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. AION and its affiliates ownhave owned and/or managemanaged at least 5,100 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

25. Defendant Cammeby's Management Co. of New Jersey L.P. ("Cammeby's") is a limited partnership organized and existing under the laws of New Jersey and headquartered in Lakewood, New Jersey. Cammeby's does business under the name JCM Living. Cammeby's is a residential apartment manager that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Cammeby's and its affiliates ownhave owned and/or

9

managemanaged at least 5,100 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

26.     Defendant Veris Residential, Inc. ("Veris") is a corporation organized and existing under the laws of Maryland and headquartered in Jersey City, New Jersey. Veris is a residential apartment manager and owner that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Veris and its affiliates ownhave owned and/or managemanaged at least 4,600 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

27.     Defendant Russo Development, LLC, and its affiliate, Russo Property Management, LLC (collectively, "Russo") are limited liability companies organized and existing under the laws of New Jersey and headquartered in Carlstadt, New Jersey. Russo is a residential apartment manager and owner that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Russo and its affiliates ownhave owned and/or managemanaged at least 3,600 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

28.     Defendant Bozzuto Management Company ("Bozzuto") is a corporation organized and existing under the laws of Maryland and headquartered in Greenbelt, Maryland. Bozzuto is a residential apartment manager that utilizeshas utilized RealPage RM Software to maximize the price of its rental leases in New Jersey. Bozzuto and its affiliates ownhave owned and/or managemanaged at least 3,100 units in the State and used RealPage RM Software during at least the past six years pursuant to its agreement with RealPage.

### UNNAMED CO-CONSPIRATORS

29.     Not all landlord members of the conspiracy (together, "Participating Landlords") have been named as Defendants in this Complaint. On information and belief, additional landlords

10

owning or managing multifamily rental properties also unlawfully colluded to raise rents by collectively setting rents based on RealPage RM Software and unlawfully agreed to exchange competitively sensitive information. Plaintiffs' investigation into the alleged conspiracy is ongoing and Plaintiffs may name additional Defendants as their investigation progresses.

## RELEVANT FACTS

I.    **RealPage and Defendant Landlords Position RealPage RM Software to Dominate the Market.**

30.    RealPage offers a variety of technology-based products and services to real estate owners and property managers (collectively, "landlords"). These include, among others, property management software, sales and marketing solutions, tenant screening capabilities, and, most relevant for the purposes of this Complaint, revenue management applications and services. RealPage's unparalleled access to proprietary data, and its significant market share, have positioned RealPage as the "Big Tech" company of multifamily rental housing.

31.    RealPage RM Software first hit the residential real estate industry in the early 2000s and, in the intervening twenty years, has been adopted by a meaningful portion of the multifamily rental housing market nationwide and in New Jersey.

### A. RealPage RM Software Uses Public and Proprietary Data to Increase Landlords' Returns Above Competitive Levels.

32.    RealPage markets three ~~revenue management~~RM Software products: YieldStar, LRO, and AIRM. The products are functionally similar in that they automate pricing of multifamily units using algorithms fueled by RealPage's vast data repositories, including ~~repositories~~data shared among the three products. RealPage RM Software allows clients to "[o]ptimize rents to achieve the overall highest yield, or combination of rent and occupancy, at each property." Stated simply, these products ~~employ~~have employed statistical models that use data—including proprietary, non-public data—to estimate supply and demand for multifamily

11

housing that is specific to particular geographic areas and unit types, and then generate a price to charge for renting those units that maximizes the landlord's revenue.

33. Each Defendant Landlord has used one or more of ~~RealPage's~~the RealPage RM Software products to set the price of multifamily housing leases in New Jersey. Defendant Landlords that have used YieldStar within the last six years include at least Bozzuto and Greystar. Defendant Landlords that have used LRO within the last six years include at least AvalonBay, AION, Cammeby's, Kamson, LeFrak, Russo, and Morgan. Defendant Landlords that have used AIRM within the last six years include at least Bozzuto, Greystar, Russo, and Veris.

34. Defendants have worked to aggressively increase the portion of New Jersey rental units that are priced using RM Software. In an email from late March 2020, right as the COVID-19 pandemic was beginning to take its toll, Defendant Greystar's Senior Director of Revenue Management Alaina Emley wrote in an internal email regarding the news that an additional property would be priced using RealPage RM Software: "NJ is going to kill the other regions in their adds this year 😊 ."

35. RealPage contracts with property managers and owners, though in some instances the property manager and owner are the same entity, to provide its RM Software. Each of the Defendant Landlords in this case entered into contracts and otherwise participated in and acted to materially advance the anticompetitive agreements. Even where a Defendant is a property manager but not an owner, its success is tied to that of the properties it manages and it therefore has an economic incentive to implement the scheme for its own benefit. Defendant Bozzuto's Chief Administrative Officer Julie Smith, for example, wrote that the reason "why people hired us" is because Bozzuto's business practices "result in the **highest rents** in each of our submarkets" and "we are completely aligned with all of our owners to drive revenue as hard as we can."

36.    While access to RealPage RM Software is typically purchased on a per-property basis, RealPage charges the landlord an initial setup fee and then a monthly fee for each multifamily residential unit. This has been incredibly lucrative for RealPage, which has earned hundreds of millions of dollars in revenue as a result. Participating Landlords' ongoing and substantial payments to RealPage for access to the RM Software and related services evidence their continuing commitment to the scheme. They would not pay to receive RealPage-generated prices that they did not actually use to price their multifamily units.

37.    In addition to fees, Participating Landlords compensatehave compensated RealPage by providing their valuable proprietary data. This exchange is expressly stated in many Participating Landlord contracts with RealPage. For example, RealPage's contracts with Defendants Bozzuto and Morgan state: "RealPage's Product Centers [i.e., products including RM Software] rely upon Site Owner Data to function and deliver value to Site [O]wners, managers and residents. The pricing for the Product Centers is partially based on the expected value exchange whereby Site Owner grants to RealPage certain limited rights in the Site Owner Data."

## B. RealPage Models itsIts RM Software Off Software Previously Deemed Anticompetitive.

38.    RealPage purchased its first RM Software product, YieldStar, in 2002. From the get-go, RealPage used YieldStar as an opportunity for competitors to coordinate pricing strategies. In the fall of 2002, RealPage hosted a series of "executive-level revenue management summits" with key clients (i.e., landlords) to discuss various elements of revenue management, including:

- "Methods for establishing a forecast of weekly supply for each floor plan based on vacant units" and "Methods for establishing a forecast of weekly demand for each floor plan[.]"

- "Methods to price units in real time based on statistically validated price elasticity models that predict the relationship between price imbalances in supply and demand[.]"

13

- "Methods to adjust pricing to reflect nonoptimal lease terms" and "Methods to adjust pricing to optimize renewal pricing[.]"

- "Methods to manage concessions as a marketing tool that gross up net effective base rents computed by the pricing engine."

RealPage promised to incorporate feedback from these "summits" into future releases of YieldStar.

39.    Two years later, in 2004, RealPage acquired RE-Opt, which marketed a competing RM Software product, "Price Optimizer." Like YieldStar, RE-Opt's "Price Optimizer" used a proprietary model to maximize revenue in the apartment rental market. As part of the acquisition, RealPage named ReRE-Opt's CEO, Jeffrey Roper, "President and Principal Scientist" of YieldStar.

40.    Roper had previously served as Alaska Airlines' Director of Revenue Management and a member of its pricing committee in the 1980s. In that capacity, he developedused price-setting software for the airline industry that the Department of Justice's Antitrust Division later challenged as facilitating illegal anticompetitive agreements among the nation's largest airlines, costing consumers more than a billion dollars in artificially increased airfares between 1988 and 1992. After the airlines abandoned their expansive revenue management program to satisfy the Department of Justice, Roper went on undeterred to work at Talus, a consulting firm that developed revenue management programs for multifamily housing.

41.    Leveraging his experience in the airline industry and at Talus, Roper expanded YieldStar's use of proprietary data and incorporated RE-Opt's pricing model into YieldStar.

42.    Roper predicted that multifamily housing market participants would quickly embrace revenue management for pricing: "Clearly the whole industry will embrace it one day . . . . It will reach the point where [industry participants] don't have a choice because [they] can't compete effectively with what is going on around [them]."

14

43.     This prediction proved accurate. Between 2004 (when Roper joined RealPage) and 2016, use of revenue management for pricing grew significantly, and RealPage was a key part of that growth. In 2016, RealPage was reporting double-digit growth, largely driven by YieldStar.

**C. RealPage Acquires Its Largest RM Competitor, LRO, Cementing Its Dominant Market Position in 2017.**

44.     Like YieldStar, LRO was initially developed in the early 2000s by ~~an~~a REIT— Archstone (which was subsequently acquired in part by Defendant AvalonBay). Archstone believed "there was a better way of pricing . . . than the old model, where the pricing authority was effectively your onsite staff[.]" Archstone hired Talus—the same software company where Roper had worked—to develop LRO.

45.     Like YieldStar, LRO used timely and competitively sensitive, non-public data to generate the revenue-maximizing rent to charge for landlords' multifamily units.

46.     By 2017, YieldStar and LRO were the two largest RM products for rental real estate in the United States. RealPage then solidified its position as the dominant player in the revenue management space by purchasing LRO for $300 million. Prior to the acquisition, YieldStar was pricing approximately 1.5 million multifamily housing units in the United States; combining forces with LRO immediately brought that number to 3 million.

47.     Between 2018 and 2020, RealPage continued to market both YieldStar and LRO, noting that RealPage's RM products used an "unmatched database" reflecting "lease transaction data on over 12M units." Indeed, RealPage wrote in one 2019 marketing document: "With over 14 million multifamily units running on RealPage products and over 20 years of historical research and development, no one else has the tremendous depth of lease transaction data and actionable intelligence to fuel a truly robust revenue management solution that works for EVERYONE." Specifically, RealPage has explained its "effective competitive data" collection process as follows: "Our Data Analytics team . . . currently collects data on over 19 million apartments on an ongoing

15

basis. We individually survey each site each month and then use screen scraping technology to update the sites that leverage revenue management to survey more frequently. That survey data is further bolstered by being able to leverage over 13.5 million apartments of lease transaction data that is being processed on RealPage servers every day through products" including the property management software RealPage offers landlords for billing.

48.    RealPage has used its control over the relevant industry data to expand the scope of its RM product offerings. In February 2020, RealPage announced the launch of its "supercharged" price optimization product, AI Revenue Management ("AIRM"). RealPage ~~claims~~has claimed that AIRM incorporates machine learning into its modeling to (1) provide "more accurate supply/demand forecasting" and (2) allow landlords to "optimize[] the price of amenity and rentable items." Since introducing AIRM, RealPage has allowed legacy YieldStar and LRO users to continue with those products, but new clients can only purchase AIRM, and RealPage has taken steps to transition existing clients to AIRM. But according to RealPage, as of September 2024, "the company has no plans to sunset any of its solutions." AIRM's core functionality and purpose, however, remain the same as YieldStar and LRO: higher rent prices and supracompetitive profits.

49.    RealPage's dominant market position stems directly from its unrivaled access to proprietary data—something RealPage itself has acknowledged at multiple investor meetings. Importantly, RealPage possesses not only a massive amount of data, but also extraordinarily detailed data. For example, RealPage ~~advertises~~has advertised that YieldStar consumes "[m]illions of units of real-time executed lease data" and "extremely targeted data as fine and granular as bits of sand" to help landlords "maximize daily performance and drive additional revenue." This highly specific, proprietary data can then be used daily to generate rental prices for each unit in the property that uses the RealPage RM Software.

16

**D. RealPage RM Software Is Used to Set Rents for a Meaningful Portion of Multifamily Apartments in New Jersey.**

50.  RealPage dominates the market for multifamily housing, including both nationally and in New Jersey.

51.  RealPage has focused on recruiting into the cartel landlords whose properties have the largest number of units. As a result, the vast majority of New Jersey's residential properties that use RealPage RM Software are large multifamily properties.

52.  Several of the nation's largest landlords—such as Defendants AvalonBay, Bozzuto, Greystar, and Morgan—usehave used RealPage RM Software for pricing, as do several landlords operating exclusively or almost exclusively in New Jersey. And Defendant Landlords are not the only landlords in New Jersey that use RealPage's RM products. Other landlords who are not named as defendants also participate in the scheme.

53.  Nor is usage of RealPage RM Software limited to any one particular geographic area in New Jersey. Defendants' anticompetitive scheme has impacted properties spanning the entire State, from Camden to Trenton to Jersey City and beyond, as is illustrated in the following map:



54.     As a practical matter, the substantial number of units priced using RealPage RM Software in New Jersey—more than 90,000 units—leaves many New Jersey residents with no choice but to pay supracompetitive rents inflated by Defendants' anticompetitive agreement to set prices using RealPage RM Software, effectively forcing renters in locales across the State to endure the inflated prices. As a result of the misconduct, hundreds of thousands of renters in New Jersey have overpaid, for years, on what is typically the largest recurring expense in their lives. Although this misconduct has occurred in other states as well, New Jersey residents have felt the effects particularly acutely given the high costs of housing in the State and constrained supply in affected areas.

## II.    Defendant Landlords Unlawfully Agree to Use RealPage RM Software to Increase Rent Prices Above Competitive Levels and to Share Competitively Sensitive Data.

55.     In a competitive market, landlords would compete with one another for customers (renters in the market for multifamily leases), including competing on the price of rental leases to increase occupancy. Prospective renters in multifamily housing units routinely consider multiple

options when evaluating potential leases, and their decision of which unit to lease is determined in large part by the price offered to rent the unit.

56.    The Defendants' scheme represents a fundamental departure from the traditional, competitive marketplace that historically existed for multifamily rentals. RealPage and Participating Landlords—including Defendant Landlords—have transformed a competitive marketplace into one in which would-be competing landlords work together for their collective benefit at the expense of renters. Indeed, when a confidential witness who was a former high-ranking manager at Defendant Greystar was asked in an interview whether landlords use RealPage RM Software to collude on raising rental prices, he responded that of course they did—it's the entire reason landlords used the software.

**A. Defendant Landlords Agreed Among Themselves to Forgo Competition and Set Rents Using RealPage RM Software.**

57.    Participating Landlords, including Defendant Landlords, have agreed with both RealPage and one another to forgo competition and use RealPage RM Software to inflate rent prices above competitive levels.

58.    Acknowledging this anticompetitive agreement between Participating Landlords, including Defendant Landlords, an executive of one Participating Landlord stated candidly in a RealPage case study: "Even though, as apartment owners/operators we are all technically competitors, LRO helps us to work together, to share challenges and experiences in an effort to make us all more successful in our pricing"—i.e., to increase prices. The executive additionally praised "the knowledge sharing LRO encourages among all its customers[.]"

59.    Another Participating Landlord disclosed that it decided to adopt LRO only after consulting with "peers that [it] trusted" who reported "some really good numbers."

60.    Similarly, a former employee of both RealPage and multiple property management companies reported numerous in-person meetings between Participating Landlords specifically for

19

the purpose of exchanging pricing data. These landlords were not acting as true competitors; rather, the meetings occurred because "[w]e didn't want to do damage to each other."

61.     As an executive of one Participating Landlord stated during a 2021 earnings call when he was asked about competition: "[W]e all make the market better. I mean [competitors] all use revenue management. They are all smart. They raised rents when they should."

62.     Cartel participants likewise have furthered their agreement by communicating to recruit additional members, exchanging proprietary data, and generally reaffirming their commitment to their agreement.

### 1. Participating Landlords—Including Defendant Landlords— Actively Recruit Additional Members to the Cartel.

63.     Numerous Participating Landlords, including Defendant Landlords, have provided testimonials in writing and in recruiting videos directed towards other landlords, encouraging them to use RealPage RM Software and join the conspiracy.

64.     Defendant Greystar, for example, has issued public testimonials to recruit other landlords into the scheme, touting how "YieldStar delivers a sustained, verifiable revenue premium" and that "coming up with the right price" is something that "YieldStar handles" through the use of "data that owners and [managers] are unable to produce on their own":



Outperform with YieldStar®

**YieldStar delivers a sustained, verifiable revenue premium of 3 to 7%.**

**Powerful Results**

"Greystar properties using YieldStar outperformed their markets* by 4.8%, according to a same store analysis of 25,077 stabilized units using YieldStar within Greystar since 2009 across 16 markets."

* Source: Axiometrics

Greystar is using or implementing YieldStar across 70,000 units on behalf of 36 clients today, with a mounting pipeline of addition units.

**Higher Revenue IQ**

With YieldStar, Greystar spends less time creating reports and setting rents, and more time analyzing results. YieldStar delivers substantially improved visibility through performance data that owners and operators are unable to produce on their own. Empowered with that intelligence, YieldStar clients like Greystar can spend time analyzing trends and discussing factors that impact revenue rather than coming up with the right price, which YieldStar handles for you. With confidence in YieldStar's pricing, Greystar can focus more attention on other revenue drivers, such as marketing, product appeal, and organizational effectiveness.

**Tom Bumpass**
*Managing Director,*
*Chief Information Officer*
*Greystar*

65.    RealPage has also directly ~~facilitates~~facilitated the agreement among the would-be competitor landlords by introducing newcomers to other landlords and encouraging them to join the conspiracy. For example, in 2020 Defendant LeFrak agreed, at RealPage's behest, to consult with another landlord who was considering pricing its units with RealPage RM Software, in an effort to persuade the newcomer to begin pricing this way rather than competing. That newcomer went on to join the cartel and use the RM Software to price hundreds of apartments.

66.    Defendants Veris and AION have likewise helped to recruit additional landlords into the cartel at RealPage's behest.

67.    An executive of one Participating Landlord (which sold an 80-property multifamily portfolio to Defendant Morgan in 2019) provided another lengthy testimonial:

> We used to produce budgets that would hold us to achieving a 97% or 98% occupancy in some secondary and tertiary markets where we are the leaders. So, it was very hard for our executives to accept that we could operate at 94% or 96% and achieve a higher [net operating income] by increasing rents. . . . We ended up operating at 95% while seeing revenue increase by 3% to 4%, making more profit at an occupancy level that would have made management uncomfortable before. But this was science, with numbers that

21

executives could understand, so nobody could deny them. Everyone's eyes were opened.

68.    Similarly, an internal Greystar training manual regarding YieldStar encourages leasing employees to "Have CONFIDENCE in your rates!"

69.    Defendant Kamson similarly emphasized in a testimonial how pricing using the RM Software—which provides comfort of knowing that competitors will not be undercutting one another—enabled a more "aggressive posture on market rents," because "when property managers understand the market that much better, it's amazing how much braver they get with pricing." To Kamson, "bravery" means inflating the price of the most important and largest payment most New Jersey renters make every single month.

70.    In a testimonial regarding AIRM, another Participating Landlord executive stated: "Being able to see transaction level data has been really important in keeping decisions in line for each market. Our very first goal we came out with immediately out of the gate is that we will not be the reason any particular sub-market takes a rate dive. So for us our strategy was to hold steady and **keep an eye on the communities around us and our competitors**. Having the data to look at every day and be able to show our operations teams – is that we could make our decisions based on that data and not on fear, not on intuition, not on rumor or memory – it was really helpful in maintaining where we were and not just taking huge jumps out of fear." (Emphasis added).

71.    RealPage has also coordinated the production of videotaped landlord testimonials that it has published on its website to bring additional landlords into the cartel. In one such video, a Participating Landlord executive speaks directly to competitors about how using YieldStar will ensure that "you're getting the best price for your unit and not leaving any money on the table." Another touts YieldStar's "unparalleled access to market data" to inform decisions based on "what everyone in the industry is doing."

22

72.     Yet another recruitment video proclaims: "The Time for Revenue Management is Now!" In it, a Participating Landlord executive professes the value of having access to competitor data, with "YieldStar being part of RealPage and RealPage having the largest footprint of any property operating software provider." The executive goes on to conclude, "We achieved results that are beyond anything we could have imagined. . . . Revenue management will become the norm, and I believe within 2 or 3 years if you are not doing it, you will be in the minority."

73.     Defendant AvalonBay's Vice President of Revenue Management Rajiv Verma also issued a statement urging adoption of LRO by any "professional who's procrastinating on using revenue management.", " a plea to his fellow competitors that conveyed the value of the tool to AvalonBay. In this same testimonial, Verma explained that AvalonBay's "number one" reason for selecting LRO as its RM Software was "revenue gain." The former President of one Participating Landlord highlighted the benefits of cartel membership as part of a RealPage-sponsored webcast recorded in mid-2021: "We're in a position now where occupancy is extremely strong and we are pushing rents[.]" In response to a question about the role of revenue management, the executive explained: "Our portfolio is 97% occupied. I would've not imagined that. And being able to push rents across the board is significant. . . . But it's interesting that . . . a lot of the resident base is taking these increases, which I think is kind of a surprise to us." RealPage removed the webcast from its website after the *Washington Post* accessed the video and sought interviews from participants.

74.     In one video created by RealPage, a Participating Landlord executive is interviewed by a RealPage employee. The RealPage employee asks: "[For] any clients or prospects that we have in that area that are currently evaluating revenue management, what would you say to them?" The Landlord executive responds: "It's successful, it's proven, it's an opportunity."

23

75.     And at a 2021 industry conference, the CEO of one Participating Landlord admitted that his company wants more landlords using RealPage RM Software so that the cartel can collectively raise rents: "[W]e want the smartest owners being our competitors . . . . We want people with revenue management. We want people to understand when to raise rents and how to operate their portfolios at maximum efficiency." Conversely, in the words of RealPage's former Principal Scientist: "If you have idiots undervaluing, it costs the whole system[.]"

76.     These testimonials confirm the existence of an unlawful agreement among Participating Landlords—including Defendant Landlords—by reaffirming one another's continued commitment to the agreement and serving as a recruitment tool for additional landlords to join in the agreement to forgo competition in favor of setting rents using RealPage RM Software.

77.     If RealPage RM Software provided landlords with a competitive edge—that is, a way to make more money at other landlords' expense—there would be no reason for them to actively work to recruit other landlords to join the scheme. A landlord would not provide its competitors with one of its best tools to increase revenue if those competitors would just take away that revenue from the landlord. But Participating Landlords did help RealPage provide the tool to their would-be competitors without worry of being undercut because, as explained in detail below, RealPage RM Software provides Participating Landlords not a competitive edge but an *anticompetitive* one, where all participants make more money at the expense of New Jersey renters.

### 2. Participating Landlords Regularly Communicate in Furtherance of the Cartel and Agree to Share Competitively Sensitive Data for the Purpose of Raising Rents.

78.     Participating Landlords—including Defendant Landlords—have knowingly effectuated their cartel via ongoing, direct communications. These communications allowed Participating Landlords to exchange sensitive, non-public information and reaffirm their continued commitment to the cartel.

24

79.     In most instances, RealPage RM Software ~~is~~has been powered by real-time, competitively sensitive, non-public data supplied by its clients, including Defendant Landlords:

- RealPage ~~sources~~has sourced competing landlords' information from its own platforms, including OneSite—a widely used Property Management System marketed by RealPage—including non-public information regarding inventory, prices of actual leases, concessions offered, and detailed information about amenities and rental unit value.

- RealPage has also ~~sources~~sourced competitor data from within the RealPage RM Software ecosystem. For example, RealPage RM Software ~~generates~~has generated pricing from information that competing landlords have provided through other RealPage RM Software products (e.g., YieldStar ~~being~~has been fueled by data collected through AIRM and vice versa); and for nearly all users, LRO ~~relies~~has relied on shared supply and demand data to calculate market-level seasonality that is used in optimizing rents for most users.

- RealPage ~~ingests~~has ingested non-public data from competing property management systems into its RM Software databases, including data from Yardi, which is OneSite's leading competitor in the market.

- In addition to its Automated Comps feature—which automatically pulls in competitor data from RealPage's systems—LRO also allows landlords to manually input competitor data. Landlords are instructed by RealPage to gather this non-public competitor data from direct conversations with their competitors. And the competing landlords ~~agree~~have agreed to provide this data, to enable the LRO algorithm to generate above-market rental prices for themselves and other cartel members. A RealPage LRO user manual states, for example, that "You should gather . . . information each week from each competitor" such as "[r]ent charged for each unit type," "[n]umber of visits to the property that week," and "[o]ccupancy percent for the property."

80.     Participating Landlords, including Defendant Landlords, expressly agree to share their non-public information with competitors and know that their competitors' information is being used to generate the rents they charge. This agreement includes but is not limited to express contractual promises, such as a "One Master Agreement" with RealPage that expressly obligate the landlord to provide RealPage with "correct and accurate" data and acknowledge that RealPage may use that data to operate its products (including the RealPage RM Software).

25

81.     In the wake of lawsuits relating to RealPage RM Software, one landlord executive notified RealPage that the landlord was pausing implementation of AIRM due to legal uncertainty, but the executive stated candidly: "I always liked this product because your algorithm uses proprietary data from other subscribers to suggest rents and term. That's classic price fixing[.]"

82.     When one Participating Landlord provided an "Introduction to LRO Webinar" for its employees, the first agenda topic after the introduction to revenue management was "Competitor Rents."

83.     The use of non-public competitor data ~~facilitates~~has facilitated Defendants' agreement to coordinate pricing and use RealPage RM Software for rent-setting. For example, the former Chief Product Officer at RealPage, Jon Pastor, described LRO as "a pricing platform that relie[s] on pricing of your competitors to figure out what your price should be." Indeed, a RealPage marketing document states: "LRO utilizes relevant competitor information accurately. It is correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."

84.     In the words of one Participating Landlord executive in a RealPage-published case study: "The design and functionality of LRO offers detailed insight into how actual competitors impact pricing strategies. . . . LRO is designed to work with a community in pricing strategies, not work separately."

85.     In addition to incorporating competitors' current data into its algorithm for generating rents, RealPage has also ~~makes~~made this data available to landlords using RealPage RM Software, including for certain landlords in specific ~~and,~~ non-aggregated ~~form,~~ and minimally aggregated forms—such as property-specific occupancy and rent data at the floorplan level for competitor properties.

26

86.     Indeed, RealPage was cognizant of the fact that obtaining a sufficient share of the market's data would enable it to ratchet up rents. For example, a 2016 investor presentation included a slide titled "Strength in Numbers," touting RealPage's market penetration and tying it to RealPage's ability to raise rents. As one former RealPage Director succinctly explained: "If you have the data for the entire market and not enough availability, then everyone's price went up. It pushed pricing up across the board. . . . Let's say you have 50% of the properties in a market and the market is constrained. The model is going to recommend higher lease rates for every property."

87.     RealPage's Revenue Management User Groups have also ~~facilitate~~facilitated the direct exchange of non-public, competitively sensitive information between Participating Landlords. For example, and as alleged elsewhere herein, Defendants AvalonBay, Greystar, and Morgan discussed and coordinated business strategies for mitigating the effects of the COVID-19 pandemic in the LRO User Group, and other Participating Landlords participated in discussions with each other about post-pandemic renewal increases and concession use in the YieldStar User Group.

88.     Pursuant to their anticompetitive agreement with one another and with RealPage, LRO users ~~can and do conduct~~have conducted weekly calls with would-be competitor landlords, and those landlords ~~agree~~have agreed to provide non-public data for input into the LRO software. The non-public data that would-be competing landlords ~~agree~~have agreed to and ~~do share~~have shared in these conversations includes current occupancy rates, how many prospects visited the competitor each week, and how many new leases a competitor signed each week.

89.     Among other competitively sensitive data, Participating Landlords (including Defendant Landlords) have unlawfully ~~exchange~~exchanged current price information with their would-be competitors. The exchange of this type of information has the greatest potential for generating anticompetitive effects, and here it did have such effects.

27

90.     Similar non-public and/or competitively sensitive information ishas also been regularly exchanged between Participating Landlords (including Defendant Landlords)—especially those using LRO—over email. For instance, Participating Landlords, including Defendants AvalonBay, Bozzuto, and Greystar, directly exchanged non-public, competitively sensitive information regarding leases and multifamily rental properties at least outside of New Jersey, including weekly traffic, occupancy rates, starting prices for floorplans, percentage of apartments leased, total appointments, and any applicable concessions/specials.

91.     Defendant Russo has also has participated in the information exchange with its direct competitors, sharing, for example, sensitive non-public information regarding its traffic and leasing activity in New Jersey with would-be competitors such as Defendant Bozzuto.

92.     Defendant Veris, through its subsidiary Roseland Residential, also has shared competitively sensitive, non-public information with its would-be competitors, including Defendants Bozzuto and LefrakLeFrak, regarding multifamily residential units in New Jersey.

93.     In one such email including some of this information, Tiffany Mott, a Bozzuto Sales and Marketing Associate outside of New Jersey, wrote to Bozzuto's so-called competitors: "Happy leasing to you all 😊 !" In another, Brandy Horne, a Sales and Service Supervisor from AvalonBay informed its competitors that, during the week prior, the property had 49 visits, 8 applications (one of which was denied/cancelled)—the kind of information that is not publicly available but directly relates to demand.

94.     Defendant Veris, through its subsidiary Roseland Residential, has shared similarly precise and non-public information with its would-be competitors in New Jersey, including Defendants Bozzuto and LeFrak. In one such exchange, Associate Director of Operations Kujtim Asani wrote that Veris's data in the prior week included "Tours(Virtual):8" "Applications: 4" "Occupied: 94%" "Leased: 95.5%." Notably, this information was exchanged in late March

28

2020—right as the COVID-19 pandemic was beginning to take hold—to help the conspirators continue to extract inflated rent prices, notwithstanding the emerging pandemic.

95.     One former Leasing Manager at Defendant Morgan acknowledges in their LinkedIn profile that they "[c]onducted quarterly in-person visits of competitors, consistently updated LRO competitor pricing weekly, and compiled a monthly Competitor Property Analysis report including . . . occupancy changes, and special incentives."

96.     This information was clearly important to the Defendant Landlords. When they would write one another, they would often specifically ask for similar information. For example, an AvalonBay employee expressly asked competitors to "provide occupancy/leasing rate, as well as any specials for prospects or renewals that your community may have."

97.     Additionally, Participating Landlords, including Defendant Landlords, have directly ~~communicate~~communicated regarding their collective use of RealPage RM Software in the RealPage User Group, which boasts over 1,000 active members and is designed specifically to "promote communications between users." RealPage ~~sponsors~~has sponsored the User Group, but it is "governed by a steering committee of [RealPage's] clients." The RealPage User Group and its subcommittees ~~meet~~have met regularly: the YieldStar and AIRM User Groups have typically ~~meet~~met telephonically once per month, with the LRO User Group generally meeting quarterly. The User Group also has a digital forum where competitor landlords can communicate with one another about using RealPage RM Software outside of scheduled meetings. RealPage's Revenue Management User Groups—which include at least Defendants AvalonBay, Greystar, and Morgan—have also ~~communicate~~communicated regularly via email.

98.     The LRO User Group membership, for instance, has included executives and other employees from Defendants AvalonBay, Greystar, and Morgan. AvalonBay's Vice President of Revenue Management, Rajiv Verma, served as the subcommittee chair of the LRO User Group

from at least 2019 to 2021. In this leadership capacity, he set LRO User Group agendas and spearheaded an effort to allow LRO User Group members to "vote" on changes to LRO like the approach adopted by the related YieldStar User Group, and he had the express objective to preside over subcommittee members who "suggest creative Software enhancements with a view that considers the mutual benefits of all users."

99.     In one example of how the RealPage User Group and its subcommittees facilitate and further the overarching conspiracy in which Defendant Landlords have participated, several Defendant Landlords used the LRO User Group to discuss and coordinate strategies for ensuring the COVID-19 pandemic did not interfere with their ability to extract more money from tenants. These LRO User Group conversations involved the exchange of proprietary business strategies and other information of significant competitive value.

100.     As discussed above, LRO considershas considered historical supply and demand patterns. Due to concerns about supply and demand disruptions associated with the COVID-19 pandemic, December 2020 LRO User Group meeting attendees initiated a discussion about how "Future Pricing will be impacted by [the] Historical behavior of Pandemic."

101.     Less than two weeks after this LRO User Group meeting, AvalonBay's Verma (then the LRO User Group chair) wrote RealPage to follow up on a prior voicemail "regarding the use of LRO and how we can manipulate the demand and supply forecasts to account for the effects of the pandemic" and sought RealPage's "recommendations on how to move forward."

102.     During the next LRO User Group meeting on February 10, 2021, attendees extensively discussed the impact of the pandemic on pricing, which included a presentation by RealPage's Jay Parsons. Meeting attendees included representatives of Defendants RealPage, AvalonBay, Greystar, and Morgan. Meeting participants discussed "the impact of Covid on historical statistics and how that will skew rents in the future" and concluded that ▮▮▮▮▮

30

██████████████████████████████████████████ in LRO. One meeting attendee from a Participating Landlord even shared that it had ████████████—so LRO User Group members knew such modifications were possible and <u>were</u> already being implemented by one key competitor.

103.    Subsequently, several Participating Landlords that attended the February 10, 2021 LRO User Group meeting—including Defendants AvalonBay and Morgan—reached out to RealPage to request that it ████████████████████████████████ ██████████████████████████ The timing and similarity of these requests was not a coincidence. As an email among RealPage employees acknowledged, the requests "stem[med] from the User Group call . . . a couple weeks back" where a ████████████████████ ████████████████████████████████████████████████ ████

104.    This collective decision by competitors, including Defendants AvalonBay and Morgan, had a very real impact on rents. For example, after RealPage ████████████ for Defendant Morgan, the initial rent swing report showed their rent prices increasing by an average of $152 per unit per year (or 1%) from this change alone. This particular incident in which would-be competitor landlords conspired to use the RM Software to raise rents is but one example of the many such incidents in the broader conspiracy. It is emblematic of the ways in which Participating Landlords, including, for example, Defendants AvalonBay and Morgan, have joined together and with RealPage to execute shared business strategies, anticompetitive conduct that comes squarely at the expense of New Jersey renters.

105.    The YieldStar User Group likewise provided a forum for Participating Landlords, and they used it to discuss competitively sensitive topics and cushion the pandemic's impact on their profits at renters' expense. For example, the May 2021 YieldStar User Group meeting

31

included a "Back to Basics" discussion about "returning to renewal increases post-Covid," "declining concessions," the "upcoming eviction moratorium," and the "significant uptick" in "Rate Acceptance Trends" "in [the] past 6 months." A record of the meeting group chat reveals that over approximately fifteen minutes, representatives of numerous Participating Landlords shared their plans for renewal increases and concession use, including statements on renewal increases such as "Increasing, back to normal," "almost all markets we are raising rents," "Back to increasing at renewal," "Increasing renewals and pushing new lease rents," and "Increasing!"

106.    The YieldStar User Group membership has included, among others, executives and other employees from Defendants AvalonBay and Greystar. Greystar's Senior Director of Revenue Management, Alaina Emley, has chaired both the YieldStar and AIRM User Groups.

107.    Participating Landlords also gather regularly, in person, to discuss their delegation of pricing to RealPage softwareRM Software and work to recruit additional members into the cartel.

108.    For example, RealPage hosts the annual "RealWorld" conference, during which landlords who use the RealPage RM Software gather in person to discuss how they are delegating and will continue to delegate the pricing for their rents. RealPage expressly describes RealWorld as an opportunity for landlords to "meet with peers." Defendant Greystar alone sent dozens of attendees to Real World in 2018, 2019, and 2020. RealPage circulated notes to attendees, including to Defendants Greystar and LeFrak, of a 2019 session titled "Revenue Management Roundtable: Optimizing Opportunity Every Day" in which would-be competitors jointly discussed how they could maximize profits by utilizing revenue management features. Representatives from Greystar and Bozzuto were also invited to the "RealWorld 2022 VIP Dinner" with representatives from RealPage and a number of their would-be competitors.

32

109.    Before LRO's acquisition by RealPage, landlords that used LRO also gathered at the annual LRO User Conference and OPTIMIZE Rainmaker User Conference.

110.    In addition to conferences hosted by RealPage, Participating Landlords, including Defendant Landlords, communicate at numerous other industry conferences and through digital channels, which provide ample opportunities to confer. Examples include:

- The OPTECH Conference held by the National Multifamily Housing Counsel ("NMHC") and sponsored by corporations including RealPage. The 2020 OPTECH Conference was sponsored by RealPage and included multiple sessions dedicated to revenue management, including one specifically on RealPage's AIRM, presented by RealPage employees Amy Dreyfuss and Keith Dunkin. Other conference participants included representatives from Defendants AvalonBay (including at least Senior Vice President for Strategic Initiatives, Karen Hollinger), RealPage (including at least Asset Optimization Analyst Adam Couch), and Greystar (including at least Managing Directors Greg Benson and Scott Berka).

  Included among the attendees of the 2021 OPTECH Conference were representatives from Defendants RealPage (which sponsored the event and sent representatives including at least Multifamily Development Director Steve Sadler), AvalonBay (including at least Karen Hollinger), and Greystar (including at least Marti Burrows).

  The 2022 OPTECH Conference was attended by representatives from, at least, Defendants RealPage (including, among others, Director of Research & Analytics Carl Whitaker and Industry Principal for Asset Optimization Tracy Saffos), AvalonBay (including, among others, Vice President of Data Analytics Kevin Geraghty, who presented on "turning [data] into business intelligence"), Bozzuto (including, among others, Vice President of Digital Marketing Daniel Paulino), and Greystar (including, among others, Managing Director of US Property Marketing Greg Benson).

  The 2023 OPTECH Conference was attended by representatives from, at least, Defendants AION, RealPage, Greystar, Bozzuto, and AvalonBay.

- NMHC facilitates the Participating Landlords' regular communication with one another about their use of multifamily housing technology, such as RealPage RM Software, through NMHC's Tech Leaders/CIO Group forum and NMHC's Technology and Innovation Committees—which include, among others, an "Enterprise Technology and Business Intelligence Committee." Competitors who meet and communicate directly with one another through these forums and committees include at least Defendants AvalonBay and Greystar.

33

- The National Apartment Association's ("NAA") 2019 Maximize conference was held in September 2019 in Atlanta, Georgia. It was an event "[f]ocused on the intersection of asset and revenue management[.]" Participants included some of the same landlords that have also published testimonials advocating for the use of RealPage RM Software.

- NAA's 2014 and 2015 Maximize conferences similarly included competing landlords communicating directly with one another about strategies to maximize revenue using software such as RealPage RM Software.

111.    RealPage and Participating Landlords not only gathered and disseminated information as to the cost of inputs that go into producing their product, the volume of production, actual prices, and stocks on hand; they also reached an agreement and took concerted action with respect to prices or production, and they restrained competition that would otherwise have driven down prices.

112.    The exchange of competitively sensitive information can, in and of itself, cause anticompetitive effects. Here, those effects ~~were~~have been compounded by Defendants' agreement to use that competitively sensitive information to fuel RealPage RM Software and enable the Defendant Landlords to collectively increase rents at the expense of renters in New Jersey. This means, for example, that Defendants AvalonBay or Greystar could reduce competition by exchanging competitively sensitive information with each other, through the LRO User Group or otherwise, and with or without using RealPage as a direct conduit.

~~113.~~

### 3. AvalonBay Joined and Participated in the Conspiracy Despite a Contract Provision that Purportedly Restricted Use of Competitor Data.

113.    AvalonBay's contract with RealPage contained a provision that purported to restrict RealPage from using any data other than data provided by AvalonBay or from public sources to calculate AvalonBay's rent pricing. Critically, however, that provision ██████████████ ████████████████████—it did not inhibit AvalonBay from providing RealPage with confidential

34

data that AvalonBay directly obtained from competitor landlords, nor did it bar AvalonBay from sharing its own competitively sensitive data with those competitors.

114. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████

115. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████

116. Although AvalonBay's contract with RealPage may have barred RealPage from using ██████████████████████████████████ to calculate AvalonBay's rent prices, the contract in no way restricted RealPage's ability to use other types of non-public, competitively sensitive competitor data to calculate AvalonBay's rent prices. ██████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████

117. Moreover, AvalonBay was fully aware that ████████████████████
████████████████████████████████████████████████████████
████████████████████████████

118. Despite its contract term with RealPage, ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

35

119. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

120. In numerous instances at its New Jersey properties, ██████████

███████████████████████████████████████

███████████████████████████████████

121. Not all competitor data could be collected from public sources. Although some competitors' advertised rent prices may have been publicly available, actual, executed prices or concession information, for example, are not always publicly listed. Therefore, ████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

122. RealPage would also notify AvalonBay if ██████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

**4. AvalonBay Repeatedly Disclosed and Received Competitively Sensitive Information as Part of Its Agreement with Would-be Competitors to Exchange Such Information.**

123.    Furthermore, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████

124.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████

125.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

126.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

127.   AvalonBay's decision to expand its initial use of LRO was driven by the fact that LRO increased rent prices. As AvalonBay summarized ████████████████████████████████

████████████████████████████████████████████████

█████████████   AvalonBay valued not only the ability to increase revenue, but specifically the ability to increase rent prices—even at the expense of renters being able to afford AvalonBay's apartments.  ████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

128.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████



129.   ███████████████████████████████████████████

███████████████████████████████████████████████████

38

130. ████████████████████████████████████████████████████

131. ████████████████████████████████████████████████████

132. ████████████████████████████████████████████████████

133.    AvalonBay's involvement in the anticompetitive agreement extended well beyond its use of LRO. ████████████████████████████████████████

39

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████

134.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

135.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

136.    AvalonBay's Verma also served as chair of the "LRO User Group" from ████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

137.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

138.    AvalonBay employees at all levels—from community managers to its most senior executives—regularly communicated with competitors. For instance, ███████████████

139.    AvalonBay executives even coordinated with competitors regarding ████████

140.    Likewise, AvalonBay's executives met with ████████████ to discuss ███████████████ including ████████████████████ ████████████████ These communications occurred over a period of many years. ████████████████ It would not have

41

been in AvalonBay's unilateral self-interest to ████████████████████████████

████████████████ reflect direct evidence of its participation in a broader conspiracy.

141. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

142. In line with the alleged conspiracy to use RealPage RMS to increase prices and

avoid competition, AvalonBay's internal communications also involved repeated discussions of

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

143. In sum, the contractual provision purportedly restricting RealPage's use of

AvalonBay's competitor data did not prevent AvalonBay from participating wholeheartedly in the

conspiracy. To the contrary, even if AvalonBay maintained technical compliance with its contract

terms, AvalonBay actively participated in and orchestrated the anticompetitive agreement by: █

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ AvalonBay's conduct, taken as a whole, demonstrates that it knowingly joined and

substantially participated in the alleged conspiracy to inflate rents charged to New Jersey renters.

42

**B. RealPage RM Software Is Anticompetitive by Design, Resulting in Consistently Higher Rents for New Jersey Renters.**

114.144.    ~~In addition to being~~RealPage RM Software has been fueled by competitively sensitive, non-public data in most instances. But in addition, RealPage has purposefully programmed its RM Software to stifle normal competitive pricing action (e.g., undercutting one's competitors to win business), maximize rent increases, and minimize rent reductions—all to the benefit of Defendant Landlords and to the detriment of New Jersey renters. In particular, the RealPage RM Software ~~contains~~has contained checks designed to limit or eliminate rent decreases, even where a landlord's specific economic conditions or overall market conditions would otherwise prompt a different pricing response in a competitive marketplace.

115.145.    LRO's mechanisms for reducing competition ~~vary~~have varied somewhat from those built into YieldStar and AIRM. LRO has largely ~~relies~~relied on the direct exchange of sensitive information between competitors and landlords' use of that information, which are all a hallmark of traditional antitrust conspiracies. ~~YieldStar and AIRM leverage~~; it has also relied on ███

███████████████████████████████████████

███████████ YieldStar and AIRM have leveraged technology to directly incorporate landlords' non-public data, rendering it unnecessary for landlords using YieldStar or AIRM to gather this information from competitors. All three products, ~~however, are~~ have been programmed to push rents higher while minimizing the frequency and magnitude of the types of rent decreases that would exist in a competitive marketplace.

### 1. LRO is Programmed to be Anticompetitive.

116.146.    LRO's express "goal is to set prices at or above the fair market value established by […] competitors." Indeed, this is the principal reason landlords use the product—according to RealPage's survey of LRO users, the primary reason they reported using LRO was that it "[e]ncourages us to push rates more frequently/aggressively."

43

117.147.    LRO ishas been programmed to ensure that landlords rarelyrelatively infrequently lower rents. Accordingly, LRO reduceshas reduced competition by design. This anticompetitive effect occurshas occurred regardless of the extent to which LRO considers non-public information, because landlords using LRO adherehave adhered to the higher rates LRO pushes them to adopt, even when their incentives would otherwise be to undercut other landlords.

118.148.    The rates LRO ultimately sets for almost all users, however, arisehas arisen from RealPage's collection of landlords' non-public information. RealPage encourageshas encouraged landlords to gather such non-public, competitively sensitive data directly from their competitors and input it into LRO. LRO's algorithm then uses the data collected by landlords to maximize rent prices. Indeed, LRO training documents explain: "it is helpful to be aware of other management companies in your markets on LRO. This might help build a relationship for the honest exchange of information needed each week to update the comp rent information." LRO has also reliesrelied on a shared poolspool of data related to supply and demand to calculate market-level seasonality that the software then uses to optimize rents for most users.

119.149.    When a landlord elects to use LRO for a particular property, the landlord must categorize the units in that property into one of thirty-two different unit types recognized by the algorithm. All landlords who use LRO use the same categories for their LRO properties, which allows the algorithm to compare those properties with those of competitors.unit types. The landlords then select which competitor properties LRO will consider in setting their rents. RealPage instructs that "a competitor is a community that you share traffic and leasing with." Landlords enter competitors' prices in LRO, and LRO uses those prices to calculate a "Market Composite." Participating Landlords who usehave used LRO understand that LRO is programmed such that the Market Composite "IS THE FLOOR FOR YOUR UNIT TYPE PRICING." This is

a high-tech way of achieving a classically anticompetitive (and unlawful) result that has been condemned for over a century: agreeing to not undercut the prices of one's competitors.

120.150.    LRO generates daily rents for every available apartment for every available lease term. To do so, LRO first calculates the "Reference Rent" on a weekly basis for every available unit. Then, LRO "[o]ptimize[s]" the Reference Rent. Optimization considers the Reference Rent, as well as the forecasted supply (how many leases are expected) and demand (how many units are available or expected to become available), to determine daily pricing. Finally, LRO applies any amenity adjustments or other offsets to the optimized rent, after which the software pushes the adjusted, optimized rent to landlords' property management systems, where they show up in the quoted rent field for particular units.

121.151.    Although "optimized" rents can be somewhat higher or lower than the Reference Rent, these effects are moderatemodest because the Reference Rent has the most influence on which prices LRO ultimately recommends. LRO uses the same formula for all landlords to determine whether the Reference Rent will change and by how much. This formula is a key determinant of the actual rent price generated by the software and is designed to keep rents high.

122.152.    Of the 108 different permutations of the five variables used to set the Reference Rent, LRO can only recommendsrecommend reducing it in sixa small handful of instances. Unsurprisingly, from week to week, in the vast majority of instances, LRO either will keep the Reference Rent the same or will raise it.

123.153.    Critically, even in those rare situations where LRO lowers the Reference Rent, constraints are hardwired into the algorithm to limit the impact of doing so. Specifically, LRO ishas been programmed such that the Reference Rent will never go below the Market Composite. This ishas been true regardless of the number of vacant units or quality of the

45

competitor's properties—the only way for the Reference Rent to go below the Market Composite ishas been if the landlord makes a temporary override (which the algorithm is programmed to undo when it calculates the next week's Reference Rent).. As one of LRO's founders acknowledged, the software was programmed in this way "to prevent 'spiral downs'" where competitors across the market lower rents. In the absence of the conspiracy at issue in this case, these pricing "spiral downs" would be the exact sort of competition to which New Jersey residents are entitled.

124.154.     Participating Defendants who usehave used LRO—including, for example, Defendants AvalonBay, Cammeby's, Kamson, LeFrak, and Morgan—have set their rents based on the Reference Rent and the underlying Market Composite.

125.155.     RealPage does not hide the fundamental nature of LRO from landlords—. RealPage shareshas shared this information regularly in pitches, at trainings, and as landlords use LRO.

126.156.     Thus, Defendant Landlords who usehave used LRO to price their apartments arehave been confident that fellow LRO users—all competitors in the market for multifamily housing—will hold or raise rents in nearly all instances, with checks in place to limit the effect of any reductions in rent. This anticompetitive agreement achieveshas achieved its goal—raising rents through the use of an algorithm that LRO-using Defendant Landlords know will inevitably lead to prices being higher than competitive levels—simply by virtue of their agreement with both RealPage and each other to use LRO.

### 2. YieldStar and AIRM are Likewise Programmed to be Anticompetitive.

127.157.     Like LRO, YieldStar and AIRM are anticompetitive by design because they eliminate or limit the sorts of competition on price that would exist in a competitive market and instead push landlords to increase prices beyond competitive levels.

46

128.158.    Similar to LRO's rule that the Reference Rent must not fall below the Market Composite, YieldStar and AIRM establishhave established a "hard floor" that preventsto prevent the RM products from ever generating a priceprices that undercutswould undercut the blended average of the lowest-priced competition. (absent an override, which RealPage discourages). And yet, there is no suchthe products have not established a corresponding "hard ceiling": the software willhas readily generate a pricegenerated prices that exceedsexceed the highest rent offered by another competitor. Thus, Defendants'Defendant Landlords' agreement to adopt prices generated by YieldStar and AIRM functionshas functioned as an agreement to not undercut one's competitors, which is anticompetitive.

129.159.    RealPage has actively discussesdiscussed these anticompetitive "hard floor" pricing features of AIRM and YieldStar with landlords:

- A RealPage Senior Manager, Jennifer Langley, explained to Defendant Russo in 2022: "If your property is performing well, the recommended rates can go above 100% of the market range, but if your property is underperforming, it cannot go below the bottom of the range. That does act as a floor."

- A RealPage Revenue Management Advisor, Brittany Glover, informed Defendant Greystar in a 2023 email: "The [YieldStar] model will never recommend a rate below the bottom of the market as this is a hard floor."

- In a 2021 email, a RealPage Senior Manager, Dusty Raiborn, explained: "If the floor plan is performing well, recommendations can exceed the top of the market. The bottom line is a blended average of the peers at the bottom of the market and this is considered a hard floor. YieldStar will not recommend rates below the bottom of the market."

- In an AIRM Manager Training presentation for Defendant Greystar and other Participating Landlords, RealPage explained how competitor rents are considered in AIRM's New Lease Workflow identifying "the bottom of the market" that "is a natural floor to your pricing. AIRM will not make a recommendation that will push you below the bottom of the market."

130.160.    Another anticompetitive element that RealPage has programmed into YieldStar and AIRM is a setting known as "Revenue Protection" mode. In YieldStar and AIRM,

47

revenue protection mode is activated when the model predicts that expected demand is too low for a landlord to meet its target occupancy. Rather than recommending a rent decrease to stimulate more demand (the usual pricing response to low demand in a competitive market), the YieldStar and AIRM algorithms instead increase rent prices. As one RealPage Senior Manager noted, under revenue protection mode, "the model is wanting to raise rates to get the highest dollar value possible for the leases we can statistically achieve." But participants in a competitive marketplace, absent a conspiracy, would not respond to low demand by increasing prices or limiting price cuts.

131.161. A 2020 email exchange between a RealPage YieldStar advisor and a Participating Landlord illustrates how revenue protection mode reduceshas reduced competition. In May 2020, a Participating Landlord reached out to RealPage regarding a concern about low occupancy at one of its properties. The landlord inquired whether it could "[d]ump the prices until I can get to 90% [occupancy]." Responding to the Participating Landlord's idea to decrease prices to sign more leases, the YieldStar advisor explained that "YieldStar is in revenue protection mode right now. We are in a significant demand shortfall. It is constrained and unable to recommend decreases unless the decreases lead to a more positive revenue outcome."

132.162. YieldStar and AIRM's revenue protection mode have ultimately leadsled to higher rents and decreased output/occupancy. As explained by one RealPage data scientist, under revenue protection mode "[t]he model wanted to decrease rents but was prevented from doing so by revenue protection."

133.163. Like LRO, YieldStar and AIRM arehave been programmed to be anticompetitive by design—even withoutbefore considering that all three RealPage RM Software products arehave been fueled by non-public, competitively sensitive information in most instances. Given the anticompetitive mechanisms programmed by RealPage into LRO, YieldStar, and AIRM, Participating Landlords (including Defendant Landlords, no matter which RM product(s) they use)

48

can be confident that their competitors will raise or hold prices in almost all instances (and, equally important, not undercut one another) simply by virtue of their agreement with RealPage.

### III.    RealPage and Defendant Landlords Agree to Delegate Rent-Setting Authority to RealPage, Which Enforces Compliance.

134.164.    As part of their agreement to forgo competition and impose inflated rent prices on New Jersey residents, Defendant Landlords and other Participating Landlords have unlawfully agreed with each other and RealPage to use a central mechanism—RealPage RM Software—to set apartment rents. Their agreement is reflected in existing documents, has been publicly acknowledged by cartel members, and is closely monitored by its members.

135.165.    RealPage documents show the methods by which the company suppresseshas suppressed Participating Landlords' independent price decision-making while also securing their cooperation in the cartel. RealPage training documents state: "You should be compliant"—i.e., each Participating Landlord should impose the rents generated by RealPage RM Software—"90+% of the time to see the best results in your revenue management." This principle ishas been reinforced during in-person trainings conducted by RealPage when Participating Landlords join the cartel.

136.166.    Illustrating that Defendant Landlords knowingly comply with these instructions, another RealPage YieldStar Manager Training document for Defendant Bozzuto assures landlords that "YieldStar is managing your price."

137.167.    RealPage documents are replete with references to the need for "discipline"—i.e., adherence to the prices generated by RealPage. For example, one LRO training presentation emphasizes the importance of "disciplined . . . pricing practices portfolio-wide." Similarly, an AIRM training presentation references Participating Landlords' commitment to the "[d]isciplined use of formal quotes." When training landlords on LRO's Lease Audit Report,

49

RealPage instructs landlords: "We should have all compliant leases. Just use the LRO price and you won't have to worry about it."

138.168.    Deviations from the RealPage-generated rent price are referred to as "overrides." Consistent with their agreement to impose rents generated by RealPage RM Software nearly all the time, Defendant Landlords agreehave agreed to limit overrides. For example, a RealPage LRO training document states: "Overrides should be few and far between." Similarly, internal RealPage LRO training documents teachhave taught cartel members' regional managers to beware of "Override Overload" or "rogue" leasing agents who too frequently override the LRO-generated pricing. Landlords cannot execute an override in YieldStar and AIRM without providing a written explanation for why they wish to depart from the RealPage-generated rent. The landlord is also required to "enter the floorplan rent that [the landlord is] recommending" for the prospective renter in order to "submit [an] override recommendation." For landlords supervised by RealPage's Pricing Advisors, RealPage willhas not acceptaccepted landlords' explanations for proposed overrides except in extenuating circumstances not visible to the software, such as a recent natural disaster.

139.169.    Participating Landlords, including Defendant Landlords, have publicly and privately acknowledged their agreement to impose rents set by using RealPage RM Software in nearly all instances. For example:

- The Director of Revenue Management from one Participating Landlord that operates in New Jersey explained that "[leasing] prospects understood that a system was producing the pricing and it wasn't up to the leasing agent's whim," touting the "sense of discipline."

- An internal presentation created by Defendant Greystar explicitly acknowledges that landlords using RealPage RM Software should each seek to accept at least 85% of the RealPage-generated prices, emphasizing that "Discipline [o]f using revenue management increases more consistent outcomes." This is in line with RealPage's "Rate Acceptance Targets" for Greystar and others of "85-95%."

50

- Former employees of Defendant Greystar have similarly confirmed that negotiating rents other than those set by the RealPage RM Software was unacceptable.

140.170.    RealPage facilitateshas facilitated landlords' compliance with the agreement in many ways, including through a software feature that automatically accepts rents generated by the RM Software. In both AIRM and YieldStar, this feature is called "Auto Pilot" and, if enabled, causes the RealPage-generated rents to be automatically "accepted" and deployed to the landlord's property management system. LRO offers a similar feature referred to as "Rent Syndication"—," which automatically sends LRO pricing information to Internet Listing Services where the landlord's units are marketed—e.g., Zillow and Trulia. When landlords usehave used this software option, RealPage generateshas generated the rent prices and has then pushespushed them directly to the public listings, where they are displayed to consumers. Thus, RealPage ishas itself been involved in the advertisement, offer for sale, and sale of multifamily leases. Indeed, RealPage refershas referred to landlords in New Jersey that use the RM Software as RealPage's "partners."

141.171.    RealPage's message to Participating Landlords ishas been that they should "let auto accept run" such that the landlords "accept all recommendations." A RealPage presentation on pushing landlords to enable auto-accept states: "Not an ask of the client. This is a command to the client. It isn't an optional process."

142.172.    The importance of auto-accept functionality is even reflected in landlords' contracts for the RealPage RM Software. For example, a Participating Landlord included in its original contract for LRO, before LRO was acquired by RealPage, a provision that LRO "automates apartment rent pricing on a daily basis," thereby leading "properties to perform better than non-LRO peers in terms of pricing."

51

143.173.    Defendant Cammeby's, for example, ~~relies~~has relied on LRO's Rent Syndication feature to automatically send the RealPage-generated prices to Internet Listing Services that advertise the units to consumers. Cammeby's ~~relies~~has relied so heavily on RealPage RM Software to price its apartments that when a technical issue led to unexpectedly low prices being generated, Cammeby's wrote to RealPage that "[i]t is a very real problem for us and MUST be resolved as soon as possible."

144.174.    Even where Participating Landlords ~~do~~have not ~~enable~~enabled auto-accept in YieldStar and AIRM, ~~landlords~~landlords' property-level employees cannot, on their own, charge rents other than those generated by RealPage RM Software without first providing a justification to "propose an override."

145.175.    For Participating Landlords that ~~use~~have used LRO, as with YieldStar and AIRM using Auto Pilot, RealPage ~~pushes~~has pushed the adjusted, optimized rents calculated by LRO to landlords' property management systems, where they show up in the quoted rent field for particular units.

146.176.    To further discourage Participating Landlords from deviating from the rents set by RealPage RM Software, attempts by Participating Landlords to depart from RealPage rents ~~will~~have often ~~trigger~~triggered outreach from a RealPage Pricing Advisor—a RealPage employee charged with directly interacting with clients (sometimes daily). In addition to the content of the communications, imposing this administrative burden ~~is~~has been one way that RealPage ~~works~~has worked to ensure adoption of the RealPage-generated prices. As a former RealPage employee explained, if a landlord persists in seeking an override, the Pricing Advisor can escalate the issue to RealPage management or the landlord's regional manager, but RealPage will not accept landlords' explanations for proposed overrides except in extenuating circumstances.

52

147.177.    RealPage has actively policespoliced Participating Landlords' compliance to ensure overrides remain rare. When a new landlord joins Defendants' rent-setting cartel, RealPage conductshas conducted "secret shops" to "confirm successful adoption" of the RM Software. This process tests whether the Participating Landlords' employees are, in fact, offering only RealPage-generated rents even in the event that a prospective renter attempts to negotiate. As detailed in the training manual that RealPage prepared for Defendant Bozzuto:

> Within 30 days of Sales Training, YieldStar will telephone shop each site. Secret shops are utilized to confirm that users of revenue management throughout the Bozzuto organization are comfortable using YieldStar, and believe that the system, its pricing, and corresponding business practices are delivering expected benefits. Results of secret shops will be carefully evaluated to determine if adjustments may be needed to product configuration and/or business processes, or if additional training may be required. Bozzuto will also shop the site using their traditional site shopping resource (we will provide guidance on how to modify the shopping report to gauge how effective the team is at selling with the new YieldStar process). Bozzuto agrees to share phone shop results with the YieldStar team.

148.178.    As part of its "Secret Shops," RealPage testshas tested whether the landlords' employees are communicating to prospective renters using the pre-approved messaging, which omits any mention of the fact that it is the RealPage RM Software setting rents and instructs landlords to tell renters, but essentially misrepresent, that apartments are "individually priced." Purposefully withholding the existence of the RM Software's use from renters is one of the many ways in which RealPage and Defendant Landlords have misrepresented the nature of the landlords' pricing and the existence of the anticompetitive scheme, as discussed more extensively in Section VII. For example, RealPage keeps its source code strictly protected and has concealed key aspects of the anticompetitive algorithmic design. RealPage and certain Participating Landlords have likewise communicatecommunicated and conductconducted their meetings to advance the conspiracy through exclusive, private channels, including email threads, conference calls, and in-

53

person meetings, the contents of which are not public, hidden even from others in the industry, and were only revealed through investigations of the misconduct.

149.179.    RealPage has also designed its RM Software to ensure that landlords monitor their own employees' compliance—i.e., whether they are imposing the RealPage-generated rent. For example, AIRM's New Lease Workflow displayshas displayed a "Lease Compliance" number where "100% means no compliance variances." YieldStar displayshas displayed a "Lease Compliance" widget to landlords that indicates whether compliance rates are acceptable and generateshas generated "Compliance Reports" for landlords that present noncompliant rents as losses in parentheses. Similarly, LRO presentshas presented a "Rent Comparison Graph" to landlords that presents compliance data and generateshas generated "Lease Audit Reports" identifying any differences between RealPage-generated rents and the rents that the landlord in fact is charging renters.

150.180.    RealPage also employs Pricing Analysts who create reports analyzing clients' compliance rates. Pricing Analysts generate "Rate Acceptance and Lease Compliance Analysis" reports that measure landlords' compliance and "identify detached potentially at-risk clients, properties that need additional training, or opportunities for parameter and strategy alignment." In other words, RealPage monitorshas monitored the prices actually imposed by cartel members to identify any member departing from the agreed-upon pricing plan, in order to discipline that member into adhering to the RealPage-generated prices. As discussed above, although non-compliance is rare, the consequences of non-compliance include RealPage imposing an administrative burden on the landlord, as well as escalating the non-compliance to the management who supervises the lower-level employee who may be unexpectedly deviating from the agreed-upon prices.

151.181.     Similarly, although RealPage has maintained a durable 95% landlord retention rate (given the supracompetitive profits available to landlords by participating in the scheme), in one internal RealPage email chain in 2022, a senior pricing advisor, Cassandra VanNuys, asserted that one client's cancellation of RealPage RM Software was "absolutely for the best" and "one we want to let go without a fight" because they "have horrible adoption and lease compliance" and the owner "manually prices the individual units and offers up front concessions as they become available, and they do not use YieldStar renewals." This demonstrates that poor adoption and compliance is the rare exception.

152.182.     Adherence to the strictures of the cartel's agreement has been high. OverridesFor several Participating Landlords, overrides are exceedingly rare, thanks to the strictures RealPage has put in place. According to one former employee of RealPage and a Participating Landlord that operates in New Jersey, it was very rare for the Participating Landlord to deviate from the RealPage-generated rates for renewals, and compliance for pricing new leases was absolute. In one RealPage-published case study, an executive of Participating Landlord admitted: "With LRO, we rarely make any overrides to the recommendations." Multiple industry participants and documents have confirmed that—consistent with Defendants' agreement and facilitated by RealPage's oversight—Participating Landlords impose prices based on RealPage-generated rents the vast majority of the time, in some instances 90% of the time or greater.

153.183.     RealPage and Participating Landlords executehave executed these compliance mechanisms to ensure that their agreement achieves its intended effect: to inflate rents and extract supracompetitive profit from renters. Absent these compliance efforts, it would be more likely that a Participating Landlord could cheat the cartel by undercutting other participants to steal their business. The manifold compliance and enforcement mechanisms that RealPage and the Participating Landlords use preventshave used prevent such cheating from occurring.

154.184.    ~~In the rare instance when~~When a landlord ~~does~~has not ~~impose~~imposed the RealPage-generated rent, the cartel's oversight mechanisms have sought to ensure that such a decision is not the result of a landlord cheating the system, but rather is accounting for some factor of which RealPage RM Software was unaware (e.g., a recent natural disaster that substantially affected the property's value). Moreover, RealPage has often ~~evaluates~~evaluated Participating Landlords' compliance not by how often the landlord imposes the exact rent price generated by the RM Software, but rather as a measure of how often the rents imposed by the landlord fall within a certain percentage of the software-generated rents. The reason for this is clear: Participating Landlords need not adopt rents generated by RealPage RM Software in every instance for their collective use of the software to raise rents overall. Critically, RealPage RM Software ~~raises~~has raised the baseline from which Participating Landlords set rents, ensuring that all rents set by Participating Landlords were determined pursuant to their agreement.

155.185.    At bottom, the rents RealPage generates are not merely recommendations. Rather than competing on price, Participating Landlords ~~agree~~have agreed to and ~~do impose~~have set their rent prices based on the RealPage-generated rent prices.

## IV.    Market "Plus Factors" Support the Existence of an Unlawful Agreement Among Defendants.

156.186.    The structure and characteristics of the multifamily housing rental market in New Jersey are particularly conducive to an unlawful agreement among direct competitors. Such market conditions are sometimes referred to as "plus factors." Numerous "plus factors" support the existence of an unlawful agreement among RealPage and Defendant Landlords.

157.187.    First, demand in the multifamily housing rental market is highly inelastic~~—~~: residents' demand for housing does not change dramatically in response to pricing increases or decreases. Housing is a human necessity. Defendant Landlords are thus essentially guaranteed a

56

reliable and steady supply of customers. Because the demand for multifamily housing is relatively insensitive to changes in price, it is ~~more~~highly susceptible to collusion on price-setting.

~~158.~~188.    Second, the market for multifamily leases for affected communities in New Jersey is heavily concentrated. Many of the largest landlords in New Jersey—including Defendant Landlords—use RealPage RM Software. It therefore takes discussions between only a small number of landlords to effect and administer the agreement regarding how Defendant Landlords will use RealPage RM Software to benefit themselves at the expense of New Jersey renters.

~~159.~~189.    Third, the multifamily housing rental market is characterized by high barriers to entry—in other words, there are many challenges that would make it difficult for would-be competitors to enter the market. These barriers are manifold. Entering the multifamily housing market requires developing a new property or acquiring an existing property—either of which demands investment of many millions of dollars—as well as resources to ensure compliance with the laws and regulations that govern multifamily housing. Further, the ability to build in New Jersey is partially limited by zoning laws that present a legal barrier to entry. There are also inherent geographic constraints to building multifamily housing in New Jersey: there is only so much physical space available, and New Jersey is already the most densely populated state in the country. Indeed, one Participating Landlord expressly notes on its website that it "target[s] markets that are relatively supply-constrained and have high barriers to entry." Defendant Morgan has publicly disclosed that it has a "strategic goal of acquiring large multifamily portfolios with high barriers to entry."

~~160.~~190.    Fourth, there are high switching costs for renters in the relevant market. Once a renter has begun renting in a property, there are substantial costs to switching to a competitor building, making it easier for competitors like Defendant Landlords to effectuate an anticompetitive scheme. If a renter wants to switch before their lease has expired, they may be

subject to penalties and double-rent payments. Searching for a new apartment involves a substantial investment of time and in-person research and potentially application and background-check fees. Indeed, over twelve prospective tenants on average compete for each apartment vacancy in North Jersey. And the cost of physically moving all of one's possessions from one apartment to another can easily reach into the thousands of dollars and require multiple days of work. These costs are especially burdensome for renters in New Jersey, where the cost of living is among the highest in the country. The farther a renter moves, the more of their life they must adjust, and therefore the higher the switching costs and the higher the likelihood that they will simply absorb a rent increase. Indeed, RealPage itself has recognized the direct connection between the high cost of moving and landlords' ability to extract supracompetitive rents: in a training on "Overcoming Renewal Objections," RealPage instructs landlords to remind the tenant of the high cost of moving to force acceptance of the RealPage-generated price.

161.191.      Fifth, product fungibility is conducive to unlawful coordination. The more alike products are, the easier it is for competitors to agree on how to price them. Defendants have worked to standardize the products being offered by Defendant Landlords (multifamily housing leases) based on their floorplans. By standardizing their products in this manner, Defendants facilitate the anticompetitive agreements by making coordination more straightforward and enabling easy detection of cheating on the cartel agreement.

162.192.      Finally, Defendants' substantial motivation to collude (millions of dollars in fees paid to RealPage and increased rents for Landlords), existence of numerous modes of cartel enforcement, evidence of cartel recruitment, and substantial opportunity to collude all constitute market "plus factors" that, in addition to the facts set forth in this Complaint, render allegations of collusion plausible.

**V.    Impact and Damages: Defendants' Agreement to Set Rents and Information Sharing Unlawfully Increased Rents, Overcharging New Jersey Residents Millions of Dollars.**

163.193.    Defendants' agreement to use RealPage RM products to set rents has reduced competition in the multifamily housing market, allowing Defendant Landlords to charge higher rents than they otherwise would have and artificially reducing the supply of housing units in New Jersey—all to the detriment of New Jersey residents.

164.194.    RealPage widely touts the impact of its RM products, advertising revenue lifts of 2 to 7%. For example:

- In a marketing document provided to potential clients, RealPage advertises that YieldStar delivers "a Sustained, Verifiable Revenue Premium of 3 to 7%" and presents a case study showing that Defendant Greystar's "properties using YieldStar outperformed their markets by 4.8% according to a same store analysis of 25,077 stabilized units using YieldStar within Greystar since 2009 across 16 markets."

- In a published case study, RealPage points to one Participating Landlord's revenue lift: "Since engaging LRO as its sole revenue management software system, [the landlord] is realizing tremendous upward trends – increases ranging from 5% to 12% across the board." According to one of the Participating Landlord's executives, "It simply comes down to this – had we not made the decision to fully engage LRO in 2011, I don't believe we would be seeing the revenue growth we are today[.]"

- In another RealPage-published case study, an executive of one Participating Landlord explains: "YieldStar has been so effective in driving higher profits that it has actually become part of our sales pitch to [multifamily property] owners. . . . We've seen a 4.8% outperformance to the market, portfolio-wide . . . . Comparisons within our own portfolio show a difference of almost 4% between properties using YieldStar and those still pricing manually. So it's not surprising we strongly encourage our owners to adopt YieldStar and let us put it to work at their properties."

- In a March 2020 YieldStar Executive Training for Defendant Bozzuto, RealPage explained that tracking "market movement" in competitor data could help identify situations where landlords "may have a $50 increase instead of a $10 increase" on a given day.

These revenue lifts are attributable to the artificially inflated rents that cartel landlords extract. Participating Landlords, including Defendant Landlords, have been similarly open regarding the

59

direct connection between their adoption of RealPage RM products and increased rents as the countless client testimonials demonstrate.

165.195.   As one Participating Landlord's then-Regional Vice President explained, prior to using YieldStar, the Participating Landlord was "raising rents, but we were not aggressive enough in what we really could be getting[.]" Likewise, a Participating Landlord's then-CEO observed that, with LRO, the Participating Landlord's "raised rents hundreds of dollars in some markets and I don't think the people onsite, given the way we'd trained them to think about pricing, would have had the courage to push it as aggressively as this program has."

166.196.   AIRM's machine learning engine has only increased the impact. According to a 2020 earnings call, AIRM was "generating as much as 100 basis points of incremental yield over YieldStar or LRO stand-alone." By June 2023, RealPage had revised this metric upwards in an AIRM presentation: "Partners who have moved from YieldStar/LRO revenue management platforms to AIRM are achieving an additional 100-200 bps of outperformance."

167.197.   DefendantsDefendant Landlords and other users of RealPage RM Software receive reports detailing how much they have been able to increase rents as a result of adopting RM for pricing. For example, RealPage reported that in 2022 Defendant Morgan increased its average occupied rent by 9.2% (a $110 increase) and revenue per unit by 9.3% (an $88 increase) even though occupancy decreased by 1%.

168.198.   Another Participating Landlord shared with RealPage that it began raising rents at one property within just one week of adopting YieldStar, and within eleven months it was able to raise rents from "$825 and $950 (along with a free 60 inch TV)" to "$1,090 and $1,215 and we do not have to give anything away!" The Participating Landlord boasted that it "brought the rest of the Comps rents up with us." A RealPage executive, Jason Arnold, responded in a

60

subsequent email that this was "a great case study that highlights performance before, during, and as a result of [~~Yieldstar].".~~YieldStar]."

~~169.~~199.      RealPage RM Software ~~has~~products have   also allowed Participating Landlords, including Defendant Landlords, to maintain artificially high rents even in difficult market conditions. Even in the ~~rare~~relatively infrequent instances in which RealPage RM Software might decrease the asking rent for a particular unit, Defendants' coordinated use of the pricing software ~~renders~~has rendered rent decreases smaller than they would have been in competitive market conditions. Indeed, RealPage advertises that, with its RealPage RM Software, clients have "achieved revenue lift between 3% to 7% in challenging cycles"—including revenue increases "at the height of the recession in 2009."

~~170.~~200.      Defendants have also ~~coordinate~~coordinated to ensure their conspiracy maximized prices even in markets subject to rent control legislation. For example, representatives from Defendants AvalonBay, Greystar, and others have worked directly with RealPage to direct RealPage's creation of a ███████████████████████████ that made it easier to utilize the software despite rent control laws. More recently, ~~Defendants have conspired~~Defendant Landlords worked with RealPage and among themselves to use the RealPage RM Software to extract supracompetitive rents from New Jerseyans during the COVID-19 pandemic as part of their conspiracy.

~~171.~~201.      Defendant Kamson indicated in a testimonial to recruit others to the scheme that "At these rent-controlled properties, our income growth has been phenomenal[.]"

~~172.~~202.      Defendants' anticompetitive agreement to use RealPage RM Software to set rents has artificially limited the supply of multifamily housing units. RealPage RM Software has facilitated—indeed, encouraged—this practice by having landlords set "sustainable occupancy" rates for their properties. ~~RealPage RM Software's~~AIRM and YieldStar's "sustainable

61

occupancy" setting allows landlords to identify target occupancy levels to maximize rent—even if it means keeping some units vacant rather than lowering prices. As one Participating Landlord's CEO bluntly put it, with YieldStar, "[t]he net effect of driving revenue and pushing people out was $10 million in income . . . I think that shows keeping the heads in the beds above all else is not always the best strategy." Importantly, the increased revenue obtained by Participating Landlords, including Defendants, stems directly from their collective ability to increase rents; higher revenues are not the result of reduced costs or other realized efficiencies. As one former employee of a Participating Landlord explained, "We've squeezed expenses to the point where really the only ability to capture more revenue was going to be on the income side versus trying to cut expenses."

173.203.     With more than 90,000 units impacted, New Jersey residents have overpaid millions in rent as a result of Defendants' unlawful conduct.

## VI.     Defendants Have Market Power in the Relevant Market(s).

### A. The Relevant Product Market(s).

174.204.     One relevant product market is the market for leases in multifamily residential properties (i.e., those with at least five units). Additionally, a substantial portion of properties in which RealPage RM Software is used are large multifamily properties. The market for leases in large multifamily properties (i.e., those with at least fifty units) is another relevant product market, and other properly defined relevant product markets may exist.

175.205.     The markets for leases in multifamily and large multifamily properties satisfy the "hypothetical monopolist" or "SSNIP" test that economists and federal antitrust enforcement agencies use to define relevant antitrust markets. The test asks whether a hypothetical monopolist or cartel in a posited market could profitably charge prices that are significantly higher than the prices that would prevail if the market were competitive. If a hypothetical monopolist could do so, then the test is passed, meaning that the posited market is sufficiently broad (i.e.,

62

includes a sufficient number of substitutes) to be useful in economic analysis. If the test is failed, the posited market is too narrow (i.e., includes an insufficient number of substitutes) to be useful in economic analysis. The posited market should then be expanded to include the next closest substitute, and the hypothetical monopolist test should be repeated to see whether the slightly broader market is sufficiently broad.

176.206.    The markets for leases in multifamily and large multifamily properties are properly defined because they satisfy the SSNIP test. Landlords can take rate increases "year-over-year between 5%-12% in every market[,]" without driving enough renters out of the market to make the price increase ineffective or unprofitable. Because landlords can significantly increase prices without losing sufficient sales to render the increase unprofitable, the markets for leases in multifamily and large multifamily properties is properly defined.

177.207.    For consumers, apartments available to purchase, condominiums available to purchase, or homes available to purchase are not economic substitutes for rental units in multifamily or large multifamily properties. Among other reasons, purchasing real estate requires the ability and willingness to make a substantial down payment and to obtain financing. In addition, purchasing real estate involves substantial transaction costs (e.g., broker fees, inspection costs, taxes, and closing costs) that make purchasing impractical absent a long-term commitment to a particular home.

178.208.    Single-family real estate is also not an economic substitute for leases in multifamily or large multifamily properties for several reasons, including because single-family properties typically do not offer the same amenities and security.

179.209.    Leases for units in large multifamily properties (i.e., those with 50+ units) are not economic substitutes for single-family real estate or other apartment rentals. Large multifamily properties offer unique amenities that are only available in properties of that size.

Among other amenities, large multifamily properties offer tenants community rooms, fitness centers, parking facilities, roof decks, and upper-floor apartments with unique views. Defendant Realty OperationsLeFrak, for example, advertises that its Newport Rentals complex of large multifamily properties in Jersey City offers an "unmatched selection of amenities, including state-of-the-art fitness centers, roof decks, and 24-hour concierge services."

180.210.    Industry participants typically distinguish between multifamily and single-family real estate. Defendant Morgan describes itself as a "multifamily owner" on its website.

181.211.    Hotel rooms are also outside the relevant market, as they have lower square footage for the same occupancy, are priced at substantially higher rates than multifamily and large-complex residential leases, typically lack facilities that are standard in multifamily and large-complex units (e.g., kitchens, in-unit washers/dryers, and windows that open), and limit guests' control over the rooms in ways that multifamily units do not.

182.212.    Short-term rental units are also outside the relevant market, as they too have substantially higher rates than multifamily and large-complex residential real estate leases, by regulation require occupants to stay no longer than a maximum number of days, and, like hotels, do not provide renters with control over the property akin to that available to purchasers of multifamily and large-complex residential leases.

183.213.    RealPage itself differentiates the multifamily residential real estate market as a separate and distinct market from other residential markets. RealPage's contracts with Defendants describe its services as "for use in the management and operation of multifamily properties"—which includes both multifamily (i.e., 5+ unit properties) and leases in large multifamily properties (i.e., those with 50+ units). RealPage also describes its RM Software as "developed solely for multifamily." And RealPage includes among its core beliefs: "[w]e believe we should know the multifamily business, not just revenue management."

64

**B. The Relevant Geographic Market(s).**

184.214.    Housing markets can be defined with respect to clusters of geographically associated places such as workplaces, schools, and homes of persons within one's social network. Commuting distance to a place of work or school, or to visit persons within one's social network, is a significant geographic constraint on where a person chooses to live.

185.215.    The size of relevant geographic housing markets can vary based on the particular circumstances; for example, a geographic housing market in a rural location may be physically more expansive than a relevant market that is primarily urban.

186.216.    Renters who live in one locale do not consider multifamily and large-property residential leases in another locale as adequate substitutes for leases in their own. For many renters, leases in their area are not substitutable for leases elsewhere, including because they would leave those renters with impractical commutes to schools or jobs. Multifamily leases outside of one's own locale also require distancing from one's physical social networks, including friendships, family relationships, religious communities, and other community groups—all of which are facilitated by proximity to one's place of residence. Multifamily leases within a particular locale also offer proximate access to unique cultural, economic, and other attractions not available in another area.

187.217.    Recognizing this, RealPage's internal documents organize properties into what RealPage refers to as geographic "submarkets." According to RealPage's internal documentation, these submarkets "reflect areas within markets that feature similar properties that compete within the same pool of resident prospects." In New Jersey, the RealPage-defined submarkets include: Bergen County, Bethlehem/Easton, Burlington County, Camden/Cherry Hill, Central Middlesex County, Gloucester County, Hoboken/North Hudson County, Jersey City, Lower Camden County, Monmouth County, Morris County, Newark, North Mercer County,

65

Northeast Middlesex County, Passaic/Sussex Counties, Somerset/Hunterdon Counties, South Middlesex County, Union County, and West Essex County.

188.218.    As is reflected in RealPage's own business practices, the markets for leases in multifamily and large multifamily properties are local. When Participating Landlords begin using RealPage RM Software at a particular property, they must select a set of comparators or properties whose data will be used to generate rent prices. This process is called "peer mapping." RealPage begins the process by looking only at properties that are within a half-mile, and then expands the radius in half-mile increments until a sufficient number of competitors (typically between 10-25 properties) has been identified.

189.219.    In a training on peer mapping, a RealPage employee emphasized that "we start out with the closest proximity." The trainer went on to explain that a property's "competition" is "the properties around them," and that "generally, when a property is looking at their competitors, they just go next door or across the street. They may go to the next street down."

190.220.    A Senior Vice President for Defendant Russo, John Calabrese, stated in an email to RealPage, "[T]he markets in Northern NJ are extremely tight. Rents [and] trends in a town five miles away can be completely different to rents and trends of one of our subject properties. This is mostly due to New York City and its immediate secondary markets."

191.221.    The Census Bureau defines Public Use Microdata Areas ("PUMAs") as non-overlapping, statistical geographic areas that partition each state or equivalent entity into geographic areas containing no fewer than 100,000 people each. PUMAs can be a relevant geographic market.

192.222.    Through its suite of business products, including RM Software, RealPage collects and shares among competitors pricing, occupancy, and other information for substantial

portions of the multifamily residential apartment units within each of the relevant geographic markets in New Jersey.

193.223.        Defendants have market power in the relevant product and geographic markets. New Jersey has multiple distinct relevant geographic markets with high barriers to entry, as discussed above, for the provision of multifamily leases and leases in large apartment complexes. For example, Defendants have over a 30% share in the market for leases of multifamily residential units and/or in the market for leases of residential units in large multifamily properties in geographic markets including Jersey City and the following PUMAs:

- Burlington County (West Central)

- Burlington County (South & East)

- Essex County (Southwest)—West Orange & Livingston

- Gloucester County (Northeast)—Woodbury City

- Hudson County (Central)—Jersey City (North)

- Hudson County (Northeast)—Union City & Hoboken

- Mercer County (North)—Princeton Borough

- Middlesex County (Northwest)—North Piscataway & South Plainfield

- Morris County (West)

- Union County (North Central)—Union Township & Roselle Park

Defendants have a 25% or greater share, supported by high barriers to entry, in the market for leases of multifamily residential units and/or in the market for leases of residential units in large multifamily properties in the following additional PUMAs:

- Camden County (East Central)—Haddonfield Borough

- Camden County (South & West)—Bellmawr & Pine Hill Boroughs

- Morris County (South)—Morristown, Madison & Florham Park

67

- Union County (Northwest)—Summit & Cranford

194.224.    Individual neighborhoods can also be a relevant geographic market. When looking at the neighborhood level, there will be relevant geographic markets where Defendants' market share is substantially higher than 30%. The same is true when looking at the market for leases in large multifamily properties; that can constitute a relevant product market, and when looking at that market Defendants have substantially higher market shares.

195.225.    One former employee of RealPage described the company as the "Amazon" of property management software, saying that they "monopolize the industry." RealPage's marketing pitches have likewise sought to leverage RealPage's dominant market share and resulting control over vast troves of data, emphasizing, for example, that YieldStar was used by over 85% of the Top 50 apartment managers in the NMHC rankings, thus indicating the substantial portion of all multifamily units priced using the software; among these Top 50 managers include numerous New Jersey landlords, such as Defendants Bozzuto and Greystar.

196.226.    Throughout New Jersey, the rents of over 90,000 units are priced using RealPage RM Software, affecting hundreds of thousands of New Jersey renters. The extent to which RealPage RM software has captured landlords in the State becomes even more stark when looking at the local level.

197.227.    In Jersey City, for example, over 16,000 multifamily units are priced using the RealPage RM software as of 2024. These units constitute over 40% of units in large multifamily properties. The impact of RealPage's dominance of the Jersey City market has been felt acutely; for example, between 2021-2022 asking rents were up 17.4% year-over-year. Smaller relevant geographic markets within a particular city, including Jersey City, may exist.

198.228.    Another relevant geographic market that has been significantly impacted is the Piscataway PUMA—home to many in the Rutgers University community, including

financially vulnerable students. Over 2,500 apartment homes in Piscataway alone are priced using RealPage RM Software as of 2024. This represents over 40% of all multifamily units in the Piscataway PUMA and an even higher percentage of units in large apartment complexes.

199.229.    The Hudson County (Northeast)—Union City & Hoboken PUMA, which also includes Weehawken, has also been severely affected and is a relevant geographic market. At least 4,500 apartments in the Hudson County (Northeast)—Union City & Hoboken PUMA are priced using RealPage RM Software as of 2024. This represents over 35% of all units in large multifamily properties in the Hudson County (Northeast)—Union City & Hoboken PUMA.

200.230.    Defendants know that other properly defined relevant geographic markets may exist—both smaller geographic markets within or outside the specific areas identified above, or larger markets that encompass them—and the anticompetitive effects of their scheme may be even greater in such markets. For example, many thousands of multifamily rental units in Jersey City's Newport neighborhood alone are priced using RealPage RM software. In practice, this means that New Jerseyans who want to live in this particular neighborhood—with its unique blend of waterfront location, amenities, and access to transit—are forced to pay supracompetitive prices or seek housing elsewhere.

201.231.    Market power can also be shown through direct evidence of anticompetitive effects. Direct evidence includes evidence that the defendants have been able to raise prices higher than would be expected under competitive conditions. Landlords using RealPage RM Software have touted their ability to raise rents by 20%, while RealPage itself represents that landlords that use its RM Software can increase revenue by at least 2-7%.

202.232.    Another form of direct evidence of market power concerns a firm's ability to deviate profitably from marginal cost pricing–that is, to set the price of a good persistently above the extra cost of producing it. Defendant AvalonBay's Form 10-K for the fiscal year ending

69

December 31, 2024, reports that it earned $1.08 billion of income, net of depreciation and other expenses, on revenues of $2.91 billion, for a profit margin of approximately 37%. Defendant Bozzuto reported a 2010 profit margin of 35%. Defendants' durable ability to extract such high margins without being undercut by competitors willing to accept lower profit margins is further evidence of their market power.

**VII.    Defendants' Unconscionable Commercial Practices and Misrepresentations Harm New Jersey Consumers.**

203.233.    ~~By unlawfully colluding to inflate rents for New Jersey renters through RealPage RM Software and agreeing to exchange competitively sensitive, non-public information,~~ RealPage and Landlord Defendants have engaged in unconscionable commercial practices in violation of New Jersey law, which harms New Jersey consumers and violates the CFA. ~~As a result of the unconscionable scheme~~, including, for example, by unlawfully colluding to inflate rents for New Jersey renters through RealPage RM Software and agreeing to exchange competitively sensitive, non-public information. As a result of Defendants' unconscionable practices, certain renters have faced unlawfully inflated prices, including renewal notices that in some cases demand rent increases of at least 30% for renters to stay in their homes.

204.234.    There is a substantial power imbalance between Defendant Landlords and renters—with Defendant Landlords holding the power. Housing is an essential human need, and so renters ultimately must accept some offer—there is no ability to walk away from housing entirely. Markets are also supply-constrained, both for natural reasons like geography and space availability, and reasons such as zoning laws. The market for multifamily housing is also highly concentrated, leaving renters with few or no alternatives in the face of anticompetitive pricing.

205.235.    Defendant Landlords are cognizant of and attempt to exploit this power imbalance in order to unconscionably inflate prices to artificially high levels through unlawful conduct. Indeed, as Defendant Bozzuto noted in a document analyzing the Chester County, PA

70

market—seated within the Philadelphia-Wilmington-Camden Metropolitan Statistical Area, which includes areas in New Jersey affected by Defendants' misconduct—as of 2023, "landlords are still exhibiting immense bargaining power in lease negotiations." Defendant Landlords then exploit the immense bargaining power they know they have, including for example by deceiving renters as to the nature of the prices being offered and creating a false sense of urgency to force acceptance of the supracompetitive prices generated through their unlawful scheme.

206.236.    One way that Defendant Landlords exploit the power imbalance is to use constantly changing prices and exploding offers with the intent of creating a false sense of urgency in the consumer that will pressure the consumer into accepting the inflated, cartelRealPage-generated rent price. RealPage instructs landlords to communicate to renters that prices change daily in order to create a sense of urgency, and then uses secret shops (as described further below) to test that landlords are conveying this message to prospective renters. A RealPage training manual teaches that one of the "best practices" is to "create a sense of urgency." Another RealPage training to Defendant Bozzuto urged the landlord to "Create Urgency in Every Scenario." Defendant Landlords follow these instructions by using the RealPage RM Software to generate prices that must be accepted quickly or they "expire." For example, a presentation created by RealPage to train Participating Landlords directs them to "Create a sense of urgency!" by quoting a rate that expires in two days. An internal Greystar training manual likewise instructs employees to tell renters that "[o]ur current availability will fluctuate in pricing and must be secured today in order to take advantage of the lower rate listed." New Jersey renters have complained to Participating Landlords about these pressure tactics, but Participating Landlords have not relented. Traditionally, advertised prices for apartments did not fluctuate daily. But Defendant Landlords decided to implement a system where rates change daily, motivated in part by the knowledge that doing so will create a sense of urgency that will force renters to accept inflated prices. Their

71

knowing implementation of an "exploding offer" system for the purpose of forcing unlawfully high prices on renters is unconscionable.

207.237.    In addition to participating in Defendants' conspiracy to inflate rents for multifamily residential leases and, presenting constantly changing prices, and deploying exploding offers, as described herein, Defendants RealPage, Bozzuto, and Greystar took further steps to manipulate New Jersey consumers into believing that they were being offered competitive rates for their apartment leases, including in many instances by concealing the existence of the RealPage RM Software. In reality, as alleged in the preceding paragraphs, Defendant Landlords charge New Jersey renters supracompetitive rates for multifamily residential leases and set rents using RealPage RM Software.

208.238.    RealPage plays a critical role in facilitating these misrepresentations and omissions by developing and disseminating trainings that, in effect, encourage landlords to mislead renters about the existence of the RealPage RM Software and its role in setting prices.

209.239.    In these trainings, RealPage instructs landlords to conceal the fact that they use RealPage RM Software and conceal the pricing matrix generated by the RM Software from current and prospective tenants.

210.240.    For example, a RealPage training presentation entitled "Pricing with YieldStar for Community Management" lists as "Best Practices": "Never mention YieldStar to Future Residents or Residents!" and "Never show the Matrix to Residents or Future Residents!" Another RealPage training states, "should you tell your prospects what your software is called? NO."

211.241.    Similarly, a RealPage "shopping report to provide insight into how YieldStar's best leasing practices are being employed" by one landlord recommends that during phone calls with prospective tenants the landlord should: "Try to avoid mentioning the specific

72

software used[.]" One internal RealPage recap of a YieldStar training emphasizes, "we went over

DO NOT SHOW THE MATRIX."

212.242.    RealPage, Bozzuto, and Greystar misrepresent the existence and nature of

the RealPage RM Software to renters because if consumers were to learn the truth, they would

instead seek to rent from landlords who do not use the RealPage RM Software, be unwilling to

pay the inflated prices the landlords initially demand, and/or seek to negotiate based on the

knowledge that the prices being offered are above what a competitive market will bear. For

example, if a prospective renter knew that the price being offered was not in fact the "market rate"

but rather was generated in collusion with other landlords and purposefully above-market, the

prospective renter could (1) reject the offer and attempt to obtain a lower-priced multifamily lease

from a landlord who does not participate in the cartel, and/or (2) exert greater effort into

negotiating with the offering landlord—because the prospective renter would know that the

landlord can afford to accept a price lower than the inflated one it offered—ultimately leading to

a lower-priced lease. RealPage, Bozzuto, and Greystar carefully tailor their messaging and restrict

information because they understand that consumers' awareness of the underlying scheme would

harm their businesses.

213.243.    For example, in early 2023, one renter in a Bozzuto building in Hoboken

learned that his renewal offer had been priced using the RM Software. Although he previously had

been willing to accept the increase, upon learning of the existence and nature of the RealPage RM

Software—including the pending governmental investigations of the anticompetitive scheme—the

renter re-opened negotiations, using the information to push back on Bozzuto's claim that the rent

was "low and fair based on the market"—which the renter now knew to be incorrect.

214.244.    RealPage also coaches landlords on how to answer questions from renters

regarding the rent prices generated by the RM Software. RealPage calls these guides to

"overcoming objections." In these guides, RealPage provides language that Participating Landlords can use when speaking to prospective renters. RealPage repeatedly directs landlords to tell prospective renters that "all of our apartment homes are individually priced." Such statements misrepresent the way that the landlords' apartments are actually priced in at least two ways. First, the RM Software algorithms function by classifying units into "floorplans" within a building— e.g., one-bed/one-baths—and although unit-specific adjustments can be made, the starting point of the algorithm is to generate a floorplan-wide rate, *not* to "individually price" particular units. More fundamentally, the claim of apartments being "individually priced" misleadingly conveys that the apartments are priced *independently* by the landlord offering the apartment. They are not. In truth, apartments are priced by landlords using software and direct information exchanges with their competitors, based on the private agreement and shared understanding among those competitors, never disclosed to consumers, that the purpose and effect of the software is to jointly raises prices across the board rather than compete and to depart from the RealPage RM Software prices only in limited, extenuating circumstances.

215.245.    RealPage tests Participating Landlords' compliance with the directive to conceal the existence of the RM Software through "secret shops" or "mystery shops." In these secret shops, a RealPage employee calls the property pretending to be a renter. In truth, the RealPage employee is checking to make sure that the landlord presents the pricing information consistent with RealPage's directives—including to confirm that the landlord's employee did not mention the existence of the RM Software. RealPage assigns each landlord a "score" based on its secret shop response; those scores are then provided to the landlord's management, which can use the reports to address any employees who are not compliant in their messaging. One of the questions that determines the landlord's "score" is, "How were varying prices explained?" This

74

evidences RealPage enforcing the directive to explain the prices being offered in a particular way—i.e., without mentioning the existence of the RM Software.

216.246.    RealPage has subjected properties across the State to "secret shops" to ensure compliance with prospective renter communications, including but not limited to Bozzuto buildings located at 99 Gorge Road in Edgewater and 33 Park View Ave in Jersey City.

217.247.    Many landlords, including Defendants Bozzuto and Greystar, follow RealPage's guidance and carefully tailor communications with consumers to avoid any mention of their use of RealPage's anticompetitive RM Software in pricing multifamily leases.

218.248.    Bozzuto purposefully prevents consumers from learning the truth about how its apartments are priced. An internal Bozzuto "YieldStar Best Practices" document lists three "DON'Ts": (1) "Avoid mentioning the market rate of the apartment unless it's much higher[;]" (2) "Never show prospects the matrix – it will confuse them and/or frustrate them[;]" and (3) "Never mention 'YieldStar' at all." As indicated in this document, Bozzuto recognizes that consumers would be "frustrated" to learn the truth about their scheme. This is why Bozzuto and other Defendant Landlords wrongfully conceal it.

219.249.    In 2023, Bozzuto imposed a rent increase of 30% on two residents of the Park + Garden property in Hoboken. When the residents attempted to negotiate, Bozzuto informed them that this was the "market rate." In truth, the rate had been generated by the RealPage RM Software. An internal Bozzuto document confirms that, although the "market data" showed 6.7% average rent increases for other properties, Bozzuto had imposed rent increases of more than double that—13.8%—at this property. After the renters went public and other Bozzuto residents reported similar experiences, the Mayor of Hoboken wrote a letter to Bozzuto's President and CEO, assailing the "egregiously high increases" that would lead to being people "forced out of their homes." As the Mayor observed, the company's website committed itself to "integral

75

business practice[s] that allow[] us to effect change and make a positive impact on people's lives"—but Bozzuto's actual practices were not consistent with that statement. Bozzuto leadership responded in writing and in phone calls with the Mayor; they attempted to allay his concerns by representing that "rising operating expenses are also contributing to the need for renewal increases. Insurance, taxes and utilities have increased substantially, in some cases, in excess of 20-30% year over year." In truth, however, Bozzuto knew that its overall expenses in 2022 vs. 2021 had increased by less than 1/2%. Bozzuto's willingness to mislead even government officials regarding the nature of how and why it imposes such exorbitant rent increases are consistent with its effort to mislead renters regarding the same. In a post-mortem of the incident, Bozzuto's President and CEO, Toby Bozzuto, acknowledged to company leadership that their approach to rent discussions lacked a "human approach," and that although the company should "treat [residents] like human beings," he was "[n]ot sure if this happened here or not."

220.250.    In an internal email chain, a Greystar senior revenue associate, Tiffiny DePoy, confirmed Greystar's policy or practice that, "we do not discuss our use of YieldStar outside of our company[.]"

221.251.    In some instances, landlords' employees may disclose the use of RealPage RM Software; but they misrepresent the nature of the algorithm to renters. Specifically, these employees misleadingly convey to consumers that the RM Software merely determines what the "market rate" is. Such statements are misrepresentations because, in truth, the RealPage RM Software does not merely determine a "market rate"; rather, it generates a supracompetitive price designed to push the entire market higher.

222.252.    For example, in 2023, Defendant Bozzuto attempted to impose a substantial rent increase on a renter in Hoboken, who then tried to negotiate. Bozzuto's Property Manager, Kelly Streaser, refused to negotiate; she stated that "we use a pricing software that takes into

account a number of factors to generate prices for each lease term," but withheld the truth about the nature of the algorithm—i.e., that it is hardcoded to push prices higher, and does so in collaboration with the would-be competitors in the multifamily market—instead telling the renter, simply (and misleadingly), "we did try to still keep your renewal offer below the comparable market rate."

223.253.    Bozzuto is aware that its exorbitant price increases may force renters to leave their homes. For example, a General Manager at Bozzuto's Park + Garden property in Hoboken, Jomarie Negron, wrote to two residents to inform them that Bozzuto planned to increase their rent by 25%. "I am aware the increase is a very large increase, and I understand that it will likely make a large impact on your residency here at Park + Garden but we really appreciate your residency here at Park + Garden and would love for you to stay with us."

224.254.    While secretly reaping the benefits of anticompetitive pricing, *see supra*, Defendant Landlords simultaneously mischaracterize the nature of their prices to prospective and current tenants. For example, Defendant LeFrak advertises that its apartments in Jersey City "come at a competitive price point." In truth, the prices for leases in these properties are generated using the anticompetitive RM Software.

225.255.    Similarly, Defendant Veris bills itself as "a forward-thinking, socially conscious real estate investment trust" and prominently advertises its ESG (environmental, social, and governance) commitments. One of the features of its ESG program that Veris advertises is its purportedly "supporting an equitable housing market." Such commitments matter to consumers, as evidenced by Veris's 2022 ESG report which includes a section captioned "What ESG feature(s) factored into you leasing or renewing at a Veris building?" In truth, however, Veris has eroded the possibility of an equitable housing market by conspiring with its competitors to drive up the price

of rent in a way that harms all New Jersey renters, especially the most financially vulnerable who are forced from their homes due to untenable price increases.

226.256.      New Jersey renters do not have the ability to easily or independently learn the truth about how Defendant Landlords price their apartments, and are thus susceptible to signing leases at supracompetitive prices because Defendant Landlords, acting on RealPage's instructions, knowingly conceal the material fact that the landlord is using RealPage RM Software and the nature of the RM Software, and conceal the pricing matrix generated by the RM Software from current and prospective tenants.

## COUNT ONE
### Violation of 15 U.S.C. § 1
### (Sherman Act)

227.257.      Plaintiffs hereby incorporate and re-allege each allegation in each of the preceding paragraphs as though fully set forth herein, and further allege as follows:

228.258.      By entering an agreement with RealPage and with each other, providing for the use of RealPage RM software and related services, Defendant Landlords and RealPage have entered into contracts, combinations, or conspiracies that unreasonably restrain trade or commerce, in violation of the Sherman Act, 15 U.S.C. § 1.

229.259.      Defendant Landlords have agreed with RealPage to have RealPage set prices for multifamily residential real estate leases in New Jersey, rather than competing with other landlords on the basis of price. Through numerous means of communication, including writings, videos, and in-person meetings, RealPage has recruited Participating Landlords and Defendant Landlords have recruited one another into this anticompetitive agreement.

230.260.      By delegating a substantial majority of price-setting authority to a centralized entity, RealPage, Defendants have conspired to reduce the supply of multifamily housing units in the form of limited target occupancy rates, and to fix and increase the price of

78

leases for multifamily housing units in New Jersey. Defendant Landlords further advanced the anticompetitive scheme by agreeing to share and in fact sharing competitively sensitive, non-public information with their competitors, through RealPage and directly with each other.

231.261.    Further, by agreeing to exchange and in fact exchanging non-public, competitively sensitive information with competitors through RealPage and other mediums of communication (e.g., direct communications, market surveys, RealPage User Groups, industry conferences), Defendant Landlords and RealPage have entered into contracts, combinations, or conspiracies that unreasonably restrain trade or commerce, in violation of the Sherman Act, 15 U.S.C. § 1.

232.262.    RealPage has recruited Participating Landlords and Defendant Landlords have recruited one another to exchange non-public, competitively sensitive data to fuel RealPage RM Software algorithms. RealPage or landlords themselves input this granular data (e.g., effective rents, occupancy rates, concessions, prospective renter traffic) into RealPage RM Software as part of the process of generating price recommendations for YieldStar, LRO, and AIRM users. This unlawful information exchange precludes Defendant Landlords from making fully independent pricing decisions and distorts the competitive process.

233.263.    Defendants' anticompetitive misconduct is unlawful per se under the Sherman Act, 15 U.S.C. § 1. Even if the misconduct were not found to be unlawful per se—and it should be—the misconduct is additionally unlawful under the rule of reason. There are no procompetitive justifications sufficient to outweigh the anticompetitive effects of the misconduct.

234.264.    The result of Defendants' anticompetitive conspiracy has been to limit competition in the market for leases of multifamily housing units in New Jersey, forcing New Jersey renters to pay illegal, supracompetitive rents and incur substantial damages.

## COUNT TWO
### Violation of N.J. Stat. Ann. § 56:9-3
### (New Jersey Antitrust Act)

235.265.      Plaintiffs hereby incorporate and re-allege each allegation in each of the preceding paragraphs as though fully set forth herein, and further allege as follows:

236.266.      By entering an agreement with RealPage and with each other, providing for the use of RealPage RM software and related services, Defendant Landlords and RealPage have entered into contracts, combinations, or conspiracies that unreasonably restrain trade or commerce, in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3.

237.267.      Defendant Landlords have agreed with RealPage to have RealPage set prices for multifamily residential real estate leases in New Jersey, rather than competing with other landlords on the basis of price. Through numerous means of communication, including writings, videos, and in-person meetings, RealPage has recruited Participating Landlords and Defendant Landlords have recruited one another into this anticompetitive agreement.

238.268.      By delegating a substantial majority of price-setting authority to a centralized entity, RealPage, Defendants have conspired to reduce the supply of multifamily housing units in the form of limited target occupancy rates, and to fix and increase the price of leases for multifamily housing units in New Jersey. Defendant Landlords further advanced the anticompetitive scheme by agreeing to share and in fact sharing competitively sensitive, non-public information with their competitors, through RealPage and directly with each other.

239.269.      Further, by agreeing to exchange and in fact exchanging non-public, competitively sensitive information with competitors through RealPage and other mediums of communication (e.g., direct communications, market surveys, RealPage User Groups, industry conferences), Defendant Landlords and RealPage have entered into contracts, combinations, or

conspiracies that unreasonably restrain trade or commerce, in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3.

240.270.    RealPage has recruited Participating Landlords and Defendant Landlords have recruited one another to exchange non-public, competitively sensitive data to fuel RealPage RM Software algorithms. RealPage or landlords themselves input this granular data (e.g., effective rents, occupancy rates, concessions, prospective renter traffic) into RealPage RM Software as part of the process of generating price recommendations for YieldStar, LRO, and AIRM users. This unlawful information exchange precludes Defendant Landlords from making fully independent pricing decisions and distorts the competitive process.

241.271.    Defendants' anticompetitive misconduct is unlawful per se under the New Jersey Antitrust Act. Even if the misconduct were not found to be unlawful per se—and it should be—the misconduct is additionally unlawful under the rule of reason. There are no procompetitive justifications sufficient to outweigh the anticompetitive effects of the misconduct.

242.272.    The result of Defendants' anticompetitive conspiracy has been to limit competition in the market for leases of multifamily housing units in New Jersey, forcing New Jersey renters to pay illegal, supracompetitive rents and incur substantial damages.

### COUNT THREE – PRESERVED CLAIM[3]
**Violation of the New Jersey Consumer Fraud Act**
**(Commercial Practices in Violation of State or Federal Law)**

243.273.    Plaintiffs hereby incorporate and re-allege each allegation in each of the preceding paragraphs as though fully set forth herein, and further allege as follows:

---

[3] Plaintiffs restate the following claim for the express purpose of preserving their right to appeal dismissal of such claim.

244.274.      The New Jersey Consumer Fraud Act states: "In an action brought by the Attorney General, any commercial practice that violates State or federal law is conclusively presumed to be an unlawful practice under [N.J. Stat. Ann. § 56:8-2]." N.J. Stat. Ann. § 56:8-4(b).

245.275.      In operating their businesses, Defendant Landlords and RealPage have engaged in numerous commercial practices that violate the Sherman Act, 15 U.S.C. § 1, and the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3, including unlawfully agreeing to set rents for multifamily residential real estate leases and unlawfully agreeing to exchange non-public, competitively sensitive information.

246.276.      Each violation of the Sherman Act and New Jersey Antitrust Act by Defendants constitutes a separate unlawful practice and violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, under N.J. Stat. Ann. § 56:8-4(b).

### COUNT FOUR – PRESERVED CLAIM[4]
### Violation of the New Jersey Consumer Fraud Act
### (Unconscionable Commercial Practices, Misrepresentations, and Acts of Deception)

247.277.      Plaintiffs hereby incorporate and re-allege each allegation in each of the preceding paragraphs as though fully set forth herein, and further allege as follows:

248.278.      The New Jersey Consumer Fraud Act states:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

N.J. Stat. Ann. § 56:8-2.

---

[4] Plaintiffs allege this claim to the extent it was approved by the Court's March 31, 2026 motion to dismiss order; to the extent it was dismissed in part as to certain Defendants, Plaintiffs restate the claim for the express purpose of preserving their right to appeal dismissal of such claim.

249.279.     The New Jersey Consumer Fraud Act defines "merchandise" as including "any objects, ware, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann. § 56:8-1(c).

250.280.     The New Jersey Consumer Fraud Act defines "person" as including "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent." N.J. Stat. Ann. § 56:8-1(d).

251.281.     The New Jersey Consumer Fraud Act defines "sales" as including "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." N.J. Stat. Ann. § 56:8-1(e).

252.282.     The New Jersey Consumer Fraud Act defines "advertisement" as including "the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof . . . ." N.J. Stat. Ann. § 56:8-1(a).

253.283.     The acts alleged in the Complaint occurred "in connection with the sale or advertisement of any merchandise or real estate" in the State of New Jersey. N.J. Stat. Ann. § 56:8-2.

254.284.     At all relevant times, Defendants are persons that have engaged in the advertisement, offer for sale, and sale of merchandise or real estate within the meaning of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §. § 56:8-1(a), (c)-(e).

255.285.     In the operation of their businesses, Defendants have engaged in numerous unconscionable commercial practices that harmed New Jersey consumers.

83

256.286.    Defendant RealPage engaged in unconscionable commercial practices and acts of deception in violation of N.J. Stat. Ann. § 56:8-2, including, but not limited to, the following:

a. Engaging in an unlawful rent-setting scheme to inflate prices for multifamily real estate leases in New Jersey by offering the RM software and related services to Participating Landlords;

b. In connection with the advertising and offering of rates for apartment leases to New Jersey consumers, providing consumer-facing communications containing misrepresentations that were disseminated by the Participating Landlords and further instructing the Participating Landlords how to communicate to renters about RealPage-generated prices which limited the information available to consumers and undermined consumers' ability to make informed choices;

c. Directly causing supracompetitive prices generated pursuant to the unlawful scheme to be pushed to Internet Listing Services, where they are displayed directly to consumers to advertise the apartments whose prices have been unlawfully inflated; and

d. Enforcing Participating Landlords' compliance in the rent-setting scheme through Defendant RealPage's directions and training on consumer-facing messaging, including through secret shops.

257.287.    Defendant Landlords engaged in unconscionable commercial practices and acts of deception in violation of N.J. Stat. Ann. § 56:8-2, including, but not limited to, the following:

84

a. In advertising and offering of rates for apartment leases to New Jersey consumers, engaging in an unlawful conspiracy to set prices for multifamily apartment leases in New Jersey; and

b. Carrying out RealPage's instructions about communicating with consumers and employing misleading consumer-facing communications strategies designed to obfuscate the cause of rent increases and limit the information available to consumers, thereby undermining consumers' ability to make informed decisions.

258.288.    Defendant LeFrak has further engaged in unconscionable commercial practices and deception in violation of N.J.S.A. § 56:8-2 by advertising its properties as offering competitive rents while simultaneously participating in an unlawful conspiracy that enables LeFrak to charge anticompetitive prices.

259.289.    Through these unconscionable commercial practices and acts of deception, these Defendants deprive consumers of a competitive multifamily housing market, instead imposing exorbitant and unjustified prices on New Jersey renters who need access to an essential human need: shelter. These Defendants' conduct also undermines the ability of consumers to make informed decisions in the rental market by limiting the information available to consumers. As a result, these Defendants' conduct exacerbates the power imbalance between these Defendant Landlords (sophisticated corporate landlords that have unlawfully conspired to control the rental market) and consumers (renters who need a place to live).

260.290.    Defendants RealPage, Bozzuto, and Greystar further made misrepresentations in violation of N.J. Stat. Ann. § 56:8-2. Defendants Bozzuto and Greystar misrepresented and omitted material facts directly in connection with the sale of multifamily leases. The material facts misrepresented and omitted include the reasons for their pricing decisions—for example, by concealing the existence of revenue management software and/or

85

claiming that their rent prices were market rate, when in fact they were set by an anticompetitive algorithm with the express purpose of inflating rents—and, even when they disclosed the existence of revenue management software, misrepresenting and/or omitting the nature of its purpose and function. Defendant RealPage misrepresented material facts in connection with the sale of multifamily leases. Among other practices, RealPage promulgated instructions to Participating Landlords to misrepresent the nature of their pricing decisions to renters, and conducted secret shops to ensure that Participating Landlords did not disclose the existence of the revenue management software and instead misrepresented to and/or omitted from renters the truth of their pricing decisions as previously instructed by RealPage.

261.291.    The conduct of Defendants is unconscionable and constitutes acts of deception, as defined under the New Jersey Consumer Fraud Act's prohibition of such commercial practices. Each instance of an unconscionable commercial practice constitutes a separate violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2.

262.292.    The conduct of Defendants Bozzuto, Greystar, and RealPage further constitutes the misrepresentation of material facts as defined under the New Jersey Consumer Fraud Act's prohibition of such commercial practices. Each instance of misrepresentation of any material fact constitutes a separate violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court, as authorized by statute and its own equitable powers, enter final judgment against Defendants and:

a.  Adjudge and decree that Defendants' actions constitute unreasonable and unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

86

b.  Adjudge and decree that Defendants' actions constitute unreasonable and unlawful restraints of trade in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3;

c.  Adjudge and decree that Defendants' actions constitute multiple instances of unlawful commercial practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, 56:8-4(b);

d.  Enjoin and restrain Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on Defendants' behalf or in concert with them, from continuing to violate the Sherman Act, the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the actions set forth above;

e.  As needed, enter such relief to remove any ability of Defendants to harm competition or consumers by the actions set forth above, including but not limited to structural relief as well as effective, monitorable, and measurable conduct remedies that eliminate the ability of Defendants to continue to reap benefits from their pattern of harm;

f.  Appoint a corporate monitor to ensure implementation of all structural or practice remedies ordered by the Court, as well as to ensure that Defendants do not engage in further unlawful conduct, at Defendants' expense;

g.  Award to Plaintiffs any other equitable relief as the Court finds appropriate to redress Defendants' violations of the laws specified above and to restore

competitive conditions in the markets affected by Defendants' unlawful conduct and deprive Defendants of any advantages from their unlawful acts;

h.  Award to Plaintiffs the maximum civil penalties as provided by the Sherman Act, the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act;

i.  Award to Plaintiffs actual damages, statutory damages as *parens patriae*, punitive damages, treble damages, refunds of moneys acquired by means of unlawful commercial practices, and any such other relief as provided by the Sherman Act, the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act;

j.  Award pre-judgment and post-judgment interest on such monetary relief;

k.  Award to Plaintiffs statutory or equitable disgorgement, restitution, or any other equitable relief for the benefit of New Jersey consumers, as appropriate under the Sherman Act, the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act;

l.  Award to the State of New Jersey its costs, including reasonable attorneys' fees; and

m.  Order any additional relief that this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.


July 8, 2026                                    Respectfully submitted,

~~MATTHEW J. PLATKIN~~
JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Brian F. McDonough*
Brian F. McDonough (NJ Bar No. 026121980)
Assistant Attorney General
Brian.McDonough@law.njoag.gov

88

David Reichenberg (NJ Bar No. 507282024)
Deputy Attorney General
Section Chief, Antitrust Section
David.Reichenberg@law.njoag.gov

Jesse J. Sierant (NJ Bar No. 049342013)
Deputy Attorney General
Section Chief, Consumer Fraud Prosecution
Section
Jesse.Sierant@law.njoag.gov

~~Leslie Prentice~~Laura E. Sedlak (NJ Bar No.
~~021952011~~271282018)
Deputy Attorney General
Assistant Section Chief, Antitrust Section
~~Leslie.Prentice~~Laura.Sedlak@law.njoag.gov

~~Blair Gerold~~Monisha A. Kumar (NJ Bar No.
~~294602019)~~ 900212012)
Deputy Attorney General
Assistant Section Chief, Consumer Fraud
Prosecution Section
~~Blair.Gerold~~Monisha.Kumar@law.njoag.gov

Samuel T. Eglow (NJ Bar No. 394462022)
Deputy Attorney General
Consumer Fraud Prosecution Section
Samuel.Eglow@law.njoag.gov

Douglas T. Post (NJ Bar No. 405852022)
Deputy Attorney General
Douglas.Post@law.njoag.gov

NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (609) 696-5271

*Attorneys for Plaintiffs*

*/s/ Brent W. Johnson*
Brent Johnson (NJ Attorney ID 031902003)
Emmy L. Levens (*pro hac vice* ~~forthcoming~~)
Robert A. Braun (*pro hac vice* ~~forthcoming~~)
Amanda K. Chuzi (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL ~~PLLC~~LLP

89

1100 New York Avenue NW, Suite 800
Washington, DC 20005
(202) 408-4600
bjohnson@cohenmilstein.com
elevens@cohenmilstein.com
rbraun@cohenmilstein.com
achuzi@cohenmilstein.com

Aaron J. Marks (*pro hac vice* ~~forthcoming~~)
COHEN MILSTEIN SELLERS & TOLL ~~PLLC~~LLP
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
amarks@cohenmilstein.com

*Attorneys for Plaintiffs*

90